STEPHEN J. SORENSON, First Assistant United States Attorney (#3049)
STEWART C. WALZ, Assistant United States Attorney (#3374)
LESLIE HENDRICKSON-HUGHES, Special Assistant United States Attorney
185 South State Street, #400
Salt Lake City, Utah   84111
Telephone: (801) 524-5682
Facsimile:  (801) 524-6924
**Attorneys for the United States of America**

FILED
8 DEC 99 PM 6: 05
DISTRICT OF UTAH
BY: _____
    DEPUTY CLERK

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | 2:98CR 0278ST |
| Plaintiff, | : | SUPERCEDING INDICTMENT |
| vs. | : | Vio. 15 U.S.C. § 78m, 17 C.F.R. § 240.13b2-2; 15 U.S.C. § 78j(b),  17 C.F.R. § 240.10b-5, 15 U.S.C. § 78ff, 18 U.S.C. § 1001, 18 U.S.C. §§ 2(a) and (b),  18 U.S.C. § 371 and 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i), Failure to Disclose to an Accountant, Securities Fraud, False Statement, Conspiracy, and Money Laundering. |
| ROBERT G. WEEKS, DAVID A. HESTERMAN, TERRENCE DUNNE, JOSEPH A. FABILLI, CHRISTOPHER S. KNIGHT, LAWRENCE A. KRASNY, AND KENNETH L. WEEKS, | : : : | |
| Defendants. | : | |

---

The Grand Jury charges:

<u>COUNT 1</u>

1.    PanWorld Minerals International, Inc., (PanWorld) was a company whose stock was publicly traded during all times material to this Indictment.

2.    The defendant ROBERT G. WEEKS was the president and principal executive officer of PanWorld during all times material to this Indictment.

*53*

3.    The defendant DAVID A. HESTERMAN was represented as a consultant to PanWorld at all times material to this Indictment. According to PanWorld, the defendant HESTERMAN consulted on management, financial, capitalization, securities and other matters. The defendant HESTERMAN was convicted of two counts of securities fraud on or about June 22, 1984.

4.    At the conclusion of the calendar year 1992, PanWorld was required to obtain audited financial statements for inclusion in its 1992 annual report to the Securities and Exchange Commission (SEC). This annual report is a Form 10-K. The defendant WEEKS signed this report as the principal executive officer of PanWorld.

5.    The officers and directors of PanWorld were required to report all material transactions and information occurring in 1992 to the accountant auditing PanWorld's financial statements for 1992.

6.    PanWorld, through its subsidiary, Andes Minerals Recovery Chile, Ltd.(Andes), owned the Las Rosas mine. During 1992, each of the defendants HESTERMAN and WEEKS were told by a mining engineer residing in Santiago, Chile, that the Las Rosas mine, a mining property included in the financial statements of PanWorld at $3,473,000, had no mineral reserves, that a valuation report of the mining property obtained by PanWorld was incorrect and misleading, that Las Rosas could not be mined profitably based on current mining material containing copper of two percent or less, and that in order to conduct an appropriate exploration program to determine the mineral potential of Los Rosas, PanWorld would have to spend approximately $1,000,000.

7.    Even though the information given to the defendants WEEKS and HESTERMAN by the mining engineer was material to the valuation of the Las Rosas assets contained in PanWorld's financial statements, the defendants did not disclose that information to the accountant conducting the audit of PanWorld's financial statements for the year 1992.

8.    When PanWorld, through Andes, purchased the Las Rosas mining property, the original purchase price for the property was cash payments of $600,000. PanWorld included the Las Rosas mine at a value of $600,000 on its financial statements filed with its quarterly report for September 1990 Form 10-Q. Later, the defendants WEEKS and HESTERMAN modified the agreement and increased the purchase price by including 3,000,000 shares of preferred PanWorld stock. PanWorld arbitrarily and fraudulently valued the preferred stock at $1.00 per share, which resulted in an increase in the value of the Las Rosas property to $3,600,000.

9.    The defendants WEEKS and HESTERMAN did not disclose that the original purchase price was $600,000 to the accountant conducting the audit of PanWorld's financial statements for the year 1992.

10.    PanWorld listed the value of Las Rosas at the reduced amount of $3,473,000 on the financial statements included in the December 31, 1992 Form 10-K filed with the SEC. The reduced value was based on attributing a portion of the cash payments to interest.

11.    In connection with the purchase of the Las Rosas property, the defendants WEEKS and HESTERMAN knew that PanWorld did not deliver the preferred stock discussed above in paragraph 8. to the sellers of the property. The defendants WEEKS and HESTERMAN did not disclose that information to the accountant conducting the audit of PanWorld's financial statements for the year 1992.

12.    During 1990 PanWorld, through Andes, purchased the Europa Mill to process copper ore from the Las Rosas and other mines. However, PanWorld failed to make the required payments for the Europa Mill. The sellers of the Europa Mill sued PanWorld in Chile and obtained a court decision revoking the agreement and returning the Europa Mill to the sellers. On or about December 24, 1992 the Europa Mill was repossessed by the sellers.

13.    Even though the information about the repossession of the Europa Mill was material, the defendants WEEKS and HESTERMAN did not disclose that information to the accountant conducting the audit of PanWorld's financial statements for the year 1992.

14.    On or about May 28, 1993, in the Central Division of the District of Utah, the defendants

ROBERT G. WEEKS and
DAVID A. HESTERMAN

did willfully, directly and indirectly, omit to state, did aid, abet, counsel, command, induce and procure each other to omit to state, and caused other persons to omit to state material facts necessary in order to make the statements made, in light of the circumstances under which statements were made, not misleading to an accountant in connection with the audit and examination of financial statements of PanWorld Minerals International, Inc., and in  connection with the preparation and filing of a Form 10-K of PanWorld Minerals International, Inc., said material facts being the information given to the defendants by the mining engineer, the original purchase price of the Las Rosas mining property, and the failure of PanWorld Minerals International, Inc., to deliver the preferred stock; all in violation of 17 C.F.R. § 240.13b2-2, promulgated under 15 U.S.C. § 78m, in violation of 15 U.S.C. § 78ff, and 18 U.S.C. § § 2(a) and (b).

4

COUNT 2

1.    The Grand Jury realleges and incorporates paragraphs 1. through 13. of Count 1

of this Indictment as though fully set forth herein.

2.    In its 1992 annual report on Form 10-K, PanWorld made disclosures about the

Las Rosas mining property discussed in the immediately preceding Count.  PanWorld also

included the Las Rosas property in its financial statements for the year 1992 at a value of

$3,473,000.  Because of the defendants WEEKS' and HESTERMAN's  failures to disclose

material facts to the accountant conducting the audit of PanWorld's financial statements for the

year 1992, the  financial statements for PanWorld for the year 1992 included in PanWorld's Form

10-K were false and misleading.

3.    The 1992 Form 10-K also discusses a report by Ronald Atwood on the Las Rosas

property dated January 21, 1991, and states that report may be in error in its reporting of reserves

on the property.  The discussion of the property contains the following statement:

> While Dr. Atwood's report is encouraging,, [sic] and has provided the Company
> (PanWorld) a basis on which to proceed, the Company does not yet have
> sufficient supporting data from drilling and other exploration methods to
> determine with assurtey [sic] that Las Rosas is a viable mine that can be operated
> profitably.

4.    The statement in the immediately preceding paragraph is misleading in that it

omits to disclose that PanWorld, and the defendants WEEKS and HESTERMAN had discussions

with the mining engineer referred to in the preceding count, which information indicated that

PanWorld did not have reserves on Las Rosas and could not operate the Las Rosas property

profitably on recovering  copper ore of 2 percent or less.

5

5. The text of the 1992 Form 10-K discloses that PanWorld is a defendant in a lawsuit by the sellers of the Europa Mill and that the company will not be adversely affected by this action. PanWorld included the value of the Europa Mill at $133,000 on the financial statements filed with the 1992 Form 10-K. Defendants WEEKS and HESTERMAN omitted to disclose the material fact that the Europa Mill was repossessed during December 1992.

6. Beginning on or about May 9, 1989 with formation of PanWorld, the defendant HESTERMAN exercised substantial control over the affairs of PanWorld. The defendant HESTERMAN negotiated the acquisition of properties and other agreements, sold stock and directed the sale of stock of the company and directed that the proceeds from such sales be provided to the company, made business decisions for the company, participated in the drafting of periodic reports with the SEC, participated in hiring and other personnel decisions, and had discussions with individuals and firms involved in selling and marketing the stock of the company. In performing these functions, the defendant HESTERMAN exercised authority over individuals who were named officers and directors of PanWorld.

7. The defendant HESTERMAN's title with PanWorld was "consultant." In fact, the defendant HESTERMAN exercised control and decision-making authority within PanWorld sufficient so that the failure to disclose his true role in the 1992 Form 10-K and the other periodic reports of the company was the omission of a material fact. Furthermore, in light of the defendant HESTERMAN's role with the company, the failure to report the defendant HESTERMAN's prior conviction on two counts of securities fraud was the omission of a material fact.

8.    The 1992 Form 10-K for PanWorld was filed with the SEC on or about June 1, 1993, and was thereafter supplied to shareholders of PanWorld and to broker-dealers and registered representatives actively engaged in the sale of PanWorld stock.

9.    On or about June 1, 1993, in the Central Division of the District of Utah, the defendants

ROBERT G. WEEKS and
DAVID A. HESTERMAN

did willfully, directly and indirectly, and did aid, abet, counsel, command, induce and procure each other, by use of means and instrumentalities of interstate commerce and of the mails, (1) employ a device, scheme, and artifice to defraud; (2) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engage in acts, practices, and courses of business which would operate and did operate as a fraud and deceit upon any person in connection with the purchase and sale of a security, that is the common stock of PanWorld Minerals International, Inc.; in that the defendants, in the 1992 Form 10-K for PanWorld Minerals International, Inc., did omit to state material facts about the viability, operating costs and mineral reserves of Las Rosas mining property, did make untrue statements about the value of Las Rosas mining property, misrepresented the current status of the Europa Mill, and did omit to disclose the true role of the defendant HESTERMAN with the company and the defendant HESTERMAN's felony convictions; all in violation of 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-f, 15 U.S.C. § 78ff, and 18 U.S.C. § 2(a).

7

## COUNT 3

1.      On or about March 3, 1993, the defendant WEEKS signed an agreement to acquire one-half of the assets of a placer mining project in Montana known as Washington Gulch.  The purchase price called for in the agreement was $5,555,000 consisting of: cash payments of $350,000, 2,500,000 shares of PanWorld preferred stock valued at $2.00 per share, 500,000 shares of restricted common stock and assumption of some liabilities.  The preferred stock was arbitrarily and fraudulently valued by PanWorld at $2.00 per share.

2.      The agreement signed by the defendant WEEKS on behalf of PanWorld required a closing on or before March 30, 1993.  By that time, certain documents were to be prepared, PanWorld stock was to be transferred to the sellers, and the liabilities to be assumed by PanWorld were to be calculated.

3.      The March 30, 1993 closing did not take place, title to the Washington Gulch assets never passed to PanWorld, and the conditions required to be met by March 30 were not accomplished.  Discussions on that point were carried on between the attorney for the sellers and the defendant HESTERMAN, among others.  As a result, on or about April 2, 1993, counsel for the sellers wrote a letter to the defendant WEEKS, stating that it was the position of the sellers that the agreement of March 3, 1993 was void, in part because there had never been a "meeting of the minds" regarding a term or terms of the March 3 agreement.

4.      The defendant WEEKS did not show the April 2, 1993 letter, which addressed to him taking the position that the March 3, 1993 agreement was void, to the accountant who prepared the unaudited financial statements included by PanWorld in its March 31, 1993 quarterly report to the SEC, the March 31, 1993 Form 10-Q.

8

5.    The financial statements included in PanWorld's March 31, 1993 Form 10-Q contained the Washington Gulch property/assets as an asset at $5,500,000. The defendant WEEKS signed the March 31, 1993 Form 10-Q as president of PanWorld.

6.    Title to the properties/assets that PanWorld agreed to purchase in the March 3, 1993 agreement never passed to PanWorld because there was never a closing of the transaction. Furthermore, the sellers communicated to the defendant WEEKS that it was the sellers' position that the March 3 agreement was void. Therefore, it was fraudulent for PanWorld to include the Washington Gulch property/assets as an asset on the company's financial statements, even though there was a disclosure in the notes to the financial statements that there was a dispute about the sale.

7.    The March 31, 1993 Form 10-Q for PanWorld was filed with the SEC on or about June 6, 1993, and was thereafter supplied to shareholders of PanWorld and to broker-dealers and registered representatives actively engaged in the sale of PanWorld stock.

8.    On or about June 6, 1993, in the Central Division of the District of Utah, the defendants

ROBERT G. WEEKS and
DAVID A. HESTERMAN

did willfully, directly and indirectly, and did aid, abet, counsel, command, induce and procure each other, by use of means and instrumentalities of interstate commerce and of the mails, (1) employ a device, scheme, and artifice to defraud; (2) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engage in acts, practices,

9

and courses of business which would operate and did operate as a fraud and deceit upon any person in connection with the purchase and sale of a security, that is the common stock of PanWorld Minerals International, Inc.; in that the defendants did state in the March 31, 1993 Form 10-Q for PanWorld Minerals International, Inc., that the company had acquired the Washington Gulch property/assets for a cost of $5,500,000, which the defendants did then and there well know was not true and correct; all in violation of 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, 15 U.S.C. § 78ff, and 18 U.S.C. § 2(a).

COUNT 4

1.    The Grand Jury realleges and incorporates paragraphs 1. through 3. of Count 1 and paragraphs 1. through 7. of Count 3 of this Indictment as though fully set forth herein.

2.    At the conclusion of the calendar year 1993, PanWorld was required to obtain audited financial statements for inclusion in its 1993 annual report on a Form 10-KSB filed with the SEC.  The defendant WEEKS signed this report as the principal executive officer, principal financial officer and a director.

3.    The officers and directors of PanWorld were required to provide all material transactions and information occurring in 1993 to the accountant auditing PanWorld's financial statements for 1993.

4.    Richfield International, Inc. (Richfield), Montague Metal and Machine, Inc. (Montague), Spring Creek Sand & Gravel, Inc. (Spring Creek), and Reserve Development Corporation (Reserve), were all defunct Nevada corporations, that were owned by Waid Blomquist and Karl Blomquist, Jr., who are brothers.  Their father, Karl Blomquist Sr., was a consultant to the corporations.

10

5.       During the fall of 1993, WEEKS and HESTERMAN negotiated on behalf of PanWorld to purchase from Richfield 100 percent of the stock of Montague, Spring Creek and Reserve, and a license to manufacture mining equipment developed by Richfield.   PanWorld agreed to pay 1,000,000 preferred shares of PanWorld to Richfield, to loan of $500,000 to Richfield, and to assume $167,500 of Richfield's debts.   WEEKS and HESTERMAN arbitrarily assigned a value of $6.00 for each preferred share given to Richfield making the purchase price $6,000,000 for the companies and the manufacturing license.

6.       Defendants WEEKS and HESTERMAN stated in PanWorld's 1993 annual report filed with the SEC that PanWorld had acquired from Richfield a minority interest of 25 percent of the Washington Gulch Placer Project near Helena, Montana.   In PanWorld's 1993 annual report, they valued PanWorld's interest in Washington Gulch at $1,209,453.   They knew that the written terms of PanWorld's October 31, 1993 contract with Richfield did not sell Richfield's interest, if any, in Washington Gulch to PanWorld.   They knew that Richfield had no written agreement with the owners of Washington Gulch that gave Richfield rights, if any, to a 25 percent interest in Washington Gulch.   Defendants WEEKS and HESTERMAN knew that the owners of Washington Gulch denied that Richfield had any interest in Washington Gulch that could be sold.

7.       Further, defendants WEEKS  and HESTERMAN knew that the contract relied upon by PanWorld to transfer the interest in Washington Gulch did not transfer an interest in Washington Gulch because the purported interest in Washington Gulch was not held in any one of the corporation whose stock was purchased by PanWorld.   This fact was obvious from the contract.

11

8.    On or about May 4, 1994, in the Central Division of the District of Utah and elsewhere, the defendants

ROBERT G. WEEKS AND
DAVID A. HESTERMAN

did willfully, directly and indirectly, and did aid, abet, counsel, command, induce and procure each other, by use of means and instrumentalities of interstate commerce and of the mails, (1) employ a device, scheme, and artifice to defraud; (2) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (3) engage in acts, practices and courses of business which would operate and did operate as a fraud and deceit upon any person in connection with a purchase and sale of a security, that is the common stock of Pan World Minerals International, Inc.; in that the defendants did state in the December 31, 1993 Form 10KSB for Pan World Minerals International, Inc., that the company had acquired a 25% interest in the Washington Gulch placer project on October 31, 1993 from Richfield International, which the defendants did then and there well know was not true and correct: all in violation of 15 U.S.C. § 78 j(b), 17 C.F.R. § 240.10b-5, 15 U.S.C. § 78 ff, and 18 U.S.C. § 2(a).

## COUNT 5

1.    The Grand Jury realleges and incorporates paragraphs 1. through 3. of Count 1 of this Indictment, paragraphs 1. through 7. of Count 3 of this Indictment, and paragraphs 1. through 7. of Count 4 of this Indictment as though fully set forth herein.

2.    Defendant TERRENCE DUNNE at times and material to this Indictment was a certified public accountant from Spokane, Washington.

3.    Defendant TERRENCE DUNNE audited the financial statements included in

PanWorld's 1993 annual report.  DUNNE signed an audit opinion for the 1993 financial statements stating his audit of PanWorld was done in accordance with generally accepted auditing standards (GAAS) and the financial statements were presented in accordance with generally accepted accounting principles (GAAP).  However, DUNNE knew from the terms of the October 31, 1993 contract that PanWorld acquired no interest in Washington Gulch, and therefore, knew that the financial statements were not presented in accordance with GAAP. DUNNE took no steps to satisfy the requirements of generally accepted auditing standards to determine if the Washington Gulch interest were properly included in the PanWorld financial statements, and the defendant DUNNE did not acquire competent evidential matter as required by GAAS that showed the acquisition of the Washington Gulch interest by PanWorld on October 31, 1993.

      4.      On or about May 4, 1994, in the Central Division of the District of Utah, and elsewhere,

TERRENCE DUNNE,

in a matter within the jurisdiction of the SEC, an independent agency of the Executive Branch of the United States, did make a materially false, fictitious, and fraudulent statement and representation in that the defendant TERRENCE DUNNE did certify that the financial statements for Pan World Minerals International, Inc. for the year ending December 31, 1993 were presented in accordance with generally accepted accounting principles (GAAP), and audited in accordance with Generally Accepted Auditing Standards (GAAS), when, as the defendant then and there well knew, such was not the case; all in violation of 18 U.S.C. § 1001.

13

## COUNT 6

1.     The Grand Jury realleges and incorporates paragraphs 1. through 3. of Count 1 of this Indictment as though fully set forth herein.

2.     The defendant KENNETH L. WEEKS is the brother of the defendant ROBERT G. WEEKS and was represented by PanWorld to be a consultant to the company during times material to this Indictment.

3.     The defendant JOSEPH A. FABIILLI is an individual who lived in New York at times material to this Indictment.  The defendant FABIILLI operated a business known as Puritan Communications Corporation (Puritan), which supposedly provided financial public relations services.  Relative to PanWorld,  Puritan conducted a boiler room sales operation to encourage members of the public to buy PanWorld stock.  The defendant FABIILLI also exercised substantial control over LaJolla Capital Corporation's New York City branch (LaJolla). LaJolla  was at times material to this Indictment a securities broker-dealer.

4.     The defendant CHRISTOPHER S. KNIGHT is an individual who at  times material to this Indictment lived in New York.  The defendant KNIGHT was a stockbroker at LaJolla and  was in charge of the stockbrokers and other individuals who sold PanWorld stock through LaJolla.

5.     The defendant LAWRENCE A. KRASNY is an individual who at times material to this Indictment lived in North Hills, California, and operated a business known as LK Management Corporation.  LK Management purportedly provided financial public relations services to PanWorld in exchange for stock.

14

6.    The securities laws require that in order to offer or sell stock, a company must file a registration statement with the Securities and Exchange Commission (SEC) making disclosures about the company, its business, and its financial statements, unless the offering is exempt from registration. Form S-8 (S-8) is one type of registration statement that a company may file before issuing stock to consultants for services. The Form S-8 registration may be used to register stock owned by consultants so that the consultant may sell the stock to others. However, Form S-8 may not be used to register stock given to consultants for capital raising activities such as making or creating a market for the company's stock or selling the company's stock and returning some or all of the proceeds from the sales of the stock to the company.

Regulation S (Reg. S) is one of the exemptions from the requirement that an offering of stock be registered. Under Reg. S, a company that is selling stock to foreign investors need not file a registration statement with the SEC. However, the recipient of the stock must reside in a foreign country and the stock cannot be issued to a corporation created by U.S. residents for the purpose of receiving the Reg. S stock.

7.    One of the purposes of the securities laws is to promote free and open securities markets based upon fair dealing. Buyers and sellers of securities cannot use manipulative devises to influence the securities markets. Some of these devices include:

a. Matched trades in which buy or sell orders are entered by a person or persons who knows  corresponding sell or buy orders of substantially the same size and at substantially the same price have been or will be entered;

b. Wash sales, which are securities transactions that involve no change in the beneficial ownership of the security; and

c.  Trading that is based upon a series of transactions that create actual or apparent activity in a security for the purpose of inducing the purchase or sale of the security by others.

8.    From on or about March 1, 1994 until on or about May 10, 1995, in the Central Division of the District of Utah and elsewhere,

ROBERT G. WEEKS,
DAVID A. HESTERMAN,
KENNETH L. WEEKS,
JOSEPH A. FABIILLI,
CHRISTOPHER S. KNIGHT, and
LAWRENCE A. KRASNY

defendants, did knowingly conspire, confederate, and agree with each other and with others known and unknown to the grand jury, to commit one or more of the following offenses against the United States:

a.    Fraud in the purchase and sale of securities, in violation of 15 U.S.C. Section 78j(b) and 17 C.F.R. Section 240.10b-5 and 15 U.S.C. Section 78ff in the following ways:

i.    By creating an artificial and manipulated market in the stock of PanWorld by wash sales, matched orders for purchases and sales, by engaging in a series of transactions for the purpose of creating actual and apparent activity in the market for the purpose of inducing the purchase of PanWorld stock, and for the purpose of providing a guaranteed profit to themselves for engaging in transactions of PanWorld stock;

16

      ii       By recommending that people buy PanWorld stock without disclosing that the conspirators were selling stock issued to them or for their benefit;

      iii     By providing undisclosed compensation to individuals to conduct transactions in PanWorld stock.

b.      False statements, false documents, and falsifying and concealing by scheme, trick and device material facts in matters within the jurisdiction of the Securities and Exchange Commission, in violation of 18 U.S.C. Section 1001 through the issuance of stock purportedly under S-8 and Reg. S;

c.      Giving publicity to a security without disclosing the compensation received, in violation of 15 U.S.C. Sections 77q(b) and 77x;

d.      Money laundering by using the proceeds of fraud in the sale of securities to promote the carrying on of the fraudulent securities operation and to conceal and disguise the nature, source, ownership, and control of the proceeds of fraud in the sale of securities, in violation of 18 U.S.C. Sections 1956(a)(1) (A)(i) and (a)(1)(B)(i).

OBJECT OF THE CONSPIRACY

It was the object of the conspiracy for the defendants ROBERT G. WEEKS, DAVID A. HESTERMAN, KENNETH L. WEEKS, JOSEPH A. FABIILLI, CHRISTOPHER S. KNIGHT, and LAWRENCE A. KRASNY to issue millions of shares of PanWorld at no cost to the conspirators in order to create an artificial market for sales of PanWorld stock so the defendants could profit.

MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which said conspiracy was sought to be accomplished,

17

included among others, the following:

1.    During 1994 and 1995, the defendants ROBERT G. WEEKS and DAVID A.

HESTERMAN issued millions of shares of PanWorld stock to Puritan Communications, a

company controlled by defendant JOSEPH FABIILLI, and LK Management, a company

controlled by LAWRENCE KRASNY.  The stock was supposedly issued under S-8.

2.    The defendants  ROBERT G. WEEKS and DAVID A. HESTERMAN engaged in

a scheme to issue stock, supposedly exempt from registration under Reg. S,  to foreign

companies so that the defendants FABIILLI and KRASNY would benefit from the eventual sales

of the stock.  Additionally, the stock sold by the foreign company for the benefit of FABIILLI

was sold to LaJolla and used to create the artificial market in PanWorld stock.

3.    The defendants  ROBERT G. WEEKS and DAVID A. HESTERMAN caused the

stock to be issued fraudulently to the companies of the defendants FABIILLI and KRASNY in

order to induce the defendants FABIILLI and KRASNY to create a market in PanWorld stock.

The defendants FABIILLI and KRASNY received the stock at no cost.  Therefore, all sales of

stock resulted in monetary gain to the defendants FABIILLI and KRASNY.

4.    The defendants conspired to have a portion of the proceeds from the sales of

PanWorld stock provided to the defendants ROBERT G. WEEKS, DAVID A. HESTERMAN,

and KENNETH L. WEEKS or to be used to pay some of the bills of PanWorld Minerals.  This

was done despite the prohibition against issuing S-8 stock for capital raising purposes for

PanWorld.

5.    The defendants FABIILLI and the defendant CHRISTOPHER KNIGHT marketed

PanWorld stock through LaJolla in New York City, New York.  These two defendants caused

individuals at LaJolla and Puritan Communications to sell stock to members of the public

through a boiler room type operation where members of the public were contacted by cold

callers, and then sales were effectuated through brokers and others at LaJolla.

6.      When investors placed orders for the purchase of PanWorld stock through

LaJolla, LaJolla obtained stock to sell to the investors from the defendant FABIILLI through his

and Puritan's brokerage accounts.  In this way, the defendant FABIILLI profited from the sales

of the stock to the public.  Also in this way, the defendants FABIILLI and KNIGHT engaged in

matched sales and orders of PanWorld stock in order to hide the true nature of the market, that is,

that LaJolla had an undisclosed supply of PanWorld stock from which buy orders were being

filled and which was available to ensure that LaJolla would profit from each transaction.

7.      The defendant KRASNY also used cold callers operating from LK Management

to encourage members of the public to buy PanWorld stock.  When investors expressed an

interest in buying the stock, Krasny's cold callers at LK Management directed investors to

contact brokers who were working with the defendant KRASNY.  These brokers then executed

sales orders of PanWorld stock to the investors, often filling those orders with the defendant

KRASNY's or LK Management's stock without disclosing that fact to the members of the

public, and thereby engaged in a series of matched trades that hid the true nature of the market,

that is, that the defendant KRASNY had an undisclosed supply of PanWorld stock from which

buy orders were being filled.  In this way, the defendant KRASNY had a direct interest in

encouraging purchases of PanWorld stock so that he could profit from those purchases.

8.      The defendant KRASNY paid compensation to one broker to ensure that the

defendant KRASNY's stock was in fact sold to members of the public when they placed orders

to buy the stock.  This compensation was not disclosed to the members of the public by the defendant KRASNY or the stockbroker.

9.     The defendants ROBERT G. WEEKS, DAVID A. HESTERMAN and KENNETH G. WEEKS had an arrangement with FABIILI AND KNIGHT to split profits from the sales of PanWorld stock.  The fact of this agreement was not disclosed to potential purchasers and actual purchasers of PanWorld stock.

10.     Neither the defendant KRASNY nor the defendant FABIILLI disclosed to individuals who were contacted by their cold callers that the defendants KRASNY, FABIILLI, or their companies, LK Management and Puritan Communications, respectively, received millions of shares of stock as compensation from PanWorld Minerals.

11.     None of the defendants informed members of the public who were encouraged or who did buy PanWorld stock that the defendants were selling the stock held by them or for their benefit at the same time they or people working as their agents were recommending that the members of the public buy PanWorld stock.

12.     ROBERT WEEKS and DAVID A. HESTERMAN caused PanWorld to issue 7,000,000 shares to HESTERMAN and 3,400,000 shares to Seaboard Investments, a name that HESTERMAN did business under during 1994 and 1995.  Once the market was created, HESTERMAN sold a portion of the stock and delivered the balance of the shares to companies controlled by an individual in Florida.

13.     The defendants ROBERT G. WEEKS, DAVID A. HESTERMAN, and KENNETH L. WEEKS issued and caused to be issued PanWorld stock to companies controlled by the same individual in Florida.  That individual sold some of the shares of PanWorld stock

and paid a portion of the proceeds back to some or all of the defendants WEEKS, HESTERMAN, and WEEKS.

14.    In order to profit from the creation of the artificial market, the defendants ROBERT G. WEEKS and DAVID A. HESTERMAN caused 106 million shares of PanWorld stock to be issued to Canyon Corporation (Canyon), which then sold approximately sixty million of these shares.  The defendant KENNETH WEEKS caused Canyon Corporation to be created in Nevis, British West Indies.  He then directed the president of Canyon to open brokerage accounts and   directed the disposition of the money from the sale of PanWorld stock conducted through those accounts.  The stock issued to Canyon was issued fraudulently under S-8 because Canyon performed no services for PanWorld and it was issued for capital raising activities and was fraudulently issued under Reg. S because the foreign corporation was created for the purpose of receiving and selling Reg. S stock for a U.S. resident.

<u>OVERT ACTS</u>

1.    On or about March 15, 1994, the defendant ROBERT G. WEEKS and JOSEPH FABIILLI entered into a contract  for PanWorld to provide stock registered under Form S- 8 to Puritan in exchange for Puritan's providing financial public relations services to  PanWorld.

2.    On or about the following dates, the defendant ROBERT G. WEEKS or the defendant DAVID A. HESTERMAN instructed PanWorld's transfer agent to issue the following shares of stock to Puritan Communications, and said stock was issued pursuant to the instructions:

| | |
|---|---|
| 3/29/94 | 375,000 |
| 4/13/94 | 1,000,000 |

21

| | |
|---|---|
| 5/17/94 | 1,000,000 |
| 5/31/94 | 2,000,000 |
| 6/30/94 | 3,000,000 |
| 8/11/94 | 8,000,000 |
| 9/20/94 | 2,500,000 |
| 10/04/94 | 5,000,000 |
| 10/24/94 | 5,000,000 |
| 12/06/94 | 2,000,000 |
| TOTAL: | 29,875,000 |

3.      On or about December 10, 1994, the defendant JOSEPH FABIILLI caused the 2,000,000 shares of PanWorld stock issued on December 7, 1994, to be deposited into his stock brokerage account at Investor Associates.

4.      Between on or about April 4, 1994 and December 22, 1994, the defendant FABIILLI sold 30,373,500 shares of PanWorld stock issued to Puritan or purchased by the defendant FABIILLI through brokerage accounts at A.T. Brod and Investors Associates for total proceeds of $1,287,295.48.

5.      During the period from on or about April 6 through November 9, 1994, LaJolla purchased 26,177,191 shares of PanWorld common stock from other stock brokerage firms; of this amount, Puritan and Fabiilli supplied 93 percent or 24,285,200 shares through their sales at A.T. Brod and Investors Associates.

6.      On or about a series of unknown days, the defendant FABIILLI used the proceeds from the PanWorld stock sales made through A.T. Brod and Investors Associates to pay the

22

operating expenses of the LaJolla brokerage office at 50 Broad Street, New York, New York.

7.      On or about the following dates the defendant FABIILLI wire transferred

proceeds from the PanWorld stock sales to the following persons or companies on PanWorld's

behalf:

| | | |
|---|---|---|
| 5/27/94 | $25,000 | CRC |
| 6/2/94 | $20,000 | CRC |
| 6/6/94 | $25,000 | CRC |
| 7/1/94 | $20,000 | Seaborad Investment/Barbara Hesterman |
| 8/3/94 | $40,000 | CRC |
| 8/3/94 | $ 9,500 | Minerals Investment Trust |
| 8/12/94 | $ 4,000 | Minerals Investment Trust |
| 8/12/94 | $ 7,000 | Larry Krasny |
| 10/3/94 | $25,000 | Hemisphere |
| 10/11/94 | $60,000 | Luis Chamon / Transandiana Corp. |
| 11/4/94 | $ 5,000 | Canyon Corporation |
| 11/10/94 | $20,000 | Canyon Corporation |

8.      Between on or about October 3, 1994, and January 26, 1995, the defendants

ROBERT G. WEEKS and DAVID A. HESTERMAN issued instructions to PanWorld's transfer

agent to issue 50 million shares to Bartos Gold Holdings Ltd. pursuant to Reg. S. 37 million of

these share were deposited in a Bartos Gold stock brokerage account in Canada.

9.      From on or about November 3, 1994, until on or about an unknown date in

February, 1995, the defendant FABIILLI exercised trading authority over the Bartos Gold

23

brokerage account mentioned in the immediately preceding paragraph and sold 37,198,952

shares of PanWorld stock from this account.  Proceeds of $204,760.14 from these sales were

transferred to the bank account of Puritan.

      10.    On or about May 1, 1994, the defendants  ROBERT G. WEEKS and

LAWRENCE KRASNY entered into a contract for PanWorld to provide stock registered under

Form S-8 to LK Management  in exchange for LK Management's financial public relations

services to PanWorld.

      11.    On or about the following dates, the defendant ROBERT G. WEEKS or the

defendant DAVID A. HESTERMAN instructed PanWorld's transfer agent to issue the following

shares of stock to LK Management, and said stock was issued pursuant to the instructions:

| 5/05/94 | 1,000,000 |
|---------|-----------|
| 5/23/94 | 416,000 |
| 6/30/94 | 1,000,000 |
| 8/16/94 | 1,000,000 |
| 9/09/94 | 1,000,000 |
| 9/21/94 | 1,000,000 |
| 10/07/94 | 1,000,000 |
| 10/27/94 | 2,000,000 |
| 11/14/94 | 1,000,000 |
| 11/14/94 | 1,000,000 |
| 11/22/94 | 1,000,000 |
| 11/22/94 | 1,000,000 |

| | |
|---|---|
| 11/30/94 | 2,000,000 |
| 12/01/94 | 2,000,000 |
| 12/02/94 | 2,000,000 |
| 12/07/94 | 2,000,000 |
| 12/13/94 | 1,000,000 |
| 12/13/94 | 3,000,000 |
| 12/20/94 | 1,000,000 |
| 12/20/94 | 1,000,000 |
| 12/20/94 | 1,000,000 |
| 12/20/94 | 1,000,000 |
| 12/20/94 | 1,000,000 |
| 12/28/94 | 2,000,000 |
| 1/05/95 | 3,000,000 |
| 1/30/95 | 3,000,000 |
| 2/09/95 | 3,000,000 |
| 2/09/95 | 3,000,000 |
| TOTAL: | 43,416,000 |

12.    Between May 17, 1994, and May 11, 1995 the defendant LAWRENCE KRASNY

sold over 43,000,000 shares of PanWorld stock issued under S-8 and Reg. S through brokerage

accounts at S.B. Cantor, Equity Programs, GDN Securities, Regency Capital, and LaJolla total

proceeds $782,047.89.

13.    On or about the following dates, the defendant ROBERT G. WEEKS or the defendant DAVID A. HESTERMAN instructed PanWorld's transfer agent to issue the following shares of stock to Corporación de Racionalización y Consultoría S.A. (CRC), supposedly under Reg. S:

| | |
|---|---|
| 12/29/94 | 6,000,000 |
| 2/17/95 | 10,000,000 |
| 2/22/95 | 10,000,000 |
| 2/22/95 | 10,000,000 |
| 3/21/95 | 10,000,000 |
| 4/07/95 | 20,000,000 |
| 4/07/95 | 10,000,000 |
| TOTAL: | 76,000,000 |

14.    Between on or about March 6, 1995 and March 29, 1995, 10,000,000 shares of CRC's PanWorld stock, mentioned in paragraph 13, were deposited into CRC's brokerage accounts at Equity Programs Corporation and sold for proceeds of $74,790. Of those proceeds, $39,992.00 were transferred to the brokerage account of defendant LAWRENCE KRASNY.

15.    Between on or about March 23, 1995 and April 27, 1995, 20,000,000 shares of CRC's PanWorld stock, mentioned above in paragraph 13, were deposited into LK Management's brokerage account at Equity Programs Corporation and over seven million of these shares were sold.

16.    On or about the following dates, the defendant ROBERT G. WEEKS issued

26

instructions to PanWorld's transfer agent to issue the following shares of stock to Canyon, and such shares were issued:

| | |
|---|---|
| 12/08/94 | 1,000,000 |
| 12/21/94 | 2,000,000 |
| 1/06/95 | 2,000,000 |
| 1/06/95 | 4,000,000 |
| 1/13/95 | 5,000,000 |
| 1/26/95 | 5,000,000 |
| 1/26/95 | 5,000,000 |
| 1/26/95 | 5,000,000 |
| 2/14/95 | 10,000,000 |
| 3/16/95 | 10,000,000 |
| 3/16/95 | 10,000,000 |
| 3/24/95 | 17,000,000 |
| 4/18/95 | 30,000,000 |
| TOTAL: | 106,000,000 |

17.    Between on or about October 24, 1994 and April 28, 1995, Canyon sold 45,750,000 shares through its account at M. Rimson for proceeds of $362,349.00.  Between on or about February 10, 1995 and March 15, 1995, Canyon sold 20,000,000 shares through its account at Yorkton Securities in Canada for proceeds of  $198,442.50.  Proceeds of the stock sales were transferred to Canyon's bank account in the Bahamas.  Defendant KENNETH L. WEEKS then directed the disposition of the funds.

18.    The grand jury alleges the acts in Counts 7 through 21 as overt acts of this Indictment;

all in violation of 18 U.S.C. Section 371.

COUNTS 7 through 21.

1.    The grand jury realleges and incorporates herein the allegations of Count 6 as though fully set forth.

2.    On or about the following dates, in the Central Division of the District of Utah, the defendants

ROBERT G. WEEKS,
DAVID A. HESTERMAN,
KENNETH L. WEEKS,
JOSEPH A. FABIILLI,
CHRISTOPHER S. KNIGHT, and
LAWRENCE A. KRASNY,

knowing that the property involved in the below- listed financial transactions involved the proceeds of some form of unlawful activity, conducted and attempted to conduct the below-listed financial transactions which in fact involved the proceeds of the specified unlawful activity of fraud in the sale of the securities of PanWorld, with intent to promote the carrying on of said specified unlawful activity, and knowing that each transaction was designed in whole or in part to conceal, or disguise the nature, the location, the source, the ownership, or the control of the proceeds of fraud in the sale of securities; each such transaction being a separate count of this Indictment:

| COUNT | DATE | TRANSACTION | AMOUNT |
|-------|------|-------------|--------|
| 7. | 12/16/94 | Krasny transfer to Hesterman account | $7,470.00 |

| 8. | 12/19/94 | LK Management transfer to Hesterman account | $10,000.00 |
| 9. | 12/27/94 | LK Management transfer to Hesterman account | $11,000.00 |
| 10. | 12/30/94 | Canyon transfer to Ken Weeks Insurance account | $10,985.00 |
| 11. | 1/4/95 | LK Management transfer to Hesterman account | $6,000.00 |
| 12. | 1/5/95 | Canyon transfer to Ken Weeks account | $12,000.00 |
| 13. | 1/20/95 | Canyon transfer to Ken Weeks account | $48,000.00 |
| 14. | 1/20/95 | LK Management transfer to Hesterman account | $8,000.00 |
| 15. | 1/20/95 | LK Management transfer to Hesterman account | $10,000.00 |
| 16. | 1/30/95 | LK Management transfer to Hesterman account | $25,000.00 |
| 17. | 2/7/95 | Canyon transfer to Ken Weeks account | $47,000.00 |
| 18. | 2/14/95 | Canyon transfer to Ken Weeks account | $44,000.00 |

| 19. | 2/16/95 | LK Management transfer to Hesterman account | $27,000.00 |
| 20. | 4/14/95 | LK Management transfer to Hesterman account | $3,000.00 |
| 21. | 4/17/95 | LK Management transfer to Hesterman account | $3,000.00; |

all in violation of 18 U.S.C. Sections 1956(a)(1) (A)(i) and (a)(1)(B)(i).

A TRUE BILL:

_____
FOREPERSON OF THE GRAND JURY

APPROVED:
STEPHEN J. SORENSON
First Assistant United States Attorney

_____
STEWART C. WALZ
Assistant United States Attorney

30