

RECEIVED CLERK
**FILED**
2000 SEP 12  P II: 13

U.S. DISTRICT COURT
DISTRICT OF UTAH

FRANCIS M. WIKSTROM (3462)
H. DOUGLAS OWENS (7762)
PARSONS BEHLE & LATIMER
Attorneys for Kenneth Weeks
201 South Main Street, Suite 1800
Post Office Box 45898
Salt Lake City, Utah  84145-0898
Telephone: (801) 532-1234

MAX D. WHEELER (3439)
RICHARD A. VAN WAGONER (4690)
ROBERT J. SHELBY (8319)
SNOW, CHRISTENSEN & MARTINEAU
Attorneys for Defendant David A. Hesterman
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145
Telephone: (801) 521-9000

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.  2:98CR 0278ST |
| vs. | **MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE RELATING TO ROBERT CORDES AND FOR DISCOVERY** |
| ROBERT G. WEEKS, et al., | |
| Defendants. | Judge Ted Stewart<br>Magistrate Judge Ronald Boyce |

356903.2

119

\*  \*  \*  \*  \*  \*  \*

Defendants Kenneth L. Weeks and David A. Hesterman hereby move the Court for an order suppressing any evidence obtained from Robert Cordes, including any testimony or documents subpoenaed from Cordes and any evidence derived therefrom. The grounds for this Motion are that the government has misused the discovery process in an administrative investigation to obtain evidence in this case. There is also evidence supporting an inference that the testimony of a grand jury witness, Barbara Hesterman, may have been disclosed in violation of Fed. R. Crim. P. 6(e).

Defendants request that the Court's ruling on this Motion be delayed until after discovery on matters concerning the use of subpoenas issued to Cordes and concerning the possible disclosure of Barbara Hesterman's grand jury testimony. Defendants will file a supplemental brief after discovery is completed, which may request additional relief relating to Cordes and/or Barbara Hesterman.

## STATEMENT OF FACTS

Evidence available to defendants indicates that the staff of the Securities and Exchange Commission has misused the discovery process available in an administrative proceeding (In re Dynamic American Corporation) to improperly further their investigation of this criminal matter concerning individuals associated with PanWorld Minerals International, Inc.

**A.      The PanWorld Criminal Matter.**

The original Indictment in the instant case was filed on May 27, 1998.   It contained four counts and named two defendants, Robert Weeks and David Hesterman.   It alleged that the defendants had caused an issuer of securities, PanWorld Minerals International, Inc., to file false periodic reports with the Securities Exchange Commission.   The first Superceding Indictment was filed on April 28, 1999.   It added one related count against an accountant, Terrence Dunne.   A second Superceding Indictment was filed on December 8, 1999.   Four new defendants were added, including Kenneth Weeks, Robert Weeks' brother.   Sixteen new counts were added, one of which alleges a conspiracy to defraud the public in the purchase and sale of PanWorld securities through boiler-room type sales operations and improper sales of unregistered securities.   The other fifteen new counts allege money laundering against all defendants except Dunne.

**B.      Related Administrative and Civil Proceedings in the PanWorld Matter.**

Well before the original PanWorld Indictment, a formal order of investigation was issued by the SEC in the PanWorld matter on January 17, 1992.   The investigation culminated in the filing of a civil complaint by the Commission against PanWorld on June 2, 1997 in U.S. District Court for the District of Utah (No. 2:97CV 0425).   On October 3, 1997, the U.S. Attorney for the District of Utah moved to intervene and stay the proceedings pending the outcome of the parallel criminal investigation.   Ex. 1, Brief in Support of Application for Leave to Intervene and in Support of Motion to Stay Proceedings.   An order was granted on February

10, 1998 staying all proceedings. Ex. 2.[1]  As noted, the original Indictment in this matter was filed on May 27, 1998, some eight months after the civil stay was issued.  The stay in the civil matter remains in effect to the present time.

**C.     Proceedings in the Dynamic American Matter.**

The Commission issued a formal Order Directing Private Investigation and Designating Officers regarding another issuer of securities, Dynamic American Corporation, on January 16, 1997.  Defendants Hesterman and Robert and Kenneth Weeks were subjects of the investigation in the Dynamic American matter, and were ultimately respondents in an administrative enforcement action, in which an evidentiary hearing was held in July 2000.

**D.     Overlapping Investigations.**

The formal order regarding Dynamic American designated, among others, attorney Leslie J. Hendrickson and geologist Carleen H. Achuff as officers of the Commission to conduct the Dynamic American investigation.  Both Hendrickson and Achuff also participated heavily in the investigation of the PanWorld matter.  Hendrickson signed the complaint initiating the PanWorld civil proceeding, and she conducted some 45 transcribed interviews in the PanWorld investigative matter.  She has also been designated as a Special United States Attorney for the District of Utah and, in that capacity, has participated extensively in proceedings before

---

[1] Although the defense initially opposed the motion, there was a stipulated agreement that the order should be entered. Ex. 3, Stipulation of October, 1998.

the grand jury that issued the Indictments in this matter. Achuff likewise appeared at some 20 transcribed interviews in the PanWorld investigative matter.

**E.     The Government's Discovery of Robert Cordes.**

Robert Cordes is a citizen of Canada and a resident of the Bahamas. Cordes testified that he operates a company called Management and Service Company, Limited ("MASCO") which "forms corporations in various jurisdictions, provides nominee officers and directors for some of those corporations. It operates a number of corporations with varied interests, ranging from insurance to shipping to conducting stock brokerage accounts." Ex. 4 Cordes Transcript at 12-13, 14-15. Cordes testified that he or MASCO established several off-shore corporations some of which, as described more fully below, transacted business in Dynamic American stock and one of which, Canyon Corporation, transacted business in PanWorld stock.

Cordes traveled to the United States in December 1998. While in Fort Lauderdale on December 15, 1998, he was served by Achuff with a subpoena duces tecum in the Dynamic American investigative proceeding. See Ex. 4, Cordes Transcript at 21-22; Ex. 5, December 14, 1998 Subpoena to Robert Cordes (the "Dynamic American subpoena"). On information and belief, at the same time Cordes was served with the Dynamic American subpoena, Achuff or a person with her also served Cordes with a subpoena to appear before the grand jury sitting in the PanWorld matter. Ex. 6, December 15, 1998 Subpoena to Robert Cordes (the "PanWorld subpoena").

The Dynamic American subpoena is a subpoena duces tecum and has an extensive document request attached. The PanWorld grand jury subpoena indicates that it requires the appearance of the person only; the box requiring production of documents is not checked, the space where documents would be listed is empty, and there is no document request attached.

The Dynamic American subpoena called for Cordes's appearance in Denver, Colorado on January 12, 1999. The PanWorld subpoena called for Cordes's appearance in Salt Lake City on January 6, 1998 (evidently intending 1999). Pursuant to an agreement with Achuff, Cordes actually appeared for an interview under oath before a stenographer (essentially a deposition) on January 27 and 28, 1999, in Dallas, Texas. Ex. 4, Cordes Transcript at 22. Cordes never appeared before the grand jury. Cordes and his attorney evidently made some agreement with Hendrickson that Cordes would not need to appear before the grand jury in the PanWorld matter.[2]

---

[2] At the commencement of the deposition, after Achuff's introduction, the following exchange took place between attorney Hendrickson and the witness:

> Q: Mr. Cordes, I'm Leslie Hendrickson, and I'm here participating both as a member of the Securities and Exchange Commission, but also as a Special United States Attorney for the District of Utah, and your appearance here was part of an agreement that you would testify here rather than in front of the grand jury. Is that correct?
>
> A: That's correct.

Ex. 4, Cordes Transcript at 9. Thus, the agreement appears to have been that Cordes would give a deposition in lieu of a grand jury appearance. The foregoing also represents Hendrickson's express acknowledgment that she was appearing in connection with the prosecution of the criminal matter involving PanWorld (there are no criminal matters involving Dynamic American known to Defendants).

The Dynamic American subpoena, issued some ten months after the stay in the PanWorld civil case, calls directly for the production of documents related to PanWorld. See Ex. 5, Dynamic American subpoena, attached document requests 6 (calling for "[d]ocuments identifying the amount, type, and payor of all compensation received by MASCO [a Cordes company] from or on behalf of . . . (k) PanWorld Minerals International, Inc.") and 7 (" . . . all correspondence during the period between MASCO and any other person or entity that refers to, relates to, or reflects Dynamic American Corp. or PanWorld Minerals International, Inc.").

Additionally, the subpoena indirectly required production of documents relating to PanWorld. For example, it calls for the production of banking records and brokerage account records for Canyon Corporation, Ex. 6 Cordes Subpoena, requests 4 and 5. Cordes testified that Canyon was an off-shore corporation which was used to deal in PanWorld securities, and testimony and documents he provided indicate that Canyon received proceeds from the sale of PanWorld securities. Ex. 4, Cordes Transcript at 271-91, 298-311 (PanWorld securities transactions by Canyon Corporation); id. at 314-18 (Canyon Corporation banking transactions); id. at 315 (testimony concerning spreadsheet prepared by Achuff summarizing Canyon banking records provided by Cordes); Ex. 7, (Achuff's spreadsheet summarizing Canyon banking records, showing the source of deposits as brokerage houses at which Canyon had trading accounts (this was exhibit 20 at the Cordes deposition)).

The government was fully aware before drafting the Dynamic American subpoena's document request that Canyon documents would relate to PanWorld. Ex. 8,

PanWorld Civil Complaint (dated June 2, 1997) at 8-9 (alleging that Canyon "holds funds that represent fruits of illegal acts"); id. at 50 ("PanWorld issued 97 million shares of Regulation S stock to Canyon" which were illegally sold back into the U.S. market). Indeed, Canyon was actually a defendant, apparently for purposes of obtaining relief, in the PanWorld civil matter. Id. at 59.

The government cannot legitimately claim that Canyon had anything to do with Dynamic American. A review of the Cordes transcript reveals no discernable connection between Dynamic American and Canyon. A review of Achuff's testimony in the Dynamic American administrative hearing demonstrates that she testified extensively about other off-shore corporations set up by Cordes, such as Hamilton Limited and Stockton Limited, which she had questioned Cordes about, but she does not mention Canyon in her testimony. Ex. 9, Achuff Testimony in Dynamic American Proceeding, July 13, 14, 2000.

During his testimony, Cordes testified that he was appearing pursuant to the Dynamic American subpoena. Ex. 4, Cordes Transcript at 21. The documents Cordes produced at his deposition were produced pursuant to the Dynamic American subpoena. Ex. 4, Cordes Transcript at 22. (The PanWorld grand jury subpoena, as noted, never requested any documents.) Many of the Cordes documents relate directly and indirectly to PanWorld,

including banking records (and apparently also brokerage records) associated with the sale of PanWorld securities.[3]

Both Achuff and Hendrickson questioned Cordes extensively about PanWorld matters (and about Canyon Corporation matters relating to PanWorld). Ex. 4, Cordes Transcript at 30-75, 82-83, 104-105 (Achuff questioning about Canyon and PanWorld); id. at 269-314 (Hendrickson's questions on the same). Achuff also asked about Dynamic American matters, but Hendrickson asked few questions on anything other than PanWorld and Canyon.

Achuff left the deposition after handing off the questioning to Hendrickson. Achuff testified as follows at the Dynamic American hearing in response to a question as to why she did not remain:

> Because my understanding was that if Ms. Hendrickson had a subsequent interview with Mr. Cordes, it was going to be, if you will, wearing her hat as a special U.S. Attorney – I'm sorry. I don't know exactly what her title is, and I had no part of that. And so there was no reason for me to stay. Furthermore, I was under the impression it would have been inappropriate for me to stay.

Ex. 9, Achuff Testimony in Dynamic American hearing, at 1115. Achuff could not identify why she thought it would be inappropriate to stay. Id. at 1116.

Defendants have no direct knowledge as to whether any portion of the transcript of the Cordes deposition and the documents he produced were submitted to the grand jury.

---

[3] The Cordes transcript does not identify all of the documents Cordes provided. The transcript does specifically identify that the Canyon banking records were provided by Cordes. These were attached as exhibit 128 to the transcript, Ex. 4, Cordes Transcript at 46. (They are bates numbered 48463-48539.) The transcript is not clear as to whether all or only a portion of the many brokerage account records attached as exhibits were provided by Cordes.

Based on the statement of attorney Hendrickson, however, supra n. 2, it appears that they were. Defendants believe that the Cordes evidence may have been the sole or at least predominant support for Counts 6, 10, 12, 13, 17, 18 and perhaps others of the second Superceding Indictment.

**F.    Suspected Disclosure of Grand Jury Testimony of Barbara Hesterman.**

Defendant Hesterman's mother, Barbara Hesterman, was called by SEC counsel to testify in the recent hearing in the Dynamic American administrative matter. The only statement she had made to any government agent prior to being called to testify in Dynamic American was before the PanWorld grand jury. Ex. 10, Affidavit of Barbara Hesterman. Ordinarily, one would not expect SEC counsel to call as a witness a person whom he had not spoken with at all unless he was otherwise familiar with what the witness's expected testimony. The only source for any knowledge of how Barbara Hesterman could be expected to testify would logically have to come from her grand jury testimony. This raises the inference that Barbara Hesterman's grand jury testimony was disclosed to SEC counsel. Defendants' counsel has not yet been able to review the transcript of Barbara Hesterman's testimony at the Dynamic American hearing, but understand that counsel for the SEC may have stated or otherwise suggested that he did not know ahead of time how Barbara Hesterman would testify. Nevertheless, the circumstances just described suggest that Barbara Hesterman's grand jury testimony may have been improperly disclosed to SEC agents, perhaps to someone other than the attorney who questioned Mrs. Hesterman.

## ARGUMENT

### I.    Evidence Related to Robert Cordes Should be Suppressed.

The government's use of the Dynamic American subpoena and investigative process to obtain PanWorld-related documents from Cordes and then to question him about PanWorld matters (and the related Canyon Corporation matters) was illegal and improper. Although parallel criminal, administrative and civil proceedings are permissible in many cases, the law is clear that the prosecution may not take advantage of the investigative and discovery mechanisms available in civil or administrative discovery solely to further the investigation of a criminal matter.

One of the leading cases on the rules applicable to collateral proceedings is Securities and Exchange Comm'n v. Dresser Industries, Inc., 628 F.2d 1368 (D.C. Cir. 1980). The court explained that "[t]he civil and regulatory laws of the United States frequently overlap with the criminal laws, creating the possibility of parallel civil and criminal proceedings, either successive or simultaneous. In the absence of substantial prejudice to the rights of the parties involved, such parallel proceedings are unobjectionable under our jurisprudence." Id. at 1374. The court continued, however, to explain that in many cases, a stay may be required:

> Other than where there is specific evidence of agency bad faith or malicious governmental tactics, the strongest case for deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter. The noncriminal proceeding, if not deferred, might undermine the party's Fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of Federal Rule of Criminal Procedure 16(b), expose the basis of the defense

> to the prosecution in advance of criminal trial, or otherwise prejudice the case.

Id. at 1375-76 (emphasis added).

The case at bar is one of the class of "strongest cases," id., where the stay of related civil proceedings is warranted because of the risk that one party may seek to "expand the rights of criminal discovery beyond the limits of . . . Rule 16(b)." Id. Indeed, it was on that very basis that the government sought and obtained a stay of the related PanWorld civil proceeding. As the government explained in its motion: "criminal investigations and cases are susceptible to injury by use of a civil case to obtain a preview of a possible criminal case, as well as by the use of civil proceedings to obtain unlimited discovery in an ongoing criminal case." Ex. 1, Brief in Support of Application for Leave to Intervene and In Support of Motion to Stay Proceedings, at 3.

The government's brief continues: "A grave concern to the United States in parallel proceedings, generally, and this case specifically, is that a defendant may attempt to use the liberal discovery and trial devices available to him in the civil action to circumvent the more restricted procedures regulating criminal discovery, thus gaining through the "back door" information that he would not be entitled to in the criminal case." Id. at 8. This same "grave concern" of the government is shared by defendants here. The government is no more entitled to use the civil or administrative discovery to gain "back door" discovery in a criminal matter than would be a defendant. See Dresser Industries, 628 F.2d at 1376 (enumerating improper disadvantages placed on defense by failure to stay parallel civil actions); United States v. Stewart, 872 F.2d 957, 962-63 (10th Cir. 1989) ("the district court has authority under Rule 16(d) to prevent the parties from abusing discovery procedures, including attempts to avoid limitations on criminal discovery through the use of civil discovery provisions") (emphasis added).

There appear to be no precedents dealing directly with the exact situation which has arisen here. Nevertheless, the cases are clear that neither party to a criminal matter should be permitted to make use of civil or administrative discovery mechanisms with the intention of furthering discovery in the criminal matter. "A bad faith investigation, in the Court's conception, is one conducted solely for criminal enforcement purposes." Dresser Industries, 628 F.2d at 1387 (citing United States v. LaSalle Nat'l Bank, 437 U.S. 298, 307-308, 316 and 316 n. 18 (1978)). Conversely, "[w]here the agency [the SEC] has a legitimate noncriminal purpose for the investigation, it acts in good faith under the LaSalle conception . . . ." Id. The government's conduct here fails this test. The use of an administrative subpoena in the Dynamic American matter to obtain Cordes's PanWorld and Canyon documents and then requiring him to appear pursuant to that subpoena for questioning concerning PanWorld and Canyon matters by both Achuff and Hendrickson was apparently "solely for criminal enforcement purposes." Id. Such actions have no discernible purpose in the Dynamic American investigation.

Further, the use of the administrative proceeding in a way that effectively avoids the strictures of discovery in a criminal matter is improper, particularly where, as here, there is an order in place to prevent just such abuses. See Dresser Industries, 628 F.2d at 1376 (civil or administrative actions should be deferred to avoid "expand[ing] rights of criminal discovery beyond the limits of Federal Rule of Criminal Procedure 16(b)"); United States v. Armada Petroleum Corp., 700 F.2d 706, (Temp. Emer. Ct. App. 1983) (affirming decision to decline to enforce subpoena in parallel DOE civil case because "[t]he result would be the impermissible expansion of the government's right to pretrial discovery in the criminal prosecution."); cf. United States v. LaSalle Nat'l Bank, 437 U.S. 298, 311-313 1978) (IRS may not use its summons authority to investigate possible violations of the tax laws after it has referred those violations to the Justice Department for prosecution) (now superseded by statute).

The facts in <u>Afro-Lecon, Inc. v. United States</u>, 820 F.2d 1198 (Fed Cir. 1987), are similar to the facts in this case in most respects. There, a company had a contract to supply filing cabinets to a federal agency. A contract dispute arose and was the subject of litigation initiated by the company before the Board of Contract Appeals. During the pendency of this litigation, the company learned that it was the subject of a grand jury proceeding. <u>Id.</u> at 1199-1200. While the civil proceeding was progressing, the government had criminal investigators posing as persons concerned with the civil case attend various civil discovery meetings and depositions. <u>Id.</u> at 1200, 1203. The company moved repeatedly to stay the civil proceedings, but the board denied the requests and ultimately dismissed the company's case. <u>Id.</u> at 1200.

On appeal, the court reversed the dismissal and remanded for consideration of whether there was any ongoing risk of discovery abuse. <u>Id.</u> at 1204. The court condemned the prosecution's actions in having criminal investigators participate in civil discovery, and noted that the federal district court which was trying the criminal matter had suppressed the "fruits of the discovery abuses:"

> This Court is not approbatory of the prosecution's utilization of the ploy of having a criminal investigator "sit in" on and participate in a non-criminal conference or interview when criminal prosecution was, as here, eminently predictable and without advising the "target" of the investigator's role and purpose. . . . Suppression . . . is merited not only by equity and good conscience but also by the salutary aspect of impressing upon the prosecution that such overreaching is not compatible with evenhanded justice which, rather than achieving convictions, should be a prosecutor's goal.

<u>Id.</u> at 1204 (quoting <u>United States v. Okwumabua and Afro-Lecon, Inc.</u>, No. CR-86-28E (W.D.N.Y. Dec. 26, 1986)).[4]

---

[4] Unfortunately the quoted decision appears to be unavailable by electronic search.

As in <u>Afro-Lecon</u>, Achuff "posed" as a person interested in the administrative Dynamic American matter, but actually subpoenaed documents and spent substantial time questioning on matters related to PanWorld. Achuff's conduct is unjustifiable in light of the PanWorld stay, her on-going role as investigator in the Dynamic American and her lack of any role in the on-going PanWorld grand jury investigation. Hendrickson also relied in questioning Cordes on the documents improperly obtained pursuant to the Dynamic American subpoena.[5] The use of the Dynamic American subpoena to obtain PanWorld documents from Cordes seems to be the government's direct embrace of the abuse that should have been prevented by the stay in the PanWorld matter and the law established by <u>Dresser Industries</u> and <u>Afro-Lecon</u>. What is far worse here than in those cases is that there was in place an order staying discovery in the PanWorld matter, requested and obtained by the government, which the government then disregarded, using the Dynamic American investigation to obtain documents and obtain discovery in the PanWorld matter in a manner not permitted by the rules of criminal discovery. Here, as in <u>Afro-Lecon</u>, suppression "is merited . . . by equity and good conscience." 820 F.2d at 1204. The deposition of Cordes on PanWorld matters was a "bad faith investigation . . . [because

---

[5] It may be asserted by the government that it was appropriate for Hendrickson, as a specially designated Assistant U.S. Attorney, to subpoena Cordes and then, in lieu of his appearance before the grand jury, to agree that he could appear for an interview. Such an interview was not appropriate in the instant case because of the government-requested order staying civil discovery (taking Cordes's deposition should have been, by any interpretation, forbidden by the stay), and because, even had there not been a stay in place, the prosecution should not have used the Dynamic American investigative proceedings to obtain documents for use in the PanWorld matter.

it was] conducted solely for criminal enforcement purposes." <u>Dresser Industries</u>, 628 F.2d at 1387.

**II.    Disclosure of Barbara Hesterman's Grand Jury Testimony, If It Occurred, Was Improper.**

As described earlier, there is an inference, supported by circumstantial evidence, that Barbara Hesterman's testimony before the PanWorld grand jury was disclosed to SEC staff prior to the administrative hearing. Such disclosure would violate Fed. R. Crim. P. 6(e), which provides that virtually anyone involved with the grand jury except the witness "shall not disclose matters occurring before the grand jury." Defendants need discovery to determine whether in fact a violation of Rule 6(e) has occurred, but believe that the facts described herein establish a prima facie showing that a violation has occurred. <u>See</u> Wright, Federal Practice and Procedure: Criminal § 106 at 375-76 (3rd ed. 1999) ("The burden is on those claiming that there has been an improper disclosure to make a prima facie case of a Rule 6(e) violation by government representatives. A prima facie showing shifts the burden to the government to come forth and negate the prima facie case.").

**CONCLUSION**

For the foregoing reasons, Defendants Hesterman and Kenneth Weeks request that the Court suppress any testimony that has or may be obtained from Robert Cordes, any documents obtained from him, or any other evidence of any sort derived from information the government has obtained from him. Defendants request that the Court delay a ruling on this Motion until after discovery has been obtained. Although, as demonstrated, Defendants are currently aware of some prosecutorial impropriety, Defendants need discovery directed toward understanding all surrounding facts. Thereafter, Defendants will file a supplemental brief in

support of the Motion and request relief concerning Barbara Hesterman and perhaps additional relief concerning Cordes if justified.

Discovery is requested on the following matters: 1) whether any of Cordes's testimony or summary thereof was presented to the grand jury, and how and by whom such presentation was made; 2) identification of all documents obtained by Cordes pursuant to the Dynamic American subpoena; 3) whether any of these documents or summaries thereof were presented to the grand jury and how such presentation was made; 4) whether any of the documents obtained from Cordes were also obtained from other sources and whether these were presented to the grand jury; 5) what evidence was presented to the grand jury concerning Counts 6 through 21 of the second Superceding Indictment other than evidence obtained from Cordes; 6) the reasons for, and any communications concerning, the use of the Dynamic American subpoena to request and obtain documents relating directly and indirectly to PanWorld; 7) copies of all other subpoenas issued in the Dynamic American matter; 8) what information and evidence were derived from Cordes's evidence; and 9) whether any disclosure of Barbara Hesterman's grand jury testimony was made to SEC counsel.

DATED this 13th day of September, 2000.

FRANCIS M. WIKSTROM
H. DOUGLAS OWENS
PARSONS BEHLE & LATIMER
Attorneys for Defendant Kenneth L. Weeks

MAX D. WHEELER
RICHARD A. VAN WAGONER
ROBERT J. SHELBY
SNOW, CHRISTENSEN & MARTINEAU
Attorneys for Defendant David A. Hesterman

## CERTIFICATE OF SERVICE

I hereby certify that on this ___14th___ day of September, 2000, I caused to be faxed

and sent by first class mail a true and correct copy of the foregoing **MEMORANDUM IN**

**SUPPORT OF MOTION TO SUPPRESS EVIDENCE RELATING TO ROBERT**

**CORDES AND FOR DISCOVERY** to:

Mr. Stewart C. Walz, Esq.
Assistant U.S. Attorney
Criminal Division
185 South State Street, Suite 400
Salt Lake City, Utah 84111

James N. Barber
Bank One, Suite 100
50 West Broadway
Salt Lake City, Utah 84101

Earl G. Xaiz
Yengich, Rich, Xaiz
175 East 400 South #400
Salt Lake City, Utah 84111

Ed Brass
321 South 600 East
Salt Lake City, Utah 84102

Delano S. Findlay
5350 South 925 East #E
Salt Lake City, Utah 84117

EXHIBIT 1 

SCOTT M. MATHESON, JR.,
United States Attorney (#4714)
STEWART C. WALZ,
Assistant United States Attorney (#3374)
185 South State Street, #400
Salt Lake City, Utah   84111
Telephone: (801) 524-5682
Facsimile:  (801) 524-6924
**Attorneys for the United States of America**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

Securities and Exchange Commission,      :

      Plaintiff,      :      Civil No. 2:97CV-0425B

      vs.      :

PanWorld Minerals International, Inc. et al.  :

      Defendants.      :

## BRIEF IN SUPPORT OF APPLICATION FOR LEAVE TO INTERVENE AND IN

## SUPPORT OF MOTION TO STAY PROCEEDINGS

The United States of America, by the undersigned Assistant United States Attorney, submits this brief in support of its application to intervene in this civil action and to stay proceedings pending the outcome of a parallel criminal case.

10/8/97

The Unites States is currently investigating possible criminal conduct in connection with trading from 1990 through 1995 in the common stock of PanWorld Minerals International, Inc. (PanWorld). The criminal investigation, which is based on the same or similar facts as the civil action, involves possible violations of federal securities laws, including 15 U.S.C. §§ 77e(a), 77e(c), 77q(a), 77q(b), 77x, 78j(b), 78o(a)(1), 78m(a), 78o(d), and 78ff, as well as wire fraud, 18 U.S.C. § 1343, mail fraud, 18 U.S.C. § 1341, conspiracy, 18 U.S.C. § 371, and money laundering, 18 U.S.C. §§ 1956 and 1957.

## I.    INTERVENTION IS PROPER UNDER F.R.C.P. 24(a).

The Unites States seeks to intervene under Rule 24(a) of the Federal Rules of Civil Procedure.    An applicant seeking to intervene as a matter of right must meet four requirements:

> First, the applicant must be timely.  Second, the applicant must have a direct and substantial interest in the subject matter of the litigation.  Third, the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest. Finally, the applicant's interest must be inadequately represented by the existing parties.

Caterino v. Barry, 922 F.2d 37, 39-40 (1st Cir. 1990); Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Department of Interior, 100 F.3d 837 (10th Cir. 1996).

## A.   Timeliness

The United States has recently initiated an active criminal investigation into the same or substantially similar issues that are involved in this civil action.

It is not significant, in terms of the United States' motion, that criminal charges have not yet been filed.  The interests of the United States concerning criminal investigations and cases are susceptible to injury by use of a civil case to obtain a preview of a possible criminal case, as well as by the use of civil proceedings to obtain unlimited discovery in an ongoing criminal case.  The United States should not be forced to indict a criminal case prematurely simply to generate the grounds for a stay.  <u>See Board of Governors of the Federal Reserve v. Pharon</u>, 91 Civ. 6250 (PL), 1991 U.S. Dist. Lexis 18176 (S.D.N.Y. 1991) (court allowed intervention before criminal case was brought).

## B.   Direct and Substantial Interest of the United States.

The United States has a direct and substantial interest in the subject matter of the litigation.  The vital interests of the United States in the present case match those found in <u>Securities and Exchange Commission v. Chestman</u>, 861 F.2d 49, 50 (2d Cir. 1988), where the court allowed the United States to intervene,

pursuant to Fed. R. Civ. P. 24 and stayed discovery in the civil actions. The Second Circuit stated:

> The government had a discernable interest in intervening in order to prevent discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter.

Accord First Merchants Enterprise, Inc. v. Shannon, 1989 Fed. Sec. L. Rep. (CCH) ¶ 94,421 at page 92,715 (S.D.N.Y. 1989) (permissive intervention appropriate where the government contends that an ongoing criminal investigation would be prejudiced by civil discovery concerning the same facts and circumstances).

The United States' interests in the investigation and possible criminal prosecution of securities fraud and related offenses will be severely impeded and impaired if the instant suit is not stayed. Allowing the civil discovery to continue may permit the defendants to obtain discovery of the potential criminal case through the examination of actual or potential grand jury witnesses and grand jury evidence. Continuing civil discovery might also permit defendants to examine witnesses who may be in the process of working out cooperation agreements with the government. Disclosure of these matters during discovery or during the civil trial would impair the United States' legitimate interest in, and ability to protect its, investigative strategy and sources of information.

-4-

Perhaps more importantly, however, because it now appears that the instant case and the criminal investigation have virtually identical legal and factual issues, any subsequent criminal prosecution of these defendants may be severely restricted by claim and issue preclusion doctrines. See e.g. United States v. Rogers, 636 F. Supp. 237, 254-55 (D. Colo. 1986) (although rarely presented, it is well-established that findings against the government in a civil action may support preclusion in a subsequent criminal prosecution). Yates v. United States, 354 U.S. 298, 335-36 (1957) (collateral estoppel is not made inapplicable by the fact that the subsequent proceeding is a criminal case, whereas the prior proceedings were civil in character).

The United States also has an interest in promoting the efficient use of its investigative and prosecutive resources. As the complaint in this case demonstrates, the factual underpinnings of this matter are complex. This case is based upon the activities of many defendants over a long period of time. The assistance of members of the staff of the Securities and Exchange Commission is necessary to a prompt and accurate resolution of the criminal investigation. Cf. United States v. Matthews, 787 F.2d 38, 44-5 (2d. Cir. 1986). Allowing intervention by the United States and staying the civil proceedings will allow for the necessary

-5-

resources to be applied to the criminal investigation so that it may proceed in a timely and efficient manner.

C.   **Inability of SEC to Protect Interests of the United States.**

The United States, as an "intervenor of right has an interest in the litigation that it cannot fully protect without joining the litigation." Stringfellow v. Concerned Neighbors in Action, 480 U.S. 370, 381 (1987) (Brennan, J. concurring).  While the interests of the United States and the SEC are similar, Congress has established that the public interest is in both civil and criminal enforcement of the securities laws.  No party to this suit represents, nor can represent, the interest of the United States Attorney concerning the investigation and prosecution of a criminal case, since only the United States (by the Justice Department and the United States Attorney's Office) can initiate, investigate and prosecute a criminal case.

II.  **PERMISSIVE INTERVENTION IS IN THE PUBLIC INTEREST.**

Application of Rule 24(b) requires analysis similar to that of Rule 24(a) with respect to the timeliness of the application and commonality of questions of law and fact.  In addition, Rule 24(b) specifically permits intervention by state or federal governments. The thrust of this provision of Rule 24(b) "is in the direction of allowing intervention liberally to governmental agencies and

-6-

officers seeking to speak for the pubic interest."   7C Wright,

Miller and Kane, Federal Practice and Procedure, §1912 at 373-74

(2d Ed. 1986)  As more fully set forth above, the United States'

intervention in this case is sought to protect the public interest

in criminal prosecution of securities fraud and related crimes, as

well as the substantial interest of the SEC in civil enforcement of

securities statutes.  Failure to grant the application and motion

to stay will thwart the public interest in one or both of these

proceedings.

**III. A STAY OF THE CIVIL PROCEEDINGS SHOULD BE GRANTED.**

It has long been held that a court has authority to stay civil

proceedings.  See, e.g. Landis v. North American Co., 299 U.S. 248

(1936).   Indeed, a stay of a civil case may be particularly

appropriate where as here, a parallel criminal proceeding is

anticipated or underway. See United States v. Kordel, 397 U.S. 1,

12 n. 27 (1970) ("Federal courts have deferred civil proceedings

pending the completion of parallel criminal prosecutions when the

interests of justice seemed to require such action, sometimes at

the request of the prosecution").

The Federal Circuit in Afro-Lecon, Inc. V. United States, 820

F.2d 1198, (Fed. Cir. 1987), noted: "it has long been the practice

to 'freeze' civil proceedings when a criminal prosecution involving

-7-

the same facts is warming up or under way." 820 F.2d at 1204
(citations omitted). The court stated that the stay will sometimes
occur at the request of the government and sometimes at the request
of the defense. 820 F.2d at 1202. The stay is often is generated
to protect fifth amendment concerns of the defendant:

> "but also rises out of a sense that deferrable civil
> proceedings constitute improper interference with the criminal
> proceedings if they churn over the same evidentiary material."

820 F.2d at 1204 (quoting Peden v. United States, 512 F.2d 1099,
1103 (Ct. Cl. 1975)).

The potential for this "improper interference" is present in
this case. A grave concern to the United States in parallel
proceedings, generally, and this case specifically, is that a
defendant may attempt to use the liberal discovery and trial
devices available to him in the civil action to circumvent the more
restricted procedures regulating criminal discovery, thus gaining
through the "back door" information that he would not be entitled
to in the criminal case. The leading case addressing the problem
of balancing discovery interests in parallel proceedings is
Campbell v. Eastland, 307 F.2d 478 (5th Cir. 1962), cert. denied,
371 U.S. 955 (1963). Judge Wisdom, speaking for the Fifth Circuit,
emphasized the public interest in a criminal case is entitled to
precedence over the civil litigant, noting that "a trial judge
should give substantial weight to [the public interest in law

enforcement] in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claim or liabilities." <u>Id</u>. at 487. When faced with parallel proceedings, "[j]udicial discretion and procedural flexibility should be utilized to harmonize the conflicting rules and to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other." <u>Id</u>. at 487.

Many courts have endorsed this reasoning and stayed civil proceedings at the behest of the criminal authorities pending resolution of criminal matters. <u>See</u>, <u>e.g.</u> <u>United States v.</u> <u>Stewart</u>, 872 F.2d 957, 962-63 (10th Cir. 1989). Such stays have been routinely granted at the request of criminal prosecutors in SEC civil cases where similar criminal investigations were present. <u>See</u>, <u>e.g.</u>, <u>United States v. Chestman</u>, 861 F.2d 49 (2d. Cir. 1988); <u>In Re Ivan F. Boesky Securities Litigation</u>, 128 F.R.D. 47, 48-9 (S.D.N.Y. 1989); <u>Securities and Exchange Commission v. Drexel</u> <u>Burham Lambert, Inc.</u>, 88 Civ. 6209 (MP) (S.D.N.Y. 1988); <u>Securities</u> <u>and Exchange Commission v. Yagoda</u>, 88 Civ. 763 (MP) (S.D.N.Y. 1988).

For the foregoing reasons, the United States prays to intervene in this action, and to stay these proceedings pending the outcome of the criminal investigation.

-9-

Respectfully submitted October 9, 1997.

SCOTT M. MATHESON, JR.
United States Attorney

By: _____
STEWART C. WALZ
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 1997 I caused true and correct copies of the attached **APPLICATION TO INTERVENE AND MOTION TO STAY PROCEEDINGS** to be served upon the following parties by U.S. mail, postage prepaid:

Robert H. Bretz
520 Washington Blvd. Suite 428
Marina Del Rey, CA  90292
(Attorney for PanWorld, Robert Weeks, Ken Weeks, David Hesterman, Larry Krasny, L.K. Management, Randall Gilbert, Joseph Fabiilli and Puritan Communications )

Nathan Drage
50 West Broadway Suite 1130
Salt Lake City, Utah  84101
(local counsel for above listed defendants)

Canyon Corporation
c/o Morning Star Holding
P.O. Box 556
Charlestown, St. Christopher and Nevis

Rita Wenger
8025 Hampden Lane
Bethesda, MD  20814
(Pro se)

Vincent Verdiramo, Sr.
VERDIRAMO & VERDIRAMO P.A.
3163 Kennedy Boulevard
Jersey City, New Jersey 070306
(Attorney for Jerome Wenger)

EXHIBIT 2

FEB 9 - 1998

`` ..: ..  ..:...
`'... SAM

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | CASE NO. 2:97 CV 00425 S |
| Plaintiff, | : | |
| vs. | : | ORDER GRANTING INTERVENTION AND STAY |
| PANWORLD MINERALS INTERNATIONAL, INC. ET AL. | : | |
| Defendants. | : | |

The Court conducted a hearing on this matter on February 3, 1998. The United States was represented by Stewart C. Walz and Leslie J. Hendrickson, the Securities and Exchange Commission was represented by Thomas M. Melton, the responding defendants Robert Weeks, Kenneth Weeks, David Hesterman, Larry Krasny, L.K. Management, Joseph Fabiilli, Puritan Communications, and Randall Gilbert, were represented by Robert H. Bretz and James Prestiano, and Rita Wenger was represented by Lisa R. Petersen.  Defendant Jerome Wenger and relief defendant Canyon Corporation did not appear.

On October 3, 1997 the United States Attorney for the District of Utah filed a motion to intervene in this case and stay all

ORIGINAL

proceedings until resolution of its criminal investigation.  The
Plaintiff Securities and Exchange Commission joined in the motion.
The defendants represented by attorney Robert Bretz responded to
the motion consenting to the stay as to all the defendants who are
targets of the criminal investigation, which are all the individual
defendants except Gilbert.  Defendant Jerome Wenger and relief
defendants Rita Wenger and Canyon Corporation did not file any
response to the motion or raise any objection.

The Securities and Exchange Commission and defendant Gilbert
have submitted a stipulation to dismiss Gilbert from the civil case
without prejudice.

The responding defendants, except for Jerome Wenger, Rita
Wenger and Canyon Corporation, have submitted a stipulation
agreeing to stay the civil proceeding in this case until resolution
of the pending criminal investigation.

The Court has considered the pleadings, arguments of counsel,
and the stipulation of the parties, and the lack of objection by
Jerome Wenger, Rita Wenger and Canyon Corporation.

The Court enters the following ORDER:

1.    The United States' motion to intervene in this case is
granted.

2.    The United States' motion to stay all proceedings in this

2

civil case is granted as to all the defendants and relief defendants until the conclusion of the criminal investigation.

Dated this _10 ᵗ_ day, February, 1998.

United States District Court
David Sam

3

We consent to the Form of this Order granting the Motion to Intervene and Stay this case.


_____
Assistant United States Attorney
Stewart C. Walz


_____
Robert H. Bretz
Attorney for Responding Defendants


_____
Thomas M. Melton
Attorney for the plaintiff
Securities and Exchange Commission

4

We consent to the Form of this Order granting the Motion to Intervene and Stay this case.

_____
Assistant United States Attorney
Stewart C. Walz

_____
Robert H. Bretz
Attorney for Responding Defendants

_____
Thomas M. Melton
Attorney for the plaintiff
Securities and Exchange Commission

4

United States District Court
for the
District of Utah
February 10, 1998


* * MAILING CERTIFICATE OF CLERK * *


Re:  2:97-cv-00425



True and correct copies of the attached were mailed by the clerk to the
following:


        Mr. Thomas M Melton, Esq.
        SEC
        50 S MAIN STE 500
        500 KEY BANK BLDG
        SALT LAKE CITY, UT  84144-0402

        Robert M. Fusfeld, Esq.
        SECURITIES AND EXCHANGE COMMISSION
        1801 California St., #4800
        DENVER, CO  80202

        Mr. Nathan W Drage, Esq.
        50 W BROADWAY STE 1130
        SALT LAKE CITY, UT  84101-2006

        Robert H. Bretz, Esq.
        520 WASHINGTON BLVD #428
        MARINA DEL RAY, CA  90292

        Vincent L. Verdiramo, Esq.
        VERDIRAMO & VERDIRAMO
        3163 KENNEDY BLVD
        JERSEY CITY, NJ  07306

        Mr. Bryon J Benevento, Esq.
        VAN COTT BAGLEY CORNWALL & MCCARTHY
        50 S MAIN STE 1600
        PO BOX 45340
        SALT LAKE CITY, UT  84145
        FAX 9,5340058

        Mr. Stewart C. Walz, Esq.
        US ATTORNEYS OFFICE - UTAH

        FAX 9,5246925

EXHIBIT 3 

DAVID J. SCHWENDIMAN, United States Attorney (2889)
STEWART C. WALZ, Assistant United States Attorney (3374)
Attorneys for the United States of America
185 South State Street, #400
Salt Lake City, Utah 84111-1506
Telephone: (801) 524-5682
Facsimile: (801) 524-6924

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | CASE NO. 2:97 CV 00425 S |
| Plaintiff, | : | |
| vs. | : | STIPULATION ON INTERVENTION AND STAY OF CIVIL CASE |
| PANWORLD MINERALS INTERNATIONAL, INC. ET AL. | : | |
| Defendants. | : | |

On October 3, 1997, the United States filed a Motion to
Intervene in the above captioned case and to stay the proceeding
in the case pending the outcome of its criminal investigation.
The defendants Robert Weeks, Kenneth Weeks, David Hesterman,
Joseph Fabiilli, Larry Krasny, Randall Gilbert, and L. K.
Management, Inc. and Puritian Communications, Inc. responded
through their counsel Robert Bretz. The other defendants named
in the case did not respond to the Motion of the United States.

All of the responding defendants, except Randall Gilbert,

**ORIGINAL**

consented to the intervention by the United States and the stay

of the proceedings.  Mr. Gilbert objected to the stay.  Mr.

Gilbert and the Security and Exchange Commission have reached an

agreement to dismiss the case against Mr. Gilbert without

prejudice, contingent upon Mr. Gilbert's signing a tolling

agreement. Mr. Gilbert's objection to the stay of the proceedings

is now rendered moot.

ACCORDINGLY, it is hereby stipulated:

1.   that the responding defendants Robert Weeks, Kenneth

Weeks, David Hesterman, Joseph Fabiilli, and Larry Krasny and the

entities L.K. Management and Puritian Communications consent to

the intervention by the United States;

2.   the aforesaid responding defendants and entities

stipulate and agree that proceedings in this case will be stayed

pending resolution of the criminal investigation.

DAVID J. SCHWENDIMAN
United States Attorney

STEWART C. WALZ
Assistant United States Attorney

THOMAS M. MELTON
Securities and Exchange Commission

ROBERT H. BRETZ
Responding Defendants

consented to the intervention by the United States and the stay

of the proceedings. Mr. Gilbert objected to the stay. Mr.

Gilbert and the Security and Exchange Commission have reached an

agreement to dismiss the case against Mr. Gilbert without

prejudice, contingent upon Mr. Gilbert's signing a tolling

agreement. Mr. Gilbert's objection to the stay of the proceedings

is now rendered moot.

ACCORDINGLY, it is hereby stipulated:

1.  that the responding defendants Robert Weeks, Kenneth

Weeks, David Hesterman, Joseph Fabiilli, and Larry Krasny and the

entities L.K. Management and Puritan Communications consent to

the intervention by the United States;

2.  the aforesaid responding defendants and entities

stipulate and agree that proceedings in this case will be stayed

pending resolution of the criminal investigation and proceeding, if ~~the~~

any, resulting therefrom.

DAVID J. SCHWENDIMAN
United States Attorney


STEWART C. WALZ
Assistant United States Attorney


THOMAS M. MELTON
Securities and Exchange Commission


ROBERT H. BRETZ
Responding Defendants

COPY                                    EXHIBIT 4

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           )
DYNAMIC AMERICAN           )   File No. D-2049
CORPORATION               )

WITNESS:  Robert E. Cordes

PAGES:    1 through 234

PLACE:    Board Room, Suite 3000
          Thanksgiving Tower
          1601 Elm Street
          Dallas, Texas

DATE:     Wednesday, January 27, 1999

        The above-entitled matter came on for hearing at 9:00
a.m., pursuant to notice.


APPEARANCES:

On behalf of the Securities and Exchange Commission:

        CARLEEN H. ACHUFF
        Regional Geologist
        1801 California Street, Suite 4800
        Denver, Colorado 80202-2658
        (303) 844-1098

        LESLIE HENDRICKSON, ESQ.
        1801 California Street, Suite 4800
        Denver, Colorado 80202-2658
        (303) 844-1000

On behalf of the Witness:

        INDRAJIT "BOBBY" MAJUMDER, ESQ.
        Gardere & Wynne
        3000 Thanksgiving Tower
        Dallas, Texas 75201
        (214) 999-4268



SECURITIES AND EXCHANGE COMMISSION
RECEIVED
FEB 1 0 1999
CENTRAL REGIONAL OFFICE


DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45672

1          MR. MAJUMDER:  Oh, 214/999-3000.

2          MS. ACHUFF:  Thanks.

3          MS. HENDRICKSON:  Mr. Cordes, I'm Leslie

4    Hendrickson, and I'm here participating both as a member of

5    the Securities and Exchange Commission, but also as a Special

6    United States Attorney for the District of Utah, and your

7    appearance here was part of an agreement that you would

8    testify here rather than in front of the grand jury.  Is that

9    correct?

10          THE WITNESS:  That's correct.

11          MS. HENDRICKSON:  And you understand that the

12   testimony you give today is not subject to the same kinds of

13   confidentiality protections that grand jury testimony would

14   be subject to.  Do you understand that?

15          THE WITNESS:  Yes.

16          MS. HENDRICKSON:  ~~And you consent to~~ me

17   participating today.

18          THE WITNESS:  Yes.

19          MS. HENDRICKSON:  Thank you.

20          MS. ACHUFF:  A couple of just preliminary matters:

21   As you can see, your testimony and everything that we say

22   here today will be recorded.  In the interest of creating a

23   clear record it's best if we just have one person speaking at

24   a time, so I'll try to avoid talking over you, and if you can

25   do the same, that will help things out.

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45680

12

1      A      No.

2      Q      Do you have a cell phone?

3      A      No.   Sorry.   I do have a cell phone, but I only

4   use it on my boat, and it doesn't ring at the house.

5      Q      Okay.   Do you recall the cell phone number?

6      A      No, I don't.

7      Q      Okay.   Are you married?

8      A      Yes.

9      Q      And what is your wife's name?

10     A      It's Wenche, W-E-N-C-H-E, J. Cordes.

11     Q      And what was her maiden name?

12     A      Kubon, K-U-B-O-N.

13     Q      And for how long have you been a resident of the

14   Bahamas?

15     A      Since 1963.

16     Q      Continuously since that time?

17     A      Yes.

18     Q      What is your business address?

19     A      Second floor, CitiBank Building, Freeport,

20   Bahamas.

21     Q      And is there also a PO box?

22     A      Yes.   Post Office Box F42544.

23     Q      And what is the business at that address?

24     A      Management and Service Company, Limited.

25     Q      And does that company also go by an acronym?

45683

13

1        A    MASCO.

2        Q    M-A-S-C-O?

3        A    Yes.

4        Q    Okay.  So if we used the term MASCO today -- if

5   you use it, will you be using it to stand for Management and

6   Service Company --

7        A    Yes.

8        Q    -- Inc.?  Inc. or Limited?

9        A    Company, Limited.

10       Q    Limited, okay.  Oh, sitting right in front of me.

11   And can you summarize your education for me, starting

12   with graduation from high school or its equivalent?

13       A    Apart from some banking courses conducted through

14   Queens University in Canada, I've had no further formal

15   education.

16       Q    And did you attend high school in --

17       A    In Halifax, Nova Scotia.

18       Q    Tell me just, in general, what was covered in the

19   banking courses that you took.

20       A    Accounting, practical law, commercial law --

21   that's about all I remember; it was a long time ago.

22       Q    And so you would have graduated -- so your working

23   career would have started roughly when?

24       A    1949.

25       Q    Okay.  Recognizing that that's a 50-year period, I

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45684

14

1    don't want to go blow by blow, but can you sort of summarize

2    your work experience?

3         A    In 1949 I commenced employment with the Bank of

4    Nova Scotia in Halifax and worked at a dozen or so branches

5    in Canada before being transferred to Nassau in 1963 and

6    Freeport in 1965, and I resigned from the Bank of Nova Scotia

7    in 1968.

8              In 1968 I joined the Port Authority group of

9    companies, a Freeport-based firm, and worked in several of

10   their subsidiary companies.

11             In 1971 I commenced employment with another group

12   in Freeport, a Norwegian-based group that were into a number

13   of enterprises.  I was in their banking division.  The bank

14   was involuntarily liquidated in 1978, and in 1978 I purchased

15   Management and Service Company, where I have been occupied

16   since.

17        Q    You say you purchased MASCO.

18        A    Yes.

19        Q    Do you continue to own MASCO today?

20        A    May we go off the record for a moment?

21        Q    Is there -- we can.  Is there anything in my

22   question that is difficult for you to --

23        A    I'd like to have a discussion with my attorney.

24             MS. ACHUFF:  Okay.  We'll go off the record for a

25   moment.

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45685

15

1              (Discussion off the record.)

2              MS. ACHUFF:  We're back on the record after just a

3    short break.

4              BY MS. ACHUFF:

5        Q    Mr. Cordes, you were explaining sort of the

6    details of the ownership.  As I understand it, MASCO is owned

7    by a trust of which you are trustee, and there has been no

8    change in the ownership of MASCO since 1978 to date.  Is that

9    correct?

10       A    That's correct.

11       Q    Okay.  I think that's all that I'm concerned with.

12             Aside from yourself, are there any other persons

13   who have -- yourself in your capacity as trustee, are there

14   any other persons who have an ownership interest in MASCO?

15       A    No.

16       Q    Okay.  What is the business of MASCO today -- or

17   actually, let's start with '78.  At the time that you

18   purchased or became associated with the company, what was

19   it's business?

20       A    In 1978 it really didn't have scarcely any

21   commercial activity; it served as local registered office for

22   half a dozen Bahamian companies, and that was all it did in

23   '78.  Over the years, through various contacts, I've enlarged

24   the business.  It forms corporations in various

25   jurisdictions, provides nominee officers and directors for

21

1    A    Yes.

2    Q    Okay.  Any other involved in the management

3    level -- officer and director level of MASCO?

4    A    No.

5         MS. ACHUFF:  I'm going to have the reporter mark a

6    new exhibit, and also I realized that I neglected to have the

7    reporter mark Exhibit 121, Mr. Cordes' Form 1662, so I'll ask

8    the reporter at this point to place his initials and the date

9    on Exhibit 121.

10        I've had the reporter mark Exhibit 122.  This is a

11   subpoena duces tecum addressed to Robert E. Cordes.  It's

12   dated December 14, 1998, signed by Carleen H. Achuff.  The

13   exhibit consists of a cover page, the subpoena itself, and

14   two pages of attachments.

15                              (SEC Exhibit No. 122 was marked

16                                   for identification.)

17        BY MS. ACHUFF:

18   Q    Handing you Exhibit 122, Mr. Cordes, is this the

19   subpoena pursuant to which you are appearing here today?

20   A    Yes.

21   Q    And it gives your address as Freeport, Bahamas,

22   and at the top notes that it was served by personal service.

23   As much as I would have liked to have done so, did I serve it

24   on you in Freeport, Bahamas?

25   A    No, you did not.

22

1      Q    And were did I serve you this?

2      A    In Fort Lauderdale, Florida.

3      Q    And was that on December 15, 1998?

4      A    Yes.

5      Q    Okay.  And we'll just note for the record that the

6    subpoena originally called for Mr. Cordes' testimony in

7    Denver on January 12, and by arrangement between us, we

8    rescheduled it for today in Dallas.

9             The subpoena, Exhibit 122, calls for the

10   production of a large number of documents.  Have you tendered

11   to the staff all of the documents called for by Exhibit 122?

12     A    With the exception of the matter I referred to in

13   my second letter to you.

14     Q    And I'm not going to mark this as an exhibit, but

15   I'm placing in front of Mr. Cordes a letter on the letter of

16   Management and Service Company, Limited, dated January 11,

17   1999, addressed to me.  It's been marked as page 11006.

18     A    With the exception of the material requested for

19   X-Stra Graphics, I have produced everything required or

20   requested.

21     Q    Okay.  And I think there were also some documents

22   requested relating to a company called Andrew Industries,

23   Inc.

24     A    Yes.

25     Q    And in your first cover letter I think you said

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45693

30

1    investigation?

2              THE WITNESS:  No.

3              MS. ACHUFF:  I'm going to hand you a document that

4    has been marked as Exhibit 125.  It's a multi-page document,

5    the pages of which have been Bates-stamped 11679 through

6    11711, inclusive.  The first page reads, "Island of Nevis

7    Office of the Registrar of Companies Endorsement Certificate

8    for Canyon Corporation."  It's date September 23, 1994.

9                              (SEC Exhibit No. 125 was marked

10                              for identification.)

11             BY MS. ACHUFF:

12        Q    Is Exhibit 125 a document that you provided to the

13   SEC pursuant to subpoena?

14        A    Yes.

15        Q    What is it, please?

16        A    The first six pages constitute the incorporating

17   documents issued in the Island of Nevis for the formation of

18   Canyon Corp:

19        Q    So that takes us through 11684.

20        A    Yes.

21        Q    Let's hold off for a moment on the remaining --

22   actually, go right ahead, if you'll just describe for me what

23   the remaining pages are.

24        A    11687 and -8 is a corporate resolution; actually,

25   it's the minutes of the -- organizational minute to complete

                DIVERSIFIED REPORTING SERVICES, INC.
                        (202) 296-2929

                                              45701

31

1    the formation of the corporation.  11689 is part of the

2    incorporating documents produced in Nevis, as are the bylaws,

3    which start on 11690 through 11698.

4              The documents starting at 11701 through 11707 are

5    the -- contain the corporate resolution authorizing the

6    establishment of a bank account at Canadian Imperial Bank of

7    Commerce in Freeport.  The rest are copies of the documents

8    prepared for and given to the bank.

9              11708 and -9 and -10 and -11 are part of the

10   minutes done to complete the formation and establishment of

11   the company:  appointment of directors, et cetera.

12             11685 and -6 is the first annual meeting of the

13   company, and 11700 is the annual meeting of the board of

14   directors, and 11699 is a copy of a resolution issued by the

15   directors.

16        Q    Okay.  Since it's before you, looking at page

17   11699, there is what purports to be the signature of Lynn

18   Turnquist.  Have you seen Lynn Turnquist's signature before?

19        A    Yes.

20        Q    Does that appear to be a facsimile of her

21   signature?

22        A    Yes.

23        Q    The documents that comprise Exhibit -- the

24   individual documents that comprise Exhibit 125 -- are these

25   typical of the documents that are created when MASCO forms a

32

1    corporation?

2        A    Yes.

3        Q    Okay.   MASCO is in the Bahamas.

4        A    Yes.

5        Q    And you're located in the Bahamas.   Why was Canyon
6    Corporation formed in Nevis?

7        A    MASCO forms the majority of their companies in
8    Nevis, for the simple reason that the company formation
9    department in Nevis is about the most efficient we know, and
10    we can form a company in Nevis in less than a day.

11        Q    So it's an expediency decision.

12        A    Yes.

13        Q    Is there any other reason to choose Nevis?

14        A    No.

15        Q    Page 11684 is on the letterhead of a company
16    called Morningstar Holdings, Limited, and the document is
17    entitled Designation and Acceptance of Registered Agent.
18    What is Morningstar Holdings, Limited?

19        A    They are the agents that we employ in Nevis to
20    form corporations in Nevis.

21        Q    And this -- are they the ones that MASCO typically
22    goes through in Nevis to form corporations?

23        A    The only ones that we go through.

24        Q    And why do you use an agent to help form the
25    corporations?

33

1      A    Up until very recently, Morningstar Holdings,

2    Limited, had an exclusive from the Nevis government for

3    corporation formations, and nobody else could form them.

4      Q    Must have been a very lucrative arrangement.

5           Okay.  So that's recently changed?

6      A    I believe that another firm has obtained the

7    authority or ability to provide the same service, but we

8    don't use them.

9      Q    Do you recall the name of that other entity?

10     A    No.

11     Q    Now, the various documents that -- continuing on

12    in Exhibit 125, the minutes of the organizational meeting,

13    transfer of subscription rights that appears at 11689 -- are

14    these all -- is this sort of a canned procedure, if I can use

15    that expression?

16     A    Yes.  Very much so.  They're all -- every Nevis

17    company we form, we go through this -- we receive the same

18    type of documents, and we do the same minutes; it's very

19    boilerplate.

20     Q    Okay.  Who is Conrad Smithen, S-M-I-T-H --

21     A    A little girl in Nevis --

22     Q    -- E-N?

23     A    -- that signs every company that's formed.

24     Q    A little girl?

25     A    I'm sorry.  A lady in the office there that is a

1    Nevis citizen that works for Morningstar Holdings.

2         Q    I see.  So Conrad L. Smithen is actually --

3    despite the fact that Conrad I normally think of as a man's

4    name -- that actually is her name --

5         A    Yes.

6         Q    -- this woman.  Okay.  And so she is, in a sense,

7    acting for Morningstar in being the person who signs?

8         A    Well, she's -- an individual has to create -- has

9    to, I believe, sign the articles.  Yes.  You'll see her

10   signature on 11682 --

11        Q    I see.

12        A    -- as being the incorporator.  So she comes by way

13   of owning one share by being the incorporator.

14        Q    And then what happens to that one share?  That's

15   one share of --

16        A    That's -- at the organizational meeting we

17   theoretically assign that to the directors for further

18   issuance.

19        Q    Are there ever any other shares issued of the --

20   and is that the case with all of the client corporations?

21        A    Yes.

22        Q    And is there ever --

23        A    All the Nevis corporations.  Yes.

24        Q    And for the Nevis client corporations of MASCO,

25   are there ever any additional shares of those corporations

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45705

35

1    issued?

2        A    Occasionally, yes.

3        Q    Is that more the exception than the rule?

4        A    Yes.

5        Q    And so as a general matter, the sole share of the

6    client corporation, does that remain with persons connected

7    with MASCO?

8        A    It remains, as stated in the -- on the second page

9    of the organizational meeting minutes --

10       Q    Page 11688?

11       A    Yes.  That it's transferred to the directors for

12   further handling, and it stays in that state unless it is

13   retransferred to somebody else.

14       Q    Now, that's specifically with respect to Canyon

15   Corporation.  Is that the case in general?

16       A    Yes -- not in general; with every corporation at

17   that point, yes.

18       Q    On page 11688, as long as we're looking at that,

19   there is a signature line for Robert E. Cordes, transferee of

20   sole incorporator's one share of common stock.  Is that your

21   signature appearing?

22       A    Yes, it is.

23       Q    And likewise, the signature for Lynn Turnquist?

24       A    Yes.

25       Q    Page 11685 -- if you'll turn to that for a moment.

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45706

36

1          A     (Complying.)

2          Q     And I'll just note for the record that although

3     all of the pages are in the interval that I cited when I

4     introduced the exhibit, they are not necessarily in straight

5     numerical order; we reordered them to -- generally to put

6     things in chronologic order.

7               On 11685 there are -- the names of two entities

8     are given as being elected directors of Canyon Corporation.

9     The first is Corporate Directors, Limited.  What is Corporate

10    Directors, Limited?

11         A     Both Corporate Directors, Limited, and Directorial

12    Management, Limited, are in exactly the same category as the

13    earlier companies we discussed:  MASCO Services, Limited, and

14    MASCO, Limited.

15         Q     So these are subsidiaries of MASCO?

16         A     Yes.

17         Q     And is it the case that Corporate Directors,

18    Limited, and Directorial Management, Limited, were created --

19    their function is to serve as nominee officers and directors?

20         A     Yes.

21         Q     Who are the officers and directors of Corporate

22    Directors, Limited?

23         A     I don't know, but I am probably the president of

24    both, and another MASCO employee would be the secretary, and

25    the directors would be MASCO, Limited, and MASCO Services,

1    Limited.

2          MR. MAJUMDER:  I don't know how you keep all this

3    straight.  Obviously you don't either.

4          THE WITNESS:  I don't.

5          BY MS. ACHUFF:

6      Q    On the second-to-the-last page of Exhibit 125

7    there are the minutes of the annual meeting of the board of

8    directors of Canyon Corporation held on September 28, 1995.

9    According to this page, you are -- you were appointed

10   president of Canyon Corporation, and Lynn Turnquist was

11   appointed secretary.  Am I reading that correctly?

12     A    Yes.

13     Q    Throughout -- first of all, is Canyon Corporation

14   still in existence as an entity?

15     A    I'm sorry; I don't know.

16     Q    Let me show you what's been marked as -- oops; I

17   think we missed one.  I'll have the reporter mark Exhibit

18   126.

19                          (SEC Exhibit No. 126 was marked

20                           for identification.)

21          MS. ACHUFF:  Exhibit 126 is a one-page document

22   Bates-stamped page 11678.  It appears to be -- it's entitled

23   Declaration of Annulment for Canyon Corporation.

24          BY MS. ACHUFF:

25     Q    Is Exhibit 126 a document that you provided to the

38

1    SEC?

2         A    Yes.

3         Q    And what is it?

4         A    It confirms that the company has, I believe,

5    ceased to exist in Nevis, effective September 23, 1994.

6         Q    Okay.  And I'm going to ask a favor:  During our

7    testimony here today we're going to be referring to a large

8    number of companies, and if -- we all have this habit of

9    saying "the company," but if at all possible, if we can both

10   try to give the full name or at least some shortened name

11   like Canyon, it's going to make things a lot easier.

12         And, actually, looking at Exhibit 126, I wonder if

13   you misspoke on the date.  Was September 23, 1994, the date

14   on which Canyon was incorporated, and was it in fact annulled

15   on another date?

16         A    Yes.  I'm sorry.  I misread it.  The annulment

17   date apparently is the 11th of November 1996.

18         Q    Okay.  Through the period of its existence, did

19   you continue to be president of Canyon Corporation, as

20   indicated at the -- in the minutes of the annual meeting that

21   we were just looking at?

22         A    I believe so.

23         Q    And throughout its existence, did Lynn Turnquist

24   continue to be secretary of Canyon Corporation?

25         A    I believe so.

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929                    45709

39

1    Q    Okay.  Is there anything in what we have looked at

2    that refreshes your recollection about how it is that MASCO

3    came to have Canyon Corporation as one of its client

4    corporations?

5    A    No.

6    Q    Okay.  Where did the name Canyon Corporation come

7    from?  How was that name chosen?

8    A    I have no idea.

9    Q    Among the documents that are in Exhibit 125 are

10   documents related a bank account for the corporation at

11   Canadian Imperial Bank of Commerce in Freeport, which I'll

12   abbreviate as CIBC, along with, I imagine, a large number of

13   other people.

14   A    If I could just comment on that, that's correct.

15   We all call it CIBC.  At the time the account was opened in

16   1994, the bank was Canadian Imperial Bank of Commerce; it

17   subsequently Bahamianized itself, and it's now CIBC Bahamas,

18   Limited, controlled by Canadian Imperial Bank of Commerce,

19   Canada.  But I think for our purposes it would be accurate

20   enough to still call it CIBC.

21   Q    Okay.  Let's continue to do that; it's a lot less

22   of a mouthful.

23        Who made the decision, first of all, to open a

24   bank account for Canyon Corporation?

25   A    Not recalling the precise details of the reason

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45710

40

1    for the formation, we were either -- MASCO was either

2    requested by the people that requested us to form Canyon

3    Corporation to also establish a bank account, or for reasons

4    that were self-apparent to us at the time, we decided it was

5    appropriate, and we proceeded to form the account.

6              CIBC would have been selected because we -- MASCO

7    conducts the majority of its business -- banking business

8    with CIBC.

9         Q    Any particular reason for the choice of that

10   particular bank?

11        A    Because we've been dealing with them for 20 years.

12        Q    Let me hand you a document that's been marked as

13   Exhibit 127.

14                              (SEC Exhibit No. 127 was marked

15                              for identification.)

16             MS. ACHUFF:  This is a two-page exhibit; the pages

17   have been stamped 11601 and 11602.  The first page is on the

18   letterhead of Management and Service Company, Limited; the

19   second on the letterhead of Morningstar Holdings, Limited.

20             BY MS. ACHUFF:

21        Q    Did you provide these two pages to the Commission

22   pursuant to subpoena?

23        A    Yes, I did.

24        Q    And what are we seeing in Exhibit 127?

25        A    The -- 11601 is a copy of MASCO's typical invoice

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45711

41

1    or statement of account to the company, Canyon Corporation,

2    or to one of the individuals to whom we would seek payment

3    for fees for Canyon Corporation.  In this instance it's

4    addressed to Mr. Kenneth L. Weeks.  It indicates a fee for

5    the formation of Canyon Corporation totalling $2500.

6            There are some handwritten notes at the bottom of

7    the page that is in my handwriting, and while I don't have a

8    recollection of the event in 1994, I can read that I have

9    noted MASCO was apparently paid from the sale of shares

10   $2000, and then -- leaving a balance of $500, and then paid

11   on March 2, 1995.

12           I'm not sure whether that means the $500 was paid

13   on March 2, '95, or not.  There's another note of $1000 being

14   added to the balance outstanding; the notation, Share

15   transaction, share transfer, or something to that effect, and

16   a further note that the total, which was apparently $1500,

17   was paid by a check on CIBC.

18       Q    Okay.  And all of those notations are in your

19   handwriting?

20       A    Yes.  There's another notation I didn't refer to,

21   on the very bottom right, which I believe is Wahoo.

22       Q    W-A-H-O-O?

23       A    Yes.

24       Q    Turn for a moment to the second page of Exhibit

25   127, the one on Morningstar Holdings, Limited.  This appears

45712

42

1    to be a transmittal letter for copies of articles of

2    incorporation for Canyon and another company called Zeus,

3    Limited.  Is Zeus, Limited, another client corporation of

4    MASCO's?

5        A    I believe so.  It would have been formed at the

6    same time as Canyon Corp., and the incorporating documents

7    were obviously transmitted to us under the same cover.  I

8    don't believe that there was any other relationship between

9    Canyon Corp. and Zeus Limited.

10       Q    So just the timing.

11       A    Yes.

12       Q    The first page of Exhibit 127, the one you've

13   described as an invoice, is address to Mr. Kenneth L. Weeks.

14   Who is Mr. Weeks?  Who is Kenneth L. Weeks?

15       A    A gentleman that resides, I believe, in Salt Lake

16   City, or near there, that has conducted business with MASCO

17   for some years.

18       Q    To the best of your recollection, when did Ken

19   Weeks first begin conducting business with MASCO?

20       A    I really don't know, but I believe it was in the

21   early 1990s.

22       Q    Do you have a recollection of how it is that you

23   came to do business with Ken Weeks?

24       A    I anticipated that question, so I've been thinking

25   about the answer for some time, and I really do not recall

43

1    how Kenneth Weeks ended up in our office.  He had to have

2    been introduced by somebody else, but I don't recall.

3        Q    Is there any possibility that Ken Weeks was

4    introduced to MASCO through Richard Mallion, the person whom

5    you associate with Andrew Industries?

6        A    That's certainly a distinct possibility, but I

7    couldn't say yes to that.

8        Q    And why is the invoice in Exhibit 127 addressed to

9    Ken Weeks?

10       A    Because we would associate him as being a person

11   directing the affairs of Canyon Corporation, insofar as MASCO

12   was concerned.

13       Q    And what would cause -- or what did cause MASCO to

14   associate Ken Weeks as a person directing the affairs of

15   Canyon Corporation?

16       A    In light of this invoice and our last brief

17   discussion, I don't understand the question.

18       Q    Okay.  Is it your recollection that Ken Weeks

19   approached MASCO about forming Canyon Corporation?

20       A    To be honest, I don't have any recollection of him

21   approaching us and asking us to form Canyon Corporation, but

22   the -- MASCO's records certainly indicate that that happened.

23       Q    As  a general practice at MASCO, when -- is it

24   part of MASCO's general practice to prepare invoices similar

25   to the first page of Exhibit 127?

45714

44

1    A    Yes.

2    Q    And does MASCO have a general practice about who

3    they address those invoices to?

4    A    It's not a consistent practice.  In many cases the

5    invoice would be prepared addressed to the subject company,

6    as opposed to an individual, and there's no rhyme nor reason

7    to that; it just happens.  But in this instance, as you see,

8    it's addressed to Kenneth Weeks.

9    Q    Do you have -- with respect to the formation of

10   Canyon Corporation, looking just at Canyon, do you have a

11   recollection about whether you had a face-to-face meeting

12   with any person or persons at the very beginning when you

13   were asked -- when MASCO was asked to set up Canyon

14   Corporation?

15   A    No, I don't.

16   Q    Okay.  Do you have a recollection of whether there

17   was a telephone conversation?

18   A    No.  I really have no recollection, none, on what

19   caused us to do what we obviously did.

20   Q    Do you know who chose the name Canyon Corporation?

21   A    No.

22   Q    Did MASCO choose it?

23   A    I said I don't know, and I don't know.  I could

24   expand and say that we -- in the running of our business, we

25   have a list of names that are approved and reserved for us in

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45715

1    Nevis, and we know we can use the name as a company in

2    process of formation immediately and will do this from time

3    to time.

4        And if somebody requested the name of a company that

5    was -- you know, could be formed that day or the next day, we

6    would offer a selection of names.  I don't know whether this

7    is that or whether we were asked if we would see if the name

8    was available and then proceeded to form it.  I don't know.

9        Q    Regarding your handwritten notations on the bottom

10   of page 11601, do you have a recollection of what shares were

11   sold to provide the initial $2000 payment, the notation that

12   you have made?

13       A    No.  I'm sorry.  I have no recollection at all.

14       Q    Okay.  And do you have a recollection what account

15   at CIBC was debited to pay for the -- what appears to be the

16   balance of $1500?

17       A    No.

18.      Q    Now, as part of your -- as part of MASCO's

19   services for Canyon, did it in fact set up a bank account at

20   CIBC?

21       A    Yes.

22       Q    And have you provided to the staff documents

23   relating to that bank account?

24       A    Yes.

25       Q    I'll have the reporter mark Exhibit 128.

46

1              (SEC Exhibit No. 128 was marked

2                  for identification.)

3          MS. ACHUFF:  Exhibit 128 is a multi-page document,

4     the pages of which have been Bates-stamped as 11524 through

5     11600, inclusive.  Right now they are not physically bound

6     together in any fashion, in part just to make it a little

7     easier to deal with.

8              BY MS. ACHUFF:

9     Q      Handing you Exhibit 128, can you identify it?

10    A.     These are the documents that MASCO forwarded to

11    your offices, and they constitute the records we have of the

12    CIBC bank account of Canyon Corporation with all the

13    supporting evidence that we could locate and provide for you

14    with respect to debits and credits.

15    Q      Now, with respect to the documents that MASCO

16    provided through you pursuant to the subpoena, could you

17    describe the search that was made for the documents called

18    for by the subpoena?

19    A      Yes.  We have a -- MASCO maintains a bank file for

20    each client corporation that has a bank account, and in the

21    account -- in that file are normally all the bank statements

22    received, copies of instructions given to the bank with

23    respect to payments, disbursements, provision of documents;

24    copies of advices from the bank with respect to incoming

25    payments, deposits and, more specifically with respect to our

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45717

47

1    search, pursuant to your request, we went a little further

2    than that; we -- our files are not always perfect, and we saw

3    that there were some debit and credit entries for which there

4    was no evidence of backup in the bank file, so we searched

5    other pertinent areas of the office and located all that we

6    could.

7        Q    And when you say you searched other pertinent

8    areas, what would those other pertinent areas consist of?

9        A    Boxes of items remaining -- not filed; other bank

10   accounts where things were misfiled; Canyon Corporation's

11   other files that may have contained the type of information

12   that was missing.

13       Q    In addition to maintaining a bank file for each

14   client corporation, are there other files that MASCO

15   maintains on a regular basis for its client corporations?

16       A    Yes.  We would have a separate file for the

17   minutes and normally a separate file for invoices, in which

18   other correspondence of any kind would be filed.

19       Q    Is there a file -- do you, as a general practice,

20   maintain a file for incorporation documents?

21       A    Yes.

22       Q    Any other files?

23       A    We'd have a file for share certificates if we

24   issued them.

25       Q    So those would be certificates of the client

45718

48

1    corporation?

2            A    Of, for example, client corporation.  Yes.

3            Q    In the documents that were provided to the SEC

4    there are no share certificates of Canyon Corporation.  Do

5    you have a recollection of whether Canyon Corporation itself

6    ever issued shares other than the one incorporator's share?

7            A    Was a request for such things on your --

8            Q    It may not have actually been included.  It was

9    not included specifically.

10           A    I don't think, then, as a result -- had shares

11   been issued, we would have provided you a copy of them, but I

12   don't believe they were issued anyway.

13           Q    Okay.  The subpoena, Exhibit 122, does call for

14   the production of documents sufficient to identify all

15   officers, directors, control persons, 5-percent or greater

16   shareholders, and persons having a beneficial interest in --

17   and then there's a whole list of corporations, including

18   Canyon Corporation.

19               Have you tendered to the staff all of the

20   documents in the custody, possession, or control of MASCO

21   that would be responsive to that item as far as Canyon goes?

22           A    Yes.  And I might state that, had there been share

23   certificates issued, in all likelihood they would have been

24   bearer share certificates, which would not indicate who the

25   owner would be.

45719

49

1      Q    That's the general practice?

2      A    Yes.

3      Q    Aside from -- let me back up.

4           Exhibit 128 is documents for account number 03010-

5      19 at CIBC in the name of Canyon Corporation.  Aside from the

6      account reflected in the documents in Exhibit 128, has Canyon

7      Corporation ever had any other bank account?

8      A    Not to my knowledge or recollection.

9      Q    Now, looking back at Exhibit 127, the first page

10     of that exhibit, which is the invoice addressed to Ken Weeks,

11     the notations that you've made at the bottom of a $1500

12     payment by check on CIBC -- in looking at the documents that

13     were provided in Exhibit 128, the Canyon bank account, I

14     didn't see what appeared to be any checks on that account

15     made out to MASCO or any persons whose names I recognize as

16     being connected with MASCO.

17          Is there anything that would help us learn where

18     that check came from, that $1500 check?

19     A    Nothing that I know of that is here.

20     Q    In your mind, do you associate Canyon Corporation

21     with any other of MASCO's client corporations?

22     A    Yes.

23     Q    And what association do you have?

24     A    May I see the subpoena?

25     Q    Sure.

50

1      A    I associate with Canyon Corporation Stockton,

2  Limited; Hamilton, Limited, and that's all.

3      Q    That's all on the list on Exhibit 122?

4      A    Yes.

5      Q    Are there any other corporations that, in your

6  mind, you associate with Canyon besides Stockton, Limited,

7  and Hamilton, Limited?

8      A    Yes.   There are one or two other corporations that

9  I -- that are related to the group, but I just cannot recall

10  their names.

11      Q    Why -- let's leave that aside for a moment, the

12  question of other corporations.

13          Why do you associate Canyon Corporation with

14  Stockton, Limited?

15      A    Simply because I believe that we, MASCO, obtained

16  instructions for the operation of Stockton from Kenneth

17  Weeks.

18      Q    So the common connector is Ken Weeks?

19      A    I believe so.  Yes, that's what I was saying.

20  Yes, I'm quite sure they're both Weeks' companies

21      Q    Just to maybe complete the other entities whose

22  names aren't coming to mind just at the moment, the documents

23  within Exhibit 128 are arranged in chronologic order by

24  month:  the statement for each month and then the various

25  debit and credit items for each month; and then each month's

51

1    group is held together with a staple in the upper left-hand

2    corner, so it makes it a little easier to locate a month.

3            If you will turn to March -- to the group of

4    documents for March 1995, and in particular if you will turn

5    to the second page within that group, page 11565, which is --

6    it's a legal-size, and it's folded under so the --

7        A    585?

8        Q    11565.   Now, you said that to gather the documents

9    that were responsive to the subpoena you went to various

10   files that you've described.   Who conducted that search for

11   documents?

12       A    Sylvia Seymour and Karin Sanchez.

13       Q    At your direction?

14       A    Yes.

15       Q    And then did they show you the documents that they

16   had collected?

17       A    Yes, basically, after the copying machine broke

18   down a few times and they said, Do we have to copy more?

19       Q    And what was your response?   Did they have to copy

20   more?

21       A    Yes.   They had to wait for it to cool down and

22   then copy more.

23       Q    You said that the bank file -- MASCO's bank file

24   for each of its client corporations contains copies of the

25   statements, copies of instructions with respect to payments,

52

1     and copies of advices from the bank.

2              On page 11565, among other things, we're looking

3     at a couple of checks written on the Canyon account:  one to

4     CIBC for $17,025.25, dated, it looks like, March 1 of '95;

5     and another check dated March 2, 1995, for $4000, payable to

6     Aspen Investments, Inc.

7              You see the two checks?

8         A    Yes.

9         Q    In its files for Canyon Corporation, did MASCO

10    have copies of the actual cancelled checks?

11        A    These would be copies of the actual cancelled

12    check.

13        Q    Okay.  And by cancelled, I mean you write a check

14    out, you give it to the payee, the payee sends it through

15    their bank; the bank does its magic on the check, and then

16    the check will return to the payor's bank; in this case,

17    CIBC.

18             Generally, when that happens, there is some

19    electronic coding that's put on the check by the receiving

20    bank, and I don't see that here.

21        A    Not in the Bahamas.

22        Q    Not in the Bahamas?  And so then in its files for

23    Canyon does MASCO have copies of the actual, physical check

24    that was returned to CIBC?

25        A    I believe that we would have the originals of

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45723

53

1    these two items.

2        Q    Okay.  And would that be the case for any actual

3    check, as opposed to a wire draft?

4        A    Normally, yes.

5        Q    That you would have the originals.

6        A    Yes.

7        Q    I directed your attention to this particular page,

8    11565, because of a check written out to Aspen Investments,

9    Inc.  I was wondering if that was one of the companies that

10   you associate with Canyon.

11       A    No.  Aspen Investments, Inc., is another company

12   in the MASCO, Limited/MASCO Services category.  It maintains

13   bank accounts in the Bahamas to facilitate a number of

14   different transactions.

15            We prefer to use nominee companies rather than put

16   a lot of transactions through Management and Service

17   Company's bank accounts because of a local Bahamian

18   regulation regarding Bahamian companies not being permitted

19   to have US dollar accounts, and MASCO has Central Bank of the

20   Bahamas' approval to have a US dollar account, but we have to

21   provide explanations for everything that goes through it on a

22   monthly basis, so we use nominee companies to also have bank

23   accounts, really at the sole ownership and direction of

24   MASCO.

25            I have no idea what this $4000 represents, but in

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45724

54

1    all likelihood it represents -- that doesn't appear to be

2    fees, but it might be fees for -- it might be part of that

3    whatever was owing on the Canyon Corp. invoice and another

4    company.

5         But Aspen Investments is not in any way related to

6    Canyon Corp.

7         Q    Are you -- are you related -- you, as an

8    individual, related to Aspen Investments, Inc.?

9         A    Yes.

10        Q    And what is your relationship?

11        A    I'm president and director.

12        Q    Turn back to the beginning of Exhibit 128, the

13   Canyon bank documents.  Looking at the month of November

14   1994, which is the first month that actually transacted any

15   business in the account, page 11595 are copies of some credit

16   advices; funds coming into Canyon's account.  You see those?

17        A    Yes.

18        Q    There are funds coming in in two instances. a

19   total of $25,000 from a company called Puritan Communication,

20   Inc.  Do you know anything about Puritan Communication, Inc.?

21        A    I don't recall anything about the name now.

22        Q    Okay.  Do you have any recollection of why Puritan

23   is paying $25,000 to Canyon?

24        A    No.

25        Q    Do you know what the source for those funds

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45725

55

1    were -- what Puritan -- how Puritan got that money to pay

2    Canyon?

3          A    I have no recollection of it and no idea who

4    Puritan is or where they got the money to pay Canyon.

5          Q    Turn two more pages into Exhibit 128.  This is a

6    page marked 11597.  It's an instruction to effect a wire

7    transfer of $20,000 US to Ken Weeks Insurance Services, and

8    there purports to be the signature of Robert E. Cordes.  Is

9    that your signature appearing on that page?

10         A    It's my initial on the second copy of the letter.

11   The original would be held by the bank.

12         Q    And would have had --

13         A    My full signature.

14         Q    -- your full signature.  Okay.  So is it -- is

15   that your general practice when directing a wire transfer,

16   that you retain an initial copy?

17         A    Yes.

18         Q    And you send another copy to the bank.

19         A    We would deliver the original and an initialed

20   copy to the bank and have their acknowledgement in the lower

21   left-hand corner, and they would return that copy to us.

22         Q    Okay.  And so their acknowledgement is by their

23   way of a receipt for having received your instructions.

24         A    Yes.

25         Q    What is Ken Weeks Insurance Services?

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45726

1        A    I have no idea.  It's the payee of this wire

2    transfer.  I don't know if it's a corporation or a trade name

3    or what it is.

4        Q    How is it that you came to direct that this wire

5    transfer of $20,000 to Ken Weeks Insurance be made?

6        A    We would have been requested to have made the

7    transfer --

8        Q    You say you --

9        A    -- by the principals of Canyon Corporation, and we

10    did it.

11        Q    Okay.  And you say you would have been requested.

12    It's just a trick of our language.  Were you in fact

13    requested by the --

14        A    I'm sure we were.

15        Q    Okay.  Whenever Canyon Corporation -- whenever you

16    signed an instruction such as that at 11597 -- whenever you

17    signed an instruction for CIBC to wire money out of Canyon's

18    bank account, did you do so upon instructions from other

19    persons?

20        A    Yes.

21        Q    And how did you obtain those instructions?

22        A    I have no recollection in this instance, but

23    generally it would be by request by telephone from Kenneth

24    Weeks.

25        Q    So Ken Weeks called you up, and what did he --

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45727

57

1    what information did he give you?

2         A    Just the precise information that you would see

3    here:  would request that Canyon Corporation pay $20,000 to

4    Bank One for the account of Ken Weeks Insurance Services.

5         Q    So Ken Weeks called and said, Here's the amount;

6    here's the date; here's the recipient, and here's the

7    receiving account?

8         A    In effect, yes.

9         Q    In effect -- and you're frowning at me.  Am I --

10        A    He -- you mentioned the date.  That would be

11   superfluous; we know what day it is.  He'd phone and say, Do

12   it today.

13        Q    Okay.  I understand.  So --

14        A    Furthermore, because of the fact, as I'm sure

15   you've noticed -- there were -- this was not the solitary

16   wire going to Ken Weeks Insurance Services.  The second and

17   third and fourth times he wouldn't give us the full routing

18   instructions for Bank One or the account number for the

19   payee.

20        Q    So he's just say, 20,000 to Ken Weeks, and you'd

21   know to do it as --

22        A    Insurance Services, yes.

23        Q    Insurance Services.  And was it your general

24   practice to -- with respect to Canyon Corporation, to issue

25   this wire instruction as soon as you could after receiving

58

1    those instructions from Ken Weeks?

2        A    If it was intended to go as soon as possible, yes,

3    it would go that day or the next day.

4        Q    Did anyone else give you instructions -- anyone

5    else besides Ken Weeks give you instructions for disbursing

6    funds from Canyon's CIBC account?

7        A    No.

8        Q    Aside from -- did Ken Weeks -- was it always a

9    telephone call from Ken Weeks?  Did you ever get written

10   instructions in any fashion from him?

11       A    If we received written instructions -- and I think

12   we might have once or twice -- it would be in the documents

13   that I provided to you.  But I would say 99 percent of the

14   instances were telephone.

15       Q    What determined whether the debit item to Canyon's

16   account at CIBC would be done as a wire or as a check written

17   against the account?

18       A    Whatever instructions we received from Kenneth

19   Weeks.  If he requested us to send -- it wouldn't be a check.

20   I might say that -- could we return to the page that had the

21   Aspen Investment check on it?

22       Q    Sure.  It's 11565 in March.

23       A    Okay.  If I could direct you to the check payable

24   to CIBC, there's a little squiggle through there over the

25   bank stamp that says DFT, indicating that it's in payment for

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45729

59

1    a bank draft.

2        Q    I'm sorry.  I'm missing the squiggle.  Can you --

3        A    It's right here.  It says "CIBC," and then there's

4    a space and the "DFT."

5        Q    Oh, right after -- on the payee line it says

6    "CIBC" and then "DFT" is handwritten in after that.  Okay.

7        A    Which indicates that the check was in payment for

8    a bank draft or cashier's check, and I know that bank charges

9    would amount to $25.25, so Canyon Corp. obtained from CIBC

10    that day a bank draft for $17,000, to whom I don't know.

11        Q    From other documents in that group it looks like

12    this one was to American Express.

13        A    Okay.

14        Q    There's -- I don't know the page cite

15    specifically, but there is, as you say, a $17,000 debit item

16        A    The point in my drawing attention to that is to

17    indicate Canyon Corp. nor any of client corporation would

18.    issue a check and mail it or send it to anybody in the US or

19    elsewhere, because they're not negotiable outside the

20    Bahamas.  We'd obtain a bank draft and send that.

21        Q    Okay.  And what would determine whether Canyon

22    obtained a bank draft versus doing a wire transfer?

23        A    The direction of the person we took instructions

24    from for the account.

25        Q    In this case, Ken Weeks.

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45730

1         A    Yes.

2         Q    Do you know why Mr. Ken Weeks in some instances

3    would direct Canyon to do a wire transfer and in other

4    instances direct that a bank draft be sent?

5         A    To answer, no, but I'm sure that the reason -- if

6    the $17,000, for example, was paid by Canyon Corporation by

7    the bank to buy a bank draft to American Express, it was done

8    to pay an American Express bill that's very difficult to pay

9    by wire.

10        Q    Okay.  And there is a bank draft at page 11568 to

11   American Express, or a document --

12        A    That would be it.

13        Q    Yes.  If you would just turn to that page and

14   confirm for me that 11568 -- is that a receipt, if you will,

15   for a bank draft?

16        A    No.  It's --

17        Q    Or a nonnegotiable copy of the bank draft.

18        A    Yes.

19        Q    Okay.  So in the case of a bank draft we have a

20   document of the form that we see at 11568.

21        A    Yes.

22        Q    Okay.  So in that -- so if I understand what

23   you're saying, then, anytime that I see an actual check drawn

24   against Canyon Corporation's account, such as the one to

25   Aspen, that means it's staying within the Bahamas?

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45731

1      A      Yes.

2      Q      Does Ken Weeks have anything to do with Aspen

3   Investments, Inc.?

4      A      No.

5      Q      Did Aspen Investments, Inc., ever disburse any

6   monies to Ken Weeks?

7      A      I don't believe so.

8      Q      And so what would be the purpose in Canyon

9   Corporation paying checks to Aspen Investments, Inc.?

10   There's only the one check for $4000 that was paid.

11      A      I can only speculate that it's payment of fees for

12   Canyon Corporation, possibly some of this balance here, and

13   another corporation.

14      Q      So part of the cost of forming Canyon Corporation.

15      A      Yes.

16      Q      So those would be fees, basically, to MASCO --

17      A      Correct.

18      Q      -- and one of the sub-boxes of MASCO.

19      A      Yes.

20      Q      Okay.   There is another entity that I've seen --

21   and we'll come across it a little later, but I'll bring it up

22   now -- called Oakridge Industries, Limited.   There are

23   checks -- again, this is a situation where there are checks

24   rather than wires written to Oakridge Industries, Limited.

25   What is Oakridge Industries, Limited?

1    A    It's another one of these client corps, and I

2    believe that they have a bank account in CIBC Freeport, and a

3    check to them would have been for that bank account.

4    Q    Okay.  So Oakridge Industries, Limited, is not

5    like Aspen, part of MASCO.

6    A    No.

7    Q    It is a client corporation.

8    A    Yes.

9    Q    Do you make any association between Oakridge

10    Industries, Limited, and Canyon Corporation?

11    A    That's a very broad question.  They have dealings

12    with each other, but I believe that the ownership or control

13    is completely different.

14    Q    Who owns Oakridge Industries, Limited?

15    A    I don't know.  I can't answer that.

16    Q    What is the basis for your belief that the

17    ownership and control of Oakridge Industries, Limited, is

18.    different from that of Canyon?

19    A    I wish I had something here from Oakridge to help

20    my memory, but I believe that Oakridge is a company that is

21    controlled by a man by the name of Fabiilli.

22    Q    Joseph Fabiilli?

23    A    I believe so.

24    Q    And as you sit here now -- and, unfortunately, all

25    I've got in the way of Oakridge documents that you've

45733

63

1  provided are the checks, so I can't offer you anything to

2  refresh your recollection.  But what is it that makes you

3  associate -- or makes you think that Oakridge Industries,

4  Limited, is controlled by Fabiilli?

5       A    Because I believe that we accept telephone

6  instructions from Joseph Fabiilli on Oakridge's account.

7       Q    Do you get telephone instructions from anyone else

8  relating to Oakridge Industries, Limited?

9       A    That's a complex question, because I believe we

10  have received instructions in the past from somebody

11  representing themselves as Joseph Fabiilli but not Joseph

12  Fabiilli.

13       Q    Tell me about that.

14       A    Well, we received the instructions, and I wasn't

15  comfortable with them, and I believe I called Fabiilli and

16  asked him if he'd given these instructions -- and the

17  instructions don't always come to me; they might come to one

18  of the other few people in our office -- and something just

19  didn't seem right.

20            And he said, no, he didn't ask us to do that.

21       Q    Do you have any idea who it was who gave you

22  the --

23       A    I don't to speculate.  It wasn't the Weeks group.

24       Q    The Weeks group.  Who is the Weeks group?

25       A    Well, I believe there are other Weekses.  When you

45734

64

1    served your subpoena on me in Fort Lauderdale, you asked me

2    if I knew a -- I think a Robert Weeks, and I responded in the

3    negative, and I later learned that I believe he's an older

4    brother of Kenneth, but I've never met and never spoken to

5    him, to my knowledge, and have no business relationship with

6    him.

7            And I think I discovered there's more than the two

8    of them, but I'm not sure.

9        Q    More Weekses than just --

10       A    Right.

11       Q    Have you ever heard the name Gray Weeks, G-R-A-Y?

12       A    I think maybe it was in your subpoena.  I've heard

13   the name, but, similar to Robert Weeks, I've never met him,

14   have no connection with him; I don't know who he is.

15       Q    The name Gray Weeks is not in our subpoena.  But

16   that name does seem familiar to you?

17       A    No, not -- I'm sorry.  I said it was familiar, but

18   I shouldn't have.  I'm not sure.

19            MR. MAJUMDER:  The Weeks just sort of run

20   together, huh?

21            MS. ACHUFF:  Don't they all, followed rapidly by

22   the years.

23            MR. MAJUMDER:  Sorry about that.

24            MS. ACHUFF:  I think that's redundant, actually,

25   Mr. Majumder.

65

1          MS. ACHUFF:  Set aside Exhibit 128 for the moment,

2     if you will, and let me hand you -- whoa.  We've got -- I

3     think we have a redundancy here I need to -- let's go off the

4     record just for a moment.

5          (Whereupon, a short recess was taken.)

6          MS. ACHUFF:  We're back on the record after about

7     a ten-minute break.  While we were off the record, Mr.

8     Cordes, did either Ms. Hendrickson or I have any discussion

9     with you or your counsel regarding your testimony or this

10    investigation?

11         THE WITNESS:  No.

12         MS. ACHUFF:  Okay.  And I'll just note for the

13    record that Mr. Majumder is not present, but both he and Mr.

14    Cordes, when we first arrived this morning, said that he

15    might be in and out because of other matters, and we assume

16    that he will join us shortly.

17         BY MS. ACHUFF:

18    Q    Just briefly I want to put Exhibit 126 back in

19    front of you.  This is the declaration of annulment for

20    Canyon Corporation.  And according to the document, the

21    corporation was -- the articles of incorporation were revoked

22    for failure to maintain a registered agent or pay annual fees

23    to the government of Nevis.

24         Who made the decision not -- to cease maintaining

25    a registered agent for Canyon Corporation?

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45736

66

1        A     MASCO would have.

2        Q     And why did -- we're both saying "would have."

3   Did in fact MASCO make the decision?

4        A     Yes.

5        Q     And why did MASCO make that decision?

6        A     Either because they were directed to by Kenneth

7   Weeks, or it was self-evident that the company was no longer

8   required, and MASCO ceased paying fees.

9        Q     Do you recall which was the case in this instance?

10       A     No, I don't.

11       Q     Okay.  The last documents in the Canyon bank

12  account are dated November -- pardon me -- October of 1995.

13  To the best of your knowledge, was that the last time that

14  there were transactions in Canyon's CIBC bank account?

15       A     I'm sorry.  Could you repeat the --

16       Q     Sure.  Let me make it a tad less cumbersome.

17             When we look through Exhibit 128, we see that we

18  have documents extending for November 1994 through October

19  of -- pardon me -- November of 1995, and there's nothing

20  after that point.  Does that mean that no business was

21  transacted in that account after November of '95?

22       A     Yes, that's correct.

23       Q     And was there ever a successor bank account that

24  picked up the transactions or anything like that?

25       A     No.

                DIVERSIFIED REPORTING SERVICES, INC.
                          (202) 296-2929

                                                    45737

67

1          Q    And similarly, then, the question, who made the

2    decision to cease paying annual fees to the government of

3    Nevis for Canyon Corporation?

4          A    Well, the decision was made by MASCO.

5          Q    For the same reasons:  either instructions from

6    Ken Weeks or it was self-evident that the corporation was

7    really defunct.

8          A    Yes.

9          Q    Okay.  You're looking at page number 11526, second

10   to the last page of Exhibit 128, which is a -- and tell us

11   what we're seeing on this page, if you would.

12         A    The letter from Canyon Corp. to CIBC, dated

13   October 4, '95, just caught my attention because of the

14   previous question.  It's apparent that, by this letter, we

15   were requesting CIBC to close the account of Canyon

16   Corporation and transfer the balance to Stockton, Limited,

17   indicating no further use or anticipated requirements for a

18   bank account for Canyon, which ties in to the ceasing of

19   paying fees for Canyon in Nevis.

20         Q    And how did you know to close out the Canyon

21   account to Stockton?

22         A    It's not evident from the letter, and I don't have

23   any recollection whether it was -- whether we were instructed

24   to it or it was, in all this activity, because of

25   circumstances of the time -- I just don't recall.

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45738

68

1      Q     Now, we marked but have not yet introduced

2    Exhibits 123 and 124.  I'm going to hand you both of these at

3    one time.

4           124 is a copy that we made of Exhibit 123, and it

5    was just done on a darker setting to highlight a handwritten

6    notation on the upper left-hand corner of the first page.

7    Both Exhibits 123 and 124 are two-page documents, both of

8    them consisting of pages 11603 and 11604.

9                            (SEC Exhibits No. 123 and 124

10                            were marked for

11                            identification.)

12           BY MS. ACHUFF:

13      Q     I'm handing you Exhibits 123 and 124.  Are these

14    documents that MASCO provided to the Securities and Exchange

15    Commission?

16      A     Yes.

17      Q     And what -- it's a document headed Affidavit.

18    What is it?

19      A     Do you wish me to read it or --

20      Q     No.  Don't --

21      A     -- paraphrase it.

22      Q     Just -- this is an affidavit.  Correct?

23      A     Yes.  It's an affidavit made by me on behalf of

24    Canyon Corporation.

25      Q     And that's your signature appearing on page 11604?

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45739

69

1      A    Yes.

2      Q    What was the occasion of your executing this

3  affidavit?

4      A    I beg your pardon.

5      Q    What prompted you to execute the affidavit,

6  Exhibit 123 and 124?

7      A    I don't have any present recollection of doing it,

8  but it would have been -- it's quite apparent it would have

9  been forwarded to us for execution by others, and we would

10  not have executed it without the authority or direction of

11  Kenneth Weeks.

12      Q    And just now you said it would have been forwarded

13  to you by others.  And earlier in your testimony you referred

14  to the principals of Canyon.  In your mind, are there others

15  besides Ken Weeks who are principals of Canyon Corporation?

16      A    I think I'd really have to have principals

17  defined.  I know I used the expression myself, not quite

18  knowing what it meant.  We would only take instructions --

19  we, MASCO, on behalf of Canyon Corp., would only take

20  instructions for the disbursement of funds from Kenneth

21  Weeks.

22      Something such as this affidavit -- I would guess

23  because the print is clear and legible, it was probably faxed

24  to us and retyped by us, and the handwritten note at the top

25  is that it was FedExed to somebody on February 11, 1997, the

45740

1    date after it's dated.

2           We would -- it would not be uncommon for us to

3    receive something of this nature from David Hesterman, who --

4    I don't know what his association is with Kenneth Weeks, but

5    they have some type of apparent business association.

6           And if that was the way this came to us, we would

7    have obtained the consent of Kenneth Weeks to execute it and

8    send it to whom I don't know, but we obviously FedExed it to

9    somebody.

10       Q    So if I understand what you just said, you -- it's

11   your understanding that David Hesterman is an associate of

12   some sort of Ken Weeks.

13       A    I believe he is.  Yes.

14       Q    And how do you come to have that belief?

15       A    Because, as I'm sure some of the documents that we

16   have sent to you have been sent to one of the Canyon or

17   Stockton companies by David Hesterman, and because we only

18   recognize Kenneth Weeks as the person that we will take

19   instructions from, to me that gives him some type of

20   relationship.

21       Q    Okay.  Whenever you got instructions -- so I -- if

22   I understand what you said, you believe that you may have

23   received the affidavit from David Hesterman, Exhibit 123?

24       A    Yes.

25       Q    And do you have a specific recollection of that

71

1    or --

2         A    No, I don't, but I say that because, as I'm sure

3    the files reveal, there have been a number of items sent to

4    MASCO by David Hesterman, and -- relating to what I might

5    refer to as Kenneth Weeks' companies.

6         Q    And the Kenneth Weeks companies -- using that as

7    an umbrella term --

8         A    Yes.

9         Q    -- the companies that you would consider to be

10   Kenneth Weeks' companies are what?

11        A    Immediately, Canyon Corporation and Stockton,

12   Limited.

13        Q    And also Hamilton, Limited?

14        A    Yes.

15        Q    And there are others that you can't recall just at

16   the moment.

17        A    Yes.

18        Q    Okay.  Did Canyon Corporation establish accounts

19   at broker/dealers?

20        A    Yes.  When you say broker/dealers, I'm not --

21        Q    Brokerage firms.

22        A    At brokerage firms, yes.

23        Q    Okay.  At brokerage firms.  Who selected the

24   specific firms at which Canyon would open brokerage accounts?

25        A    We would -- MASCO would receive instructions on

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45742

73

1    and Exchange -- the caption is Securities and Exchange

2    Commission v. Pan World Minerals International, Inc., and

3    others.

4         It's a summons to Canyon Corporation dated June 2,

5    1997, and then the remainder of the exhibit is a complaint in

6    the same matter. The pages are numbered 1 through 61.

7              BY MS. ACHUFF:

8         Q    I'm handing you Exhibit 130.  If you'll take a

9    moment, have you ever seen this document?

10        A    (Perusing document.)  Yes, I believe I have.

11        Q    Did MASCO, on behalf of Canyon, receive a copy of

12   Exhibit 130, the summons and complaint?

13        A    I believe it was received.  I'm not sure how.  It

14   wouldn't have come through the post addressed like that, but

15   I am fairly sure I've seen it.

16        Q    Do you believe that there -- somewhere in the

17   files that MASCO maintains relating to Canyon there would be

18.  a copy of this complaint and summons?

19        A    Well, I know there isn't, because I tried to find

20   something of this nature.  I had a recollection of having

21   seen it, and I know it's not in Canyon's files.

22        Q    Do you believe that it was -- but you believe it

23   was in Canyon's possession at some point in the past.

24        A    I believe it was in my possession.  I don't know

25   if that would constitute Canyon's possession.

45744

74

1    Q    I'll settle for yours.  Did you give it to
2    somebody?

3    A    No.

4    Q    Do you still have it?

5    A    I don't know.  I tried to find it.  I have a
6    recollection of having seen it and tried to find it when this
7    matter first came up to MASCO's attention, and I could not
8    find it.

9    Q    Did Canyon serve upon the Securities and Exchange
10    Commission an answer to the complaint which is included in
11    Exhibit 130?

12    A    I don't believe so.

13    Q    Was that an actual decision made not to serve an
14    answer -- not to answer the complaint?

15    A    Well, I think Canyon at that point had been
16    dissolved, and I don't think any decision was consciously
17    taken by Management and Service Company to do or not do
18    anything.  I suppose it did -- took a decision not to do
19    anything.

20    Q    Okay.  Did you discuss Exhibit 130 with Ken Weeks?

21    A    No.  Excuse me.  I might have.  There was
22    something of that nature that I saw and was rather disturbed
23    to see it and did speak to Weeks and then got some sort of a
24    passing off or, It's under control and being looked after,
25    defended, or whatever, in response, but nothing more formal

45745

75

1    than that.

2        Q    I'm going to switch gears somewhat here and talk

3    some more about Stockton Corporation and have the reporter

4    mark Exhibit 131.

5                            (SEC Exhibit No. 131 was marked

6                                 for identification.)

7            MS. ACHUFF:  Exhibit 131 is another of our famous

8    multi-page documents.  The pages are stamped 10615 through

9    10622, inclusive.  I just note for the record that there are

10   some leading zeros which I'm routinely leaving off with Bates

11   numbers.

12           BY MS. ACHUFF:

13       Q    Look through Exhibit 131, and if you'll tell me,

14   first of all, is this a document that MASCO provided to the

15   SEC pursuant to subpoena?

16       A    Yes, it is.

17       Q    You've described in a fair amount of detail the

18   types of files that MASCO maintains for its corporate

19   clients -- or client corporations; pardon me.  In responding

20   to the subpoena, did persons at MASCO make a search of those

21   records for documents pertaining to Stockton?

22       A    Yes.

23       Q    And this is the same Stockton that you've

24   associated with Canyon, the same Stockton, Limited?

25       A    Yes.

                   DIVERSIFIED REPORTING SERVICES, INC.
                            (202) 296-2929

1    accounts into the bank accounts of Stockton.  It might also

2    have included something from Canyon.  No, I don't -- Canyon

3    had ceased functioning by that time.

4        Q    Okay.  And I want to understand, and I don't think

5    that I do.  What is meant by the annual turnover of a certain

6    dollar amount?

7        A    The dollar amount of 3-million-odd there would be

8    the deposits made to Stockton, Limited, from proceeds in the

9    brokerage accounts, and that should be -- you could probably

10   check it, but that should be the -- an addition of deposits

11   made to Stockton's account as a result of wire transfers from

12   brokerage accounts.

13       Q    In calculating the annual turnover, were credit

14   items from any source other than brokerage accounts included

15   in that $3,136,269 figure?

16       A    I don't believe so.

17       Q    So it's strictly from brokerage accounts?

18       A    Yes.

19       Q    How was that annual fee arrangement based on the

20   annual turnover -- how was that worked out?

21       A    By negotiation.

22       Q    Between whom?

23       A    Between Kenneth Weeks and myself, as a -- the most

24   equitable way of establishing a fee for MASCO's services and

25   operating the bank account, for the lack of any other better

83

1    way of establishing a fee.

2        Q    I did not see in the documents that we looked at

3    for Canyon any invoices that refer to this annual turnover of

4    a certain dollar amount.  Was that fee structure in place for

5    Canyon as well as for Stockton?

6        A    I don't recall when this was introduced, but it

7    wasn't introduced at day one, so maybe Canyon Corporation

8    didn't pay anything extra.

9        Q    In your negotiations with Ken Weeks relating to

10   the turnover fee, if I can call it that, were any other --

11   did you and Ken Weeks discuss any other methods of

12   calculating the fee that would go to MASCO, any other bases

13   that were considered?

14       A    I don't recall any other basis.  No, I don't

15   believe so.

16       Q    Looking further down on the first page of Exhibit

17   133, there's an entry, a debit of $2000 for administration

18   fees charged 6/28/95 for Stockton and Nevada County Mining.

19   Now, we have a 6/28/95 invoice as the second page, but that's

20   for 2500.  Can you tell me where the $2000 figure came from

21   on the first page of Exhibit 133?

22       A    I can only assume that, by the recital, that the

23   administration fee of $1000 for Stockton plus a similar fee

24   for Nevada County Mining that we don't have aggregated $2000,

25   and because of the fact that we had agreed a turnover fee in

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45754

104

1      A    I don't think so.  On principle, I wouldn't do --
2    I wouldn't create 100 -- that would sound ridiculous.

3      Q    Why?

4      A    You know, if you have one certificate, you need
5    one stock power.

6      Q    If you had 100 certificates, would you need 100
7    stock powers?

8      A    Don't know.

9      Q    I've had the reporter mark Exhibit 137.  It's a
10   five-page document Bates-stamped 10770 through 10774.  The
11   cover page is a fax cover letter on a fax sheet from Pan
12   World Minerals International, Inc., and there is no date on
13   it, and the fax line is cryptic, at best.

14                          (SEC Exhibit No. 137 was marked
15                          for identification.)

16           BY MS. ACHUFF:

17     Q    I'm passing you Exhibit 137.  Is this a document
18   that MASCO provided to the SEC pursuant to subpoena?

19     A    Yes.

20     Q    And we talked about Pan World a little bit here
21   this morning.  Did you get other fax transmittals on Pan
22   World fax cover letters besides this one?

23     A    I don't remember.  If we did, we produced them to
24   you.

25     Q    Do you know who David H. is?

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-2929

45775

1        A    David Hesterman.

2        Q    And the number of pages, including the cover page,

3    is stated as being two, and we've got stapled to this fax

4    cover sheet a third-party release, a stock power, a corporate

5    resolution, and another stock power.

6             Do you recognize the signatures of Lynn Turnquist

7    and D.A. Kent on the last four pages of Exhibit 137?

8        A    Yes.  They are their signatures.

9        Q    Do you know -- the handwritten notation on the

10   first page looks like "N docs sent by FedEx 8/3/95."  Is that

11   your handwriting?

12       A    It's my handwriting, and I believe it says 22

13   documents sent by FedEx.

14       Q    Ah, 22 docs.  Okay.  What documents that -- does

15   that mean sent by MASCO to Pan World or the other way around?

16       A    It would be sent by MASCO to somebody.  I don't

17   know whether -- unless we were instructed separately, it

18   would certainly imply they were sent to Pan World, but I have

19   no recollection of doing that.

20       Q    Okay.  Now, the documents -- when we received

21   documents that MASCO sent, we just took them in the order in

22   which they were received, and we went through top to bottom

23   and Bates-stamped them in whatever the order was.

24             So that means that in the order in which we

25   received the documents this fax cover letter was on top of

45776

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           )
PAN WORLD MINERALS         )   File No. D-2049
INTERNATIONAL, INC.        )

WITNESS:  Robert E. Cordes

PAGES:    235 through 324

PLACE:    Board Room, Suite 3000
          Thanksgiving Tower
          1601 Elm Street
          Dallas, Texas

DATE:     Thursday, January 28, 1999


      The above-entitled matter resumed for hearing at 8:30
a.m., pursuant to recess.


APPEARANCES:

**On behalf of the Securities and Exchange Commission:**

      CARLEEN H. ACHUFF
      Regional Geologist
      1801 California Street, Suite 4800
      Denver, Colorado 80202-2658
      (303) 844-1098

      LESLIE HENDRICKSON, ESQ.
      1801 California Street, Suite 4800
      Denver, Colorado 80202-2658
      (303) 844-1000

**On behalf of the Witness:**

      INDRAJIT "BOBBY" MAJUMDER, ESQ.
      Gardere & Wynne
      3000 Thanksgiving Tower
      Dallas, Texas 75201
      (214) 999-4268


                   Diversified Reporting Services, Inc.
                          (202) 296-2929

45928

1    place.

2              MR. MAJUMDER:  Right.  Otherwise, I have no

3    questions.

4              MS. ACHUFF:  And we will do our best to comply

5    with your request.

6              That being the case, again thank you for your

7    attendance.  And we are off the record at 9:38.

8         (Whereupon, at 9:38 a.m., the hearing was concluded.)

9                   P R O C E E D I N G S

10   Whereupon,

11                   ROBERT EDWARD CORDES

12   having been first duly sworn, was called as a witness herein

13   and was examined and testified as follows:

14             MS. HENDRICKSON:  Mr Cordes, my name is Leslie J.

15   Hendrickson.  I'm the special United States Attorney for the

16   District of Utah.  You're appearing here pursuant to

17   agreement to take your testimony.  Is that correct?

18             THE WITNESS:  Yes.

19             MS. HENDRICKSON:  Do you understand that you have

20   the right, under the Fifth Amendment of the United States

21   Constitution, not to answer any questions that you feel may

22   incriminate you?

23             THE WITNESS:  Yes.

24                        EXAMINATION

25             BY MS. HENDRICKSON:

45961

270

1        Q    Could you please state where you live, your

2    address?

3        A    17 Santa Maria, Freeport, Bahamas.

4        Q    And your date of birth?

5        A    30th May 1932.

6        Q    In September of 1994, did you cause a company to

7    be created that's called Canyon Corporation?

8        A    Yes.

9        Q    And where was that company incorporated?

10       A    On the Island of Nevis.

11       Q    And at whose direction did you create that

12   company?

13       A    Kenneth Weeks.

14       Q    And do you know Mr. Weeks to live or reside in the

15   area of Salt Lake City, Utah?

16       A    Yes.

17       Q    As part of the creation of that company, did you

18 . open a bank account at Canadian Imperial Bank of Commerce in

19   Freeport, Bahamas?

20       A    Yes.

21       Q    And you were a signatory on that account?

22       A    Yes.

23       Q    My understanding is the account is now closed?

24       A    I believe so.

25       Q    Now, as part of the incorporation, there was an

45962

271

1    incorporator's certificate that was initially issued to

2    Conrad Smithen.  Is that correct?

3         A    I believe the incorporator's share was subscribed

4    to by Conrad Smithen, but there was no certificate physically

5    issued.

6         Q    And in the incorporation documents, that

7    incorporator's share is then transferred to you.  Is that

8    correct?

9         A    To the -- yes.

10        Q    Was that share ever given to anyone else?

11        A    By the standard minutes of the organizational

12   meeting, the benefits of the share are transferred to the

13   directors of the company for further dealing, and to the best

14   of my recollection, nothing further was done with respect to

15   the shares of Canyon Corp.  I don't believe a physical

16   certificate was issued.

17        Q    And the incorporation documents also provided the

18   directors could create bearer shares for Canyon Corporation.

19        A    That's correct.

20        Q    Was that ever done?

21        A    No.

22        Q    So there were never physical certificates that

23   were issued to various people in connection with Canyon

24   Corporation?

25        A    That's my recollection.

272

1      Q    As part of the work that you and your company,

2    Management and Services Company did for Canyon, was that to

3    open brokerage accounts?

4      A    Yes.

5      Q    And you provided to us documents -- brokerage

6    account documents for Yorkton Securities and M. Rimson for

7    Canyon Corporation. Do you recall that?

8      A    Sorry.  What was the second name?

9          MS. HENDRICKSON:  M. Rimson.  Let me show you some

10   documents.  I'm going to ask the reporter to mark this as

11   Exhibit 16.  I'm handing you Exhibit 16.  These are account

12   statements for M. Rimson & Company, a brokerage firm in New

13   York, for the account of Canyon Corporation.  They cover the

14   period from October 31, 1994 through January 30, 1998.

15                           (SEC Exhibit No. 16 was marked

16                             for identification.)

17         BY MS. HENDRICKSON:

18      Q    These are records that you had provided.

19      A    Yes.  Sorry, I had just momentarily forgotten the

20   name M. Rimson.

21      Q    So there were accounts at M. Rimson in New York

22   and at Yorkton in Canada, and then you also provided one

23   document for Investor Associates which is a brokerage firm

24   based in New Jersey.

25      A    Yes.

45964

273

1        Q      Do you have a recollection of there being any

2    other brokerage accounts besides those three?

3        A      No.   The only brokerage accounts of which we at

4    MASCO are aware are the ones for which we provided documents

5    last month.

6               MS. HENDRICKSON:   Can I have the court reporter

7    mark this as Exhibit 17?   Exhibit 17 is a two-page document;

8    it's the account statement for Canyon Corporation's account

9    at Yorkton Securities, and it covers the period of 1995.

10                              (SEC Exhibit No. 17 was marked

11                               for identification.)

12              BY MS. HENDRICKSON:

13       Q      Is this a document that you provided?

14       A      Yes.

15              MS. HENDRICKSON:   And I'll have the court reporter

16   mark this as Exhibit 18.   Exhibit 18 is a one-page document;

17   it consists of two confirmations from Investor Associates,

18   Incorporated for transactions done in the account of Canyon

19   Corporation.

20                              (SEC Exhibit No. 18 was marked

21                               for identification.)

22              BY MS. HENDRICKSON:

23       Q      Do you recognize this document?

24       A      May I ask who provided this document?

25       Q      It is a document that MASCO provided to us.

                    Diversified Reporting Services, Inc.
                            (202) 296-2929

                                                        45965

274

1      A     I don't understand the question.

2      Q     Okay.  Are you familiar -- did you open a

3   brokerage account at Investor Associates, Incorporated for

4   Canyon Corporation?

5      A     I assume so; I don't recall it.

6      Q     Do you recall any trading that occurred in that

7   account?

8      A     No.

9      Q     And do you know whether the two confirmations that

10   we're looking at here -- which are transactions in a company

11   called Dynamic American Corporation -- it appears to me, in

12   looking at these two confirmations, that it was a purchase

13   and a cancellation of a purchase.  Do you know anything about

14   this transaction?

15      A     No.

16      Q     Aside from these three brokerage accounts that you

17   provided to us for Canyon Corporation -- which were at

18   Yorkton M. Rimson, and Investor Associates -- are you aware

19   of any other brokerage accounts that MASCO opened for Canyon

20   Corporation?

21      A     No.

22      Q     Who made the decision to open these brokerage

23   accounts at Yorkton, Rimson, and Investor Associates?

24      A     I don't know who made the decision, but we would

25   have been -- MASCO would have been directed to do so by

1    Kenneth Weeks.

2        Q    Did he ever discuss with you why he wanted those

3    accounts opened?

4        A    Not that I recall.

5        Q    Did he discuss with you why he wanted an account

6    open in Canada at Yorkton?

7        A    No.

8        Q    Now, the broker on the Yorkton account is a man

9    named Keith Bekker, B-E-K-K-E-R.  Do you know Mr. Bekker?

10       A    No.

11       Q    Have you ever had any conversations with him?

12       A    Yes.  I have spoken with him on the telephone on

13   maybe two or three occasions some years ago -- I don't even

14   recall the nature of the conversation -- but I've never met

15   him.

16       Q    Do you know if those conversations with Mr. Bekker

17   related to the account that Canyon Corporation has at

18 . Yorkton?

19       A    I believe they must have because I don't know of

20   any other accounts at Yorkton Calgary.

21       Q    That MASCO is involved with.

22       A    Yes.

23       Q    Now, the broker at M. Rimson & Company for Canyon

24   Corporation is a man named Patrick Giordano, G-I-O-R-D-A-N-O.

25   Do you know Mr. Giordano?

45967

1       A       No.

2       Q       Have you had any conversations with him?

3       A       Not that I recall.

4       Q       No telephone conversations you recall?

5       A       Never, no.

6       Q       Then the person who is listed as the broker for

7    Canyon Corporation is a man named Anthony DeFilippo.  Have

8    you ever met Mr. DeFilippo?

9       A       No.

10      Q       Have you ever had any telephone conversations with

11   him?

12      A       I don't believe so.

13      Q       Mr. Cordes, I'm going to put back in front of you

14   Exhibit 16 which is the Canyon Corporation account at Rimson,

15   and in looking at that account, there are tens of millions of

16   shares of Pan World Minerals International that are delivered

17   into that account.  Have you heard of the company Pan World

18   Minerals International before?

19      A       Before when?

20      Q       Have you ever heard of the company Pan World

21   Minerals International?

22      A       Not other than through the statements of the

23   brokerage accounts.

24      Q       Did Ken Weeks ever discuss with you Pan World

25   Minerals International?

277

1          A     Not to my recollection.

2          Q     Do you know if Mr. Ken Weeks is associated in any

3     way with Pan World Minerals International?

4          A     I don't know, no.  I know that his associate --

5     I'm not even sure if he's an associate, but related to him in

6     some manner -- David Hesterman, uses Pan World Minerals

7     letterhead -- or has used it in the past to send faxed

8     messages to MASCO.

9          Q     Did Ken Weeks ever discuss with you that he was a

10    consultant for Pan World?

11         A     Not to my recollection.

12               MS. HENDRICKSON:  I'm going to place in front of

13    you Exhibit Number 1 which is a transfer agent document, and

14    in particular, I would like you to look at the last page of

15    that document.  This is a Pan World stock certificate that

16    was delivered into Canyon's account at Yorkton, and it's in

17    the name of Karl Blomquist.

18                                 (SEC Exhibit No. 1 was marked

19                                  for identification.)

20               BY MS. HENDRICKSON:

21         Q     Did you or anyone at MASCO ever physically possess

22    this stock certificate?

23         A     Not that I recall.

24         Q     Do you know who delivered it into Canyon's

25    brokerage account at Rimson?

1         A    No.

2         Q    Do you know a Mr. Karl Blomquist?

3         A    No.

4         Q    Did Canyon pay Mr. Blomquist any money for these

5    500,000 shares of Pan World?

6         A    Not that I'm aware of.

7              MS. HENDRICKSON:  I'm going to hand you Exhibit

8    Number 2.  This is also a transfer agent record, and I'd ask

9    you to look at page 117870. These are -- and the following

10   pages -- are four stock certificates, each for 100,000 shares

11   of Pan World stock in the name of Karl Blomquist.

12                             (SEC Exhibit No. 2 was marked

13                             for identification.)

14             BY MS. HENDRICKSON:

15        Q    Did you or anyone at MASCO ever physically possess

16   these certificates of Karl Blomquist's?

17        A    I don't believe so.

18        Q    Do you know how they came to be delivered into

19   Canyon's account at Rimson?

20        A    No, I don't.

21        Q    Did Canyon ever pay Mr. Blomquist any

22   consideration for these 400,000 shares?

23        A    Not that I'm aware of.

24             MS. HENDRICKSON:  Let me show you Exhibit Number

25   3.  This is another transfer agent document; this involves

                    Diversified Reporting Services, Inc.
                           (202) 296-2929

                                                    45970

279

1    the transfer of 100,000 shares of Karl Blomquist's stock

2    which was also delivered into Canyon's account at Rimson.

3                          (SEC Exhibit No. 3 was marked

4                          for identification.)

5              BY MS. HENDRICKSON:

6         Q    Did you or anyone at MASCO ever physically possess

7    the stock certificate which is the last page of Exhibit

8    Number 3?

9         A    I don't believe so.

10        Q    Do you know how it came to be transferred into the

11   account of Canyon Corporation at Rimson?

12        A    No, I don't.

13        Q    And did Canyon ever pay Mr. Blomquist

14   consideration for these 100,000 shares?

15        A    Not that I'm aware of.

16        Q    Do you know of any agreement whereby Canyon was to

17   act as the agent for Mr. Blomquist in selling these shares?

18        A    No.

19        Q    Do you know of any agreement between Canyon and

20   Mr. Blomquist in which these shares were to be sold to pay

21   for his consulting services to Pan World?

22        A    No.

23        Q    Also into the Canyon account at Rimson there were

24   nine million shares of stock that were delivered that in the

25   transfer agent records it was said that Puritan

280

1    Communications had directed that the stock be issued in

2    Canyon's name.  Are you familiar with a company called

3    Puritan Communications?

4         A    Only by name as a payee on some transfers that

5    were effected by MASCO from, I believe, Canyon's account.

6         Q    Do you associate any individual with Puritan

7    Communications?

8         A    No.

9              MS. HENDRICKSON:  I'm going to hand you what we've

10   marked as Exhibit Number 4; this is another stock transfer

11   document.  In particular, I'd like you to look at the third

12   page which is a letter dated August 8, 1994 to National Stock

13   Transfer from Robert Weeks.  The body of the letter says,

14   "Pursuant to the instructions of Puritan Communications, and

15   as part of the recent S-8 registration statement that the

16   company filed, would you please issue one million common

17   shares to Canyon Corporation?"

18                              (SEC Exhibit No. 4 was marked

19                                   for identification.)

20             BY MS. HENDRICKSON:

21        Q    Are you aware of any agreement between Puritan

22   Communications and Canyon Corporation which discussed them

23   directing a million shares of Pan World stock to Canyon

24   Corporation?

25        A    No.

281

1          Q     Do you know if Canyon Corporation paid Puritan

2     Communications any compensation for this million shares?

3          A     I don't know.

4          Q     And then if you would look at the second to the

5     last page of Exhibit Number 4.  This is a Pan World stock

6     certificate which, pursuant to this letter, was issued in the

7     name of Canyon Corporation; it's certificate number 4248.  Do

8     you know if you or anyone at MASCO ever possessed this stock

9     certificate?

10         A     I don't know.

11         Q     Do you know how it came to be delivered into

12    Canyon Corporation's account at Rimson?

13         A     No.

14               MS. HENDRICKSON:  I'm going to hand you Exhibit

15    Number 5.  This is another stock transfer agent record, and

16    if you would look at the second page -- excuse me -- the

17    third page, there's a December 21, 1994 letter to Roger Greer

18 ·  at National Stock Transfer from Robert Weeks, again

19    indicating that Puritan Communication had given instructions

20    that two million shares of Pan World Stock should be issued

21    in Canyon's name.

22                                    (SEC Exhibit No. 5 was marked

23                                     for identification.)

24               BY MS. HENDRICKSON:

25         Q     Were you aware of this transaction?

282

1       A    I don't believe so.

2       Q    Do you know of any agreement between Puritan and

3   Canyon Corporation for the issuance of these two million

4   shares?

5       A    No.

6       Q    Are you aware of any compensation that Canyon

7   Corporation paid to Puritan for these two million shares?

8       A    No.

9       Q    Are you aware of any compensation that Canyon

10  Corporation paid to Puritan for these two million shares?

11      A    No.

12           MS. HENDRICKSON:   I'm going to show you what we've

13  marked as Exhibit Number 6.  Again, I would have you look at

14  the third page which is a January 5, 1995 letter to National

15  Stock Transfer from Robert Weeks, again instructing the

16  transfer agent to issue two million shares to Canyon

17  Corporation based on instructions from Puritan

18 · Communications.

19                              (SEC Exhibit No. 6 was marked

20                                  for identification.)

21           BY MS. HENDRICKSON:

22      Q    Were you aware of this transaction?

23      A    No.

24      Q    Do you know of any agreement between Puritan and

25  Canyon for the issuance of these two million shares?

45974

1          A       No.

2          Q       Do you know of any compensation that Canyon paid

3     to Puritan for these shares?

4          A       No.

5          Q       Do you know how the stock that was issued pursuant

6     to this agreement, the two million shares, came to be

7     delivered to Canyon's account at Rimson?

8          A       No.

9          Q       Then if you would look at the fourth page of this

10    exhibit, here is a second letter again instructing that four

11    million shares be issued to Canyon Corporation based on

12    Puritan's instructions.  If I asked you the same series of

13    questions, are your answers the same about your knowledge of

14    this transaction?

15         A       Yes.

16         Q       And you don't know anything about an agreement

17    between Puritan and Canyon, any compensation arrangement, or

18    how the stock was delivered to Rimson?

19         A       That's correct.

20              MS. HENDRICKSON:   I'm going to hand you Exhibit

21    Number 7.   These are transfer agent documents transferring

22    one million shares of Pan World stock from a company called

23    National Insurance Marketing Services, Inc. to Canyon

24    Corporation, on or about January 23, 1995.

25                                   (SEC Exhibit No. 7 was marked

284

1                              for identification.)

2              BY MS. HENDRICKSON:

3         Q     Do you know of any agreement between Canyon

4    Corporation and National Insurance Marketing Services, Inc.

5    for this transaction?

6         A     No.

7         Q     Had you heard of this company, National Insurance

8    Marketing Services, Inc., before?

9         A     No

10        Q     Has Canyon Corporation obtained any insurance from

11   this company, National Insurance Marketing Services, Inc.?

12        A     No.

13        Q     On the third page of the transfer agent documents

14   are some transfer instructions, and at the bottom I believe

15   that they are signed by Mr. Kenneth Weeks.  Do you see that

16   signature?

17        A     I see the signature, yes.

18        Q     Are you familiar with Mr. Weeks' signature, Ken

19   Weeks' signature?

20        A     I'm not familiar enough with it to confirm or deny

21   that this is his signature.

22        Q     Now, looking at pages 122304 of this document and

23   -305, there is an affidavit that appears to be executed by

24   Mr. Weeks, Kenneth Weeks.

25        A     Yes.

Diversified Reporting Services, Inc.
(202) 296-2929

45976

285

1        Q    Have you ever seen this affidavit?

2        A    I don't believe so.

3        Q    Now, these million shares of Canyon stock were

4    delivered into Canyon's Rimson account.  Were you aware of

5    that?

6        A    No.

7        Q    Did you or anyone at MASCO physically possess the

8    certificate?

9        A    I don't believe so.

10       Q    Do you know how it was delivered into Canyon's

11   account at Rimson?

12       A    No, I don't.

13            MS. HENDRICKSON:   I'm going to give you Exhibit

14   Number 8.  This is another transfer agent record.  If you

15   would look at the second page, there is a letter dated

16   January 12, 1995 to National Stock Transfer from Robert

17   Weeks, and in the second paragraph it is directing that five

18   million shares be issued to Canyon Corporation based on the

19   instructions of Bartos Gold Holding Company.

20                          (SEC Exhibit No. 8 was marked

21                           for identification.)

22            BY MS. HENDRICKSON:

23       Q    Do you know of any agreement between Canyon

24   Corporation and Bartos Gold Holding Company for the transfer

25   of this five million shares?

286

1     A    No.

2     Q    Do you know of any consideration that Canyon paid

3  to Bartos for the issuance of these shares?

4     A    No.

5     Q    These shares were delivered into Canyon's

6  brokerage account at Rimson.  Do you know how that delivery

7  occurred?

8     A    No.

9     Q    And did anyone at MASCO or yourself ever

10  physically possess this stock certificate for five million

11  shares?

12     A    I don't believe so.

13     Q    Were you aware that Pan World Minerals was engaged

14  in a joint venture with Bartos Gold Holdings in Bolivia?

15     A    I don't believe so.

16     Q    And did Canyon Corporation provide any kind of

17  consulting services, along the lines of geologic work, for a

18  project work in Bolivia that Pan World was involved in?

19     A    No.

20     Q    Did Bartos ever hire any consultants to act for

21  Pan World, people to do drilling or geological testing or

22  anything along doing gold mining work?

23          MR. MAJUMDER:  Do you mean Bartos or Canyon?

24          MS. HENDRICKSON:  Did Canyon ever hire anyone for

25  Pan World?

45978

1       THE WITNESS:  I thought you asked if Bartos had.

2   No, Canyon did not.

3       MS. HENDRICKSON:  Let me show you Exhibit Number

4   9.  These are additional transfer agent records directing

5   that 15 million shares of Pan World stock be issued to Canyon

6   Corporation.

7                           (SEC Exhibit No. 9 was marked

8                           for identification.)

9       BY MS. HENDRICKSON:

10      Q    Were you aware of these 15 million shares being

11  issued?

12      A    No.

13      Q    Do you know of any agreement between Canyon

14  Corporation and Bartos Gold Holdings for it to issue its Pan

15  World shares to Canyon?

16      A    No.

17      Q    Do you know of any consideration that Canyon paid

18  to Bartos for these 15 million shares?

19      A    No.

20      Q    These shares were delivered in part into Canyon's

21  Rimson account, and I think in part into Canyon's account at

22  Yorkton.  Right, two of the certificates were delivered into

23  the Yorkton account and one certificate was delivered into

24  the Rimson account.  Do you know who delivered these stock

25  certificates to those two brokerage accounts of Canyon?

288

1           A    No, I don't.

2           Q    Did anyone at MASCO, including yourself,

3      physically possess these certificates?

4           A    I don't believe so.

5                MS. HENDRICKSON:  I've put in front of you Exhibit

6      Number 10.  These are transfer agent instructions, and I'd

7      have you look at the third page; this is a letter dated

8      February 14, 1995 to National Stock Transfer from Robert

9      Weeks directing that, "per instructions of Bartos Gold

10     Holdings, please issue 10 million shares of Pan World stock

11     to Canyon Corporation."

12                              (SEC Exhibit No. 10 was marked

13                              for identification.)

14               BY MS. HENDRICKSON:

15          Q    Were you aware of this issuance of stock?

16          A    No.

17          Q    Do you know of any agreement between Canyon

18     Corporation and Bartos Gold Holdings for this issuance?

19          A    No.

20          Q    Did Canyon Corporation pay any compensation for

21     these shares?

22          A    Not that I am aware of.

23          Q    These 10 million shares were delivered into Canyon

24     Corporation's account at Yorkton in Canada.  Do you know how

25     those stocks were physically delivered into the account?

45980

1          A    No.

2                  MS. HENDRICKSON:    I'm going to hand you what we've

3     marked as Exhibit Number 11, and looking at the third page,

4     this is a March 16, 1995 letter to National Stock Transfer

5     from Robert Weeks.    In it he is asking the transfer agent to

6     issue 10 million shares of Pan World stock to Canyon

7     Corporation.

8                                   (SEC Exhibit No. 11 was marked

9                                       for identification.)

10                 BY MS. HENDRICKSON:

11         Q    Do you know why he was directing 10 million shares

12    to be issued to Canyon Corporation?

13         A    No.

14         Q    Looking at the third page, it's a corporate

15    resolution, and it indicates that these shares were issued in

16    consideration of services performed by Canyon to Pan World.

17    Are you aware of any services that Canyon Corporation has

18.   provided to Pan World?

19         A    No.                                               .

20         Q    Did you or anyone at MASCO ever physically receive

21    possession of these two share certificates?

22         A    I don't believe so.

23         Q    Do you know how these shares came to be delivered

24    to Canyon's account at Rimson?

25         A    No.

290

```
 1                    MS. HENDRICKSON:  I'm going to show you Exhibit

 2      Number 12.  Exhibit Number 12 is a transfer agent document,

 3      and I'd ask you to look at the second page.  On this page,

 4      Pan World is issuing a corporate resolution to issue 17

 5      million shares of Pan World to Canyon Corporation for

 6      services that Canyon Corporation has rendered to the company.

 7                              (SEC Exhibit No. 12 was marked

 8                               for identification.)

 9                    BY MS. HENDRICKSON:

10           Q     Do you know if Canyon provided any services for

11      these 17 million shares?

12           A     No.

13           Q     Do you recall having any discussions with Ken

14      Weeks about the issuance of these 17 million shares?

15           A     No.

16           Q     Did you or anyone at MASCO ever physically the

17      share certificate that is these 17 million shares?

18           A     I don't believe so.

19           Q     These shares were delivered, also, into Canyon's

20      account at Rimson.  Do you know who made that delivery?

21           A     No, I don't.

22                    MS. HENDRICKSON:  I'm going to hand you Exhibit

23      Number 13.  Exhibit Number 13 are additional transfer agent

24      documents.  This involves, if you'd look at the second page,

25      a letter to National Stock Transfer from Robert Weeks asking
```

291

1    that he issue 30 million shares of Pan World stock to Canyon

2    Corporation.

3                          (SEC Exhibit No. 13 was marked

4                               for identification.)

5               BY MS. HENDRICKSON:

6          Q    Were you aware of this transaction?

7          A    No.

8          Q    Are you aware of any services that Canyon

9    performed for Pan World in exchange for these 30 million

10   shares?

11         A    No.

12         Q    On the third page of Exhibit 13 there is a

13   corporate resolution and in it Robert Weeks is stating that

14   these shares are issued "in consideration of services

15   rendered on behalf of the company furthering its objectives

16   in exploration and development."  Do you know of any work

17   that Canyon did on Pan World's behalf to "further its

18   objectives in exploration and development"?

19         A    No.

20         Q    And my understanding is you have never had any

21   discussions with Robert Weeks.  Is that correct?

22         A    That's correct.

23         Q    Never received any correspondence from Robert

24   Weeks?

25         A    I don't believe so.

45983

292

1          MS. HENDRICKSON:  Let me show you what we have

2    marked as Exhibit Number 14.  These are additional transfer

3    agent records that relate to Canyon Corporation transferring

4    shares to its broker at Yorkton.  In particular, I would like

5    you to look at page 123086 which is a stock power.

6                              (SEC Exhibit No. 14 was marked

7                              for identification.)

8          BY MS. HENDRICKSON:

9          Q    Do you recognize your signature on the line for

10   the president of Canyon Corporation?

11         A    Yes.

12         Q    And on the next page, 123087, do you recognize

13   your signature on that corporate resolution?

14         A    Yes.

15         Q    Do you know how the transfer agent came to have

16   this stock power and corporate resolution?

17         A    No.

18         Q    Did Ken Weeks ever request that you send a stock

19   power and a corporate resolution to Yorkton Securities?

20         A    I don't recall.

21         Q    And if you would turn towards the end of the

22   document and there's a folded over page, 123094.  This is an

23   irrevocable power of attorney transferring 10 million shares,

24   certificates 4538 and 4539.  Do you see your signature

25   appearing on that document in the lower right-hand corner?

293

1       A    Yes.

2       Q    And it's right under the word Canyon Corporation

3   that's printed in?

4       A    Yes.

5       Q    Do you recall any details about completing this

6   document?

7       A    No, I don't.

8       Q    Now, where it makes specific reference to these

9   two certificates, do you recall ever having those two

10  certificates in your possession?

11      A    No, I don't.

12      Q    *When you would receive -- who would you typically*

13  *receive a stock power like this from?*

14      A    Because of the form on which this stock power is

15  produced, I don't believe it would have originated at MASCO's

16  offices, because any that we would originate by telephone

17  request or whatever, would be on the form used in Exhibit

18  *Number 123086.*

19      Q    So that's the stock power we saw earlier in this

20  exhibit.

21      A    Yes.   That would have been originated in MASCO's

22  offices, as would 123087, the corporate resolution; but the

23  stock power in the form of 123094 which I have signed, would

24  not have originated at MASCO, it would have been sent to

25  MASCO for signature, but I have no recollection of how or

294

1    when.

2        Q    So you don't know whether this came to MASCO from

3    Yorkton or whether it came from Ken Weeks?

4        A    I have no idea.  Sorry.

5        Q    To be able to fill in the information about the

6    amount of shares and the stock certificates that are actually

7    being transferred, who would you get that information from?

8        A    I would not seek that information; I assume it

9    would have been in there when it was sent to us.

10       Q    And do you recognize your handwriting in the

11   portion that describes the number of shares and the share

12   certificates?

13       A    That's not my handwriting.

14       Q    And if you would look at the next page, 123093,

15   this is another corporate resolution.  Do you recognize your

16   signature on the lower left-hand side?

17       A    Yes.

18       Q    And is this a form that MASCO would typically

19   prepare?

20       A    No.

21       Q    So again, this is something that would have been

22   sent by a third party to you.

23       A    Yes.

24       Q    The last page of Exhibit 14 is a March 20, 1995

25   letter to Roger Greer from Robert Weeks.  In it, he states,

45986

295

1    "The company -- meaning Pan World -- is aware that certain

2    shares held by Canyon Corporation have been presented for

3    transfer."  Do you know of any way -- did you have any

4    discussions with Robert Weeks to alert him that shares of

5    Canyon Corporation were being presented for transfer?

6         A    I don't believe I've ever spoken to Robert Weeks,

7    ever.

8         Q    In here he further states, "We understand that the

9    shareholders are relying on the benefits of Regulation S for

10   this transfer."  Did you ever have any discussions with the

11   people at Yorkton that you were relying on Regulation S for

12   this transfer?

13        A    No.

14        Q    Did you ever have any discussions with Mr. Weeks

15   that Canyon was relying on Regulation S for the benefit of

16   the transfer?

17        A    No.

18        Q    Did you ever have any discussions with Ken Weeks

19   about relying on the benefits of Regulation S?

20        A    I'm sorry.  I thought you asked --

21        Q    First I asked about Robert who is the signature of

22   this letter.

23        A    I repeat, I've never, ever spoken to Robert Weeks,

24   and I did not discuss this with Ken Weeks.

25             MS. HENDRICKSON:  Thank you.  And I'll ask you to

296

1    indulge me if some of my questions seem repetitive, but on

2    certain issues I want to make it extremely clear whether or

3    not you had a discussion with Mr. Weeks.  And I do understand

4    that you're saying you haven't had discussions with him, but

5    on particular issues, I want to clarify that, if you'll

6    indulge me.

7                THE WITNESS:  I understand.

8                MS. HENDRICKSON:  I'm going to hand you what we've

9    marked as Exhibit Number 15.  These are additional transfer

10   agent records dated February 3, 1995 transferring Canyon

11   shares into the name of Larkin.  In particular, I'd like you

12   to look at page 122523.  This is a letter dated January 30,

13   1995, directed to National Stock Transfer from your

14   signature, Robert E. Cordes, on Canyon Corporation

15   letterhead.

16                              (SEC Exhibit No. 15 was marked

17                                  for identification.)

18               BY MS. HENDRICKSON:

19        Q    Do you recognize your signature on this letter?

20        A    I do.

21        Q    Did you prepare it on or about January 30, 1995?

22        A    I believe so.

23        Q    And at the very top there is a fax line wherein

24   it's been sent from a telephone number 809-352-3932.  Do you

25   recognize that fax telephone number?

297

1       A    Yes.

2       Q    Who does that number belong to?

3       A    MASCO.

4       Q    Do you remember the events of creating this

5   letter?

6       A    No, I don't.

7       Q    Do you know if you prepared it at the request of

8   Ken Weeks?

9       A    I can only assume we did; I don't have any

10  recollection of it.

11      Q    You don't recall talking to the transfer agent for

12  Pan World, this Mr. Greer?

13      A    No, I don't believe I have ever talked to the

14  transfer agent.

15      Q    And if you'd look two pages later 122525.  This is

16  a legal opinion letter prepared by a man named Raymond L.

17  Ridge, dated November 17, 1992; it goes on for seven pages.

18  Did you ever request Mr. Raymond Ridge to prepare an opinion

19  letter on the application of Regulation S?

20      A    No.

21      Q    Do you know if anyone at MASCO requested Mr. Ridge

22  to prepare an opinion letter on Regulation S?

23      A    I don't believe so.

24      Q    Have you ever seen this letter before?

25      A    I don't believe so.

45989

298

1    Q    Do you recall Mr. Ridge ever calling you and

2  asking information about Canyon's transactions?

3    A    No.

4    Q    Did you ever ask Ken Weeks to obtain an opinion

5  letter about the use of Regulation S?

6    A    No.

7    Q    Did you and Ken Weeks ever discuss that he had

8  obtained an opinion letter on the Regulation S?

9    A    I don't believe so.

10    Q    I'm going to have you look again at Cordes Exhibit

11  Number 16.  These are the brokerage statements for the Rimson

12  account -- for Canyon's account at Rimson.  Did you ever

13  personally place any trades in this account to buy or sell

14  Pan World stock?

15    A    No.

16    Q    Do you know if anyone at MASCO placed trades to

17  buy or sell stock in this account?

18    A    No.

19    Q    I think I may have asked that question in a

20  poor -- framed it poorly.  Did anyone at MASCO direct the

21  purchase or sale of Pan World stock through Canyon's account

22  at Rimson?

23    A    No.

24    Q    Do you know who placed trades in that account?

25    A    No.

45990

299

1          Q      Did you give trading authority to any person?

2          A      I don't believe so.

3          Q      Do you have any belief about who was placing

4    trades in that account?

5          A      No.

6          Q      Do you have any reason to believe that Ken Weeks

7    was placing trades in that account?

8          A      I really don't know; I'm quite sure he would be

9    aware of it; whether or not he initiated the orders, I don't

10   know.

11         Q      Now, Ken Weeks asked that the account at Rimson be

12   opened on behalf of Canyon Corporation.  Is that correct?

13         A      I believe so.

14         Q      Did he ever discuss any of the transactions that

15   occurred in that account?

16         A      With me?  No.

17         Q      In that account, in January of 1995, there is a

18   purchase of 55,000 shares of a company called Life Concepts.

19   Do you know anything about that transaction?

20         A      No.

21         Q      In May of 1995, Canyon Corporation purchased

22   600,000 shares of Pan World at eight-tenths of a cent.  Do

23   you know anything about the purchase of those 600,000 shares

24   of Pan World stock?

25         A      No.

300

1        Q   Do you know of any reason why Canyon bought

2   600,000 shares when it, at the time, was holding 33 million

3   shares of Pan World stock in the account?

4        A   No.

5        Q   Do you know of any reason why David Hesterman

6   would wire $4,748 into the Rimson account to pay for that

7   transaction?

8        A   No.

9        Q   Were you aware of him paying for that transaction?

10       A   No.

11       MS. HENDRICKSON:  Next I want to talk with you

12   about the letters of authorization to relate to the account

13   at Rimson.

14       Mr. Cordes, these are letters of authorization and

15   other correspondence we received from you and MASCO that

16   relate to Canyon's account at Rimson.

17                 (SEC Exhibit No. 19 was marked

18                 for identification.)

19       BY MS. HENDRICKSON:

20        Q   Looking at the first page, this is a December 8,

21   1994 letter to Patrick Giordano over your signature.  Do you

22   recognize your signature on that letter?

23       A   I do.

24        Q   There's some handwriting at the bottom of the

25   letter.  Can you read to me what that says?

301

1      A    I can make out part of it.  It's in my handwriting

2  and it says, "We give our permission to do a block trade" --

3  I believe -- "in excess of 5 percent below market" -- a word

4  that's not decipherable.

5      Q    Do you know why you wrote that across the bottom

6  of this letter?

7      A    I believe it was, in effect, dictated to me by

8  somebody as being a request to send a further letter to

9  Rimson with that wording.

10     Q    Do you know who dictated it to you?

11     A    No, I don't.

12     Q    Based on your experience, do you have a belief who

13  dictated it to you?

14     A    I think it was dictated to me by Ken Weeks.

15     Q    And in fact, if you look at the second page of

16  Exhibit 19, you've, in essence, written a letter with that

17  same language.  Isn't that correct?

18     A    Yes.

19     Q    And did you send that to Mr. Giordano?

20     A    I believe so.

21     Q    Can you think of any reason why Canyon would agree

22  to sell its Pan World stock at more than 5 percent below the

23  market bid?

24     A    No, I don't know the reason for why I was asked to

25  do this.

302

1       Q      Looking at the letter dated December 22, this is

2    again a letter wherein you're giving Mr. Giordano authority

3    to trade at -- to make sales at less than 5 percent below the

4    market bid price.  Is there a reason why you sent another

5    letter?

6       A      I would have been asked to repeat the previous

7    letter.

8       Q      And who, most likely, asked you to do that?

9       A      Ken Weeks.

10      Q      Do you have any understanding about what the

11   brokerage rules are in terms of the amount of markup or

12   markdown that a broker can take on a sale?

13      A      No, I don't.

14      Q      Did you have any understanding that a markup or a

15   markdown of more than 5 percent would be considered

16   excessive?

17      A      No, I didn't.

18      Q      The next page, 11619, this is a letter dated March

19   17, 1995 to Mr. Giordano from you.  Do you recognize your

20   signature?

21      A      Yes, that's my signature.

22      Q      This letter of authorization is instructions to

23   transfer two million shares of Pan World from Canyon's

24   account to Kevin Mahar.  Do you know why you directed this

25   transfer?

303

1          A    I would have been requested to do so by Ken Weeks.

2          Q    Do you know of any compensation that Canyon

3    Corporation received from Mr. Mahar for these two million

4    shares?

5          A    No, I don't.

6          Q    Do you know of any services that Mr. Mahar

7    provided to Canyon Corporation?

8          A    No, I don't.

9          Q    Have you ever met Mr. Mahar?

10         A    No.

11         Q    Ever spoken with him on the telephone?

12         A    No.

13         Q    Have any sense what he does for a living?

14         A    No idea.

15         Q    Did you and Mr. Weeks, Ken Weeks, discuss why he

16   was directing you to transfer these two million shares to Mr.

17   Mahar?

18         A    I don't believe so.

19         Q    Looking at the next page, 11617, this is a March

20   20, 1995 letter to Patrick Giordano in which -- do you

21   recognize your signature on this letter?

22         A    Yes, that's my signature.

23         Q    And you are confirming, "We are aware the current

24   market price of Pan World Minerals International, Inc. stock

25   is at seven-tenths of a dollar a share, but we give our

45995

304

1    consent to sell up to 1,500,000 shares at one-tenth of a

2    cent." Do you know why you wrote this letter?

3          A    Because I would have been requested to do so by

4    Ken Weeks.

5          Q    Do you know of any reason why Canyon Corporation

6    was agreeing to sell its stock at so much below the market

7    price?

8          A    No.

9          Q    Basically, here you are agreeing to sell it at

10   one-seventh of the market price, the going market price.  Was

11   that your understanding?

12         A    Yes.

13         Q    Do you remember any discussion with Ken Weeks

14   about the preparation of this letter?

15         A    No.

16         Q    Looking at the next page, 11622, this is a March

17   23, 1995 letter to Patrick Giordano from Mr. Cordes.  Do you

18   recognize your signature on this letter?

19         A    Yes.

20         Q    Do you know why you prepared this letter?

21         A    Because I would have been requested to do so

22   probably by Ken Weeks.

23         Q    And you're couching that in tentative language

24   because you have no specific recollection?

25         A    That's correct.

305

1      Q      Did you ever prepare letters like this for Canyon

2  Corporation without Ken Weeks' instruction?

3      A      I don't believe so.

4      Q      Let's look at the next page; this is 11624.  This

5  is a March 23, 1995 letter to Patrick Giordano from Mr.

6  Cordes instructing the transfer of 500,000 shares to Steve

7  Cole.  Is that your signature on this letter?

8      A      Yes, it is.

9      Q      And basically, it and the second letter ar

10 identical except for the spelling of Mr. Cole's name.

11     A      And the indication that one went by fax and the

12 other by courier.

13     Q      I see; I had missed that distinction.  Thank you.

14            Do you know why you wrote this letter?

15     A      I would have been asked to do so by Ken Weeks.

16     Q      Have you ever met Steven Cole?

17     A      I don't believe so.

18     Q      Have you ever spoken with him on the telephone?

19     A      I don't believe so.

20     Q      Do you know if he provided any services to Canyon

21 Corporation?

22     A      None that I know of.

23     Q      Were you aware that he was a consultant who

24 provided services to Pan World Minerals International?

25     A      No.

1      Q     Were you aware that Mr. Cole was receiving these

2   shares as compensation for work that he had done for Pan

3   World Minerals International?

4      A     No.

5      Q     Let's look at the next document which is at 11620.

6   This is a March 23, 1995 letter to Mr. Giordano from you,

7   directing the transfer of one million shares of Pan World

8   stock to David Andorl, A-N-D-O-R-L.  Why did you write this

9   letter?

10     A     Because we would have been directed to do so by

11  Ken Weeks.

12     Q     Do you know Mr. David Andorl?

13     A     No, I don't.

14     Q     Have you had any conversations with him?

15     A     I don't believe so.

16     Q     Do you know of a reason why you were transferring

17  a million shares of Pan World stock to him?

18     A     No.

19     Q     Skip the next page which is a fax copy of that

20  same letter.

21           Now, page 11616 is an April 4, 1995 letter to

22  Kevin Mahar, over your name, stating, "For the purchase of

23  two million shares of Pan World Minerals International, Inc.,

24  please forward your check or bank draft to us for $11,000 to

25  the address noted hereon."  Is that your signature on this

307

1    letter?

2         A    Yes, it is.

3         Q    Did you negotiate with Mr. Mahar to purchase --

4    for him to purchase two million shares of Pan World stock for

5    $11,000?

6         A    I did not personally, no.

7         Q    How did you become aware of this transaction?

8         A    I have no recollection of it.

9         Q    Why do you think you wrote this letter?

10        A    Because I would have been asked to do so by

11   Kenneth Weeks.

12        Q    Looking at the next letter, this is an April 4,

13   1995 letter to Patrick Giordano from you.  Do you recognize

14   your signature on this letter?

15        A    Yes, that's my signature.

16        Q    This is directing the transfer of two million

17   shares of Pan World stock to Kevin Mahar and also 750,000

18   shares to Technical Research Reports, Inc.  We talked about

19   Kevin Mahar's transaction at the previous page.  Do you know

20   why you're directing an additional 750,000 shares to

21   Technical Research Reports, Inc.?

22        A    No.

23        Q    Do you know of any services that Technical

24   Research Reports, Inc. provided to Canyon Corporation?

25        A    No, I don't.

45999

1         Q    Were you aware that it prepared a newsletter

2    featuring Pan World Minerals International?

3         A    No.

4         Q    Do you know if this 750,000 shares is compensation

5    to Technical Research for the work it did on Pan World's

6    behalf?

7         A    I don't know.

8         Q    Did you and Ken Weeks discuss why Canyon should

9    transfer these 750,000 shares to Technical Research Reports?

10        A    Not to my recollection.

11        Q    Looking at the next page of Exhibit 19 which is

12   11614, this is a letter to Mr. Giordano dated April 19, 1995.

13   Do you recognize your signature on that letter?

14        A    Yes, it's my signature.

15        Q    It's directing one million shares be transferred

16   to the account of WJM Communications, Inc. at the brokerage

17   firm of Murphy, Marsails, Smith & Namak, Inc.  Do you know

18   why you prepared this letter?

19        A    Because I would have been requested to do so by

20   Kenneth Weeks.

21        Q    Do you know of any services that WJM

22   Communications, Inc. provided to Canyon Corporation?

23        A    No, I don't.

24        Q    Did Canyon Corporation receive any compensation

25   from WJM Communications for these million shares?

309

1          A      Not that I'm aware of.

2          Q      Were you aware that WJM Communications was

3     providing consulting services to Pan World Minerals?

4          A      No.

5          Q      Let's look at 11612.  This is the fax copy of the

6     april 21, 1995 letter to Patrick Giordano, directing another

7     transfer of two million shares of Pan World stock to Kevin

8     Mahar's account.  Did you write this letter at the direction

9     of Ken Weeks?

10         A      I believe so.

11         Q      And that's your signature that appears on it?

12         A      Yes.

13         Q      Now, this letter doesn't indicate any

14    consideration from Mr. Mahar for these shares.  Do you know

15    why there's a difference between the previous letter we

16    looked at where he was going to pay $11,000 and this letter

17    where it appears he's paying nothing?  The previous letter is

18    at 11616.

19         A      Well, I believe they're different types of letters

20    completely.  The April 21 letter to Rimson is authorizing the

21    free transfer of two million shares to Kevin Mahar;

22    similarly, with an earlier letter in --

23         Q      It was on April 4; it's page 11616.

24         A      Similarly, on March 17 there was a transfer of two

25    million shares free, but the letter of April 4 was not

Diversified Reporting Services, Inc.
(202) 296-2929          46001

310

1    directed to M. Rimson, it was a simple letter to Kevin Mahar
2    asking him to pay, as opposed to the direction to the
3    brokerage firm to the transfer the shares to him.

4        Q    I guess what I'm trying to understand is why on
5    one transfer, the April 4, 1995 transfer of two million
6    shares, do you write a letter to Mr. Mahar asking for
7    payment, but as to the other transfers that we've seen to Mr.
8    Mahar, there isn't a similar request for payment.

9        A    Well, I'm not sure if the request of April 4 to
10   Mr. Mahar to pay for two million shares relate to the shares
11   that were transferred to him free on March 17, or if it's
12   another two million shares.

13       Q    Based on looking at the Rimson account statements
14   which are Exhibit 16, there were transferred, out of the
15   account, two million shares on March 17 of 1995, an
16   additional two million shares on April 4, 1995, an additional
17   two million shares on April 21, 1995, all to Kevin Mahar; so
18   there were three transfers that are documented in the Rimson
19   account statements.

20       A    All right.  Well, to answer your question why we
21   only requested payment on April 4, I don't know.

22       Q    I would have you look again at Exhibit 19; the
23   next page is 11611.  This is a May 7, 1995 letter to Patrick
24   Giordano from you directing that 300,000 shares of Pan World
25   stock be transferred to Abram Baum, B-A-U-M, and 150,000

311

1    shares of Pan World stock to Ken Barton, B-A-R-T-O-N.  Do you

2    know why you wrote this letter?

3        A    Because I would have been requested to do so by

4    Ken Weeks.

5        Q    Do you know either Mr. Baum or Mr. Barton?

6        A    No, I don't.

7        Q    Have you had any telephone conversations with

8    those gentlemen?

9        A    No.

10       Q    Do you know of compensation that Canyon

11   Corporation received for the transfer of these shares?

12       A    No.

13       Q    Looking at the next page, 11609, this -- I don't

14   know what this is -- it looks like some kind of a fax

15   transmission to you directing the -- talking about a share

16   transfer instruction.  Do you recognize the handwriting

17   that's on the lower part of this document?

18       A    Yes.  It's mine.

19       Q    What can you tell me about this document?

20       A    I have no recollection of having written that note

21   or seeing the document before, but I obviously did.  Based on

22   the letter immediately following it, I assume that MASCO

23   received this typed instruction and it was followed up by a

24   telephone call with further details to transfer the 17

25   million shares of Pan World to the people named in the fa,

312

1    because that appears to be what was done in the letter that I

2    signed October 3 to Rimson.,

3        Q    In that October 3 letter, you're directing 17

4    million shares of Pan World be transferred through Waterhouse

5    Securities to the account of Richardson Greenshields?

6        A    Yes.

7        Q    Do you remember any discussions with Ken Weeks

8    about this transfer?

9        A    No, I don't.

10       Q    Were you aware that Pan World Minerals had failed

11   to deliver 17 million shares to Richardson Greenshields and

12   that there was a lawsuit that related to that transaction?

13       A    No.

14       Q    Do you know whether the transfer of this 17

15   million shares of Pan World Minerals stock was to pay that

16   obligation that Pan World owed to Richardson Greenshields?

17       A    No, I don't believe I knew that.

18 .     Q    Looking at the next page which is 11618, this is a

19   letter to Sandy Fong from you directing the transfer of

20   750,000 shares of Pan World stock to LaJolla Capital/Richard

21   Smith.  Did you prepare this letter at the direction of Ken

22   Weeks?

23       A    Yes.

24       Q    Do you know Richard Smith?

25       A    No.

46004

313

1       Q    Or why he's receiving these shares?

2       A    No.

3       Q    Did he pay any consideration to Canyon Corporation

4  for these shares?

5       A    Not that I'm aware of.

6       Q    And looking at the last page of Exhibit 19, this

7  is a May 9, 1996 letter to Emmitt Larkin from you directing

8  the transfer of 1,501,000 shares of Pan World to the account

9  of Gray Weeks at Wilson Davis Securities.  Is that your

10  signature on this letter?

11      A    Yes, it is.

12      Q    Did you create this letter at the direction of Ken

13  Weeks?

14      A    Yes, I believe so.

15      Q    Do you know why Gray Weeks is receiving over a

16  million shares of Pan World stock?

17      A    No, I don't.

18      Q    Did Canyon Corporation receive any compensation

19  from Mr. Gray Weeks for these shares?

20      A    Not that I'm aware of.

21      Q    Were you aware that Gray Weeks is the father of

22  Ken Weeks?

23      A    No, I was not.

24           MS. HENDRICKSON:  Why don't we take a five-minute

25  break.  We're off the record.

314

1          (Whereupon, a short recess was taken.)

2          MS. HENDRICKSON:  We are back on the record after

3    a short break.

4          Mr. Cordes, what I have placed in front of you is

5    Exhibit Number 20.  This is a three-page document; it's a

6    summary that was created by Carleen Achuff, in our office, of

7    the transactions in Canyon Corporation's bank account at CIBC

8    Freeport.

9                              (SEC Exhibit No. 20 was marked

10                             for identification.)

11          BY MS. HENDRICKSON:

12     Q    Have you had a chance to familiarize yourself with

13    it?

14     A    Yes, I have.

15     Q    On the third page is a summary of where the

16    credits came from and where the debits went, the sources of

17    the deposits in the account and where the money was

18    disbursed.

19          It appears that roughly $359,000 was deposited

20    into the account from the Rimson brokerage account and the

21    sales of Pan World stock, and that approximately $147,000 was

22    deposited from Canyon's account at Yorkton, again from the

23    sale of Pan World stock.  the balance of the money that comes

24    in, we have talked about in your testimony in the last two

25    days, and so I'm not going to repeat those things, but in

315

1   terms of where the money was disbursed, did you receive

2   instructions from Ken Weeks about where the money should be

3   distributed?

4        A    Yes.

5        Q    And would you have made any of the distributions

6   without instructions from him?

7        A    No, with the obvious exception of bank fees and

8   the $4,000 payment which would be for MASCO's corporate fees.

9        Q    And that 4,000 payment was made to Aspen

10  Investments, Inc.?

11       A    That's correct.

12       Q    Do you know of any work that Robert Scudieri has

13  done on behalf of Canyon Corporation for which he received

14  over $200,000?

15       A    No, I don't.

16       Q    Do you know of any work that Ken Weeks has done to

17  receive $139,000?

18       A    No, I don't.

19       Q    Likewise, do you know why Stockton, Ltd. received

20  $87,000 from the Canyon Corporation account?

21       A    No, I don't.

22       Q    As to the other entities that are listed, aside

23  from Aspen Investments, are you aware of any services

24  provided by those persons or entities in exchange for the

25  compensation they received?

316

1      A    I tnink we'd also have to exclude the fixed term

2    deposit which was an in-and-out transaction; otherwise, no, I

3    do not.

4      Q    Are you aware of any property that Canyon received

5    from these individuals or entities in exchange for this

6    compensation?

7      A    No.

8      Q    Are you aware of any loan arrangements that were

9    repaid to these individuals or entities on Canyon's behalf?

10     A    No, I'm not.

11     Q    Are you aware of any of these payments being gifts

12   made from Canyon Corporation?

13     A    No, I'm not.

14     Q    The payments to American Express which totalled

15   $31,100, were they expenses that were incurred by Canyon

16   Corporation?

17     A    No, they weren't.

18     Q    Were they incurred by MASCO employees?

19     A    No, they weren't.

20     Q    Do you know whose American Express bills those

21   related to?

22     A    No, I couldn't say.  We discussed the American

23   Express situation yesterday, and my recollection is that we

24   have seen, in one or two instances, the top of the monthly

25   American Express credit card bill for the sake of having an

1    account number and name and an amount to pay for certain

2    people.  We have paid American Express bills in the name of

3    Michele Martin and for another account that I don't

4    remember -- I don't believe it was Ken Weeks, but there was

5    another account number -- I don't even know if I knew the

6    name at the time -- but that's all I remember about it.

7          Q    I want to talk with you about Canyon's account at

8    Yorkton for a few minutes.  I've put back in front of you

9    Exhibit 17.  Did you personally direct any of the purchases

10   or sales of stock that occurred in Canyon's Yorkton account?

11         A    No, I didn't.

12         Q    Did anyone at MASCO direct the purchases or sales

13   that occurred in Canyon's account at Yorkton?

14         A    No.

15         Q    Are you aware of who placed the orders in Canyon's

16   account at Yorkton?

17         A    No.

18         Q    Do you have any reason to believe that Ken Weeks

19   or David Hesterman placed those orders?

20         A    I believe one of them would have.

21         Q    Did Ken Weeks or David Hesterman ever discuss with

22   you any of the transactions that occurred in the Yorkton

23   account?

24         A    I don't recall.

25         Q    Did you ever give trading authorization to either

318

1      Ken Weeks or David Hesterman to act in the Canyon account?

2           A    I don't believe so.

3           Q    Now I want to switch from talking about Canyon

4      Corporation to talking about Stockton, Ltd.  Now, Stockton,

5      Ltd. was a Nevis corporation that was created by MASCO at the

6      direction of Ken Weeks.

7           A    Yes.

8           Q    And it had several brokerage accounts which we

9      spoke about yesterday.

10          A    Yes.

11          Q    And in particular, I want to talk about the

12     brokerage accounts at Yorkton, at Pacific, at Investors

13     Associates, and at LaJolla Capital.

14               Starting with Stockton's account at Yorkton, did

15     you personally do any of the trading that occurred in that

16     account?

17          A    No.

18          Q    Did any other employee of MASCO do the trading

19     that occurred in that account?

20          A    No.

21          Q    Do you have any reason to believe that Ken Weeks

22     directed the trading that occurred in Stockton's account at

23     Yorkton?

24          A    I believe he probably did.

25          Q    Do you have any reason to believe that David



EXHIBIT 5



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
CENTRAL REGIONAL OFFICE
1801 CALIFORNIA STREET
SUITE 4800
DENVER, COLORADO 80202-2648

In replying
please quote
CHA
D-2049

December 14, 1998

VIA PERSONAL SERVICE

Robert E. Cordes
c/o Management & Services Company, Ltd.
P.O. Box F42544
Freeport, BAHAMAS

> Re:   *In the Matter of Dynamic American Corp.* (D-2049)

Dear Mr. Cordes:

The enclosed subpoena *duces tecum* has been issued pursuant to a formal order of investigation entered by the United States Securities and Exchange Commission ("Commission") in the above-captioned matter. The subpoena requires you to testify and to produce documents to the Commission by Tuesday, January 12, 1999 at 9:00 a.m. at the Commission's Central Regional Office, 1801 California Street, Suite. 4800, Denver, Colorado 80202-2648.

Information provided is subject to the Commission's routine uses. A list of those uses is contained in the enclosed copy of SEC Form 1662, which also contains other important information.

This inquiry is confidential and should not be construed as an indication by the Commission or its staff that any violation of the United States federal securities laws has occurred, nor should it be construed as an adverse reflection on any person, entity, or security. If you have any questions concerning this matter, you or your attorney may call me at (303) 844-1098 or Robert A. Intartaglio at (303) 844-1012.

Sincerely,

Carleen H. Achuff
Regional Geologist

Enclosures:   Subpoena *duces tecum* with Attachment
SEC Form 1662

EXHIBIT
_122_
D-2049
1/27/99

48419

8E-GC-2

## SUBPOENA DUCES TECUM

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

TO _Robert E. Cordes, c/o Management + Services Company, Ltd._
_P.O. Box F 42544, Freeport, Bahamas_

At the instance of _the United States Securities and Exchange Commission_
you are hereby required to appear before _Carleen H. Achuff,_
_Robert A. Intortaglio, or any other Officer_

of the Securities and Exchange Commission, at _1801 California Street,_
_Suite 4800_

in the City of _Denver, Colorado  80210-2648_
on the _12th_ day of _January_____, 19 _99_, at _9:00_ o'clock
_a._m. of that day, to testify in the Matter of _Dynamic American_
_Corporation_____ involving _an investigation pursuant to_
_a formal order issued by the Securities and Exchange Commission under the_
_authority of Section 20 (a) of the Securities Act of 1933, as amended, and Section_ 21(a)
_of the Securities Exchange Act of 1934, as amended._
And you are hereby required to bring with you and produce at said time
and place the following books, papers, and documents:

_as described in the Attachment hereto:_

### Fail not at your peril.

In testimony whereof, the seal of the Securities
and Exchange Commission is affixed hereto, and
the undersigned, a member of said Securities and
Exchange Commission, or an officer designated by
it, has hereunto set his hand at _Denver, Colorado_
this _14th_ day of _December_____, 19 _98_.

_Carleen H. Achuff_
Carleen H. Achuff, an Officer

NOTICE TO WITNESS.—If claim is made for witness fee or mileage, this subpœna should accompany voucher.  Witness fees and
mileage shall be paid by the party at whose instance the witness appears.

48420

ATTACHMENT TO SUBPOENA DUCES TECUM

RE:    *In the Matter of Dynamic American Corp. (D-2049)*
TO:    Robert E. Cordes
DATE:    December 14, 1998

Produce the following documents in your custody, possession. or control and in the same form and order in which they are maintained by you that were created during or that reflect events that occurred during, **the period January 1, 1994 to the date of this subpoena ("the period")**.

In this attachment, **"MASCO"** refers to any and all of the following, whether individually or collectively: Management & Services Company, Ltd. and its subsidiaries. officers. directors. control persons, employees, independent contractors, agents, or affiliates; Robert E. Cordes: Lynn Turnquist, also known as Lynn Turnquest; and Dorothea A. Kent, also known as D.A. Kent.

1.    Documents sufficient to identify all officers, directors, control persons. 5%-or-greater shareholders, and persons having a beneficial interest in the following:
        a.    Stockton, Ltd.;
        b.    Hamilton, Ltd.;
        c.    Wahoo International, a Florida partnership;
        d.    Wahoo International Corp., a Nevis corporation;
        e.    Canyon Corporation;
        f.    Andrew Industries, Inc.; and
        g.    X-Strav Graphics.

2.    Articles of incorporation, other formation documents, documents appointing the officers and directors, corporate minutes, and corporate resolutions of the following:
        a.    Stockton, Ltd.;
        b.    Hamilton, Ltd.;
        c.    Wahoo International, a Florida partnership;
        d.    Wahoo International Corp., a Nevis corporation;
        e.    Canyon Corporation;
        f.    Andrew Industries, Inc.; and
        g.    X-Strav Graphics.

3.    Contracts. agreements, correspondence, invoices, and letters of intent between MASCO and any of the following:
        a.    Stockton, Ltd.;
        b.    Hamilton, Ltd.;
        c.    Wahoo International, a Florida partnership;
        d.    Wahoo International Corp., a Nevis corporation;
        e.    Canyon Corporation;
        f.    Andrew Industries, Inc.; and
        g.    X-Strav Graphics.

48421

4. Banking records for the period identifying all persons with authority to direct transactions in the account, monthly statements of account, copies of the front and back sides of all checks that debit or credit the account, deposit slips, wire transfer advices for all incoming or outgoing wires, and correspondence with the bank for all bank accounts in the names of each of the following:

    a.    Stockton, Ltd.;
    b.    Hamilton, Ltd.;
    c.    Wahoo International, a Florida partnership;
    d.    Wahoo International Corp., a Nevis corporation;
    e.    Canyon Corporation;
    f.    Andrew Industries, Inc.; and
    g.    X-Strav Graphics.

5. Account statements for the period for all brokerage accounts in the names of each of the following:

    a.    Stockton, Ltd.;
    b.    Hamilton, Ltd.;
    c.    Wahoo International, a Florida partnership;
    d.    Wahoo International Corp., a Nevis corporation;
    e.    Canyon Corporation;
    f.    Andrew Industries, Inc.; and
    g.    X-Strav Graphics.

6. Documents identifying the amount, type, and payor of all compensation received by MASCO from or on behalf of the following:

    a.    Stockton, Ltd.;
    b.    Hamilton, Ltd.;
    c.    Wahoo International, a Florida partnership;
    d.    Wahoo International Corp., a Nevis corporation;
    e.    Canyon Corporation;
    f.    Andrew Industries, Inc.; and
    g.    X-Strav Graphics.
    h.    Robert G. Weeks
    i.    David A. Hesterman
    j.    Kenneth L. Weeks
    k.    PanWorld Minerals International, Inc.
    l.    Dynamic American Corp.
    m.    Nathan Drage
    n.    Richard J. Gladstone
    o.    Terry C. Turner
    p.    Bolivian Tin & Silver
    q.    Bartos Gold Holding Company

7. To the extent not provided in response to the previous Items, all correspondence during the period between MASCO and any other person or entity that refers to, relates to, or reflects Dynamic American Corp. or PanWorld Minerals International, Inc..

48422

EXHIBIT 4

# United States District Court

**Northern Division** ──────── **Utah**

──────── DISTRICT OF ────────

TO:

**ROBERT CORDES**

## SUBPOENA TO TESTIFY
## BEFORE GRAND JURY

SUBPOENA FOR:

XX

☐ PERSON          ☐ DOCUMENT(S) OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE District of Utah-Grand Jury No. N1197<br>Frank E. Moss Federal Courthouse<br>350 South Main Street<br>Salt Lake City, Utah 84101 | COURTROOM Room 311<br><br>DATE AND 01/06/98<br>9:30A.M. |
|---|---|

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):*

☐ Please see additional information on reverse

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK<br><br>MARKUS B. ZIMMER | DATE<br><br>12/15/98 |
|---|---|
| (BY) DEPUTY CLERK | |

This subpoena is issued on application
of the United States Attorney's Office
N-97-108

NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY
185 South State St. #400
Salt Lake City, Utah 84111
(801) 524-5682

**ORIGINAL**
**RETURN TO COURT**

*If not applicable, enter "none"

EXHIBIT 7

EXHIBIT 7



EXHIBIT
Canoyrs
20
RE-1

printed 1/23/99

CHA, 1/19/99, page 1 of 3

10-19, CIBC, Freeport

| STMT DATE | ITEM | PAYEE | DEBIT | CREDIT | BALANCE | PAYOR | COMMENTS | BATES #1 | BATES #2 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.00 | | | 11524-11600 | |
| 10/31/94 | | | | 1,000.00 | 1,000.00 | | to open a/c | 11524-11600 | |
| 10/31/94 | | bank fee | 6.00 | | 994.00 | | | 11524-11600 | |
| 11/01/94 | | Ken Weeks Insurance Services | 10,000.00 | | 11,459.56 | Canyon a/c, Rimson | Bank One a/c 1156-1241 | 11524-11600 | 11609-11676 |
| 11/03/94 | wire | | | 10,459.56 | 11,459.56 | | | 11524-11600 | |
| 11/03/94 | | bank fee | 55.25 | | 1,385.31 | | | 11524-11600 | |
| 11/07/94 | wire | Ken Weeks Insurance Services, Inc. | 5,000.00 | | 6,395.31 | Puritan Communications, Inc. | Bank One a/c 1156-1241 | 11524-11600 | PW 141650 |
| 11/09/94 | | | | 5,000.00 | 1,388.31 | | R. sale of BGHC PW stk in Barlos #2 | 11524-11600 | |
| 11/09/94 | | bank fee | 42.75 | | 1,352.56 | | Bank One a/c 1156-1241 | 11524-11600 | |
| 11/15/94 | wire | Ken Weeks Insurance Services | 20,000.00 | | 21,352.56 | Puritan Communications, Inc. | R. sale of BGHC PW stk in Barlos #2 | 11524-11600 | PW 141670 |
| 11/15/94 | | | | 20,000.00 | 1,352.56 | | Bank One a/c 1156-1241 | 11524-11600 | |
| 11/15/94 | | bank fee | 55.25 | | 1,297.31 | | | 11524-11600 | |
| 12/20/94 | wire | Ken Weeks Insurance Services | 11,000.00 | | 12,504.81 | Canyon a/c, Rimson | Bank One a/c 1156-1241 | 11524-11600 | 11609-11676 |
| 12/20/94 | | | | 11,207.50 | 1,504.81 | | | 11524-11600 | |
| 12/20/94 | | bank fee | 55.25 | | 1,449.56 | | | 11524-11600 | |
| 01/04/95 | | | | | 14,545.68 | | | 11524-11600 | |
| 01/05/95 | wire | Ken Weeks Insurance Services | 12,000.00 | | 2,545.68 | Santino, Canyon a/c, Rimson | Bank One a/c 1156-1241 | 11524-11600 | 11609-11676 |
| 01/05/95 | | bank fee | 55.25 | | 2,490.43 | | | 11524-11600 | |
| 01/19/95 | | | | 13,098.12 | 50,457.43 | | | 11524-11600 | |
| 01/20/95 | wire | Ken Weeks | 48,000.00 | | 2,457.43 | Canyon a/c, Rimson | Beehive CU a/c 40800501 | 11524-11600 | 11609-11676 |
| 01/20/95 | | bank fee | 60.25 | | 2,397.18 | | | 11524-11600 | |
| 02/06/95 | | | | 47,987.00 | 49,604.13 | | | 11524-11600 | |
| 02/07/95 | wire | Ken Weeks | 47,000.00 | | 2,604.13 | Santino, Canyon a/c, Rimson | Beehive CU a/c 40800501 | 11524-11600 | 11609-11676 |
| 02/07/95 | | bank fee | 59.63 | | 2,544.50 | | | 11524-11600 | |
| 02/10/95 | | | | 47,206.85 | 24,511.50 | | | 11524-11600 | 11609-11676 |
| 02/14/95 | wire | Ken Weeks | 44,000.00 | 21,967.00 | 48,027.75 | Santino, Canyon a/c, Rimson | Beehive CU a/c 40800501 | 11524-11600 | 11609-11676 |
| 02/14/95 | | | | 23,516.25 | 4,027.75 | Canyon a/c, Yorkton | | 11524-11600 | 11609-11676 |
| 02/14/95 | | bank fee | 57.75 | | 3,970.00 | | | 11524-11600 | |
| 02/15/95 | wire | American Express | 17,000.00 | 5,626.25 | 9,596.25 | Canyon a/c, Yorkton | | 11524-11600 | 11609-11676 |
| 02/21/95 | | | | 21,556.25 | 31,152.50 | Canyon a/c, Yorkton | | 11524-11600 | 11609-11676 |
| 02/21/95 | | | | 41,171.81 | 72,324.31 | Canyon a/c, Rimson | | 11524-11600 | 11609-11676 |
| 03/01/95 | wire | American Express | 17,000.00 | | 55,324.31 | | | 11524-11600 | |
| 03/01/95 | | bank fee | 25.25 | | 55,299.06 | | | 11524-11600 | |
| 03/01/95 | wire | Joseph Fabiili | 11,462.00 | | 43,837.06 | | | 11524-11600 | |
| 03/01/95 | | bank fee | 55.25 | | 43,781.81 | | | 11524-11600 | |
| 03/02/95 | check | Aspen Investments, Inc. | 4,000.00 | | 39,781.81 | | Banco Central Hispano - USA a/c 1139621 | 11524-11600 | |
| 03/08/95 | | | | 42,689.00 | 82,471.81 | Canyon a/c, Yorkton | | 11524-11600 | |
| 03/09/95 | | | | 16,662.50 | 99,134.31 | Canyon a/c, Yorkton | | 11524-11600 | |
| 03/10/95 | wire | Robert Scudieri | 20,845.00 | | 78,289.31 | | Bank of New York a/c 6300852945 | 11524-11600 | |
| 03/10/95 | | bank fee | 55.25 | | 78,234.06 | | | 11524-11600 | |
| 03/14/95 | | | | 15,572.50 | 93,806.56 | Canyon a/c, Yorkton | | 11524-11600 | |
| 03/14/95 | wire | Robert Scudieri | 7,830.00 | | 85,976.56 | | Bank of New York a/c 6300852945 | 11524-11600 | 11609-11676 |
| 03/14/95 | | bank fees | 49.83 | | 85,926.73 | | | 11524-11600 | |
| 03/15/95 | wire | Robert Scudieri | 7,280.00 | | 78,646.73 | | Bank of New York a/c 6300852945 | 11524-11600 | |
| 03/15/95 | | bank fee | 48.45 | | 78,598.28 | | | 11524-11600 | |
| 03/17/95 | | | | 22,120.00 | 100,718.28 | Canyon a/c, Yorkton | | 11524-11600 | |
| 03/17/95 | wire | Robert Scudieri | 10,560.00 | | 90,158.28 | | Bank of New York a/c 6300852945 | 11524-11600 | 11609-11676 |
| 03/17/95 | | bank fees | 55.25 | | 90,103.03 | | | 11524-11600 | |
| 03/21/95 | wire | Robert Scudieri | 20,000.00 | | 70,103.03 | | Bank of New York a/c 6300852945 | 11524-11600 | |
| 03/21/95 | | bank fee | 55.25 | | 70,047.78 | | | 11524-11600 | |
| 03/22/95 | | 30-day fixed deposit | 34,000.00 | | 36,047.78 | Canyon a/c, Yorkton | see deposit of $34,769.65 on 8/30/95 | 11566 | 11534 |

canyonbk.xls)

printed 12/30

a/c 03010-19, CIBC, Freeport

| STMT DATE | ITEM | PAYEE | DEBIT | CREDIT | BALANCE | PAYOR | COMMENTS | BATES #1 | BATES #2 |
|---|---|---|---|---|---|---|---|---|---|
| 03/28/95 | wire | Larkin t/b/o Canyon @ Rimson | 3,767.50 | | 32,280.28 | | Sanwa Bank California a/c 0660-20322 | 11524-11600 | 11609-11676 |
| 03/28/95 | | bank fee | 42.25 | | 32,238.03 | | | 11524-11600 | 11609-11676 |
| 03/28/95 | wire | Oro de Aztecas S.A. de C.V. | 15,250.00 | | 16,988.03 | | Banco Union, Hermosillo, MX, 091-900007-8 | 11524-11600 | |
| 03/28/95 | | bank fee | 55.25 | | 16,932.78 | | | 11524-11600 | |
| 03/28/95 | | | | 73,350.00 | 90,282.78 | Canyon a/c, Rimson | | 11524-11600 | 11609-11676 |
| 03/31/95 | wire | Robert Scudieri | 39,000.00 | | 51,282.78 | | Citibank a/c 04330912 | 11524-11600 | |
| 03/31/95 | | bank fee | 55.25 | | 51,227.53 | | | 11524-11600 | |
| 03/31/95 | | stamp duty | 0.50 | | 51,227.03 | | | 11524-11600 | |
| 04/05/95 | wire | Michele Martin | 7,000.00 | | 44,227.03 | | Chase Manhattan a/c 3741027001 | 11524-11600 | |
| 04/05/95 | | bank fee | 47.75 | | 44,179.28 | | | 11524-11600 | |
| 04/07/95 | wire | American Express | 14,100.00 | | 30,079.28 | | | 11524-11600 | |
| 04/07/95 | | bank fee | 25.25 | | 30,054.03 | | | 11524-11600 | |
| 04/07/95 | wire | Colonial National Bank | 2,500.00 | | 27,554.03 | | | 11524-11600 | |
| 04/07/95 | | bank fee | 10.25 | | 27,543.78 | | | 11524-11600 | |
| 04/10/95 | | | | 10,390.59 | 37,934.37 | Canyon a/c, Rimson | | 11524-11600 | 11609-11676 |
| 04/12/95 | | | | 10,999.75 | 48,934.12 | Kevin P. Mahar | Michigan Natl check #427, Mahar a/c | 11524-11600 | |
| 04/12/95 | | | | 15,367.00 | 64,301.12 | Sardine, Canyon a/c, Rimson | | 11524-11600 | 11609-11676 |
| 04/13/95 | wire | Robert Scudieri | 10,000.00 | | 54,301.12 | | Citibank a/c 04330912 | 11524-11600 | |
| 04/13/95 | | bank fee | 55.25 | | 54,245.87 | | | 11524-11600 | |
| 04/19/95 | wire | Michele Martin | 3,000.00 | | 51,245.87 | | Chase Manhattan a/c 3741027001 | 11524-11600 | |
| 04/19/95 | | bank fee | 42.25 | | 51,203.62 | | | 11524-11600 | |
| 04/21/95 | | | | 40,967.00 | 92,170.62 | Canyon a/c, Rimson | | 11524-11600 | 11609-11676 |
| 04/21/95 | wire | Michele Martin | 3,000.00 | | 89,170.62 | | Chase Manhattan a/c 3741027001 | 11524-11600 | |
| 04/21/95 | | bank fee | 42.25 | | 89,128.37 | | | 11524-11600 | |
| 04/21/95 | wire | Oro de Aztecas S.A. de C.V. | 4,750.00 | | 84,378.37 | | Banco Union, Hermosillo, MX, 091-900007-8 | 11524-11600 | |
| 04/21/95 | | bank fee | 42.25 | | 84,336.12 | | | 11524-11600 | |
| 04/21/95 | wire | Oro de Aztecas S.A. de C.V. | 15,250.00 | | 69,086.12 | | Banco Union, Hermosillo, MX, 091-900007-8 | 11524-11600 | |
| 04/21/95 | | bank fee | 55.25 | | 69,030.87 | | | 11524-11600 | |
| 04/21/95 | wire | Robert Scudieri | 25,000.00 | | 44,030.87 | | Citibank a/c 04330912 | 11524-11600 | |
| 04/21/95 | | bank fee | 55.25 | | 43,975.62 | | | 11524-11600 | |
| 04/21/95 | wire | Robert Scudieri | 25,000.00 | | 18,975.62 | | Citibank a/c 04330912; debit slip missing | 11524-11600 | |
| 04/21/95 | | bank fee | 55.25 | | 18,920.37 | | | 11524-11600 | |
| 04/28/95 | | bank fees | 0.25 | | 18,920.12 | | | 11524-11600 | |
| 05/02/95 | | | | 25,967.00 | 44,887.12 | Canyon a/c, Rimson | | 11524-11600 | 11609-11676 |
| 05/03/95 | wire | Michele Martin | 2,000.00 | | 42,887.12 | | Chase Manhattan a/c 3741027001 | 11524-11600 | |
| 05/03/95 | | bank fee | 42.25 | | 42,844.87 | | | 11524-11600 | |
| 05/03/95 | wire | Robert Scudieri | 14,500.00 | | 28,344.87 | | Citibank a/c 04330912 | 11524-11600 | |
| 05/03/95 | | bank fee | 55.25 | | 28,289.62 | | | 11524-11600 | |
| 05/08/95 | wire | Robert Scudieri | 3,000.00 | | 25,289.62 | | Citibank a/c 04330912 | 11524-11600 | |
| 05/08/95 | | bank fee | 42.25 | | 25,247.37 | | | 11524-11600 | |
| 05/12/95 | wire | Robert Scudieri | 5,000.00 | | 20,247.37 | | Citibank a/c 04330912 | 11524-11600 | |
| 05/12/95 | | bank fee | 42.75 | | 20,204.62 | | | 11524-11600 | |
| 05/16/95 | wire | Robert Scudieri | 12,000.00 | | 8,204.62 | | Citibank a/c 04330912 | 11524-11600 | |
| 05/16/95 | | bank fee | 55.25 | | 8,149.37 | | | 11524-11600 | |
| 05/31/95 | | bank fees | 0.25 | | 8,149.12 | | | 11524-11600 | |
| 06/01/95 | wire | Michele Martin | 2,500.00 | | 5,649.12 | | Chase Manhattan a/c 3741027001 | 11524-11600 | |
| 06/01/95 | | bank fee | 42.25 | | 5,606.87 | | | 11524-11600 | |
| 06/22/95 | wire | Prudential Securities | 2,616.50 | | 2,990.37 | | Canyon a/c ONE-881-428, INVA | 11524-11600 | 11608 |
| 06/22/95 | | bank fee | 42.25 | | 2,948.12 | | | 11524-11600 | |
| 06/22/95 | wire | Michele Martin | 2,000.00 | | 948.12 | | Chase Manhattan a/c 3741027001 | 11524-11600 | |
| 06/27/95 | | bank fee | 42.25 | | 905.87 | | | 11524-11600 | |

printed 1/23/96

CHA, 1/19/99, page 3 of 3

: 03010-19, CIBC, Freeport

| STMT DATE | ITEM | PAYEE | DEBIT | CREDIT | BALANCE | PAYOR | COMMENTS | BATES #1 | BATES #2 |
|---|---|---|---|---|---|---|---|---|---|
| 06/29/95 | | | | 2,485.00 | 3,390.87 | David A. Hesterman | | 1524-11600 | |
| 07/19/95 | | | | 66,000.00 | 69,390.87 | Nissan Simhon | | 1524-11600 | |
| 08/02/95 | wire | Michele Marin | 2,500.00 | | 66,890.87 | | Chase Manhattan a/c 3741027001 | 1524-11600 | |
| 08/02/95 | | bank fee | 42.25 | | 66,848.62 | | | 1524-11600 | |
| 08/10/95 | | bank fee | | 1,418.12 | 68,266.74 | | No backup | 1524-11600 | |
| 08/16/95 | wire | Michele Marin | 16,000.00 | | 52,266.74 | | Chase Manhattan a/c 3741027001 | 1524-11600 | 11531 |
| 08/16/95 | wire | Michele Marin | 30.25 | | 52,236.49 | | | 1524-11600 | |
| 08/25/95 | wire | Michele Marin | 30,000.00 | | 22,236.49 | | Chase Manhattan a/c 3741027001 | 1524-11600 | |
| 08/25/95 | | bank fee | 55.25 | | 22,181.24 | | | 1524-11600 | |
| 08/28/95 | | | | | 52,236.49 | ? revenue 8/25 wire to Michele? | | 1524-11600 | |
| 08/30/95 | check | Stockton Ltd. | 85,000.00 | | 87,006.14 | ? $34K fixed term dep on 3/27? | No backup | 1524-11600 | 11554 |
| 08/30/95 | | | | 30,055.25 | 52,236.49 | | poss. dep to Stockton @ CIBC w/ anoth $5K | 1524-11600 | 11566 |
| 08/31/95 | | bank fees | 1.00 | | 2,006.14 | | no transactions in September | 1524-11600 | 1009-11327 |
| 08/29/95 | | | | 34,769.65 | 2,005.14 | | | 1524-11600 | |
| 10/00/95 | | Stockton Ltd. | 2,005.14 | | (0.00) | | Acct closed; transf to CIBC a/c 03110-14 | 1524-11600 | |
| | | | | | (0.00) | | | | |
| | | | 678,586.05 | 678,586.05 | | | | | |
| | | Robert Scuderi | 200,015.00 | 359,114.53 | | Canyon a/c, Rimson, sale of PW | | | |
| | | Ken Weeks | 139,000.00 | 147,743.75 | | Canyon a/c, Yorkton, sale of PW | | | |
| | | Stockton, Ltd. a/c, CIBC | 87,005.14 | 66,000.00 | | Nissan Simhon | | | |
| | | Michele Marin | 88,000.00 | 34,769.65 | | return of fixed term dep, w/ interest | | | |
| | | Ken Weeks Insurance Services | 58,000.00 | 30,055.25 | | unknown, poss. reversal of wire to Michele Marin? | | | |
| | | Oro de Americas S.A. de C.V. | 35,250.00 | 25,000.00 | | Puritan Communications, sale of PW | | | |
| | | fixed term deposit | 34,000.00 | 10,999.75 | | Kevin P. Maher, purchase of PW options | | | |
| | | American Express | 31,100.00 | 2,485.00 | | David A. Hesterman, Zions a/c | | | |
| | | Joseph Fabilli | 11,462.00 | 1,418.12 | | unknown | | | |
| | | Aspen Investments, Inc. | 4,000.00 | 1,000.00 | | unknown, to open a/c | | | |
| | | Canyon a/c, Rimson | 3,767.50 | | | | | | |
| | | Canyon a/c, Investors Associates | 2,615.50 | | | | | | |
| | | Colonial National Bank | 2,500.00 | | | | | | |
| | | bank fees | 1,869.81 | | | | | | |

EXHIBIT 8

FILED

Thomas M. Melton (4999)
Securities and Exchange Commission
50 South Main Street, Suite 500
Salt Lake City, Utah  84144

Leslie J. Hendrickson
Robert M. Fusfeld
Securities and Exchange Commission
1801 California Street, Suite 4800
Denver, Colorado 80203

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| Securities and Exchange Commission, | : | |
| | : | |
| Plaintiff, | : | Civil No. |
| | : | |
| v. | : | **2:97CV 0425I** |
| | : | |
| PanWorld Minerals International, Inc., | : | |
| Robert G. Weeks, Kenneth L. Weeks, | : | |
| David A. Hesterman, Larry Krasny, | : | |
| L.K. Management Inc., | : | |
| Joseph Fabiilli, Puritan | : | |
| Communications, Inc., Jerome Wenger, | : | **COMPLAINT** |
| and Randall Gilbert, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| Rita Hilsenrath Wenger, and | : | |
| Canyon Corporation, | : | |
| | : | |
| Relief Defendants. | : | |

The plaintiff, the United States Securities and Exchange

Commission (Commission), alleges:

## SUMMARY

1.  From 1989 through 1995, PanWorld Minerals Interna-
tional, Inc. (PanWorld), a public corporation headquartered in
Salt Lake City, Utah, its chief executive officer, its control
persons, and other persons acting in concert with them violated
the anti-fraud and registration provisions of the federal secu-
rities laws.  Robert Weeks, the chief executive officer of Pan-
World, David Hesterman, and Ken Weeks, who were control persons
of PanWorld, spearheaded the fraudulent scheme.

2.  These defendants prepared false periodic reports filed
with the Commission, and distributed promotional materials to
investors and broker-dealers that fraudulently inflated the
value of PanWorld's mineral properties, misrepresented the
status of PanWorld's business operations, its skill, experience
and expertise in mining, and projected huge revenues and earn-
ings per share, among other things.  At the time defendants were
making these false statements, which were designed to give the
impression that PanWorld was an active, viable company with
profitable business operations, defendants Robert Weeks, Hester-
man and Ken Weeks also solicited a network of "consultants" to
fraudulently tout PanWorld stock.  While disseminating false
statements and engaging in other conduct to fraudulently stimu-

2

late investor interest, they manipulated the market price of
PanWorld's common stock and sold PanWorld stock into the market.

    3.    Defendants L.K. Management Co., Inc., controlled by
Larry Krasny, Puritan Communications, Inc., controlled by Joseph
Fabiilli, and Jerome Wenger, participated as consultants to Pan-
World, along with Robert Weeks, Ken Weeks and Hesterman in the
fraudulent scheme to create market demand for PanWorld stock.
They fraudulently and/or without a reasonable basis recommended
PanWorld stock to investors and solicited investors to buy Pan-
World stock.  While fraudulently touting PanWorld stock, these
promoters did not disclose that they (1) received millions of
shares of stock from PanWorld for their promotional efforts and
(2) were personally selling PanWorld stock at the same time that
they were recommending the stock and soliciting public investors
to purchase it.  Further, Puritan, and Fabiilli, also engaged in a
manipulation of PanWorld stock in the market by various means, in-
cluding wash trades.  Defendant Randall Gilbert engaged in a ma-
nipulation of the price of PanWorld's stock by buying shares and
holding them off the market to reduce the supply of stock and by
other means.

    4.    Between 1989 and 1995, as a result of this fraudulent
conditioning of the market for PanWorld stock, various defendants
engaged in a massive distribution of unregistered stock and col-

lectively sold hundreds of millions of shares of PanWorld stock to public investors. A portion of the proceeds of these sales were used to surreptitiously fund the business operations of PanWorld. Between 1989 and 1995, the number of shares of common stock of PanWorld increased from 2,686,236 shares to 491,283,026 shares. While some of the shares sold were registered with the Commission pursuant to Form S-8 and Regulation S, many of the sales were of stock that was not properly registered for public sale.

5.    While fraudulently touting PanWorld stock and manipulating its market price, Robert Weeks, Ken Weeks, Hesterman and their nominees sold PanWorld stock to unsuspecting public investors, collectively realizing proceeds of at least $6.4 million.

6.    While fraudulently touting PanWorld stock and manipulating its market price, Larry Krasny, L.K. Management, Joseph Fabiilli, Puritan Communications, and Jerome Wenger sold PanWorld stock which they owned or controlled to unsuspecting public investors, collectively realizing proceeds of at least $3 million.

7.    By engaging in this conduct, defendants Robert Weeks, David Hesterman, Ken Weeks, Larry Krasny, L.K. Management, Joseph Fabiilli, Puritan Communications, and Jerome Wenger have violated, and unless restrained and enjoined, will continue to violate Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (Securities Act) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section

4

10(b) of the Securities Exchange Act of 1934 (Exchange Act) [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Additionally, Larry Krasny, L.K. Management, Joseph Fabiilli, Puritan Communications, and Jerome Wenger have violated, and unless restrained and enjoined, will continue to violate Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)], and Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]. PanWorld has violated, and unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. PanWorld, Robert Weeks, and Hesterman have violated, and unless restrained and enjoined will continue to violate the record-keeping provisions of Sections 13(a) and 15(d) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78o(a)] and Rules 12b-20, 12b-25, 13a-1, 13a-13, 15d-1 and 15d-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.12b-25, 240.13a-1, 240.13a-13, 240.15d-1, and 240.15d-13]. Randall Gilbert has violated, and unless restrained and enjoined will continue to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### JURISDICTION

8.   This Court has jurisdiction in this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].