9.    The defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the acts, practices, and courses of business alleged in this complaint.

10.    Plaintiff Commission brings this action pursuant to authority conferred on it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§ 78u(d)].

11.    Certain of the defendants reside in the District of Utah and certain of the acts and practices alleged in this complaint occurred in the District of Utah.

### THE DEFENDANTS

12.    **PanWorld Minerals International, Inc.** (PanWorld) is a Nevada corporation with its principal place of business in Salt Lake City, Utah. PanWorld's common stock at all relevant times was publicly traded.

13.    **Robert G. Weeks**, age 55, (Robert Weeks) is a resident of Salt Lake City, Utah. He is the president and a director of Pan-World. He directed and controlled the activities of PanWorld described in this complaint.

14.    **David A. Hesterman** (Hesterman), age 40, is a resident of Salt Lake City, Utah. Although publicly described as a consultant to PanWorld, he is in fact an undisclosed control person of the

6

company.  Together with Robert Weeks and Ken Weeks, he directed and controlled the activities of PanWorld described in this complaint.  In 1984, he was convicted of criminal violations of the anti-fraud provisions of the Exchange Act.

15.  **Kenneth L. Weeks** (Ken Weeks), age 41, is a resident of Salt Lake City, Utah.  He is the brother of Robert Weeks and acts as a consultant to PanWorld.  Together with Robert Weeks and Hesterman, he directed and controlled the activities of PanWorld described in this complaint.

16.  **L.K. Management Co., Inc.** (L.K. Management) is a Nevada corporation with its principal place of business in Los Angeles, California.  L.K. Management employed persons to solicit investments from the public using fraudulent scripts and high pressure sales tactics.  It is not registered with the Commission as a broker or dealer.

17.  **Larry Krasny** (Krasny), age 63, is a resident of North Hills, California.  Krasny is the sole shareholder and director of L.K. Management, and directed and controlled its activities described in this complaint.

18.  **Puritan Communications, Inc.** (Puritan) is a Delaware corporation with its principal place of business in New York City, New York.  Puritan employed persons to solicit investments from

7

the public in return for PanWorld stock.  It is not registered
with the Commission as a broker or dealer.

19.  **Joseph Fabiilli** (Fabiilli), age 34, lives in Middle
Town, New York.  He is the sole shareholder and chief operating
officer of Puritan.  He directed and controlled the activities of
Puritan described in this complaint.

20.  **Randall Gilbert** (Gilbert), age 37, lives in Evans, Geor-
gia and is a real estate developer.

21.  **Jerome Wenger** (Wenger), age 51, lives in Bethesda, Mary-
land.  Wenger hosts *The Next SuperStock* radio show, which is
broadcast nationally, and publishes *The Next SuperStock* newslet-
ter.

22.  **Rita Hilsenrath Wenger** (Rita Wenger) was the wife of
Jerome Wenger and lived in Burtonsville, Maryland during the times
relevant to this action.  She received PanWorld stock from her
husband and promptly sold it.  She is not alleged to have engaged
in any violations of the federal securities laws, but holds funds
that represent fruits of violations committed by defendant Wenger
as alleged in this complaint.

23.  **Canyon Corporation** (Canyon) is a Bahamian entity, con-
trolled by Robert Weeks and Hesterman.  It is not alleged to have
engaged in any violations of the federal securities laws, but

8

holds funds that represent fruits of illegal acts committed by defendants Robert Weeks and Hesterman.

**FACTS**

**Background - Formation of PanWorld**

24. In May 1989, Hesterman incorporated PanWorld's predecessor, PanWorld Minerals, Inc. (PMI) as a private Utah corporation. Its shareholders were Robert Weeks and Hesterman's father. During 1989, PMI acquired three mining properties, Cerro Blanco, Pabellon, and Salar de Peidra Parada (Salar), located in Chile in exchange for 2.5 million shares of preferred stock in the company.

25. In December 1989, PMI merged with Ridgtop Resources, Inc., a public company which had stock registered with the Commission. The name of the merged public company was changed to PanWorld Minerals International, Inc.

26. Pursuant to the merger agreement, Robert Weeks received 12,026,315 shares of restricted stock and Hesterman's father received 11,101,213 shares of restricted stock, which were controlled by Hesterman. As part of the merger, PanWorld received PMI's three mining properties in Chile.

27. As an undisclosed part of the merger, Robert Weeks and Hesterman also received approximately 1.3 million shares of the approximately 1.8 million free-trading shares of Ridgtop that were outstanding before the merger.

9

**Periodic Reports filed with the Commission**

28.   PanWorld became subject to the periodic reporting re-
quirements of Section 15(d) of the Exchange Act and Rules 15d-1
and 15d-13 in December 1989 as a result of the merger with Ridg-
top.   In October 1994, PanWorld became subject to the periodic re-
porting requirements of Section 13(a) of the Exchange Act and
Rules 13a-1 and 13a-13.

29.   PanWorld filed the following required periodic reports
on Forms 10-Q, 10-QSB, 10-K and 10-KSB with the Commission for the
following periods on the following dates:

| Period | | Form | Date Filed |
|---|---|---|---|
| a. | Year ended 12/31/89 | 10-K | September 6, 1990 |
| b. | Quarter ended 3/31/90 | 10-Q | September 20, 1990 |
| c. | Quarter ended 6/30/90 | 10-Q | September 20, 1990 |
| d. | Quarter ended 9/30/90 | 10-Q | October 11, 1990 |
| e. | Year ended 12/31/90 | 10-K | July 22, 1991 |
| f. | Quarter ended 3/31/91 | 10-Q | August 19, 1991 |
| g. | Quarter ended 6/30/91 | 10-Q | August 27, 1991 |
| h. | Quarter ended 9/30/91 | 10-Q | November 11, 1991 |
| i. | Year ended 12/31/91 | 10-K | July 3, 1992 |
| j. | Quarter ended 3/31/92 | 10-Q | September 18, 1992 |
| k. | Quarter ended 6/30/92 | 10-Q | September 21, 1992 |
| l. | Quarter ended 9/30/92 | 10-Q | November 11, 1992 |
| m. | Year ended 12/31/92 | 10-K | June 1, 1993 |
| n. | Quarter ended 3/31/93 | 10-Q | June 7, 1993 |
| o. | Quarter ended 6/30/93 | 10-Q | January 31, 1994 |
| p. | Quarter ended 9/30/93 | 10-Q | January 31, 1994 |
| q. | Year ended 12/31/93 | 10-KSB | May 4, 1994 |
| r. | Quarter ended 3/31/94 | 10-Q | July 18, 1994 |
| s. | Quarter ended 6/30/94 | 10-Q | October 5, 1994 |
| t. | Quarter ended 9/30/94 | 10-QSB | January 20, 1995 |
| u. | Year ended 12/31/94 | 10-KSB | July 10, 1995 |
| v. | Quarter ended 3/31/95 | 10-QSB | July 31, 1995 |

30.   PanWorld has not filed any quarterly or annual reports since its March 1995 Form 10-QSB filed on July 31, 1995.

31.   Pursuant to Sections 13(a) and 15(d) of the Exchange Act and Rules 13a-13 and 15d-13, quarterly reports on Form 10-Q and 10-QSB must be filed within 45 days of the end of the quarter. Pursuant to Sections 13(a) and 15(d) of the Exchange Act and Rules 13a-1 and 15d-1, annual reports on Forms 10-K and 10-KSB must be filed within 90 days of the end of the fiscal year.   PanWorld failed to file nineteen of twenty-one quarterly reports within 45 days of the end of the quarter.   PanWorld failed to file seven annual reports within 90 days of the end of the fiscal year.

32.   The periodic reports listed above in paragraph 29 were prepared and distributed by Robert Weeks, Hesterman, and Ken Weeks. Robert Weeks signed all the periodic reports except the quarterly reports for 1991 and 1992 listed in subparagraphs f, g, h, j, k and l of paragraph 29.

33.   From 1989 to date, PanWorld, Robert Weeks, Hesterman and Ken Weeks failed to disclose in PanWorld's periodic reports to the Commission, and in its written and oral communications with shareholders and the public that Hesterman and Ken Weeks were control persons of PanWorld.   They also failed to disclose that Hesterman had been criminally convicted of securities fraud in 1985.

11

## FRAUDULENT COMMISSION FILINGS

34.  From September 1990 through November 1992 in connection with the fraudulent scheme, PanWorld, under the direction of Robert Weeks, Hesterman and Ken Weeks, fraudulently and/or without reasonable basis, filed with the Commission three annual reports on Forms 10-K and nine quarterly reports on Forms 10-Q.  These periodic reports falsely claimed:

a.    The Cerro Blanco and Pabellon properties were assets valued at $1.5 million in the financial statements.  The value of the Cerro Blanco and Pabellon mine tailings was based on the 1.5 million shares of preferred stock which were purportedly exchanged for the properties.  PanWorld, Robert Weeks, Ken Weeks and Hesterman arbitrarily set the value of the preferred shares at $1 per share.  This valuation violated Generally Accepted Accounting Principles (GAAP), and caused a material overstatement of the value of PanWorld's assets.  Further, PanWorld never delivered the stock to the seller.

b.    From September through July 1992, that Salar was an asset valued at $1 million in the financial statements.  The value of Salar claims was based on the $1 par value of 1 million shares of preferred stock, which were purportedly exchanged for the property.  PanWorld, Robert Weeks, Ken Weeks and Hesterman arbitrarily set the value of the preferred shares at $1.00 per share.  This

12

valuation violated GAAP, and caused a material overstatement of the value of PanWorld's assets.  Again, PanWorld never delivered the stock to the seller.

c.    Salar mining was listed as an asset through July 1992 despite the fact that in June 1990, PanWorld lost Salar, because it failed to perform work necessary to maintain the claims under Chilean law.

d.    Cerro Blanco and Pabellon were assets through November 1992 despite the fact that in November 1990, the seller of Cerro Blanco and Pabellon gave PanWorld notice that the contract was void, because PanWorld had failed to deliver the preferred stock it had promised to pay for the properties.

e.    Cerro Blanco and Pabellon were valuable mineral properties that could be processed to extract precious metals despite the fact that PanWorld learned by June 1990 that Cerro Blanco and Pabellon had no commercial value.

35.    From July 1991 through July 1994 in connection with the fraudulent scheme, PanWorld, under the direction of Robert Weeks, Hesterman and Ken Weeks fraudulently and/or without reasonable basis filed with the Commission four annual reports on Forms 10-K and 10-KSB, and ten quarterly reports on Forms 10-Q.  These periodic reports falsely claimed or failed to disclose:

13

a.    Las Rosas mine was valued as an asset worth $3,473,000
in the financial statements.  The value of Las Rosas was based on
the $1 par value of the 3 million shares of preferred stock, arbi-
trarily assigned by PanWorld, Robert Weeks, Ken Weeks, and Hester-
man, that were exchanged for the property and $473,000 for the in-
stallment payments. PanWorld, Robert Weeks, Ken Weeks and Hester-
man arbitrarily set the value of the preferred shares at $1.00 per
share. This valuation violated GAAP, and caused a material over-
statement of the value of PanWorld's assets.  PanWorld never de-
livered the preferred shares to the sellers.

b.    Beginning in January 1994, Las Rosas mine was valued as
an asset worth $1.723 million in the financial statements.  This
reduced value was set arbitrarily, violated GAAP, and caused a ma-
terial overstatement of the value of PanWorld's assets.

c.    The Europa Mill was valued as an asset worth $133,000 in
the financial statements.  The value was based on $1 per share for
36,000 shares of common stock plus the amount of cash to be paid
to the sellers and debts to be assumed.  This value of the common
stock was arbitrarily assigned by Robert Weeks, Hesterman, and Ken
Weeks.  This valuation violated GAAP, and caused a material over-
statement of the value of PanWorld's assets.  Additionally, Pan-
World never delivered the stock and failed to make full cash pay-
ment for the Europa Mill.  The stock to be exchanged for the mill

14

was restricted, could not be freely traded for two years, and
other similar shares issued at about this time by PanWorld were
valued at less than $1.

  d. Until June 1993 that the sellers of the Europa Mill had
filed a lawsuit for specific performance requiring PanWorld to
make the payments due under the agreement, and that PanWorld would
suffer no loss of property or income regardless of the outcome of
the suit.  In fact, the lawsuit was to rescind the agreement and
return ownership and possession of the mill to the sellers.  The
periodic reports failed to disclose that the Europa Mill was cru-
cial to PanWorld's ability to process ore from Las Rosas mine and
that the loss of the mill would adversely affect the company's
ability to process that ore.

  e. The periodic report filed in July 1993 announced that
PanWorld had entered into a joint venture with a Canadian corpora-
tion to operate the Europa Mill, but the report failed to disclose
that PanWorld had already lost possession of the Europa Mill.

  f. From December 1992 until January 1994, the periodic re-
ports failed to disclose that PanWorld had lost possession of the
Europa Mill in December 1992.

  36. In June 1993 in connection with the fraudulent scheme,
PanWorld, under the direction of Robert Weeks, Hesterman, and Ken
Weeks, fraudulently and/or without reasonable basis filed the



March 1993 Form 10-Q with the Commission. This periodic report falsely claimed or failed to disclose:

a. The Washington Gulch mine as an asset worth $5.5 million in financial statements. The value of the Washington Gulch mine was based on the $2 par value assigned to the 2.5 million shares preferred stock and the $1 value assigned to the 500,000 shares of restricted common stock exchanged for the property. The value of the preferred stock and common stock was arbitrarily assigned by PanWorld, Robert Weeks, Ken Weeks and Hesterman. This valuation violated GAAP, and caused a material overstatement of the value of PanWorld's assets.

b. That the sellers had declared the agreement void, because PanWorld had failed to deliver unrestricted stock to the sellers or make any of the payments required under the terms of the agreement.

37. From May 1994 through July 1995 in connection with the fraudulent scheme, PanWorld, under the direction of Robert Weeks, Hesterman and Ken Weeks, fraudulently and/or without reasonable basis filed with the Commission two annual reports on Forms 10-KSB, and four quarterly reports on Forms 10-Q and 10-QSB. These periodic reports falsely claimed:

a. The Richfield assets were valued at $6,181,845 in the financial statements. The value of the Richfield assets was based

16

on the $6 per share par value of 1 million preferred stock ex-
changed for the assets, and the debts assumed.  The par value of
the preferred shares was arbitrarily set by Robert Weeks, Hester-
man and Ken Weeks.  This valuation violated GAAP, and caused a ma-
terial overstatement of the value of PanWorld's assets.

     b.    The Mapsa iron ore project was an asset worth $3,250,000
in the financial statements.  The value of Mapsa was based on the
$10 par value of the 321,000 shares of preferred stock, arbitrar-
ily assigned by PanWorld, Robert Weeks, Ken Weeks and Hesterman,
that were to be exchanged for the property and $40,000 in cash
that was paid to the sellers.  This valuation violated GAAP, and
caused a material overstatement of the value of PanWorld's assets.

### PANWORLD ISSUES MATERIALLY FALSE AND MISLEADING PROMOTIONAL MATERIALS

     38.    From November 1989 through November 1992, in connection
with the fraudulent scheme, PanWorld, under the direction of Rob-
ert Weeks, Hesterman and Ken Weeks, fraudulently and/or without
reasonable basis, issued a series of materially false and mislead-
ing promotional materials touting PanWorld's success in the mining
business and announcing other corporate developments.  These pro-
motional materials, including press releases, advertisements, due
diligence materials, and "research reports," which were all pub-
licly distributed, caused PanWorld's stock price to increase from



no trading in early November 1989 to a high of $2.60 in March 1990, before retreating to approximately $.50 in March 1991. These promotional materials falsely claimed:

     a.   PanWorld had acquired two mine tailings properties, Cerro Blanco and Pabellon, in Chile for $1.5 million. In fact, PanWorld never paid for these properties.

     b.   Up to 2.02 ounces of gold and 50 ounces of silver per ton could be recovered from the properties and made other similar statements about the amount of gold and silver that could be recovered per ton.

     c.   Cerro Blanco contained 300,000 tons of materials worth $1,230 per ton or gross projected revenues of $369 million, and Pabellon contained 150,000 tons of materials worth $1,060 per ton or gross revenues of $159 million, and made other projections of dollar values per ton, gross revenues and earnings per share ranging from $4.91 to $8.74 per share.

     d.   Cerro Blanco was valued around $600 million, Pabellon was valued at $76 million, and PanWorld had acquired a third property worth $5 billion.

     e.   PanWorld had a special proprietary technology (state-of-the-art chemical extraction method) able to recover gold and silver left by old, inefficient mining activities.

**PANWORLD ACQUIRES ADDITIONAL MINING ASSETS TO CREATE INTEREST IN ITS SECURITIES**

39.   Between September 1990 and December 1995, in connection with the fraudulent scheme, PanWorld, under the direction of Robert Weeks, Hesterman, and Ken Weeks, fraudulently and/or without reasonable basis issued and publicly distributed a series of materially false and misleading shareholder letters, press releases and fact sheets about developments at Las Rosas mine and other properties in Chile.  These materials falsely claimed:

a.   In September 1990, PanWorld had acquired Las Rosas copper mine for $600,000 and the Europa Mill to process ore from the mine for $133,000.  PanWorld stated that historically the copper ranged from 3 to 8 percent ton, silver ranged from 3 to 8 ounces per ton, and gold ranged from .02 to .05 ounces per ton.  PanWorld projected revenues of $50 to $73.60 per ton with 100 tons of material per day to be processed within 30 days, when in fact PanWorld had no accurate data on the amount of copper that could be recovered from Los Rosas or the costs of recovery and PanWorld possessed a geologic report estimating the mine contained only 50,000 tons of 1 percent copper.

b.   In September 1990,  PanWorld was continuing to develop its proprietary technology to extract gold from mine tailings.  In

19

fact, PanWorld, Robert Weeks, Ken Weeks and Hesterman had learned in June 1990 that the technology was a fraud.

c.    In November 1990, PanWorld had been in revenue-generating operation since September 1990, that the copper sulfide material from Los Rosas had a value of $65 per ton based on 200 grams of silver, 1 gram of gold and 1.5 to 3 percent copper, and it had high grade deposits of copper oxide containing 4 percent copper as compared to Kennecott Copper Corporation which reports less than 1 percent copper from its Utah open pit mine.

d.    In January 1991, the Europa Mill had the capacity to process 175-250 tons per day, that the material being processed from Los Rosas contained 1.2 to 1.5 percent copper per ton and 100 grams of silver per ton and would produce revenues of $31 to $35 per ton at a cost of $10 to $15 per ton, and PanWorld would have a positive cash flow and earnings by the end of the quarter.

e.    In January 1991, Las Rosas contained 3 million tons of proven reserves, 11.5 million tons of probable reserves, and 50 million tons of indicated reserves consisting of 1 to 3 per cent copper that was worth $60 million and would produce profit per ton of $45.

f.    In March 1991, Las Rosas contained one billion or more tons of copper-bearing oxide ore, that the ore from the mine site contained 1 to 3 percent copper, that the value of Las Rosas was

20

$60 million, and that the company expected pre-tax earnings of $1 per share in 2 to 3 years.

g.     In March 1991, PanWorld sent letters to shareholders and others that contained a report on Las Rosas stating that Las Rosas contained 3,085,000 tons of proven reserves, 9,400,000 tons of probable reserves, and 46,000,000 tons of indicated reserves of copper ore; that Las Rosas mine was worth $60 million; and would produce yearly income of $2 million from the copper sulfides and $7 million from the copper oxides.  The report was preliminary; the author of the report indirectly owned shares in PanWorld; Pan-World possessed other geologic reports on Las Rosas that stated the probable reserves were substantially less and in the range of only 50,000 to 200,000 tons; insufficient exploration and testing had been done to support the claims of proven reserves; and calcu-lations of recoverable values were based on 2.2 per cent copper, when PanWorld's own operations were recovering only 0.8 per cent copper.

h.     In April and May 1991, PanWorld had located a high grade "lens" at Los Rosas containing 40,000 tons of 2.59 per cent or higher grade copper.  The company's gross income from Las Rosas ranges from $66.20 per ton to $112.40 per ton.  PanWorld stated that if the lens averaged 3.5 per cent copper, then it would net $300,000 per month.

i.   In June 1991, material from the Los Rosas high grade "lens" was being mixed with other material for an average grade of 1.5 per cent to 2.5 per cent copper.  It compared the grade of Las Rosas' copper to Phelps Dodge's largest copper mine in Arizona which averages 0.76 per cent copper.  It also represent that Pan-World has located a second high grade "lens" containing 9 per cent to 12 per cent copper.

j.   In February 1992, production had commenced at Europa Mill at an expanded capacity of 200 tons per day and it was recovering 1.1 to 1.3 percent copper, 50 to 150 grams of silver and .5 grams of gold collectively worth $30 per ton from Los Rosas.  In fact by January 1992, PanWorld had largely abandoned its attempt to recover copper from Las Rosas.  In January 1992, PanWorld also had lost a lawsuit brought by the sellers of the Europa Mill, and the court had ordered PanWorld to return ownership of the mill to the sellers.

k.   In June 1992, that the Europa Mill would be operating at 500 tons per day by September 1992 and would have annual net revenues of $.08 per share.

40.   In connection with the fraudulent scheme, PanWorld, under the direction of Robert Weeks, Hesterman and Ken Weeks, fraudulently and/or without reasonable basis issued a materially false and misleading press release in March 1993 about acquisition

22

of Washington Gulch L.P. Inc.  The press release falsely claimed
PanWorld had acquired half of Washington Gulch L.P., Inc., whose
assets included a mining claim near Helena, Montana, in exchange
for $5.5 million in preferred stock, common stock, and cash pay-
ments.  In fact material terms of the agreement had not yet been
finalized, and PanWorld did not have the cash resources to make
the payments required by the contract.

41.  Between January 1993 and May 1995, in connection with
the fraudulent scheme, PanWorld, under the direction of Robert
Weeks, Hesterman and Ken Weeks, fraudulently and/or without rea-
sonable basis issued a series of materially false and misleading
promotional materials touting its success in the mining business
and announcing other corporate developments.  These promotional
materials, including press releases, advertisements, overview let-
ters, due diligence materials, radio programs, televised infomer-
cials and "research reports," caused PanWorld's stock price to in-
crease from approximately $0.13 in early 1994 to a high price of
$0.20 in March 1994, before declining to $0.0079 in May 1995 at
the time of suspension of trading in PanWorld's stock by the Com-
mission.  These materials falsely claimed:

a.  PanWorld had acquired the assets of Richfield Interna-
tional, Inc. consisting of (1) a license to use certain proprie-
tary placer mining technology; (2) a minority interest in the

23

Washington Gulch mining project in Montana; (3) the Montague Metal
& Machine, Inc. (Montague Metal) manufacturing facility in Cali-
fornia which was equipped to manufacture the proprietary technol-
ogy; and (4) a lease on the Spring Creek mineral property in Cali-
fornia.  PanWorld claimed that Washington Gulch contained 1 mil-
lion cubic yards of proven ore reserves and 6 million cubic yards
of possible reserves with an average gold value of $17.00/cubic
yard.  It projected gross profits of $5 million annually for the
next 20 years from operations at Washington Gulch.  PanWorld
stated that these assets were acquired for $6 million and were ap-
praised at $10.5 million.

　　　b.    In fact, the Richfield proprietary placer mining tech-
nology was untested, and had never been used in a production scale
operation.

　　　c.    In fact there was a dispute over PanWorld's ownership of
Washington Gulch, and PanWorld had geologic reports that ques-
tioned the amount of gold contained in the property.  On or about
September 13, 1993, February 15, 1994 and March 18, 1994, PanWorld
and Robert Weeks received notice that PanWorld had no ownership
interest in the property either directly as a result of the agree-
ment dated March 3, 1993 or indirectly through an interest in
Richfield.  After receiving this notice, PanWorld, Robert Weeks,
Hesterman and Ken Weeks continued to claim the Richfield assets,

including a twenty-five percent interest in Washington Gulch, as part of its assets in its periodic reports filed with the Commission from January 1994 through July 1995, and in other public statements.

d.   In fact, the assets of Montague Metal were old equipment parts and tools located on rented property.   There were no manufacturing tools, no manufacturing staff, no detailed plans or descriptions for how to configure the equipment, and PanWorld had failed to pay the rent.

e.   In fact, PanWorld did not pay $6 million for the Richfield assets and the appraisal was based on property and water rights which Washington Gulch did not own.

42.   Between January 1994 and May 1995, PanWorld, at the direction of Robert Weeks, Hesterman and Ken Weeks, fraudulently and/or without reasonable basis made several public disclosures in letters, newsletters, televised infomercials and other promotional materials that it had acquired an interest in the San Jose mining property located in Peru, that San Jose contained average grade of .78 per cent copper oxide and 150 million to 750 million tons of copper oxide material, and that PanWorld was offering the property as a joint venture opportunity to other mining companies.   In fact, PanWorld had failed to make the first option payment that

25

was due in September 1993 and all subsequent option payments that were due under the agreement.

43.   Between February 1994 and January 1995, PanWorld, at the direction of Robert Weeks, Ken Weeks and Hesterman, fraudulently and/or without reasonable basis made statements in radio programs, press releases, letters, newsletters, and other promotional materials about the Mapsa iron ore project (also known as the Opaban property) in Peru.   These statements falsely claimed:

a.   Mapsa contained 600 million tons of measured resource containing 68 per cent hematite (iron ore) worth $40 per ton with costs $3 per ton to mine, and projected net profits of $300 million per year from a plant producing 12 million tons of ore per year.

b.   In July, October, November 1994 and January 1995, in several press releases and a "research report," that Mapsa contained 1.5 to 2.0 billion tons of hematite (iron ore) and proven/probable reserves of 700 million tons that was worth $28 billion.

c.   Further, PanWorld, Robert Weeks, and Hesterman knew that some of the reserve calculations for Mapsa were prepared by a Peruvian consulting firm that had a conflict of interest as a result of its twelve percent ownership interest in the Mapsa property and its president's status as a shareholder in PanWorld.

26

44.    Between September 1994 and March 1995, PanWorld at the
direction of Robert Weeks, Ken Weeks and Hesterman, fraudulently
and/or without reasonable basis issued and publicly distributed
press releases, letters, newsletters, "research reports" and other
promotional materials about its joint venture with Bartos Gold
Holding Company (Bartos), a Turks and Caicos Islands entity, to
operate three mines in Bolivia.  These materials falsely claimed:

a.    In a press release and shareholder letter in September
and October 1994, that PanWorld had entered into a joint venture
with Bartos to acquire a thirty percent interest in the revenues
from three Bolivian gold properties (the Bartos properties) in ex-
change for 30,000,000 shares of PanWorld common stock.  Between
October 1994 and January 1995, PanWorld issued an additional 20
million shares of common stock to Bartos as additional compensa-
tion for the property.  PanWorld stated that the Bartos properties
contained 3 million tons of proven gold reserves plus 58 million
tons of measured and indicated resources, and that the recoverable
values of ore ranged from $15 to $126 per ton.  PanWorld stated
that it expected the mines to generate yearly revenues of $12 mil-
lion, and earnings per share of $.10.  In fact, there were serious
problems with the properties that would impair production of gold
and the resulting recognition of revenues and earnings from the
Bolivian properties.

27

45.   In October 1994, PanWorld, at the direction of Robert Weeks, Hesterman and Ken Weeks, fraudulently and/or without reasonable basis sent shareholders a notice stating that the price of PanWorld's shares was artificially depressed because certain broker-dealers were engaged in short selling.  PanWorld requested that shareholders take possession of their share certificates to stop the broker-dealers from borrowing the shares to cover the short positions.  In fact, the depressed price was the result of PanWorld issuing tens of millions of shares since January 1994, which were flooding the market, to pay promoters that were hired to tout PanWorld's stock to the investing public in order to artificially stimulate demand for the stock.

46.   During the summer of 1994, PanWorld, Robert Weeks, Hesterman, Krasny and others appeared on several videos, "Financial Inquiry," "Executive Report," and "Your On The Line," that were broadcast over television, and sent to brokers and investors.  In these videos, Robert Weeks, Hesterman, Krasny and other persons acting in concert with them fraudulently and/or without reasonable basis claimed:

a.   The (Mapsa) iron ore project contained at least 600 million to 3 billion tons of measured resource with a value of $40 per ton or total value of $120 billion and would produce earnings of $0.10 per share.

29



b.   The San Jose copper project contained measured resources of 150 million to 300 million tons.  In fact there was a dispute over the ownership of San Jose, and PanWorld was making no payments under the agreement.

c.   The Richfield technology could recover gold from materials that were previously mined at a commercial profit, and that this technology added a $6 million asset to PanWorld's financial statements.  In fact the Richfield technology has never been tested in full production and the value of the technology was overstated.

d.   The Washington Gulch project contained 1 million cubic yards of ore averaging $17 a yard with costs of $6 a yard with possible additional resources of 20 million cubic yards.

e.   The Spring Creek project had 6 million tons of possible reserves worth $20 to $50 a yard.

f.   PanWorld would be listed on Nasdaq within a year and would trade at $50 per share within three years and at $5 per share within a year.

g.   The volume of trading in PanWorld stock was between 250,000 and 1 million shares a day; PanWorld stock was very liquid because of the extraordinary volume of shares, and; only a limited number of PanWorld shares were publicly trading.  In fact, the high volume was orchestrated by PanWorld, Robert Weeks, Hesterman,

Ken Weeks, Krasny, L.K. Management, Puritan, Fabiilli, Wenger, Rita Wenger, and others who were selling stock into the market to create the appearance of active trading.

h.   PanWorld was similar to a major mining company whose stock traded historically at $.17 per share and now trades at $23.00 per share.

i.   Krasny had worked as a broker or investment analyst for over 30 years.  In fact, Krasny had never worked as a broker or analyst.

j.   L.K. Management was not hired to raise money for Pan-World.  In fact, L.K. Management and Krasny paid part of the proceeds from its stock sales to bank accounts that were used to pay PanWorld's expenses.

k.   PanWorld was going to begin operations and would generate $12 million net profits a year, and earnings of $0.20 per share.

l.   PanWorld was engaged in a $5 million private placement with $2.5 million to be raised as a firm underwriting agreement.

m.   PanWorld had new mining technology, exclusive licensing rights, and a manufacturing facility that could build four processing plants a year.  The Richfield technology was developed at a cost of $50 million dollars.  The Richfield technology was actually being used.  The cost to mine using the Richfield technology

31



was only $3.50 per ton. PanWorld's production costs were so low that they could make money with gold at any reasonable price.

n. PanWorld had been written up in an environmental newsletter because the Richfield technology for placer mining was environmentally safe, when, in fact, PanWorld had paid to have the article to be published.

### ROBERT WEEKS, KEN WEEKS AND HESTERMAN DISTRIBUTE RESTRICTED PANWORLD SHARES AND MANIPULATE PRICE BETWEEN 1991 AND 1993

47. While issuing false public statements described in this complaint, PanWorld entered into a written agreement in January 1991 with a stock brokerage firm in New York, to provide "investment banking" services and to act as a market maker in PanWorld stock.

48. At the same time, PanWorld, Robert Weeks, Ken Weeks, and Hesterman also entered into a secret oral agreement with the brokerage firm to provide Panworld stock to brokerage firm at half the current market price in exchange for brokerage firm artificially raising the price of PanWorld stock and selling the stock to public investors.

49. The brokerage firm began actively selling PanWorld's stock in April 1991 at $0.50 per share. By May 1991, the brokerage firm had raised the price to approximately $0.787 per share and maintained the price in the range of $0.75 per share until ap-

proximately December 1991 when the price dropped to $0.59 per share. During 1992 and early 1993, the price was approximately $0.509 per share. When the brokerage firm stopped making a market in PanWorld stock in March 1993, the price dropped to $0.12 per share.

50. The brokerage firm had a pattern of selling more Pan-World stock than it owned in inventory and then replenishing its supply through purchases from broker-dealers in Salt Lake City, Utah, who in turn bought the stock from Robert Weeks, Ken Weeks, Hesterman and their nominees. These purchases by the Salt Lake City broker-dealers were usually at about half of the brokerage firm's public market price.

51. From January 1991 through at least March 1993, Robert Weeks, Ken Weeks, and Hesterman, directly and indirectly and through various nominees, sold approximately 10 million shares of PanWorld stock to various Salt Lake City broker-dealers who then sold the stock to the brokerage firm pursuant to the secret oral agreement. Robert Weeks, Ken Weeks, Hesterman and their nominees realized at least $5.5 million from their sales of PanWorld stock.

### CONSULTANTS ARE HIRED TO TOUT PANWORLD STOCK

52. During 1994 and 1995, Robert Weeks, Hesterman, and Ken Weeks agreed to supply stock to Wenger, Puritan, Fabiilli, L.K. Management, Krasny, Gilbert, and others in exchange for their

33

agreements to manipulate the price of PanWorld stock and to create artificial public demand for the stock through a fraudulent and orchestrated campaign to tout PanWorld stock.

**Wenger**

53.  In February 1994 and March 1994, PanWorld entered into two consulting agreements with Jerome Wenger to promote PanWorld's stock in exchange for shares of PanWorld stock.

54.  During 1994 and 1995, Wenger hosted more than a dozen radio shows and investor seminars that featured PanWorld and in which he interviewed Robert Weeks, Hesterman, Ken Weeks, and other persons about PanWorld.  During these radio shows and investor seminars, Wenger fraudulently and/or without reasonable basis recommended that investors buy PanWorld stock.

55.  In approximately July 1994, Wenger published an article about PanWorld in his newsletter, "*The Next SuperStock*."  Wenger fraudulently and/or without reasonable basis recommended that investors purchase PanWorld stock.  Wenger published at least four additional volumes of "*The Next SuperStock*" through July 1995 that fraudulently and/or without reasonable basis recommended investors either buy or hold PanWorld stock.

56.  While recommending PanWorld stock, Wenger failed to disclose or fraudulently claimed:

34

    a.    Wenger was paid 2.1 million shares of PanWorld stock to promote PanWorld.

    b.    Wenger and Rita Wenger were selling their PanWorld stock while Wenger was making his strong buy recommendations to the investing public.

    c.    In February 1994, Wenger told investors that he would wait at least a month before he purchased any PanWorld stock.  In fact, he already had received over a million shares from the company as compensation for his services.

    d.    By June 1994, Wenger was telling investors that he had bought PanWorld stock at $0.19 per share, that he had bought at $0.15 per share, and he was buying more PanWorld stock at $0.10 per share.  In fact Wenger never purchased any PanWorld shares until August 1994 and those purchases were to cover short sales.

    e.    Wenger compared PanWorld to other successful mining companies whose stock prices had sky-rocketed.

    f.    During the radio shows, Wenger urged investors to call a brokerage firm to purchase PanWorld stock, but he did not disclose that he was selling his PanWorld stock through the same firm.

**Puritan and Fabiilli**

57.   From January 1994 through March 1995, Fabiilli and Puritan shared an office with the New York City branch of a brokerage firm that was managed by Fabiilli's brother-in-law.

58.   In March 1994, PanWorld entered into a consulting agreement with Puritan and Fabiilli to promote and sell PanWorld stock. Puritan received shares of PanWorld common stock as compensation.

59.   PanWorld gave Fabiilli the names of investors who had called the toll-free telephone number announced on Wenger's radio shows, in promotional materials, and in various televised infomercials sponsored by PanWorld.  Fabiilli paid sales agents to call the investors and to solicit them to purchase PanWorld stock. When an investor was interested in purchasing the stock, the sales agent referred the investor to a broker at the brokerage firm. Puritan sales agents, under the direction of Fabiilli, used high pressure and fraudulent selling tactics to interest investors in PanWorld stock.  Puritan and Fabiilli fraudulently and without a reasonable basis distributed promotional materials to investors including PanWorld's overview letter and press releases.  Puritan, at the direction of Fabiilli, also secretly paid brokers at the brokerage firm to sell PanWorld stock to investors, which undisclosed compensation was in addition to the broker's normal compensation.

36

60.   While Puritan and Fabiilli were referring public investors to the brokerage firm to purchase PanWorld stock, they and defendants Robert Weeks, Hesterman, Ken Weeks, L.K. Management, Krasny, Wenger, Rita Wenger, and Canyon were selling PanWorld stock to create an artificially stimulated market in order to sell their PanWorld stock at inflated prices.

61.   While recommending PanWorld stock, Puritan and Fabiilli failed to disclose material facts:

a.   Puritan and Fabiilli were paid at least 29,875,000 shares of PanWorld stock to promote PanWorld.

b.   Puritan and Fabiilli were selling their PanWorld stock while Puritan's sales agents, at Fabiilli's direction, were making strong buy recommendations to the investing public.

c.   Puritan and Fabiilli were engaging in manipulative trades of PanWorld stock to create the appearance of active trading.

62.   During 1994 and 1995, Fabiilli and Puritan engaged in fraudulent and manipulative trading of PanWorld stock.  Between April and July 1994, Fabiilli and Puritan engaged in at least twenty wash trades in which they bought and sold approximately the same amount of shares on the same day with no resulting change in beneficial ownership.  On May 10, 1994, Fabiilli entered a series of five sell orders for the brokerage account of Puritan at suc-

cessively higher prices moving the price from $0.15 per share to
$0.18 per share.

63.  Fabiilli had a prearrangement to supply PanWorld stock
to a brokerage firm to meet the demand generated by the activities
of the salesmen and brokers that he paid, and by the other promo-
tional activities being conducted by PanWorld and others.

64.  Between February 1994 and January 1995, the brokerage
firm sold approximately 53,576,740 shares to approximately 450 re-
tail customers.  The brokerage firm purchased approximately
53,271,191 of these shares from other broker-dealers.  Of this
amount, Puritan and Fabiilli supplied approximately 50,793,452
shares or 95 percent of the stock that the brokerage firm pur-
chased from other broker-dealers.

**Krasny and L.K. Management**

65.  In or about May 1994, PanWorld entered into a consulting
agreement with L.K. Management and Krasny to promote and sell Pan-
World stock.  As compensation, L.K. Management was to receive
416,000 shares of PanWorld stock.

66.  Krasny and L.K. Management employed a group of telephone
solicitors who called potential investors to solicit them to pur-
chase PanWorld stock.  The telephone solicitors called investors
who had made inquiries about PanWorld on the toll-free telephone
number advertised either on the Wenger radio show or the televised

38

infomercials.  They also called other potential investors whose names appeared on lists purchased by Krasny and L.K. Management.

67.  At Krasny's direction, the telephone solicitors used scripts, and fraudulently and/or without reasonable basis told investors that:

a.   Investors would double or triple their money within four to six months.

b.   The price of the stock would increase to specific dollar amounts.

c.   PanWorld owned gold fields in Montana and had 123,000,000 ounces of gold.

d.   PanWorld could expect net profits of $12 million and earnings of $0.20 per share.

68.  The telephone solicitors failed to disclose material facts:

a.   L.K. Management and Krasny had received 57,416,000 shares of PanWorld stock as compensation from PanWorld for soliciting investors.

b.   L.K. Management and Krasny paid at least $125,470 from its stock sales indirectly PanWorld and its control persons. In fact, they stated that L.K. Management was not hired by PanWorld to raise money for PanWorld.

39

   c. L.K. Management and Krasny were selling PanWorld
stock at the same time that the telephone solicitors were recom-
mending investors purchase the stock. L.K. Management and Krasny
were supplying the stock to brokerage firms to meet the demand
generated by the telephone and other solicitations.

   69. Krasny instructed the telephone solicitors to refer the
persons interested in buying PanWorld stock to particular
"friendly" brokers. They asked investors to send L.K. Management
by mail or facsimile a copy of the confirmation showing the amount
of stock the investor had bought. The telephone solicitors' com-
pensation was based on the amount of stock that they sold.

   70. During 1994, Krasny appeared on at least three televised
infomercials promoting PanWorld stock. He fraudulently and/or
without reasonable basis made material statements about PanWorld:

   a. PanWorld's stock will be traded on Nasdaq within a
year.

   b. The price of PanWorld stock could be $5.00 per
share within a year, and $50.00 per share in three years.

   He failed to disclose material facts:

   c. L.K. Management and Krasny were paid at least
57,416,000 shares of PanWorld stock to promote PanWorld.

   d. L.K. Management and Krasny were selling their Pan-
World stock while L.K. Management's sales agents, at Krasny's di-

40

rection, were making strong buy recommendations to the investing public.

**Gilbert**

71.    During the fall of 1994, Gilbert entered into a secret agreement with Robert Weeks and Hesterman in which he agreed to purchase and hold shares of PanWorld stock, and to engage in manipulative trading practices.  The purpose of Gilbert's buying plan was to reduce the supply of stock available to the public in order to increase the price per share of PanWorld stock.  As compensation for his activities, Gilbert was to receive shares of stock from PanWorld.

72.    Between November 1994 and March 1995, Gilbert purchased 21,580,000 shares of PanWorld stock for approximately $236,645 through nine brokerage accounts, held in his name or the name of an entity that he controls.

73.    On March 2, 1995, Gilbert made eight of the purchase at three brokerage firms at successively higher prices, starting at $0.0085 and ending at $0.011 per share.

74.    On June 6, 1995, PanWorld issued 4.3 million shares of stock to Gilbert for participating in the manipulation.

41

## STOCK SALES

**Robert Weeks, Ken Weeks, and Hesterman sell unregistered common
stock**

75.   During 1990 and 1991, Robert Weeks, Hesterman and their

nominees sold the 1.3 million shares of stock that they had been

secretly received as part of the merger with Ridgtop as described

above, and they secretly paid at least $650,000 to PanWorld to op-

erate the company and kept at least $100,000 for themselves.

76.   No registration statement was filed with the Commission

for these 1.3 million shares of stock sold by Hesterman, Robert

Weeks and their nominees.

77.   Between April 15, 1991 and April 2, 1992, Robert Weeks,

Ken Weeks, and their nominees sold at least 2,960,000 shares of

restricted PanWorld common stock for proceeds of approximately

$705,000.   No registration statement was filed or in effect for

the offer and sale of these shares.

78.   Between April 15, 1991 and April 2, 1992, Hesterman and

his nominees sold at least 2,333,438 shares of restricted PanWorld

of common stock for proceeds of approximately $675,000.   No regis-

tration statement was filed or in effect for the offer and sale of

these shares.

79.   Between February 1992 and January 1994, there were at

least six three-month periods when Robert Weeks, Ken Weeks, Hes-

terman and their nominees, acting in concert, sold restricted shares in excess of the one percent volume limitation contained in Commission Rule 144. They sold at least 5,941,050 shares for proceeds of approximately $924,000. No registration statement was filed or in effect for the offer and sale of these shares.

**Form S-8 Shares and Other Unregistered Shares Issued and Sold**

80. Between January 1994 and February 1995, at the direction of Robert Weeks, Ken Weeks, and Hesterman, PanWorld issued 167,091,000 shares of common stock to various consultants, including Wenger, Hesterman, L.K. Management, Puritan, and Hesterman, who collectively received at least 99,791,000 of those shares. No registration statement was in effect for the issuance of these shares.

**Unregistered Stock Sales by Wenger and Rita Wenger**

81. Between February and March 1994, PanWorld issued 1.5 million unregistered shares to Wenger as payment for his services. On March 31, 1994 PanWorld registered the 1.5 million shares for sale by Wenger on a Form S-8. In April 1994, PanWorld issued an additional 600,000 unregistered shares to Wenger. No registration statement was in effect for the 600,000 shares.

82. Between April 14, 1994 and August 10, 1994, Wenger sold 97,000 shares of PanWorld stock for approximately $11,728 to the brokerage firm where he had suggested his listeners purchase the

43

stock.   He transferred 65,000 shares to third parties, and 938,000 shares to the brokerage account of his wife, Rita Wenger, at the same brokerage firm.   Between April 1994 and August 1994, Rita Wenger sold 938,000 registered and unregistered shares of PanWorld stock for proceeds of approximately $93,360.   No registration statement was in effect for Rita Wenger's sale of 600,000 of these shares.

**Unregistered Stock Sales by Puritan and Fabiilli**

83.   Between March 1994 and December 1994, PanWorld issued 29,875,000 shares of common stock to Puritan.

84.   On August 19, 1994 PanWorld filed a Form S-8 registration statement registering for resale 8 million shares in the name of Puritan. On October 26, 1994 PanWorld filed a Form S-8 registration statement registering for resale 5 million shares in the name of Puritan.   No registration statement was filed for the balance of 16,875,000 shares that PanWorld issued to Puritan.

85.   Between April 1994 and December 1994, Puritan, at the direction of Fabiilli, sold approximately 29,875,000 shares of common stock for proceeds of approximately $1,287,295.   No registration statement was in effect for Puritan's sales of 16,875,000 of these shares.

86.   Out of the money that Puritan received from its sales of PanWorld stock, Fabiilli and Puritan paid at least $23,000 to bank

44

accounts controlled by Robert Weeks and Ken Weeks, and at least
$20,000 to bank accounts controlled by Hesterman.  Puritan also
paid at least $210,000 to persons who had purportedly provided
services to PanWorld.

**Unregistered Stock Sales by Hesterman**

87.  Between May 1994 and January 1995, PanWorld issued 7
million shares to Hesterman and an additional 3.4 million shares
to a corporation controlled by him.  On May 25, 1994 PanWorld
filed a Form S-8 registration statement which registered for re-
sale 4 million of the shares that had been issued to Hesterman as
of that date.  However, for the balance of the 6.4 million shares,
no registration statement was in effect for Hesterman's sales.
Between May 1994 and May 1995, Hesterman and the corporation,
which he controlled, sold at least 6.5 million shares for proceeds
of at least $33,689.

**Unregistered Stock Sales by L.K. Management and Krasny**

88.  Between May 1994 and February 1995, PanWorld issued at
least 57,416,000 shares to L.K. Management and others.  These
shares were placed in brokerage accounts that were controlled by
Krasny.

89.  On May 25, 1994 PanWorld filed a Form S-8 registering
416,000 shares for resale by L.K. Management.  On August 19, 1994,
PanWorld filed a Form S-8 registering 1,000,000 shares for resale

45

by L.K. Management.  On October 26, 1994, PanWorld filed a Form S-8 registering an additional 2,000,000 shares for resale by L.K. Management.

90.  Between May 1994 and July 1995, Krasny and L.K. Management sold approximately 57 million shares of PanWorld stock for proceeds of at least $971,137.  No registration statement was filed or in effect for the sales of 54 million PanWorld shares.

91.  At least $125,470 from these sales of PanWorld stock by L.K. Management and Krasny was paid into bank accounts controlled by Hesterman, and then paid indirectly to Robert Weeks and third parties to whom PanWorld owed money.  L.K. Management and Krasny also paid third parties to whom PanWorld owed money.

**PANWORLD, ROBERT WEEKS, KEN WEEKS AND HESTERMAN FILE MATERIALLY FALSE AND MISLEADING FORMS S-8**

92.  Between March and October 1994, PanWorld, at the direction of Robert Weeks, Hesterman, and Ken Weeks, filed four Forms S-8 discussed above to register shares issued to various consultants.  Each Form S-8 was signed by Robert Weeks.  Each form stated "The services rendered by the above-named advisors were not in connection with the offer or sale of securities in a capital raising transaction."

93.  This statement was false because Fabiilli, Puritan, Krasny, L.K. Management, and Hesterman were engaged in capital

46

raising transactions by selling the PanWorld stock and returning part of the money to PanWorld, Robert Weeks, Ken Weeks, and Hesterman or paying debts owed to third parties by PanWorld.

### ROBERT WEEKS, KEN WEEKS AND HESTERMAN ISSUE REGULATION S STOCK

94.   Between January 1994 and June 1995, Robert Weeks, Ken Weeks, and Hesterman caused PanWorld to issue 275,166,170 shares of common stock to various persons and entities in sham Regulation S transactions.   The offer and sale of these shares were not made in offshore transactions.   These shares were offered and sold to persons who resided in the United States or to entities with dis- cretionary accounts held by persons who resided in the United States.   These sales were made while PanWorld and its affiliates were engaged in directed selling efforts described above in the complaint.   No registration statement was in effect for the issu- ance of these 275,166,170 shares.

### Sales of Bartos Stock

95.   Between October 1994 and January 1995, PanWorld issued 50 million shares in the name of Bartos Gold Holding Company (Bar- tos) purportedly as payment for the joint venture in Bolivia.

96.   These shares were issued purportedly to Bartos pursuant to an exemption from registration under Regulation S.   However, the shares were actually delivered to brokerage accounts con-

47

trolled by U.S. residents and sold back into the U.S. market without a registration statement being filed.

97.  Of the 50 million PanWorld shares issued in the name of Bartos, approximately 34 million shares were delivered to a brokerage account over which Fabiilli had trading authority.  Fabiilli directed the account to sell the 34 million shares for gross proceeds of approximately $344,801.  No registration statement was in effect for these stock sales by Fabiilli.

98.  Of the 50 million PanWorld shares issued in the name of Bartos, approximately 8.7 million shares were delivered to brokerage accounts controlled by nominees of Hesterman who lived in the United States.  Between December 1994 and April 1995, Hesterman's nominees sold approximately 8.7 million shares for proceeds of approximately $89,160.  No registration statement was in effect for these stock sales by Hesterman's nominees.

**Sales of CRC stock**

99.  Between December 1994 and April 1995, PanWorld issued 76 million shares in the name of Corporacion de Racionalizacion & Consultoria S.A. (CRC), a Peruvian consulting company, and an additional 24 million shares to affiliates of CRC.  These shares were issued purportedly to CRC and its affiliates pursuant to an exemption from registration under Regulation S.  However, the shares were actually delivered to brokerage accounts controlled by

48

U.S. residents and sold back into the U.S. market without a registration statement being filed.

100. Of the 100 million PanWorld shares issued in the name of CRC and its affiliates, approximately 60 million shares were delivered to brokerage accounts in the name of L.K. Management or brokerage accounts controlled by Krasny who resided in the United States. Between March 1995 and November 1995, Krasny directed the sales of approximately 51,630,000 shares for proceeds of at least $312,289. No registration statement was in effect for these sales by Krasny.

101. Of the 100 million PanWorld shares issued in the name of CRC and its affiliates, approximately 27 million shares were delivered to brokerage accounts controlled by nominees of Hesterman who resided in the United States. Between December 1994 and April 1995, Hesterman's nominees sold the 27 million shares for proceeds of approximately $252,116.

102. Of the 100 million PanWorld shares issued in the name of CRC and its affiliates, approximately 3 million shares were delivered to brokerage accounts controlled by Fabiilli. Fabiilli sold these shares during January 1995 for proceeds of approximately $33,000.

49

**Sales of Canyon Stock**

103. Between January and April 1995, PanWorld issued 97 mil-
lion shares of Regulation S stock to Canyon, which was controlled
by Robert Weeks and Hesterman. These shares were issued purport-
edly to Canyon pursuant to an exemption from registration under
Regulation S. However, the shares were actually delivered to bro-
kerage accounts controlled by U.S. residents and sold back into
the U.S. market without a registration statement being filed.

104. Between January and May 1995, Canyon sold approximately
65,750,000 shares for proceeds of at least $557,557. No registra-
tion statement was in effect for these sales by Canyon.

**Other stock sales to U.S. Residents**

105. On March 25, 1994, PanWorld sold 66,667 shares to Poco
Trust for $10,000. No registration statement was in effect for
this sale. These shares were issued purportedly to Poco Trust
pursuant to an exemption from registration under Regulation S.
However, the shares were actually delivered to the trust that was
controlled by a U.S. resident and that paid for the stock with a
check drawn on a bank in Utah.

106. On May 8, 1995, PanWorld sold 4 million shares to Alan
Perl for $20,000. No registration statement was in effect for
this sale. These shares were issued purportedly to Perl pursuant
to an exemption from registration under Regulation S. However,

50

Perl was a U.S. resident and paid for the stock with a check drawn on a bank in Rhode Island.

107. On June 9, 1995, PanWorld issued 4.3 million shares to Randy Gilbert. No registration statement was in effect for this sale. These shares were issued purportedly to Gilbert pursuant to an exemption from registration under Regulation S. However, Gilbert was a U.S. resident.

### FIRST CLAIM

**FRAUD - Violations by PanWorld, Robert Weeks, Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management, Wenger and Gilbert of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

108. Paragraphs 1 through 107 are hereby realleged and incorporated by reference.

109. Defendants PanWorld, Robert Weeks, Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management, Wenger and Gilbert, directly and indirectly, with scienter, in connection with the purchase and sale of securities, the common and preferred stock of PanWorld, by use of the means or instrumentalities of interstate commerce, or the mails, have employed devices, schemes or artifices to defraud; have made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in acts, practices or

51

courses of business which have been and are operating as a fraud or deceit upon the purchasers or sellers of such securities.

110. By reason of the conduct described in paragraph 108, defendants PanWorld, Robert Weeks, Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management, Wenger, and Gilbert have violated, are violating and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

### SECOND CLAIM

**FRAUD - Violations by PanWorld, Robert Weeks, Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management, and Wenger of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]**

111.  Paragraphs 1 through 107 are hereby realleged and incorporated by reference.

112. Defendants PanWorld, Robert Weeks, Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management, and Wenger, directly and indirectly, with scienter, in the offer and sale of securities, the common and preferred stock of PanWorld, by use of the means or instrumentalities of transportation or communication in interstate commerce or by use of the mails, have employed devices, schemes or artifices to defraud.

113. By reason of the conduct described in paragraph 111, defendants PanWorld, Robert Weeks, Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management, and Wenger have violated, are

52

violating and, unless restrained and enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### THIRD CLAIM

**FRAUD - Violations by PanWorld, Robert Weeks, Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management, and Wenger of Section 17(a)(2) and (2) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**

114.   Paragraphs 1 through 107 are hereby realleged and incorporated by reference.

115. Defendants PanWorld, Robert Weeks, Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management, and Wenger, directly and indirectly, in the offer and sale of securities, the common and preferred stock of PanWorld, by use of the means or instrumentalities of transportation or communication in interstate commerce or by use of the mails, have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make a statement made, in light of the circumstances under which it was made, not misleading, or have engaged in transactions, practices, or courses of business which have been, and are operating as a fraud or deceit upon the purchasers of PanWorld stock.

116. *By reason of the conduct described in paragraph 114, defendants PanWorld, Robert Weeks, Ken Weeks, Hesterman, Fabiilli,*

53

Puritan, Krasny, L.K. Management, and Wenger have violated, are violating and, unless restrained and enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

### FOURTH CLAIM

**UNDISCLOSED COMPENSATION FOR STOCK PROMOTION - Violations by Fabiilli, Puritan, Krasny, L.K. Management, and Wenger of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]**

117. Paragraphs 1 through 107 are hereby realleged and incorporated by reference.

118. Defendants Fabiilli, Puritan, Krasny, L.K. Management, and Wenger, and each of them, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, published, gave publicity to, or circulated communications, which, though not purporting to offer a security for sale, described such securities of Pan-World for a consideration received or to be received, directly or indirectly from an issuer, in this case PanWorld, without fully disclosing such consideration and the amount thereof.

119. By reason of the conduct described in paragraph 117, defendants Fabiilli, Puritan, Krasny, L.K. Management, and Wenger have violated, are violating and, unless restrained and enjoined, will continue to violate Sections 17(b) of the Securities Act [15 U.S.C. §§ 77q(b)].

54

## FIFTH CLAIM

**SALE OF UNREGISTERED SECURITIES - Violations by Robert Weeks, Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management, and Wenger of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]**

120.    Paragraphs 1 through 107 are hereby realleged and incorporated by reference.

121.    From December 1989 and continuing to the present, Robert Weeks, Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management, and Wenger have directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities through the use or medium of a prospectus or otherwise; or carried securities or caused securities to be carried through the mails or interstate commerce, by means or instruments of transportation, for the purpose of sale or for delivery after sale; and made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell or offer to buy securities through the use or medium of a prospectus or otherwise, without a registration statement having been filed or being in effect with the Commission as to such securities.

122.    By reason of the conduct described in paragraph 120, Robert Weeks, Hesterman, Ken Weeks, Fabiilli, Puritan, Krasny, L.K. Management, and Wenger have violated, are violating, and un-

less enjoined, will continue to violate Sections 5(a) and 5(c) of
the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### SIXTH CLAIM

**ACTING AS AN UNREGISTERED BROKER-DEALER - Violations by Fa-
biilli, Puritan, Krasny, and L.K. Management of Section 15(a)(1)
of the Exchange Act [15 U.S.C. §78o(a)(1)]**

123.   Paragraphs 1 through 107 are hereby realleged and in-
corporated by reference.

124.   From in or about January 1994 through May 1995, Fa-
biilli, acting as a broker, has made use of the means and instru-
mentalities of interstate commerce and of the mails to effect, in-
duce, and attempt to induce the purchase and sale of securities
without being registered with the Commission as a broker in accor-
dance with Section 15(a)(1) of the Exchange Act and when no exemp-
tion from registration as a broker was available.

125.   From in or about January 1994 through May 1995, Puri-
tan, acting as a broker, has made use of the means and instrumen-
talities of interstate commerce and of the mails to effect, in-
duce, and attempt to induce the purchase and sale of securities
without being registered with the Commission in accordance with
Section 15(a)(1) of the Exchange Act and when no exemption from
registration as a broker was available.

126.   From in or about January 1994 through September 1995,
Krasny, acting as a broker, has made use of the means and instru-

56

mentalities of interstate commerce and of the mails to effect, in-
duce, and attempt to induce the purchase and sale of securities
without being registered with the Commission as a broker in accor-
dance with Section 15(a)(1) of the Exchange Act and when no exemp-
tion from registration as a broker was available.

127. From in or about January 1994 through September 1995,
L.K. Management, acting as a broker, has made use of the means and
instrumentalities of interstate commerce and of the mails to ef-
fect, induce, and attempt to induce the purchase and sale of secu-
rities without being registered with the Commission in accordance
with Section 15(a)(1) of the Exchange Act and when no exemption
from registration as a broker was available.

128. By reason of the conduct described in paragraph 123,
Fabiilli, Puritan, Krasny, and L.K. Management have violated, are
violating, and unless enjoined, will continue to violate Section
15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

### SEVENTH CLAIM

**FALSE AND DELINQUENT FILINGS WITH THE COMMISSION - Violations by
PanWorld, Robert Weeks and Hesterman of Sections 13(a) and 15(d)
of the Exchange Act and Rules 13a-1, 13a-13, 15d-1, 15d-13, 12b-
20 and 12b-25 [15 U.S.C. §§ 78m(a) and 78o(d) and 17 C.F.R. §§
240.13a-1, 240.13a-13, 240.15d-1, 240.15d-13,240.12b-20,
240.12b-25]**

129. Paragraphs 1 through 107 are hereby realleged and in-
corporated by reference.

57

130.    PanWorld has failed to file periodic reports with the
Commission, filed such reports on an untimely basis, filed materi-
ally false periodic reports with the Commission, and filed such
reports with the Commission that in addition to the information
expressly required to be included in the report failed to include
such further material information as was necessary to make the re-
quired statements not misleading.

131. Pursuant to Section 20(a) of the Exchange Act [15 U.S.C.
§ 78t(a), Robert Weeks and Hesterman were controlling persons of
PanWorld.

132. Pursuant to Section 20(a) of the Exchange Act [15 U.S.C.
§ 78t(a)], Robert Weeks and Hesterman without just cause hindered,
delayed, and obstructed the making or filing of the PanWorld peri-
odic reports that were delinquent or never filed as set forth in
paragraphs 28 through 32.

133.    By reason of the foregoing conduct, PanWorld, Robert
Weeks, and Hesterman have violated, are violating, and unless en-
joined, will continue to violate Sections 13(a) and 15(d) of the
Exchange Act and Rules 13a-1, 13a-13, 15d-1, 15d-13, 12b-20 and
12b-25 [15 U.S.C. §§ 78m(a) and 78o(d) and 17 C.F.R. §§ 240.13a-1,
240.13a-13, 240.15d-1, 240.15d-13,240.12b-20, 240.12b-25].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this
Court:

### I.

Find that the defendants, and each of them, committed the
violations alleged.

### II.

Enter an Order of Permanent Injunction as to each defendant,
in a form consistent with Rule 65(d) of the Federal Rules of Civil
Procedure, enjoining each defendant from further violations of the
provisions of law and rules alleged in this complaint.

### III.

Enter an Order directing defendants PanWorld, Robert Weeks,
Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management,
Wenger, Rita Wenger, Gilbert, and Canyon to account for, disgorge
and pay over, as the Court may direct, all ill-gotten gains re-
ceived or benefits in any form derived from the illegal conduct
alleged in this complaint, together with pre-judgment and post-
judgment interest as provided by law.

### IV.

Enter an Order requiring defendants PanWorld, Robert Weeks,
Ken Weeks, Hesterman, Fabiilli, Puritan, Krasny, L.K. Management,
Wenger and Gilbert to pay civil penalties pursuant to Section

59

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section
20(d) of the Securities Act [15 U.S.C. § 77t(d)] in an amount to
be determined by the Court.

## V.

Enter an Order pursuant to Section 20(e) [15 U.S.C. § 77t(e)]
of the Securities Act and Section 21(d)(2) [15 U.S.C. § 78u(d)(3)]
of the Exchange Act unconditionally and permanently prohibiting
Robert Weeks and Hesterman from acting as an officer or director
of any issuer that has a class of securities registered pursuant
to Section 12 of the Exchange Act or that is required to file re-
ports pursuant to Section 15(d) of the Exchange Act.

## VI.

Grant such further equitable relief as this Court deems appropriate and necessary.

Dated:

Respectfully submitted,

Leslie J. Hendrickson
(303) 844-1086

Thomas M. Melton (4999)

Robert M. Fusfeld
(303) 844-1080

Attorneys for the Plaintiff
Securities & Exchange Commission
1801 California Street, Suite 4800
Denver, Colorado 80202
(303) 844-1000

Attorney for the Plaintiff
Securities & Exchange Comm.
50 South Main Street, # 500
Salt Lake City, Utah  84144
(801) 524-5796

61

EXHIBIT 9

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                )
                                 )     File No. D-2049
DYNAMIC AMERICAN CORPORATION     )
                                 )

ADMINISTRATIVE PROCEEDING

PAGES:     700 through 962

PLACE:     U.S. Securities and Exchange Commission
           46 West 300 South
           Salt Lake City, Utah

DATE:      Thursday, July 13, 2000


        The above-entitled matter came on for hearing, pursuant
to notice, before JAMES T. KELLY, Administrative Law Judge,
at 9:00 a.m.


APPEARANCES:

On behalf of the Securities and Exchange Commission:

        THOMAS D. CARTER, ESQ.
        U.S. Securities and Exchange Commission
        1801 California Street, Suite 4800
        Denver, Colorado  80202
        (303) 844-1090

On behalf of the Respondents, K. Weeks and D. Hesterman:

        DAVID W. PARSONS, ESQ.
        42 Broadway, Suite 1101
        New York, NY  10004
        (917) 320-4801

On behalf of the Respondent, R. Weeks:

        JAMES N. BARBER, ESQ.
        Suite 100, Bank One Tower
        50 West Broadway
        Sale Lake City, Utah 84101
        (801) 364-6500



                Diversified Reporting Services, Inc.
                        (202) 296-9626

774

1          JUDGE KELLY:  It's Mr. Patten's prepared report --

2          MR. BARBER:  Oh, yeah.  I have no objection.

3          MR. PARSONS:  No objection.

4          JUDGE KELLY:  Admitted.

5                              (Division's Exhibit No. 178 was

6                              received into evidence.)

7          MR. CARTER:  Thank you, Your Honor.

8          JUDGE KELLY:  Off the record.

9                              (Off the record at 11:16 a.m.,

10                             and reconvened at 11:18 a.m.)

11         JUDGE KELLY:  We're back on the record.  Ms.

12    Achuff, please, raise your hand to be sworn as a witness.

13    Whereupon,

14                        CARLEEN ACHUFF

15    was called as a witness and, having been first duly sworn,

16    was examined and testified as follows:

17         JUDGE KELLY:  Thank you.  Please, be seated.

18                      DIRECT EXAMINATION

19         BY MR. CARTER:

20    Q     Good morning, Ms. Achuff.

21    A     Good morning.

22    Q     Please, state your name and spell both your first

23    and the last name for the record.

24    A     My name is Carleen Holloway Achuff, C-a-r-l-e-e-n,

25    Achuff is A-c-h-u-f-f.

Diversified Reporting Services, Inc.
(202) 296-9626

1        Q    Ms. Achuff, what's your occupation?

2        A    I'm a staff accountant with the Securities and

3    Exchange Commission in Denver.  My functional job title is

4    securities compliance examiner.

5        Q    Compliance for what kind of companies?

6        A    Investment company and investment advisors.

7        Q    How long have you been with the Securities and

8    Exchange Commission?

9        A    16 years.

10       Q    What's your educational background?

11       A    I earned a bachelor's and master's degrees in

12   geology and have also taken college courses in accounting.

13   I'm sorry.

14            MR. PARSONS:  Hold on.  I can't hear you.

15            MR. CARTER:  I'm sorry.

16            MR. PARSONS:  Just trying to get her things up

17   here.

18            THE WITNESS:  And college courses in accounting.

19            BY MR. CARTER:

20       Q    Do you have any professional licenses?

21       A    No, I do not.

22       Q    Is geologist a professional license?

23       A    Well, in some jurisdictions.

24       Q    Okay.

1      A      I'm a certified professional geological scientist
2   with the American Institute of Professional Geologists.

3      Q      I consider that a license.  Could you tell the
4   Court, beginning 16 years ago what your positions have been
5   with the SEC?

6      A      I was hired as a geologist in 1984, promoted to the
7   senior geologist in '86, promoted to regional geologist in
8   '96.  And I worked as a geologist for the Commission, up
9   until this past March.  A portion of that work when I first
10  started was in what's termed the full disclosure program
11  which is reviewing registration statements filed by companies
12  -- small companies that want to go public.  But throughout
13  that 16 year period, I was doing enforcement work.

14     Q      And in terms of enforcement work, you did
15  investigations?

16     A      Correct.

17     Q      And what kind of investigations generally?

18     A      Principally focusing on minerals, and oil, and gas
19  companies.  Suspected incidences of false statements to the
20  public, misuse of investor proceeds.

21     Q      In the course of your work -- your enforcement
22  work, have you personally worked on obtaining financial
23  records from banks, and broker dealers, and individuals?

24     A      Yes.

777

1    Q    Have you ever written subpoenas for financial
2  records?

3    A    Oh, yes.

4    Q    Have you been responsible for receiving financial
5  records or whatever materials are coming back?

6    A    Yes, I have.

7    Q    Okay.  What -- generally what kind of materials
8  have you dealt with, from subpoenas?

9    A    Documents that would show the names on an account,
10 account opening documents, periodic statements of accounts,
11 and then all of the debit and credit items to accounts.  That
12 would be wire transfers, checks, other sorts of incoming and
13 outgoing funds.

14   Q    Okay.  You've been doing that for the last 16 years
15 basically?

16   A    Portions of it, yes.

17   Q    In the course of your working with these kinds of
18 financial records, do you work with -- do you prepare
19 summaries of information and data from those records?

20   A    Yes, I do.  I prepare spreadsheets using Excel,
21 which is a data -- or, pardon me, not a data base -- a
22 spreadsheet program.

23   Q    And you're familiar with Excel?

24   A    Yes.

778

1      Q    And it's recognized as accurate and reliable in

2  producing summaries and spreadsheets?

3      A    Oh, yeah.  I think it's one of the most widely used

4  spreadsheet programs.

5      Q    Have you ever testified in administrative

6  proceedings?

7      A    Yes.

8      Q    Have you ever testified before as a summary

9  witness?

10     A    Yes.  Yes, I have.

11     Q    Okay.  And by summary witness, you know what I

12 mean?

13     A    I understand it to be -- yes, a witness --

14 basically a fact witness, summarizing facts.

15     Q    All right.  If you would look at the notebooks that

16 contain Division Exhibits 94, 134, and 169, maybe it might be

17 actually easiest to pull those out of those notebooks.

18          JUDGE KELLY:  Off the record.

19                              (Off the record at 11:25 a.m.,

20                              and reconvened at 11:27 a.m.)

21          JUDGE KELLY:  Back on the record.

22          BY MR. CARTER:

23     Q    Ms. Achuff, are Division Exhibits 94, 134, and 169

24 schedules that you prepared in this case?

Diversified Reporting Services, Inc.
(202) 296-9626

779

1       A    They are.

2       Q    And in overview, what -- well, what are the source

3    documents for -- maybe we ought to do them one at a time.

4    What are the source documents for Exhibit 94?

5       A    The source documents, Exhibit 94, is a spreadsheet

6    of activity in the Stockton Limited account at Canadian

7    Imperial Bank of Commerce.  And so the source documents are

8    account statements and debit and credit items for that

9    account.

10      Q    All right.  And Exhibit 134.  What are the source

11   documents for that?

12      A    134 is a spreadsheet showing transactions in the

13   Hamilton Limited CIBC account.  The source documents for that

14   -- for 134 then would be the statements and debit and credit

15   items for that Hamilton account.

16      Q    For that bank account?

17      A    That bank account, correct.

18      Q    And then Exhibit 169 is what?  How does it relate

19   to 94 and 134, Ms. Achuff?

20      A    I prepared Exhibit 169 in an effort to kind of pull

21   together in one place information that I derived from the

22   brokerage and the bank accounts of both Stockton and

23   Hamilton.  And so the source documents would be -- for the

24   brokerage accounts would be brokerage -- monthly brokerage

25   statements and related documents for both Hamilton and

1   Stockton's several accounts, and then the same CIBC bank

2   account documents that underlie Exhibits 94 and 134.

3       Q    How did you obtain these source documents?

4       A    Start with the brokerage documents -- there are

5   brokerage accounts maintained in the names of Stockton and

6   Hamilton in both the U.S. and Canada.  For the U.S. accounts,

7   I sent subpoenas in the normal fashion that we do at the --

8   with the Commission.  For the --

9            MR. BARBER:  Well what is -- excuse me -- but

10  clarify what that is.

11           MR. CARTER:  What normal is?  The normal course?

12           MR. BARBER:  She did it by subpoena?

13           MR. CARTER:  Yeah.

14           MR. BARBER:  Well --

15           BY MR. CARTER:

16      Q    I'm sorry.  Would you go back over that?  How did

17  you get the brokerage records -- the broker dealer records?

18      A    Okay.  For the U.S. accounts, I sent subpoenas to

19  the broker dealers --

20      Q    All right.

21      A    -- and obtained the documents.  Either to the

22  broker dealers or the clearing firms through which they

23  clear.  For the Canadian accounts, it was necessary to go

24  through the process under a memoranda of understanding that

25  exists between the SEC, and the British Columbia Securities

1    Commission, and the Ontario Securities Commission.

2              It's a similar process.  I wrote up basically a

3    subpoena.  It was just administratively handled through the

4    memorandum of understanding.  And then to finish your

5    question on the bank records, those I obtained pursuant to

6    subpoena, both for Stockton and Hamilton.

7         Q    And are these underlying records in the courtroom

8    today, do you know?

9         A    To the best of my knowledge, they are.

10             MR. CARTER:  They're exhibits actually in the

11   Division's exhibit list, Your Honor.  I haven't offered them,

12   but they're here and available to respondents.

13             JUDGE KELLY:  Thank you.

14             BY MR. CARTER:

15        Q    Now why don't we do this step by step?  Can you

16   give just like a step-by-step breakdown of a general example

17   of how, for example, on Exhibit 134, you went about preparing

18   the schedule of Hamilton Limited's CIBC bank account?

19        A    Exhibit 134 is arranged chronologically according

20   to the date for any given transaction on the statements for

21   the Hamilton account.  And I simply went through the

22   statement noting items that were debits, items that were

23   credits, and then filled in the payee, and the payor

24   information, and any additional comments from the debit and

25   credit items themselves.  So from the statement I did not

Diversified Reporting Services, Inc.
(202) 296-9626

782

1    have the payee payor information.  I simply had the dollar
2    amounts of a debit, or a credit, and the balance for the
3    account, and the date when that --

4        Q    Okay.  And then how did you get the payee payor?
5        A    And then for the payee payor, I went to the
6    documents that were, for instance, photocopies of wire
7    transfers into or out of the account, photocopies of checks.
8     Things like bank fees, I think were noted on the statement
9    itself as being a bank fee.  And so I simply filled in that
10   information as it related to the dollar amounts that I had.
11       Q    All right.  On -- still on 134 just as an example,
12   can you take the Court, and respondents, and myself through
13   how you wrote this line for the September 4, 1996, wire to
14   Maria Rosa Baez, for example, just as an example of how you
15   did this.

16       A    Okay.  On the statement itself with a statement
17   date of 9/4/96, there would be -- or there is a note that a
18   wire -- an outgoing wire was sent.  The dollar amount is
19   shown, and then there is then a photocopy of an outgoing wire
20   from this account in the name of Maria Rosa Baez.  And then,
21   as you see, over on the comment line, First Security Bank of
22   Utah, account number 0541027116 would be the receiving
23   institution and account as identified on the wire transfer
24   documentation.

783

1    Q    So the wire transfer told you that that money was

2    going to -- or reflected as a record that that money was --

3    that wire was going to First Security Bank of Utah to a

4    certain account number?

5    A    Correct.

6    Q    Okay.

7    A    And had that -- the name, Maria Rosa Baez.

8    Q    And then the bates stamp numbers to the right of

9    that.  What do those reflect?

10    A    That series, as you can see the numbers are the

11    same throughout the column.  That is the bate number series

12    that I or someone at my instruction stamped on the Hamilton

13    Limited CIBC account documents that I received.

14    Q    Okay.  And does that same thesis work all the way

15    through this exhibit 134 as to how you obtained things?

16    A    Correct.

17    Q    Okay.  You didn't make any assumptions about who

18    these peoples names were?

19    A    No.  No, not at all.

20    Q    And how large is the -- was the Hamilton bank

21    account records?  Fairly substantial?

22    A    Yeah.  Three quarters of an inch, an inch thick.

23    Q    Okay.

24    A    You know, a hefty chunk.

Diversified Reporting Services, Inc.
(202) 296-9626

784

1       Q    And how about the Stockton Limited account?  Was

2    that a substantial number of documents?

3       A    Same thing and the same procedure that I followed

4    in -- that I described for Exhibit 134 was the procedure that

5    I followed for Exhibit 94.

6       Q    Let me turn then to Exhibit 169.  And the record

7    should reflect that I'm tendering to respondents and to the

8    Court right now a page of 169, that we would like to insert

9    in Exhibit 169, that reflects some recalculations and changes

10   that Ms. Achuff made, and she'll testify to that in a moment.

11    But I think that the Court should -- everybody ought to have

12   it as we're looking at this.

13      A    Okay, and --

14      Q    Let's turn to 169, Ms. Achuff.

15      A    And Mr. Carter, in order to make those changes,

16   I'll need -- I don't have them memorized.  I --

17      Q    Oh, okay.

18      A    -- will need a document.

19      Q    Okay.  Well, why don't you get -- here, let me --

20   let's just go along in this --

21      A    Okay.

22      Q    -- for a while, and we'll see how far we get before

23   we get to the changes.

24      A    Okay.

785

1    Q    And then we'll get that document.  What is Exhibit
2    169, Ms. Achuff?

3    A    Okay.  As I said, this is intended as a summary
4    document to show the flow of Dynamic American stock into
5    various brokerage accounts, and then the sales or other
6    transactions involving those shares in those brokerage
7    accounts.  And then the flow of money from the sale of
8    Dynamic American stock into the CIBC accounts of Stockton and
9    Hamilton and then the disposition of those funds out of the
10   CIBC bank accounts.

11   Q    Okay.  So Exhibit 169, in some ways, duplicates
12   some of the items in 94 and 134; is that right?

13   A    Exactly.  94 and 134 are, if you will, source
14   documents for a portion of 169.

15   Q    Okay.  But 169 takes us back one or two steps
16   before the bank accounts; is that right?

17   A    Correct.

18   Q    Okay.  Why don't you tell the Court what the first
19   step was then in preparing 169, the summary?  How did you
20   know, for example, you know, where the shares were coming
21   from or who the, you know, how did these shares get issued?
22   How did you know that?

23   A    Okay.  The first step is to look at the Dynamic
24   American corporate resolutions, which would be the documents
25   authorizing new issuances of stock coming out of the treasury

786

1    -- company's treasury to however the recipient is.  I think
2    that Commission's Exhibit 1 is a compilation that I made
3    during the investigative phase of this matter, reflecting
4    those corporate resolutions.

5            And so, for instance, looking at the first page of
6    Exhibit 169, which deals with Hamilton Limited, you see the
7    underlying heading, receipt of shares.  We see the first line
8    on August 21st, 1996, five million shares reflected by
9    certificate number 66944, was issued in the name of Hamilton
10   Limited.  And then that number 1122 in square brackets is a
11   copy of that certificate from the records of IDATA, Inc.,
12   Dynamic American's transfer agent.

13       Q    So if we went to IDATA's records, which Mr.
14   Bogutski discussed yesterday and went to page 1122, we'd find
15   that certificate.

16       A    Exactly.  And I think that certificate is part of a
17   stapled together stack of pages that I would refer to as a
18   transfer agent item, and those are all of the documents in
19   the transfer records that relate to the issuance of that
20   share.  And so I think, in fact, that item actually starts at
21   1120; 1122 is the actual certificate.

22       Q    Do you know how voluminous the transfer agent
23   records were in this matter?

24       A    They're quite voluminous.  They fill --

Diversified Reporting Services, Inc.
(202) 296-9626

787

```
1        Q    Banker's box full, at least?

2        A    Several -- easily -- yeah.  A document storage box

3    full, I would say.

4        Q    All right.  Go on, please.

5        A    Okay.  So the first step then, as I say, is looking

6    at the corporate resolutions that authorize the issuance of

7    shares.  Second step then, is to go to the transfer agent

8    records and find where those authorized shares are, in fact,

9    actually issued.  The transfer agent records reflect two

10   things.

11            They reflect the initial issuance of the shares and

12   then they also reflect the cancellation of those original

13   certificates and the -- their replacement by other

14   certificates when the original shares are, for instance,

15   deposited into a brokerage account.

16       Q    What happens in transfer agent records when the

17   original shares are deposited into a brokerage account, for

18   example?

19       A    When the shares go into a brokerage account, the

20   broker dealer or the clearing agent for the broker deal, but

21   I'll just lump those together and call them a broker dealer.

22    When the shares go into a particular account at the broker

23   dealer, the broker dealer will then send that certificate

24   back to the transfer agent with instructions to issue a new

25   certificate in the name of the broker dealer or in the name
```

788

1    of the clearing firm for the broker dealer.

2              And that creates another transfer agent item --

3    another record in the transfer agent records that would show

4    the disposition of the original certificate.  And that leads

5    you -- that's the way that you know where to go to find out

6    what happened to those shares.

7        Q    All right.

8        A    In the case of Hamilton, when we look at the second

9    underlined heading, delivery into broker accounts, you see

10   that on August 22nd, 1996, certificate 66944, that we just

11   looked at above, is delivered into Hamilton's account number

12   1139377-04 at Brink Hudson, which is a Vancouver, British

13   Columbia broker dealer.

14       Q    How do you know that?

15       A    How do I know which?

16       Q    How do you know that Brink Hudson is a Vancouver

17   broker dealer?

18       A    I could tell from the transfer agent records at

19   bate number -- no, I'm sorry, that's wrong -- bate number

20   1108, those are the -- that's the item that reflects the

21   delivery of those shares into the Brink Hudson account, and I

22   could see Brink Hudson's name on it, their address and all of

23   that.  And so pursuant to the memorandum of understanding

24   between the Commission and the British Columbia Securities

25   Commission, I was able to obtain Hamilton's account documents

789

1   from Brink Hudson.

2        Q    By subpoena -- MOU subpoena -- the MOU process.

3        A    The MOU process -- whatever it is, yeah.

4        Q    All right.  And go on.  Move along to what's the

5   next breakdown and how did you --

6        A    Okay.  So that gets the shares into a particular

7   brokerage account.  The thing then is to look at the account

8   statements and other documents for that brokerage account.

9   That's the third underlined heading, brokerage transactions,

10  Hamilton account, Brink Hudson.  And those are bate stamped,

11  again, by me or someone at my instruction as pages 79996

12  through 8094 inclusive.

13            And in that account, in a brokerage account you can

14  basically have four things that happen to shares.  You can

15  either receive shares in, which is the case here, 10,000 --

16  or pardon me, ten million Dynamic American shares were

17  delivered into that account.  You can buy shares.  You can

18  deliver shares out, which is a transfer of shares out of the

19  account.  Or you can sell shares.  Those are the four things

20  basically that will change the share balance in a brokerage

21  account.  And so that's what I looked at.

22       Q    And that's what you broke down here.  The buys --

23       A    Correct, that --

24       Q    -- the sells, and the deliveries?

Diversified Reporting Services, Inc.
(202) 296-9626

790

1       A    Correct.

2       Q    All right.

3       A    And that should actually reflect the receipt, I

4    suppose, of the ten million shares that we see in the lines

5    above.  So ten million shares came in, Dynamic American

6    shares; 4,775,000 shares were sold out of the Hamilton/Brink

7    Hudson account; another 2,200,000 shares were delivered out

8    of the Brink Hudson account -- out of the Hamilton account to

9    an account in the name of Richard Gladstone at Canaccord.

10   Those shares covered short sales in the Gladstone account,

11   and the sale proceeds from those short sales were wired into

12   the Hamilton/Brink Hudson account on the same day that the

13   shares were transferred out.

14      Q    Let me stop you there.  How do you know that this

15   covered short sales by the Richard Gladstone account at

16   Canaccord?

17      A    I obtained the account documents for the Gladstone

18   account, also pursuant to the MOU.  Canaccord is a British

19   Columbia brokerage firm.  So I obtained those account

20   documents as well, and by doing another spreadsheet of the

21   transactions in Dynamic American in that account, I could see

22   that at the point that this 2.2 million shares came in from

23   Brink Hudson, the Gladstone account was short, was -- had a

24   deficit of Dynamic American shares actually in the account to

25   cover the number of shares that had been sold.

791

1           And there are documents in the Brink Hudson account
2    records, that show that these 2.2 million shares are being
3    transferred to the Gladstone account against the receipt of
4    $90,000 from the sale of those -- of the Dynamic American
5    shares that were short sold in the Gladstone account.

6        Q    Okay.  And so this total then is what?

7        A    The $385,247 is a total of the sales of Dynamic
8    American in the Hamilton/Brink Hudson account and the sales
9    in the Gladstone account that were covered by shares from the
10   Brink Hudson account.

11       Q    Okay.  And why did you include the $90,000 in the
12   Hamilton account?

13       A    Because the substance of the transaction, was that
14   the shares sold out of the Gladstone account came from the
15   Brink Hudson account.  And the proceeds from those sales went
16   back to the Brink Hudson account, and so it made a little bit
17   of a detour on the way, but fundamentally the substance of
18   the transaction was that these were sales out of the Brink
19   Hudson account.

20       Q    Out of the Hamilton account?

21       A    The Hamilton account at Brink Hudson, right.

22       Q    All right.  And then what happens next with the
23   proceeds?  Let me stop you for a second.  As far as United
24   States broker dealers are concerned, isn't it a fact that
25   they are required by law to maintain certain documents?

792

1    A    Yes, they are.

2    Q    Okay.  For a certain amount of time?

3    A    For a certain amount of time in order to be

4    available for, among other things, the Commission's examiner

5    -- Securities Compliance examiners in the broker dealer area.

6    Q    In your 16 years with the Commission, have you

7    looked at thousands of sheets of broker dealer account

8    statements?

9    A    Yes, I would say so.

10    Q    More than you care to remember?

11    A    More than I care to think about.  Yes.

12    Q    And do shareholders rely on those statements for

13    their accuracy?

14    A    Oh, absolutely.

15    Q    All right.  Go on to the delivery of sales

16    proceeds.  I think it -- is that the next step?

17    A    Well, just to finish off the transactions in the

18    brokerage account, there were no buys of Dynamic American

19    sale -- stock.  There were deliveries of 5,225,000 shares out

20    of the Hamilton account to four other -- over three other

21    accounts as identified on Exhibit 169.  The two -- just to

22    note -- the two million shares going to a Gladstone account

23    are in addition to the 2.2 million shares that I've already

24    talked about.

Diversified Reporting Services, Inc.
(202) 296-9626

793

1      Q    Up above.  Okay.

2      A    Right.  So that takes care of the entire ten

3   million shares of Dynamic American stock that came into the

4   Hamilton account.

5      Q    Okay.  So where did the money go?

6      A    Well, then we look down at the fourth underlined

7   heading, delivery of sales proceeds from Hamilton account

8   Brink Hudson into Hamilton account at CIBC.  That's the

9   account that's reflected in Exhibit 134.  Basically the Brink

10  Hudson account, had transactions -- the Hamilton account at

11  Brink Hudson had transactions in Dynamic American to the tune

12  of $385,247, and in another company called Koala Capital

13  Corp., and $103,580.66 from sales of Koala Capital Corp. were

14  also wired to the Hamilton CIBC account.

15     Q    Okay.  Let me stop you there.

16     A    Sure.

17     Q    Why did you include in this 103,000 in this portion

18  of the schedule?  Why did you include in the Koala Capital

19  Corp. money?

20     A    Because during the same period of time, what I was

21  concerned with in the next underlined item is the

22  distribution of proceeds out of the CIBC account.

23     Q    Uh-huh.

24     A    And the problem was that during the same period of

25  time, there was money coming into the CIBC account from sales

794

1    of both Dynamic American and Koala Capital Corp.  And so I

2    couldn't really -- I had no basis for attributing outgoing

3    funds from the CIBC account to either Dynamic American or

4    Koala Capital.

5        Q    There was a co-mingling of funds?

6        A    Yes, exactly.

7        Q    All right.

8        A    So what I looked at, was the distribution of this

9    total of $488,827.18 in sales proceeds derived from both

10   Dynamic American and Koala Capital Corp.

11       Q    Okay.  Let me just ask you, how -- what was the

12   record that showed you that the proceeds of the Hamilton

13   account at Brink Hunson -- Hudson, excuse me -- went into the

14   Canadian Imperial Bank of Commerce, CIBC?

15       A    From the Brink Hudson documents, I had both

16   notations on the statements themselves, wire transfer to CIBC

17   Freeport, Bahamas, I think, was usually the way it read.  And

18   I think I had copies of the wire transfer advices, which

19   showed monies going to CIBC from out of that account.

20       Q    From Brink Hudson?

21       A    From Brink Hudson.

22       Q    Right.

23       A    In the Brink Hudson documents.

24       Q    Okay.  Continue.

Diversified Reporting Services, Inc.
(202) 296-9626

795

1      A     Okay.  So then in summary fashion on this first

2   page of Exhibit 169, I've shown the disposition of

3   $480,018.69 out of the Hamilton account at CIBC.  I would

4   presume that the remaining roughly 8,000 was left in the

5   account, the difference between that and the total amount

6   that was wired from Brink Hudson.

7      Q     All right.  And then going down to the distribution

8   of these sales proceeds, how did you get the names in the

9   left-hand column beginning with the Washington National

10  Limited?

11     A     Okay.  That would be reflected in Exhibit 134 as

12  I've described earlier in my testimony.  The outgoing checks

13  or wires would show the payee.

14     Q     Okay.  And these are the -- from the bank records

15  of the CIBC?

16     A     Correct.

17     Q     That you received by subpoena?

18     A     Correct.

19     Q     Okay.  Go ahead.

20     A     And so I simply totaled the amounts going to the

21  various payees and summarize them in Exhibit 169.

22     Q     All right.  And then on the right-hand side,

23  there's a comment that Washington National Limited was a K.

24  Weeks corporation?

796

```
1      A    Correct.

2      Q    How did you know that?

3      A    Robert E. Cordes testified to that effect.  He also
4  provided --

5           MR. BARBER:  Objection -- that name Cordes --

6           MR. CARTER:  All right.  Don't answer that -- well,
7  Your Honor, I'm sorry.  You see -- your ruling.

8           JUDGE KELLY:  How did you know -- what was the
9  question?

10          BY MR. CARTER:

11     Q    How did you know that -- where did your information
12 come from to make the notation here that Washington National
13 Limited was a K. Weeks corporation?

14     A    The response to my subpoena duces tecum by Robert
15 E. Cordes -- testimony and documents.

16     Q    Okay.  And you took Mr. Cordes' testimony?

17     A    I did.

18          JUDGE KELLY:  All right.  So she got it from the
19 investigative testimony.

20          MR. PARSONS:  Yes.

21          JUDGE KELLY:  And you're objection is to that --

22          MR. PARSONS:  That we will be objecting to the
23 admission of all of Mr. Cordes' testimony and the documents
24 derived therefrom.
```

797

1          JUDGE KELLY:  All right.

2          MR. PARSONS:  So Ms. Achuff can testify subject to

3     it being connected up and --

4          JUDGE KELLY:  All right.  That's fine.  We'll leave

5     it like that then at this time.

6          BY MR. CARTER:

7     Q    All right.  And the other people down here, how did

8     you determine their names?  In the same way -- it just came

9     off of Exhibit 134, it's the -- the names shown in the bank

10    records; is that right?

11    A    As being the payees, yes.

12    Q    Yeah.  And the comments are things that you learned

13    from investigation or that are obvious on their face, such as

14    Ken Weeks Insurance Services?

15    A    Exactly.  Information that I obtained in the course

16    of the Commission's investigations of both Dynamic American

17    Corporation and PanWorld Minerals International, Inc.

18    Q    All right.  And things like Dannigers being a

19    furniture store in Salt Lake City believed to be for the

20    benefit of Ken Weeks' new house in Draper, Utah.  That's --

21    what's the source for that?

22    A    I called directory assistance and asked for

23    Dannigers.  My recollection is that that's how I got the Salt

24    Lake connection to Dannigers.  I knew -- or I had learned

25    information that led me to believe that Ken Weeks had a new

Diversified Reporting Services, Inc.
(202) 296-9626

798

1    house in Draper, Utah during this period of time, and that's

2    the source for the notation over there.

3        Q    Okay.  Now let's move to the --

4             MR. CARTER:  Can you get me 169?  I don't know how

5    I get this screwed up.  I'd like to take just a moment, Your

6    Honor.  My exhibit is not correct.

7             JUDGE KELLY:  Off the record.

8                                (Off the record at 11:55 a.m.,

9                                and reconvened at 11:56 a.m.)

10            JUDGE KELLY:  On the record.

11            BY MR. CARTER:

12       Q    Let's turn to the second page of Exhibit 169.

13   Beginning with this page and going through the end, what does

14   this reflect?

15       A    The second through sixth pages of Exhibit 169 are a

16   similar analysis of Stockton Limited's receipt and

17   disposition of Dynamic American shares.  Again, tracing the

18   flow through corporate resolutions, transfer agent records,

19   brokerage accounts, and the Canadian Imperial Bank of

20   Commerce, Stockton account.

21       Q    And you did it in the same way as you just

22   discussed as to the first page by going to corporate

23   resolutions, transfer agents --

24       A    Through MOU --

Diversified Reporting Services, Inc.
(202) 296-9626

799

1     Q    -- broker dealers, bank records of CIBC and -- is

2  that it?

3     A    Correct.

4     Q    Okay.

5     A    And the documents were obtained in the same

6  fashion.

7     Q    Okay.  Why does the Stockton Limited -- why do

8  those pages take up so much more space?

9     A    A couple of reasons -- Stockton received a lot more

10  stock than did Hamilton Limited and Stockton had a number of

11  brokerage accounts, whereas Hamilton Limited only had the

12  one.

13     Q    All right.  And up at the top how do you know that

14  Stockton Limited received 23,600 -- 23,650,000 shares?  What

15  was the sources for that?

16     A    Transfer agent records.

17     MR. BARBER:  Pardon?

18     THE WITNESS:  Transfer agent records.

19     MR. CARTER:  I think we're at the stage where I

20  need to have you get your corrections, and we can go over the

21  corrections.  Could we take a moment off the record for the

22  witness to get her --

23     JUDGE KELLY:  Off the record.

24                 (Off the record at 11:58 a.m.,

25                 and reconvened at 11:59 a.m.)

800

1           JUDGE KELLY:  On the record.

2           BY MR. CARTER:

3      Q    Ms. Achuff, let's look at page five of six of

4  Exhibit 169.

5      A    Right.

6      Q    I've tendered to the Court and I've tendered to

7  respondents a new page five of six that has some handwriting

8  on it.  Is that your handwriting?

9      A    It is.

10     Q    What does your handwriting reflect?

11     A    As I was reviewing this page, I realized that I had

12  made an error in allocating sales proceeds in the Yorkton

13  account, the Stockton's -- Stockton's account at Yorkton

14  Securities in Vancouver and in the investor's -- one of the

15  investors associate's accounts that Stockton maintained.  I

16  had made an error in allocating proceeds between sales of

17  Dynamic American and sales of another stock called Lanstar,

18  L-a-n-s-t-a-r, and so the handwritten notations and the

19  corrections that are on this page are my corrections to show

20  properly the allocation of monies going into the CIBC account

21  from the sale of Dynamic American stock, as opposed to the

22  sale of Lanstar.

23     Q    All right.  And so for example, on the far left of

24  page five, there is a column that says Michelle Martin, and

25  it --

801

1    A    Oh --

2    Q    -- previously stated that Ms. Martin received

3    $884,970.88?

4    A    Right.  I'm sorry.  And in addition in that one

5    instance, I inadvertently left out, it appears, one wire from

6    the Stockton CIBC account to Michelle Martin, and so the

7    corrected amount of money coming from CIBC -- Stockton's

8    account at CIBC to Michelle Martin is $886,753.88.

9    Q    So it's about $2,000 difference?

10   A    Right.  Right.  Missed a little bit of it.

11        JUDGE KELLY:  But the name Michelle Martin is now

12   crossed out.

13        MR. CARTER:  It's not crossed out, is it?

14        THE WITNESS:  No, that was a mistake.  I circled it

15   to try and undo my cross-out.  I meant to cross out the

16   dollar amount, and I crossed out her name by mistake.  But

17   the name should still be there.

18        BY MR. CARTER:

19   Q    So Michelle Martin -- your testimony is that your

20   summary is that Michelle Martin received $886,753.88 from

21   sales of stock out of the Stockton account?

22   A    Correct.  As reflected in Exhibit 94.

23   Q    All right.  And the actual sales of Dynamic stock

24   through the Stockton Limited account should total up to

25   $3,363,289.12 rather than 3,409,357.92; is that correct?

802

1    A    It's not the sales of stock.  Those are --

2    Q    The proceeds.

3    A    -- your dollar amounts are correct.  Those are

4  proceeds from the sale of Dynamic American stock flowing into

5  Stockton's CIBC account.

6    Q    All right.  And have you totaled the proceeds of

7  stock -- I'm sorry -- the proceeds of Dynamic American stock

8  sales made by the Hamilton account and the Stockton account?

9   Have you totaled up those two things --

10   A    I have --

11   Q    -- so that it just reflects sales of Dynamic stock

12  rather than Lanstar or Koala Capital?

13   A    Yes, I have.

14   Q    And what is that figure of this income?

15   A    That figure is $3,748,536.12.

16   Q    Thank you.

17        MR. CARTER:  Where's that shown?

18        MR. BARBER:  Is that over here?

19        JUDGE KELLY:  No, just in her testimony.  It's just

20  a total.

21        THE WITNESS:  Yeah, that total is -- derives

22  directly from this amended, or whatever the term is, copy of

23  Exhibit 169.

24        BY MR. CARTER:

Diversified Reporting Services, Inc.
(202) 296-9626

803

1   Q   Right.  It derives from the figure on the front
2   page, does it not --
3   A   For Hamilton.
4   Q   -- of $385,247 in proceeds from the sales of shares
5   in Hamilton's account plus the new figure of --
6   A   Three million --
7   Q   3,363,289.  You totaled those two.
8   A   Correct.
9   Q   Thank you.  Now in addition to having subpoenaed
10  all of these records for this summary schedule, did you
11  subpoena the bank records of David Hesterman?
12  A   I subpoenaed records of a -- an account in the
13  names of David, Becky and Barbara Hesterman at First Security
14  Bank of Utah.
15      MR. CARTER:  And that, Your Honor, is -- and
16  counsel, is Division Exhibit 163 which was admitted
17  yesterday.
18      MR. BARBER:  169?
19      MR. CARTER:  163.
20      MR. BARBER:  Yeah.
21      BY MR. CARTER:
22  Q   Did you also subpoena the bank records of Michelle
23  Martin?
24  A   I did at four -- pardon me -- five banks.  Two of
25  them have now combined, so they're now actually four banks.

804

1    Q    All right.  And did you also -- and those records,

2    to the extent that they've been made exhibits here rather

3    than just being in the summary, and I don't intend to offer

4    them, are records at Exhibit 161.  Actually, maybe I ought to

5    offer them.  Did you also subpoena the records of Ken Weeks

6    or Ken Weeks, Michelle Martin?

7    A    One of the accounts, an account at City Bank is,

8    according to the account opening card, the signature cards,

9    is jointly held by Michelle Martin and Ken Weeks.

10   Q    Okay.  And that is at Division Exhibit 158.  Did

11   you also personally subpoena the records -- bank records of

12   Ken Weeks Insurance Company, or wires going into Ken Weeks

13   Insurance?

14   A    I subpoenaed statements and debit and credit items

15   for Ken Weeks Insurance Services account.

16   Q    And that's at Exhibit 159, the wire transfers from

17   CIBC to Ken Weeks Insurance.  I would -- did you also in --

18   subpoena, in this investigation, materials from Management

19   and Service Company, Limited or MASCO?

20   A    Yes, I did.

21   Q    Okay.

22        MR. CARTER:  And for the record, those are Exhibits

23   84 through 95, 98 through 112, 115 through 133, and 156 --

24   Exhibit 156.

805

1          MR. CARTER:  At this time, I'm going to offer

2    Division Exhibits 94, 134, and 169 as amended.  And, although

3    I think that -- I'm also going to offer Exhibits 161, the

4    Michelle Martin account, 158, the Ken Weeks, Michelle Martin

5    bank records, and 159, the Ken Weeks Insurances wires from

6    CIBC.  And I think, we'll wait until tomorrow to -- we'll

7    discuss the Cordes matter later today or tomorrow.

8          JUDGE KELLY:  All right.  So you're offering the

9    three summary exhibits plus 161, 158, and 159?

10         MR. CARTER:  That's correct, Your Honor.

11         JUDGE KELLY:  Okay.  Ruling is deferred pending

12   cross-examination.

13         MR. CARTER:  That's all I have.

14         JUDGE KELLY:  We'll break for lunch.

15         MR. CARTER:  Thank you.

16         JUDGE KELLY:  Off the record.

17                              (Off the record at 12:07 p.m.,

18                              and reconvened at 1:10 p.m.)

19         JUDGE KELLY:  We're back on the record.

20         MR. CARTER:  Your Honor, I had finished with this

21   witness, but then Ms. Achuff reminded me that I had requested

22   that she try to make as good a breakdown by Respondent as she

23   could, and she's finished that over the lunch hour, and I'd

24   like to just ask a couple of questions of her.  These would

25   be the breakdown of receipt of proceeds.

806

1          JUDGE KELLY:  Fine.

2          MR. BARBER:  That's fine.

3          JUDGE KELLY:  Go ahead.  Sit down.

4          BY MR. CARTER:

5      Q    Ms. Achuff, were you able in summarizing this --

6   these materials or taking these summarized materials from the

7   exhibits, the summary exhibits to break down who got how much

8   from -- these would be the three respondents remaining in

9   this case?

10     A    I could make an attempt to do so, yes.

11     Q    Okay.  And just in a brief overview, how did you do

12  that?

13     A    Primarily starting from Exhibit 169 and looking at

14  the summaries of the distribution of sales proceeds out of

15  the two CIBC accounts, Stockton's and Hamilton's, which are

16  shown on pages one, five, and six of Exhibit 169 -- starting

17  mainly from those to show monies coming directly to the

18  respondents, or entities, or persons associated with them --

19  from those two accounts.

20          Then in addition, there's a substantial amount of

21  money that flows to an entity called Washington National

22  Limited out of both Stockton and Hamilton.  Looking at the

23  Washington National Limited bank account records from it's

24  account at CIBC, which I obtained pursuant to subpoena, I

25  could then attempt to do the same breakdown of monies going

807

1    to the respondents, and persons, and entities associated with

2    them.  So I combined those three breakdowns, Stockton,

3    Hamilton, and Washington National, and came up with a total

4    for each respondent.

5        Q    All right.  And as to the respondent, Ken Weeks,

6    what was your total of stock sale proceeds received by Mr.

7    Weeks, to the best of your ability to break this down?

8        A    $1,616,072.33.

9        Q    All right.  And to -- as to respondent, Robert

10   Weeks, what specifically can you tie to Mr. Weeks' in receipt

11   of proceeds?

12       A    $53,900.

13       Q    All right.  And then as to the two Weeks'

14   respondents, Ken and Bob together, how much did they receive

15   in, either jointly or in manners in which you were unable to

16   determine how to separate it out?

17       A    Two hundred --

18            MR. BARBER:  That's not relevant, Your Honor.

19   She's given us the total for the individuals.  Just another

20   effort to paste them together.

21            JUDGE KELLY:  Well, this is going to be an

22   important area.

23            MR. BARBER:  Yes, it is.  That's why I'm objecting.

24            JUDGE KELLY:  Well, I -- it is certainly a

25   legitimate area for you to cross-examine on, and it's

1    something that if you don't cross-examine on, I'm going to

2    look very carefully at.  But I do want to hear what she has

3    to say.

4              MR. BARBER:  All right.

5              JUDGE KELLY:  Go ahead.

6              THE WITNESS:  The amount attributed jointly to Ken

7    and Bob Weeks, in addition to the amounts that I've just

8    testified to, is $278,794.54.

9              BY MR. CARTER:

10        Q    Okay.  And does that also derive from Division

11   Exhibit 169?

12        A    169 and the Washington National Limited bank

13   records, yes.

14        Q    Okay.  Could you go through the items that you

15   attribute to both Kenneth and Robert Weeks jointly and tell

16   the Court where they come from?

17        A    Yes.

18        Q    Can you do that?

19        A    From the Stockton account at Canadian Imperial Bank

20   of Commerce, $162,500 going into Augusta National Trust of

21   which the trustee is Ginger Monsen, who is the sister of Ken

22   and Bob Weeks.  $10,000 going to Draper Rehabilitation and

23   Care Center.  It was my assumption that that was related to

24   care for Gray Weeks, the father of Ken and Bob Weeks.  $3,000

25   going to Kay Wyler, w-y-l-e-r, who is another sister of Ken

809

1     and Bob Weeks.  Out of the Hamilton account at CIBC,

2     $3,294.54 going to Larkin Mortuary, again an expense that I

3     took to be related to Gray Weeks.

4         Q    And therefore took --

5         A    And therefore --

6         Q    -- both Bob and Ken Weeks.

7         A    Correct.  I couldn't make an allocation between

8     the two of them.  And then, out of the Washington National

9     Limited account, another 41,500 going to Augusta National

10    Trust.  And 8,500 going to an entity called Insurance Trust,

11    which is a business, which I understand to be jointly owned

12    or controlled by Ken and Bob Weeks.  And that's the total.

13        Q    And that's how you arrived at the total of

14    278,794 --

15        A    54.

16        Q    -- and 54 cents.

17        A    Correct.

18        Q    Okay.  Thank you.  Now with respect to respondent,

19    David Hesterman, how much did you ascertain that he got out

20    of these total proceeds?

21        A    $971,700 and no cents.

22        Q    Okay.  And again, that relates back to your three

23    summary exhibits?

24        A    Correct.

810

1      Q    And it --

2      A    Actually, in this case, only to the Stockton and

3    Hamilton summary exhibits.  I didn't identify monies coming

4    from Washington National Limited.

5      Q    And then, did you have a category for funds that

6    went to people or entities that you couldn't decide whether

7    it was Ken Weeks, Bob Weeks, or David Hesterman, but that it

8    went to entities that was -- were related somehow to all

9    three?

10     A    Yes, I did.

11          MR. BARBER:  To whom?

12          MR. CARTER:  To all three of the Respondents.

13          MR. BARBER:  Well, without some foundation, Your

14   Honor, I'll object to the point of that question.

15          JUDGE KELLY:  Yeah, I'd like to know what you're

16   talking about.  You talking about money going to other

17   entities.  I take it that you're looking to identify by name

18   those entities?

19          MR. CARTER:  Yes, Your Honor.

20          JUDGE KELLY:  All right.  And then some other

21   testimony in the record will link up the respondent to those

22   entities?

23          JUDGE KELLY:  I believe so, Your Honor.

24          JUDGE KELLY:  All right.  Well go ahead.  Let's get

25   the entities.

811

1            BY MR. CARTER:

2        Q    Ms. Achuff, can you tell us where you got the

3    figures that you attributed to all three respondents jointly?

4        A    Okay.  The amount that I attribute to all three

5    respondents jointly, in addition to the monies that I've

6    already stated, that amount is $272,847.02.  That breaks down

7    as -- from the Stockton account, payments to American Express

8    totaling $90,909.96, payments to Discover Card totaling

9    $4,885.  Out of the Hamilton CIBC account, payments to

10   American Express totaling $2,854.17, and out of the

11   Washington National account, payments to American Express

12   totaling $24,197.89.  And a payment of $150,000 to the Nathan

13   Drage trust account.  Nathan Drage is the corporate attorney

14   for Dynamic American Corporation.

15       Q    Do we know -- do you know what the account number

16   is on the American Express cards that you're attributing

17   these --

18       A    As I sit here right now, I don't --

19       Q    I mean, is it on --

20       A    -- have a recollection of that.

21       Q    Is it on some document that's in evidence?  This

22   would tie back in to Exhibit 130; is that correct.

23       A    It -- yeah, if there is anything, it would be in

24   Exhibit 134 and Exhibit 94 and --

812

```
1        Q    Well, or the base documents -- the source
2   documents --
3        A    Or the -- pardon me -- the source documents
4   underlying.
5        Q    -- which are Exhibits 130 and 92.
6        A    Yes.  I believe actually for Hamilton and Stockton
7   there are two or three exhibits for each one that I would've
8   been relying upon.
9        Q    All right.  And what would those two or three
10  exhibits have been.
11       A    If I can refer to a document, I can tell you.
12       Q    You want the exhibit list or something else?
13       A    The exhibit list or some notes that I made of -- .
14   I'm sorry -- 92 and 130.  That's correct.  I was getting it
15  confused with brokerage account related exhibits.
16       Q    So Exhibits --
17       A    92 and 130 as you said.
18       Q    -- have the underlying documents that would show
19  the American Express account numbers?
20       A    If those numbers are there, that's where they would
21  be.
22       Q    That's where they'd be.
23       A    I don't seem to have written them on Exhibit 94 or
24  Exhibit 134.  It would generally be my practice to do that if
25  they were there, so I may not have the actual account number.
```

813

1          MR. CARTER:  That's all I have.

2          JUDGE KELLY:  Let me see if I understand this

3   testimony.  I mean, I've just done a very quick calculation

4   of all this, but when I add all these numbers up, I get

5   something less than 3.2 million, which is a smaller sum than

6   the figure in your pre-hearing brief and a smaller sum than

7   the figure from this morning.  Am I correct in that?

8          THE WITNESS:  The 3.3 million figure, it's smaller

9   than that?

10         JUDGE KELLY:  Yeah.

11         THE WITNESS:  Yeah, the difference between this

12  3,193,000 total, from what I've just testified to, those are

13  the monies going just to the respondents.  The 3,300,000

14  number is all proceeds coming out of the Stockton and

15  Hamilton accounts, so that would include recipients other

16  than the respondents.

17         JUDGE KELLY:  Okay.

18         MR. CARTER:  But for the benefit of those

19  respondents, we believe.

20         JUDGE KELLY:  Well, you're going to make an

21  argument --

22         MR. CARTER:  Yes.

23         JUDGE KELLY:  -- that it ought to be attributed to

24  them.

Diversified Reporting Services, Inc.
(202) 296-9626

814

1             MR. CARTER:  Correct, Your Honor.

2             JUDGE KELLY:  All right.  Thank you very much.

3    Cross-examine?

4             MR. BARBER:  I'm perhaps more confused than the

5    Court about this last segment.

6             JUDGE KELLY:  Well, are you going to go for it?

7    Are you going to --

8             MR. BARBER:  Oh, yeah, I'm going to go for it.

9             JUDGE KELLY:  All right.

10            MR. BARBER:  That was not just an editorial.

11                        CROSS-EXAMINATION

12            BY MR. BARBER:

13       Q    You said that there were other expenditures that

14   you -- I think your language was, were related to all three

15   of the defendants.  Is that the category you've --

16       A    The last category?

17       Q    Yeah.

18       A    The last category was one that I attributed to all

19   three of them collectively, not feeling that I had the

20   ability to separate out among the three respondents.

21       Q    All right.  And let me ask some questions to you

22   about that.  There's $150,000, more than half of that money

23   was payable to the Nathan Drage trust account?

24       A    Correct.


                    Diversified Reporting Services, Inc.
                            (202) 296-9626

815

1    Q    You knew, did you not, that he was the counsel for

2  Dynamic American Corporation?

3    A    Yes, I believe I just testified to that.

4    Q    All right.  Did you ever develop any information to

5  suggest that he represented Robert Weeks?

6    A    Only insofar as it appeared Mr. Weeks was connected

7  with Dynamic American.  I mean, I -- that he was counsel for

8  Robert Weeks?

9    Q    Yeah.

10   A    No.

11   Q    Or -- and do you know any other relationship

12  between Robert Weeks and Nathan Drage?

13   A    No.

14   Q    How is it then that you assume and attribute money

15  paid to Nathan Drage, as having been paid for or on behalf of

16  Robert Weeks?

17   A    I have seen payments coming out of the Nathan Drage

18  trust account to pay -- I can recall at the moment, Alan

19  Burton.  There was at least one check to Alan Burton, so

20  payments related -- that appeared to me to be related to

21  Dynamic American Corporation.

22   Q    Okay.  So these payments, the 150,000, rather than

23  being attributed to Robert Weeks, ought to be attributed to

24  Dynamic American, shouldn't it?

Diversified Reporting Services, Inc.
(202) 296-9626

816

1    A    Well --

2        MR. CARTER:  That -- I think that's argument.  I

3  don't think that's --

4        MR. BARBER:  That's proper cross.

5        JUDGE KELLY:  No.  This is exactly the point.  And

6  this is the weak spot of your presentation.  Now we do have

7  Mr. Burton's testimony, he never got more than $8,000, I

8  believe.  But you've got to put it in the pockets of the

9  respondents.  Putting it in Nathan Drage's pockets doesn't

10  close the loop for disgorgement purposes.

11       MR. CARTER:  All right.  Your Honor, I think that

12  there are -- Mr. Bogutski, for example, testified yesterday

13  that IDATA transfer agent got paid out of Nathan Drage's

14  account.

15       JUDGE KELLY:  Fine.  Show me that those are not

16  legitimate corporate expenses, though.

17       MR. CARTER:  All right.  I'll brief it, Your Honor.

18       JUDGE KELLY:  I mean, that's where I'm coming from.

19       MR. CARTER:  All right.

20       MR. BARBER:  Thank you, Your Honor.

21       BY MR. BARBER:

22    Q    So you -- maybe I can truncate this by merely

23  asking you this:  do you have any evidence to support any

24  claim that Robert Weeks got a cent out of this $150,000 that

25  was paid to Nathan Drage?

1      A      Present in the courtroom, no, I do not.

2      Q      Well, do you have it anywhere else?

3      A      Among the documents that I've subpoenaed or

4   documents of the Nathan Drage trust account, which would show

5   the distribution of monies coming out of that account.

6      Q      Okay.  Now listen to my question.  Is there any

7   evidence that you have at all that any of this money that was

8   paid to Nathan Drage was secondarily paid by him to Robert

9   Weeks?

10     A      If that evidence exists in my --

11     Q      That's not what I asked you.

12     A      I'm sorry, sir.  I --

13     Q      Do you have any such evidence?

14     A      If that evidence exists, it is in the Nathan Drage

15  trust account bank records, which I do not have memorized and

16  which I do not have here.

17     Q      I know.  Now listen to the question again.

18            MR. CARTER:  Your Honor, he's arguing with the

19  witness.  I think she's answered the question.

20            JUDGE KELLY:  Yeah, I do understand that she

21  doesn't have them, but this is the time and the place to

22  present them.  Not some day in the future and not in a brief.

23   Now is the time to present the evidence to put this money in

24  these respondents' pockets, if you've got the proof.  If you

25  don't or if you're asking me to make an inference, fine.  But

818

1    this is what I had a problem with in your pre-hearing brief,

2    and why I asked for it very early on in this case.  There is

3    no such thing, as I understand it, about joint and several

4    liability for disgorgement sustained at the Court of Appeals

5    level.

6            MR. CARTER:  Your Honor, there are several

7    Commission cases, Sky Scientific and several other, and Court

8    of Appeals cases that do, in fact, sustain the thesis of

9    joint and several liability for a fraud like this.  There is.

10           JUDGE KELLY:  First of all, I'm not aware of any

11   Commission opinion in Sky Scientific.  I'm aware of

12   several --

13           MR. CARTER:  Well, initial decision by an ALJ.

14           JUDGE KELLY:  I'm aware of several settlements in

15   Sky Scientific, and I'm aware of an initial decision on

16   appeal to the Commissioners.  I'm talking about Court of

17   Appeals decisions saying, yes, joint and several liability

18   for disgorgement amounts.  And that's why this is an area

19   that deserves some careful attention in the record.

20           MR. CARTER:  Securities and Exchange Commission

21   versus Hughes Capital, Your Honor.  Cite is 124 Fed. Third,

22   449 and that is Third Circuit, 1997, United States Court of

23   Appeals.

24           JUDGE KELLY:  Okay.  What did they do?

Diversified Reporting Services, Inc.
(202) 296-9626

819

1          MR. CARTER:   I beg your pardon?

2          JUDGE KELLY:   What did they do?

3          MR. CARTER:   Quote, page 449, Courts have held the

4    joint and several liabilities appropriate in securities cases

5    when two or more individuals or entities collaborate or have

6    close relationships in engaging in the illegal conduct,

7    citing First Jersey Securities.

8          In the instant case, the defendants all

9    collaborated in a single scheme to defraud Hughes' investors

10   through the bogus initial public offering and the subsequent

11   sale of warrants.  They enjoyed a quote close relationship

12   with each other through their connection to Hughes, the other

13   corporations used in the scheme and the nominee accounts used

14   to perpetuate the scheme.

15         The burden is on the tortfeasor to establish that

16   the liability is capable of apportionment, citing Alcan case.

17    Generally apportionment is difficult or even practically

18   impossible because defendants have engaged in complex and

19   heavily disguised transactions citing CFTC versus the

20   American Board.  Very often defendants move funds through

21   various accounts to avoid detection, use several nominees to

22   hold securities, or improperly deprive profits or

23   intentionally fail to keep accurate records and refuse to

24   cooperate with investigators in identifying the illegal

25   profits.

820

1          Hence, the risk of uncertainty should fall on the

2     wrongdoer whose illegal conduct created the uncertainty

3     citing First City Financial Corp.

4          JUDGE KELLY:  Okay.  Thank you.  Off the record.

5                         (Off the record at 1:31 p.m.,

6                         and reconvened at 1:32 p.m.)

7          JUDGE KELLY:  We're back on the record.  During the

8     period of time we were off the record, the counsel for the

9     Division of Enforcement showed me the case of SEC versus

10    Hughes Capital in the Third Circuit, 1997, discussing joint

11    and several liability for disgorgement amounts, and we had a

12    brief discussion off the record on that.  And counsel is now

13    going to develop the record, as he sees fit, on the ability

14    or inability to a portion alleged disgorgement amounts; is

15    that right?

16         MR. BARBER:  That's correct.

17         JUDGE KELLY:  Go ahead.

18         MR. BARBER:  Thank you, Your Honor.

19         BY MR. BARBER:

20    Q    I'm going to try it one more time, Ms. Achuff.  Do

21    you have any evidence -- let me strike it again.  Have you

22    seen, to your recollection, any evidence that any of the

23    $150,000 paid to Nathan Drage was ever paid by him to Robert

24    Weeks?

821

1      A    I would have to refresh -- I do not have a current

2   recollection, no.  I would have --

3      Q    All right.  That's the answer.  You don't have

4   anything in your mind at this moment; is that correct?

5      A    Correct.

6      Q    All right.  Can you go back to Exhibit 130, I

7   believe it is, that Mr. Carter has alluded to?

8           MR. CARTER:  I think it's 134 that we were dealing

9   with, isn't it?

10          MR. BARBER:  Well, maybe so.

11          THE WITNESS:  My summary, sir?

12          MR. BARBER:  I'm looking at whatever document you

13   have that you believe may contain the AMEX numbers and

14   Discovery Card --

15          MR. CARTER:  Oh --

16          MR. BARBER:  -- accounts numbers.  I think that was

17   130 that you attributed jointly to all three of these

18   respondents.

19          MR. CARTER:  Your Honor, may I approach the

20   witness?  We've tagged some of these pages from Exhibit 130.

21          JUDGE KELLY:  Off the record.

22                                (Off the record at 1:34 p.m.,

23                                and reconvened at 1:35 p.m.)

24          JUDGE KELLY:  We're back on the record.  All right.

25   The witness is looking at Division Exhibit 130.

Diversified Reporting Services, Inc.
(202) 296-9626

822

1          BY MR. BARBER:

2      Q    And as you're browsing through that document, the

3  first one I'm going to ask you about is the first one you

4  talked about, which is a payment of $90,000 to American

5  Express.

6      A    Well, no, sir.  Those are payments totaling 90,000.

7      Q    Oh, I see.

8      A    There is no single payment with that payment.

9      Q    There was not a single payment?

10     A    Correct.

11     Q    Okay.

12          (Pause.)

13          JUDGE KELLY:  Is there a question pending or is the

14  witness looking for something?

15          THE WITNESS:  I was not aware there was a question

16  pending.

17          MR. BARBER:  There's not.

18          JUDGE KELLY:  Okay.  Go ahead.

19          BY MR. BARBER:

20     Q    But I will now address when -- are you prepared to

21  proceed on the basis of whatever's there?

22     A    I believe so, yes.

23     Q    Do you have the AMEX account number for any account

24  into which any component of this $90,000 was paid?

Diversified Reporting Services, Inc.
(202) 296-9626

1      A     If I do, it will be reflected in Exhibits 164 and

2   94, which I'm consulting at this time.

3      Q     And what are the numbers of those accounts?

4      A     The accounts numbers at CIBC?

5      Q     No, the --

6      A     Or the account --

7      Q     -- account numbers at AMEX?

8      A     I have not said at the moment that there are any.

9   I'm looking to see, sir.

10     Q     And for consideration, while you're looking for

11  those, I will address the next question which is, whether you

12  have done any investigation with AMEX or otherwise to

13  ascertain the names in whose those accounts are registered?

14     A     I have not.

15     Q     Well, maybe we can cut this short.  Do you know the

16  identity of the individual in whose name any of these

17  accounts, representing AMEX payments that you've discussed,

18  were made?

19     A     I do not.

20     Q     Then I take it I can infer from that, that you

21  don't have anything -- any evidence to support the claim that

22  any of those accounts are accounts of Robert Weeks?

23     A     Correct.

24     Q     All right.

824

 1          JUDGE KELLY:  I don't want to cut the witness

 2   short.  If you're still looking at your charts for a specific

 3   account number, let me know.  But if you've --

 4          THE WITNESS:  I've --

 5          JUDGE KELLY:  -- decided that there is no such

 6   information, just let us know.

 7          MR. BARBER:  I'm sorry.  I didn't mean to cut her

 8   off, Your Honor.

 9          THE WITNESS:  Let me just take a moment of the

10   Court's time and make sure.

11          (Pause.)

12          THE WITNESS:  Okay.  The CIBC bank documents do not

13   reflect account numbers for American Express or Discover

14   Card.

15          BY MR. BARBER:

16     Q    All right.  I guess the obvious question follows.

17   And that is, what is the basis of your conclusion that the

18   payment of these sums is attributable to the three

19   respondents jointly?

20     A    It is an inference based on the apportionment of

21   other monies coming out of the accounts -- of the CIBC

22   accounts and augmented by past -- information that I

23   previously collected in the course of the PanWorld Minerals

24   International Commission investigation, which showed abundant

25   use of American Express cards, in particular, those belonging

1  to -- or in the name of Barbara Hesterman.

2      Q     All right.  So that's some evidence you developed

3  in another matter and not this case at all; is that correct?

4      A     Correct.

5      Q     Now insofar, as your assumption that this money

6  should all be jointly attributed to the three respondents, I

7  presume you meant equally.

8      A     I did not make a presumption but that would be one

9  way of doing it, certainly.

10     Q     Well, did you have another intention?

11     A     No.  That was the point.  I could not make a

12  separate allocation.

13     Q     All right.  If you look at the -- your other

14  tallies about the respective share of proceeds received by

15  these respondents, there is a grossly disproportional receipt

16  ledger, isn't there?

17     A     I'm sorry.  I'm not --

18     Q     Well, as I understand your testimony, Robert Weeks

19  got $53,000 in change.

20     A     53,900, correct.

21     Q     Kenneth Weeks got a $1,700,000 in change.

22     A     1,616,000 --

23     Q     Uh-huh.

24     A     -- 72.33, yes.

826

1      Q    And Mr. Hesterman got a million -- I mean, 987 was

2    it?

3      A    971,700.

4      Q    Yes.  That is not an equal apportionment of

5    receipts, is it?

6      A    That's correct.

7      Q    And the percentages applied on that basis would

8    suggest that Robert Weeks is probably the recipient, if your

9    assumption even holds, of less than five percent of the

10   money; is that correct?

11     A    If you apply that ratio analysis, yes.

12     Q    Well, that's one of the things you said you applied

13    in suggesting joint apportionment of this money, isn't it?

14     A    You mean --

15     Q    You just said that.

16     A    No, sir.  I didn't apply any ratio analysis.

17     Q    All right.  Well, it's clarified now.  Now, Ms.

18   Achuff, you haven't been here during the trial, but you said

19   that there were $278,794, I believe is the figure, that you

20   attributed to Weeks in the plural.

21     A    Ken Weeks and Bob Weeks, yes.

22     Q    Bob Weeks and Ken Weeks.

23     A    Correct.

24     Q    Would your conclusion that that money ought to be

25   jointly attributed be changed, if you were aware that we have

1    had a witness at trial and whose testimony is unrebutted the

2    Augusta National Trust is a trust administered solely by

3    Kenneth Weeks and not Robert Weeks?

4        A    Yes, that would kick that money over into the Ken

5    Weeks total.

6        Q    And that would account for about 193 -- $194,000,

7    would it not, of that 274?

8        A    Whatever the totals are for Augusta National Trust,

9    right.

10       Q    Well, it's 152, 5, plus 41, 5.  That's $194,000, is

11   it not?

12       A    Sorry -- yes.

13       Q    So if the Court believes from the testimony of the

14   witnesses that that is money that was for the benefit of

15   Kenneth Weeks and not Robert Weeks, you'd have to take that

16   out of the joint attribution category, correct?

17       A    Certainly.

18       Q    All right.  You've indicated that 10,000 Draper

19   Rehab. is the Weeks' dad, that the Larkin Mortuary was to

20   bury him under -- at his unfortunate demise, correct?

21       A    Yes.

22       Q    Would your conclusion that $278,794 ought to be

23   jointly attributed to Robert and Kenneth Weeks be changed, by

24   the evidence of witnesses who have testified, I believe, that

25   Insurance Trust is a business maintained by Kenneth Weeks and

828

1    not Robert Weeks?

2            MR. CARTER:  Your Honor, I'm going to object.  I

3    believe that misstates the record.  I -- my recollection of

4    the testimony is that Bob Weeks, on the first day, said that

5    Insurance Trust was his business, because Ken hasn't

6    testified.

7            JUDGE KELLY:  I honestly don't remember what the

8    state of the record is on that issue from Robert Weeks'

9    testimony.

10           MR. BARBER:  I'll go at it another way.

11           JUDGE KELLY:  All right.

12           BY MR. BARBER:

13      Q    Have you examined any account documents of

14   Insurance Trust?

15      A    Yes.

16      Q    Whose the signatory on that account?

17      A    As I sit here today, I do not have a recollection

18   of that.

19      Q    Could you ascertain that from records that you have

20   in your possession, and let us know, perhaps, by the end of

21   the day?

22      A    By the end of the day?

23      Q    Yeah.

24           JUDGE KELLY:  Is that yes, you can?

```
 1              THE WITNESS:  Yeah -- yes, I can.  I'm sorry, Your
 2   Honor.
 3              MR. BARBER:  May I supplement the records with
 4   whatever she comes up with, Your Honor?
 5              JUDGE KELLY:  Yeah, when we take a break, she can
 6   look at that.
 7              MR. BARBER:  Okay.
 8              JUDGE KELLY:  Is that all right?
 9              MR. BARBER:  Absolutely.
10              JUDGE KELLY:  All right.
11              BY MR. BARBER:
12        Q    Ms. Wyler, that's a sister of the Weeks'?
13        A    Correct.
14        Q    Do you know who instigated the transfer of this
15   $3,000 to her?
16        A    I do not.
17        Q    Okay.
18              MR. BARBER:  I believe that's all I have, Your
19   Honor.
20              JUDGE KELLY:  Thank you.
21              MR. BARBER:  Oh, you know, I do have a couple more
22   questions.
23              BY MR. BARBER:
24        Q    Were these records difficult to ascertain the
25   substance of?  That's a horrible question.  Was it difficult
```

Diversified Reporting Services, Inc.
(202) 296-9626

830

1    for you to ascertain the substance of these records?

2        A    The CIBC bank account records?

3        Q    No, the -- well, yes.

4        A    For the most part, no.  It was pretty straight

5    forward.

6        Q    I mean, the proceeds come in and they go out.

7        A    Right.

8        Q    And you knew where they went, correct?

9        A    Based on the documents, yes.

10       Q    From the documents.  All right.  Now as to Mr.

11   Robert Weeks, money went for his benefit to Ms. Baez, didn't

12   it?

13       A    I -- Robert Weeks is a business partner of Maria

14   Rosa Baez.

15       Q    Well, he's more than that.  But he's admitted that

16   on the witness stand.  And he admitted to getting some other

17   money from the account of Barbara Hesterman.  Do you recall

18   that?

19            MR. CARTER:  She wasn't here.

20            THE WITNESS:  I wasn't here, sir.

21            MR. BARBER:  Pardon?

22            MR. CARTER:  She wasn't in the courtroom.

23            MR. BARBER:  Oh, okay.

24            BY MR. BARBER:


Diversified Reporting Services, Inc.
(202) 296-9626

831

1      Q    Were you aware that he had gotten some money out of

2  the Barbara Hesterman account?  It's in the exhibits.

3      A    The First Security account, yes.

4      Q    Yeah.  All right.  So there isn't any real question

5  of -- beyond using Ms. Baez as a conduit of Robert Weeks

6  hiding how much money he got, is there?

7      A    I wouldn't know, sir.

8           MR. BARBER:  All right.  That's all I have.

9           BY MR. PARSONS:

10     Q    Good afternoon, Ms. Achuff.  My name is David

11 Parsons.  I represent Kenneth Weeks and David Hesterman in

12 this matter.  I'm not sure I'll be as brief as Mr. Barber.

13 In the event that I ask a question that is in any way unclear

14 to you, please ask me to rephrase it.  I'll do the best I

15 can.

16           I want to try to understand your exhibits a little

17 bit better.  In particular with regard to, I believe, it's

18 number 169.  Do you have that in front of you?

19     A    I do.

20     Q    I believe you indicated on direct that the -- on

21 bates page, for example, the distribution of sales proceeds

22 out of the CIBC account for Hamilton Limited, that that's

23 simply the distribution of sales proceeds; is that right?

24     A    Proceeds from the sale of Dynamic American?

Diversified Reporting Services, Inc.
(202) 296-9626

832

1    Q    Net of all transaction costs.

2    A    Right.  Yes.

3    Q    Including bank fees?

4    A    Correct.  And, I'm sorry.  I should clarify --

5    proceeds from the sale of Dynamic American and Koala Capital

6    Corp. since I was -- there's a $103,580.66 component coming

7    in at some point from Koala Capital.

8    Q    Did you do a separate calculation that discloses

9    the transaction costs?

10    A    Transaction costs at CIBC?

11    Q    No, the transaction costs -- well, let me back up.

12    Did you do a separate calculation of gross proceeds from the

13    sales of Dynamic American stock?

14    A    In the brokerage records?

15    Q    Yes.

16    A    The brokerage records -- no, I -- they note for at

17    least some of the transactions commission fees.  But no, I

18    looked at the amount that was available as cash in the

19    account, which would be the net fees -- the net proceeds,

20    pardon me.

21    Q    From the monthly statements?

22    A    Correct.

23    Q    Now then, with respect to the discreet figures that

24    you computed with respect to Ken Weeks, Robert Weeks and

25    David Hesterman, how did you derive those gross figures?  Did

833

1    you do it with your computer?

2          A    I'm sorry.  Which -- by gross figures, what are you

3    referring to?

4          Q    For example, the $1,616,000 figure for Kenneth

5    Weeks.

6          A    Okay.  No, actually I listed them and added them

7    up.

8          Q    By hand?

9          A    Yes.

10         Q    An adding machine, or?

11         A    No, actually I did it the old fashioned way by

12   adding them by hand.  I didn't happen to have my calculator

13   handy.

14         Q    So you didn't run a code in your spreadsheet?

15         A    No.  No.

16         Q    Would it be possible to do that?

17         A    I think a code would be unduly burdensome.  It

18   would be possible to do a sort and segregate out the payments

19   of interest, and then do a -- put a formula in to total those

20   payments.

21         Q    That's, in fact, what I meant was to figure out how

22   to sort the columns or lines --

23         A    Sure.

24         Q    -- in a fashion that would give us an idea of what

25   the discreet individual items are that are included for each

834

1    of these respondents.

2         A    Yeah, and then you would total those items.   Sure.

3         Q    How long would it take you to do that?

4         A    I don't think very long.   I would sort them by

5    payee -- sort the bank records by payee, identify the

6    particular payees that I felt were -- should be included on

7    this list, and then total the amounts that went to each of

8    those payees and then do a grand total of those subtotals.

9         Q    Now do you have your magnetic spreadsheets and a

10   computer available to you here today?

11        A    Magnetic spreadsheet, I -- no, I have --

12        Q    Magnetically stored spreadsheet.

13        A    I could -- in the Commission's office I could

14   access those -- I believe that those spreadsheets would be

15   accessible from our Salt Lake office on the computer.

16             MR. PARSONS:   Your Honor, would it be possible to

17   ask the witness to do that for us?   Not necessarily now.

18             JUDGE KELLY:   Let me hear from Mr. Carter first.

19             MR. CARTER:   Your Honor, the case law is that it's

20   the burden on the tortfeasor to establish that the liability

21   is capable of apportionment.   My position -- the Division's

22   position is, if these respondents want to have more

23   definitive apportionment and to present it to the Court, they

24   can do it.   They have -- this is a case in which the

25   respondents have hidden proceeds offshore, fail to give an

1    accounting, one of the things that the Division asked for in

2    the OIP is an accounting.  I've never received an accounting

3    from them.  If the respondents wanted to do an accounting of

4    the profits and the proceeds that they received, I think that

5    it's their business to do it.

6          JUDGE KELLY:  No, before we get to that point, the

7    issue is that the Division has to make a prima facia showing,

8    a colorable showing of a certain amount that ought to be

9    disgorged.  Am I not correct?

10          MR. CARTER:  Yes, Your Honor.  And I believe that

11    we have met that burden.

12          JUDGE KELLY:  Well, the question is -- I mean, I

13    brought this up at a pre-hearing conference in April and

14    asked you early on to show them your methodology for arriving

15    at the figures that you are going to be asked to disgorged.

16    Do you remember that?

17          MR. CARTER:  Yes, Your Honor.

18          JUDGE KELLY:  Okay.  And yet the witness is here at

19    lunch time doing it by hand without a calculator.

20          MR. CARTER:  Well, you know, I'm not sure that I

21    recall you telling -- directing the Division to break it down

22    specifically as to each of these witnesses, rather than on a

23    joint and several liability basis, and I did give counsel the

24    basis for our disgorgement figures long ago when the Court

25    asked me, and it was more in the terms of, you know, Exhibits

1   94, 134, and 169.

2          JUDGE KELLY:  I'm looking at the April 18th order

3   that I put out after our pre-hearing conference, page two.

4   The Division should state the specific dollar amounts of

5   civil penalties and disgorgement it seeks as to each

6   respondent.  It should also show how it is calculated its

7   recommended disgorgement amount.  The Division should file

8   and serve a pleading containing this information no later

9   than June 26th.  Should the Division provide it earlier, the

10  issues to be resolved at the hearing may be simplified and

11  stipulations might be possible.

12          You didn't do it on June 26th.  I had to call and

13  ask for it in a supplemental pleading.  And here we are, at

14  the hearing doing it by hand at lunch time.

15          MR. CARTER:  Well, there's not much I can say about

16  that, Your Honor.  I did the best that we could in terms of

17  giving the defendants exactly the numbers we were dealing

18  with in terms of breaking it down by defendant, by

19  respondent.  You're correct.

20          JUDGE KELLY:  All right.  No, Mr. Parsons, you

21  cannot compel the Division to create exhibits that they have

22  not chosen to create.  If you can show that there are flaws

23  in their arithmetic or their methodology, go to it.

24          MR. PARSONS:  Well, without meaning to be

25  disrespectful, Your Honor, I was hoping to truncate cross-

1    examination considerably by not having to ask whether this

2    item is in that 1.6 million or it's not in that 1.6 million

3            JUDGE KELLY:  Well, I'm surprised, actually, that I

4    just got the bottom line figures without the input into each.

5            MR. CARTER:  I'm sorry, on the joint -- the

6    separate breakdown, Your Honor?

7            JUDGE KELLY:  No, the way we started after lunch

8    was testimony from the witness breaking down the dollar

9    amount sought as disgorgement and as to Kenneth Weeks, we got

10   1.6 million, as to Robert Weeks, 53,000, as to David

11   Hesterman, 971,000 and so on.  What he's asking is, or what

12   he's going to ask, if I understand correctly is, how did you

13   get the 971,000 as to David Hesterman.  Is that right?

14           MR. PARSONS:  Yeah.

15           JUDGE KELLY:  It's not yet of record.

16           MR. CARTER:  The specifics, right.

17           JUDGE KELLY:  Off the record.

18                              (Off the record at 1:59 p.m.,

19                              and reconvened at 2:02 p.m.)

20           JUDGE KELLY:  We're back on the record.

21           BY MR. PARSONS:

22       Q   Ms. Achuff, I'm not sure what you may -- book you

23   may have most near you.  I'd like you to look, thought, with

24   Exhibit 94, since it's the most extensive.

```
 1        A    I have it.

 2             MR. BARBER:  Your Honor, while she's doing that,

 3   could I be excused for a minute.  I don't have any real

 4   abiding need to be here for this.  Thank you.

 5             MR. CARTER:  Your Honor.

 6             JUDGE KELLY:  Is there a question pending?

 7             MR. CARTER:  If I may, just to short circuit this.

 8   Not short circuit it, but to put the evidence into a form

 9   that the Court obviously wants.  And I apologize that it's

10   not in the form that you want.  Maybe Ms. Achuff could do

11   this spreadsheet breakdown the way that counsel has

12   requested.  I realize that this is the middle of the

13   testimony of the witness and -- but how long would that take?

14             THE WITNESS:  Well, I have with me -- now it may be

15   marked up because it's a work copy.  I have with me, Your

16   Honor, a sort of the spreadsheet in Exhibits 94 and 134 for

17   each of them a sort by payee, which at least, takes it out of

18   chronological order and puts it in order by the recipient of

19   the dispersements.  And for some, at least, of the larger

20   ones, the recipients of multiple payments, I probably already

21   have the totals, but I could probably generate that in at

22   most, half an hour, I would think -- a total by recipient, if

23   that would be helpful to the Court.

24             JUDGE KELLY:  Off the record.
```

839

```
 1                              (Off the record at 2:07 p.m.,

 2                              and reconvened at 2:28 p.m.)

 3           JUDGE KELLY:  We're back on the record.  During the

 4   period time we were off the record, Ms. Achuff has discussed

 5   the matter with me and with counsel for both sides, and she's

 6   going to prepare a new chart with the same data organized in

 7   a different fashion.  And she will bring that back later

 8   today, and a cross-examination will proceed on that basis.

 9   Is that our understanding?

10           MR. PARSONS:  Yes, sir.

11           MR. CARTER:  That's the Division's understanding,

12   Your Honor.

13           JUDGE KELLY:  Okay, fine.  Off the record again.

14                              (Off the record at 2:29 p.m.,

15                              and reconvened at 2:30 p.m.)

16           JUDGE KELLY:  We're back on the record.  Go ahead

17   and call your next witness.

18           MR. CARTER:  Division calls Susan Weeks.

19           MR. PARSONS:  Before we begin, Your Honor.

20           JUDGE KELLY:  Let's let the witness sit.

21           MR. PARSONS:  Okay.

22           JUDGE KELLY:  Ms. Weeks, please have a seat.

23           THE WITNESS:  Thank you.

24           JUDGE KELLY:  Go ahead.
```

1          MR. PARSONS:  Your Honor, I believe I alerted the

2    Court a day or so ago that in the event Ms. Weeks was called

3    that there would be some issues respecting the marital

4    communication privilege.  Mr. Carter and I had a brief

5    discussion following my alerting the Court.  Mr. Carter

6    indicated to me that Ms. Weeks -- his intention was to only

7    examine Ms. Weeks with respect to conduct --

8          MR. CARTER:  No, that's not quite the right.  I

9    told counsel that I believe that many of the things that

10   we'll discuss are conduct, but some are clearly

11   communications.  But I certainly wouldn't call them

12   confidential communications.

13         MR. PARSONS:  In any event, Mr. Carter and I

14   concluded that we probably were not going to be able to reach

15   any agreement with respect to Ms. Weeks, and we're probably

16   going to have to go question by question.  I think that's

17   still the case, and I apologize for any burden that that

18   places upon the Court, but we're going to have to be

19   particularly attentive to it.  Especially since, in my view,

20   there's a substantial body of case law that reflects that

21   there are non-verbal matters that constitute confidential

22   marital communications.

23         JUDGE KELLY:  Thank you for the statement.  That

24   doesn't require any ruling by me --

841

1              MR. PARSONS:  No.

2              JUDGE KELLY:  -- at this moment, does it?

3              MR. PARSONS:  No, Your Honor.

4              JUDGE KELLY:  All right.  Ms. Weeks, please raise

5     your hand to be sworn.

6     Whereupon,

7                          SUSAN WEEKS

8     was called as a witness and, having been first duly sworn,

9     was examined and testified as follows:

10             JUDGE KELLY:  Okay.  You're going to have to speak

11    way louder than that.

12             THE WITNESS:  Oh, okay.

13             JUDGE KELLY:  Please, put the microphone in front

14    of you.  The microphones will hook you up to our recording

15    system, but to be heard by Mr. Parsons and Mr. Barber, you're

16    going to have to speak louder than that.

17             THE WITNESS:  All right.

18             JUDGE KELLY:  Mr. Carter -- I mean, do the

19    examination anywhere you like, but what I would like to know

20    for purposes of any objection that may come up is, date of

21    marriage, date of divorce, and things like that.

22             MR. CARTER:  Right.

23             JUDGE KELLY:  So if you could start with that, I'd

24    appreciate it.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:             )
                              )        File No. D-2049
DYNAMIC AMERICAN CORPORATION  )
                              )

ADMINISTRATIVE PROCEEDING

PAGES:      963 through 1170

PLACE:      U.S. Securities and Exchange Commission
            46 West 300 South, Suite 250
            Salt Lake City, Utah

DATE:       Friday, July 14, 2000


    The above-entitled matter came on for hearing, pursuant
to notice, before JAMES T. KELLY, Administrative Law Judge,
at 9:00 a.m.


APPEARANCES:

On behalf of the Securities and Exchange Commission:

        THOMAS D. CARTER, ESQ.
        U.S. Securities and Exchange Commission
        1801 California Street, Suite 4800
        Denver, Colorado  80202
        (303) 844-1090


On behalf of the Respondents, K. Weeks and D. Hesterman:

        DAVID W. PARSONS, ESQ.
        42 Broadway, Suite 1101
        New York, NY  10004
        (917) 320-4801


On behalf of the Respondent, R. Weeks:

        JAMES N. BARBER, ESQ.
        Bank One Tower
        50 West Broadway, Suite 100
        Salt Lake City, Utah  84101
        (801) 364-6500


                Diversified Reporting Services, Inc.
                        (202) 296-9626

1091

1    JUDGE KELLY:  All right.  Admitted.

2                         (Division's Exhibit No. 183 was

3                         received into evidence.)

4    MR. CARTER:  Your Honor, I'd like to continue the

5    examination of Ms. Achuff.

6    JUDGE KELLY:  Okay.  As I recall, when we left off

7    yesterday, Ms. Achuff was in the middle of cross-examination

8    --

9    MR. CARTER:  Oh.

10   JUDGE KELLY:  -- by Respondents.  But I understand

11   that you have new documents.  Is this all right as a way of

12   proceedings to let him admit or identify these new documents

13   and then --

14   MR. PARSONS:  Yes, I would like him to do that.

15   JUDGE KELLY:  Okay.  Fine.

16   MR. PARSONS:  It probably will aid my cross.

17   JUDGE KELLY:  Fine.  Fine.

18   MR. CARTER:  Your Honor, the Division has had Ms.

19   Achuff prepare two additional summaries to take care of the,

20   hopefully, the Court's and Respondent's concerns about the

21   distribution of proceeds to each of the Respondents or to two

22   or three Respondents as a group, if that was the way that it

23   looked, or the way that, you know, that we thought that they

24   had to be parceled out.

```
 1                        CARLEEN ACHUFF
 2   was called as a witness, and having been previously duly
 3   sworn, was examined and testified as follows:
 4                        DIRECT EXAMINATION
 5             BY MR. CARTER:
 6        Q    I guess that we only did it -- we didn't do all
 7   three did we, Ms. Achuff?
 8        A    Correct.
 9        Q    Okay.
10             MR. CARTER:  So, Your Honor, Division Exhibit 181,
11   for identification, now.
12             BY MR. CARTER:
13        Q    Would you tell the Court what that is now, Ms.
14   Achuff?  How you prepared it?
15        A    Yes.  Exhibit 181 is a summary spreadsheet prepared
16   in Excel by me of the flow of monies into Hamilton Limited's
17   account at CIBC and then the distribution of those monies out
18   of the account.
19        Q    Okay.  And you put each of the -- the first page is
20   what, the payors?
21        A    The first page is the payors, is the flow of the
22   money into the account.  As you can see, virtually all of the
23   money comes in from the Hamilton account at Brink Hudson.
24   Again it's apportioned between funds derived from the sell of
25   Koala Capital Corporation and funds derived from the sell of
```

1   Dynamic American Corporation.  The source for this

2   information would be the exhibits relating to Hamilton's

3   brokerage account at Brink Hudson, which would be Exhibits

4   131, 132, and 133.

5           The second and third pages, then, are a breakdown

6   of monies coming out of Hamilton's account at CIBC.  They're

7   sorted by payee.  And then there is an allocation made of

8   some of the funds attributed to Ken Weeks, Ken and Bob Weeks,

9   Bob Weeks and David Hesterman.  The source for this

10  information would be Exhibit 130, which are the Hamilton --

11  the underlying Hamilton account records for the Hamilton

12  account at CIBC and Exhibit 134, which is my summary

13  spreadsheet of transactions in that Hamilton account at CIBC.

14      Q    All right.  And in those instances where you

15  couldn't -- we didn't know right now, how to allocate, you

16  just put it in the payee total?

17      A    Correct.

18      Q    And did not specifically allocate it, subject to

19  being tied up later, to a specific person, if possible?

20      A    Right.  Now, the payee total column includes totals

21  for each of the payees.  So for instance, looking down at

22  Barbara Hesterman, -- I'm looking at page two of the exhibit.

23      Q    Right.

24      A    You'll see a total for Barbara Hesterman of 98,800.

25   That number shows up in the payee total column, as it does

1094

1    for every other payee.  And then, that number is also

2    attributed to David Hesterman, and shows up in his column.

3        Q    All right.  Thank you.  And then, can you similarly

4    tell the Court how Division Exhibit 182 was prepared, and

5    what we determined to drop out of these -- in the interim.

6        A    Okay.  Well into our discussion, --

7        Q    Right.

8        A    -- when I was on the stand yesterday.

9        Q    Right.

10       A    Okay.  Exhibit 182 is a companion document to

11   Exhibit 181 dealing, in this case, with the Stockton Limited

12   account at CIBC and the various Stockton brokerage accounts,

13   as reflected in my summary, which is Exhibit, I believe, 94.

14    It is compiled in -- from the same basic data of the

15   brokerage accounts records and the CIBC documents and my

16   summary spreadsheet, and the specific source documents are

17   identified on page 13 of the exhibit.  Since they are

18   voluminous, I won't bother to repeat them into the record.

19            And similarly -- and the first three pages of

20   Exhibit 182, reflect the payors, the money coming into the

21   Stockton account at CIBC.  And it's apportioned in this case,

22   the total credit is then broken out -- total credits, rather,

23   are broken out to show monies attributable to the sell of

24   Landstar.  And I think that's Landstar Inc.  I'm not really

25   sure of the full name.  The sell of Dynamic American and then

1095

1    other sources of funds coming into the account.

2              Then starting on page four --

3         Q    Let me just stop you for a minute there.

4         A    Sure.

5         Q    The reason that we left Landstar in -- at least in

6    the payor column; is what?  Even though, it's --

7         A    It has nothing to do with Dynamic American, that

8    I'm aware of.  It --

9         Q    It has nothing to do with the discouragement sum

10   that we're seeking either?

11        A    Correct.

12        Q    That bottom line?

13        A    That's correct.

14        Q    All right.

15        A    Those monies.  So in part, what I was trying to do

16   in cases where there would be a credit coming in from a

17   brokerage account that involved funds derived in part from

18   the sell of Landstar and in part from the sell of Dynamic, I

19   was trying to split those out.  And I'm sure there are some

20   examples of that.  Page two of the exhibit, for instance,

21   second line down, May 15th, 1996, we've got the payor being

22   shown as WXF Wexford, W-e-x-f-o-r-d, which is Prudential.

23   Stockton's account number, 881677-06, there's the payor.

24             The total amount is $136,185.75.  From looking at

25   the brokerage records, it's evident that $3,618.48 of that is

1    attributable to Landstar, with the remainder attributable to

2    Dynamic American.  So that's what you're seeing there.

3       Q    All right.  And then going on to the payees.

4       A    Then the payees begin on page four.  Again, it's

5    alphabetical by payee.  The payee total column is fashioned

6    in the same way that I described for Exhibit 181.  And then,

7    the allocation amongst the Respondents is also done in

8    similar fashion.  As to things that we left out, in both

9    Exhibits 181 -- left out after our -- my testimony yesterday.

10   Let's see.  In both Exhibits 181 and 182, I have made no

11   allocation of funds paid to American Express.  Same for

12   Discover card.  Same -- let's see.  Those are the ones that

13   are apparent to me.  I believe those are the ones that we

14   discussed yesterday.

15      Q    All right.  And where did we have the money to

16   attorney Drage?  Was that showing on one of these?

17      A    That was not coming out of either Stockton or

18   Hamilton.

19      Q    All right.

20      A    That was coming out of Washington National Limited.

21      Q    I see.  Okay.  And we've removed that.

22      A    Well, it's not affected by either of these two

23   spreadsheets.  Now, if we get into Washington National, then

24   that's --

1    Q    Yeah.

2    A    -- a whole other matter.

3    Q    Okay.

4            MR. CARTER:  Your Honor, while I've had Ms. Achuff

5    take this -- some of these attributions out, I believe that

6    it would be in the providence of the Court to determine if

7    certain of these American Express -- or if you find evidence

8    that they would pay for the benefit of one of the

9    Respondents, I think, that it would be appropriate to charge

10   them with it for -- as discouragement.  But at this point in

11   time, we don't have -- you know, without going back over the

12   testimony, for example of Susan Weeks, Ms. Achuff cannot make

13   that attribution.

14           JUDGE KELLY:  I understand.

15           BY MR. CARTER:

16   Q    Anything else that you want to talk about on

17   Exhibit 182, as to the payees or payors?  I think, it's

18   sufficient.  And then, you totaled these at the end, Ms.

19   Achuff; did you?

20   A    Yeah.

21   Q    All right.  And I think that, we'd offer Exhibit

22   181 and 182, as Division Exhibits, to show the basis for

23   discouragement from each of the Respondents, broken out the

24   way the Court wished.

1098

1    JUDGE KELLY:  All right.  Thank you.  Let me see if

2    I understand.  On 182, the Landstar column is really not

3    relevant to discouragement; is that correct?

4    THE WITNESS:  That's correct, Your Honor.

5    JUDGE KELLY:  And on 181, is the Koala relevant in

6    this case?

7    THE WITNESS:  No, it is not, Your Honor.

8    JUDGE KELLY:  All right.  Thank you.

9    MR. CARTER:  It's only there, Your Honor,

10   because -- Carleen?

11   THE WITNESS:  Well, it's there, again, where there

12   was a check that combined proceeds from both, I wanted to be

13   able to segregate it out.  And it would leave hanging the

14   question of, where's the rest of the money.  So it's purely

15   there to tie up the totals.

16   JUDGE KELLY:  Thank you very much.  And with that,

17   we'll resume cross-examination.

18                    CROSS-EXAMINATION

19   BY MR. PARSONS:

20   Q    Good afternoon once again, Ms. Achuff.

21   A    Good afternoon.

22   Q    I think work you've done since yesterday will be

23   very helpful in reducing my cross-examination.  I think, for

24   illustrative purposes, so that I can gain some better

25   understanding of certain matters, we can work from Exhibit 94

1099

1    and Division's Exhibit 182, relative to Stockton.

2        A    I don't have that 182.  Oh, I'm sorry.  182 is the

3    new one.  See I was --

4             (Pause.)

5        Q    Let's just start with me with the item on the first

6    page, the wire on the statement of August 30, 1995, for

7    $102,000 to Augusta National Trust number one.

8        A    Okay.  So we're on Exhibit 94?

9        Q    Yes.

10       A    Okay.

11       Q    Now, what are the underlying documents with respect

12   to that transaction?

13       A    There would be -- coming out of the Stockton CIBC

14   account, there would be the wire advice.  And then,

15   typically, there is also a letter of instruction to the bank.

16    I guess, in chronologic order, there would first be a letter

17   of instruction on Stockton letterhead to CIBC instructing

18   that a wire be sent identifying the receiving institution and

19   the name and account number at the receiving institution.

20   There would then be the wire advice relating to that.  So

21   that's on the CIBC side.  And then, of course, the statement

22   would reflect that a wire it was sent.

23       Q    Yes.

24       A    Then on the Augusta National Trust side, I would

25   show the wire coming in to Augusta National Trust University

1    of Utah Credit Union account.

2        Q    Okay.  Can you direct me, in the exhibits, to the

3    CIBC side of this transaction?

4        A    Ms. Pinkston, may I have that red one there,

5    please.  Thank you.  I am looking at our copy of Plaintiff's

6    Exhibit 92, which are the underlying account documents for

7    the Stockton account at CIBC.  And I've got copy that I'm

8    working from simply because -- for the sake of expediting

9    matters today, we've tried to tab the statements by month.

10       Q    Okay.

11       A    So --

12       Q    So in my exhibits, --

13       A    Okay.

14       Q    -- it's Exhibit 92, bates stamp number 011012, is

15   the opening wire instruction?

16       A    Okay.  I'm sorry.  Could you run that number by me

17   again.  The opening wire instruction?

18       Q    The opening wire instruction for this Augusta

19   $102,000 debit.  It's 011012.

20       A    That is the instruction for sending the wire;

21   that's correct.

22       Q    Okay.  Where did you get 011012?

23       A    I obtained Exhibit 92, in it's entirety, by

24   subpoena from Management and Services Company Inc., whose

25   president is Robert E. Cordes.  Mr. Cordes was the one who I

1    delivered the subpoena to, and I understand the documents to

2    have been produced by him.

3         Q    Did you deliver one subpoena to Mr. Cordes?

4         A    One subpoena to obtain these documents, yes,

5    Exhibit 92.  I've actually served three subpoenas on Mr.

6    Cordes.

7         Q    Do you have the subpoena that you delivered to Mr.

8    Cordes with respect to Exhibit 92?

9         A    I believe I may have a copy of it with me, if I may

10   consult some documents.

11        Q    I may be able to help.  Was it attached to the

12   affidavit you submitted a week and a half ago?

13        A    I think, it was.  Is it handwritten?

14        Q    It's a handwritten subpoena dated December 14,

15   1998, with a typewritten attachment.

16        A    That's the one.

17        Q    And the subpoena addressee is Robert E. Cordes?

18        A    Okay.  I was remembering it as MASCO, but if -- you

19   have the advantage of the document in front of you.  If it

20   says Robert E. Cordes, then that was the subpoena addressee.

21        Q    Did you ever direct a subpoena to MASCO?

22        A    No, I did not.

23        Q    Did you ever address a subpoena to Stockton?

24        A    No.

1102

1    Q    Would the same be true with respect to Hamilton

2    documents relative to MASCO and Hamilton itself?

3    A    Yes, it would.

4    Q    So you obtained all of these from Mr. Cordes?

5    A    That is correct.  All of these being the CIBC

6    documents for Hamilton and Stockton.

7    Q    Okay.  For the record, can we identify all of the

8    CIBC documents procured pursuant to the subpoena addressed to

9    Mr. Cordes?  All of Exhibit 92.

10    A    All of Exhibit 92.  All of Exhibit 130, which would

11    be the Hamilton CIBC account.  I -- if someone can provide me

12    with a list of the exhibits, I can be certain that I'm being

13    complete.  Now, are you saying all -- are you asking me to

14    identify all of the exhibits on the Exhibit --

15    Q    Yes.

16    A    Please tell me again, what it is you want me to say

17    -- or respond to.  I don't even know what you want me to say,

18    but if you'll ask your question again, so I can not confuse

19    the matter.

20    Q    To cut through everything, I can try to parcel it,

21    or you can parcel it, perhaps more quickly.  I want to

22    identify all the exhibits, in the Trial of Exhibits, that

23    came from Mr. Cordes.

24    A    Okay.  I have a list before me compiled by

25    Plaintiffs.  I don't know if all of these are in evidence.

1  So I will simply go off of this list and give you numbers.

2  And you can do with them, what you will.  Exhibits 84, 85,

3  86, 87, 89, 90, 91, 92.  With respect to 93, I would have to

4  look at a document that I have with me in order to give you a

5  definitive answer on that one.  I'm not sure.  Same for 95,

6  that I would have to consult another document.  Actually,

7  there are going to be a number of these that I am not able to

8  tell you just from the description on this list.  If I can

9  get another document, I can give you your answer.

10          MR. CARTER:  What do you need?

11          JUDGE KELLY:  Off the record.

12                          (Off the record at 2:40 p.m.,

13                          and reconvened at 2:40 p.m.)

14          THE WITNESS:  If it would be easier, -- well, let

15  me try going along, and see if we can just run it out here.

16  Okay.  93, was the first one that I was uncertain about.  93,

17  is the same as Investigative Exhibit 135.  That was obtained

18  by Robert Cordes.  Exhibit 95 is Investigative Exhibit 137.

19  That was also obtained from Robert Cordes.  Exhibit 98 was

20  obtained from Robert Cordes.  Exhibit 142 was obtained from

21  Robert Cordes.

22          Excuse me.  Not 142.  I beg your pardon.  101, I'm

23  getting my Investigative numbers mixed up with my Trial

24  numbers.  That's the only one I goofed up.  So 101 is from

25  Cordes.  102 is from Cordes.  105, 106, 108, 109, 111, 115,

```
1    116 --
2              MR. BARBER:  Pardon.
3              MR. PARSONS:  116.
4              THE WITNESS:  116.
5              MR. BARBER:  16?
6              THE WITNESS:  1-1-6, yes.
7              MR. BARBER:  Yes.  Thank you.
8              THE WITNESS:  118, 119, 121, 124, 125, 126, 127,
9    128, 129, 130, 131, 133, 135, 136, 138, 139, 140, 141, 142,
10   143, 144, 146, 147, and that is all.  Let's see.  Oh, wait a
11   second.  Okay.
12             Now, starting with Exhibit 155, we have a lot of
13   exhibits that are identified by their bates numbers rather
14   than their Investigative Exhibit number.  That's going to
15   take a little bit longer.  I can certainly do it, but it may
16   not be quite as fast going through one by one.  If I could
17   take a moment and just --
18             BY MR. PARSONS:
19        Q    We need to do it.  I can do it question by
20   question, or --
21        A    Well, I mean, it's --
22        Q    -- ask you to continue.
23        A    -- just a matter of what's most expeditious.  Let's
24   see, hang on here.  Okay.  Exhibit 155 is from Cordes.
25   Exhibit 156, 157, 160, 164, that would be it.
```

1    Q    Now, Ms. Achuff, allow me to ask you to get the

2    notebook with Division Exhibits 102 and 103.  Now, you

3    testified that Exhibit 102, Stockton accounts statements at

4    Investors Associates, were obtained from Mr. Cordes.  But you

5    did not testify that 103 and 104, which I take to be

6    additional account statements, were not obtained from Mr.

7    Cordes.

8    A    Sort of a double negative there.  Yes.  102 -- we

9    got account statements relating to this Investors Associates

10   account both from Robert Cordes and also directly from

11   Prudential Securities the clearing firm for Investors

12   Associates.  So -- okay.  So 103 and 104 would be documents

13   that I obtained from Prudential -- or -- yes, Prudential.

14   Q    Okay.  Now, in general, would you say that that is

15   true with respect to other instances in the exhibit list

16   where you've identified one brokerage account that's

17   coming -- a set of statements that's coming from Cordes, and

18   not said the same thing about other statements from the same

19   firm?

20   A    Exactly.

21   Q    Do you know whether you have identical material

22   from the two sources?

23   A    In many cases, I have identical material.  In many

24   cases, when you subpoena a brokerage firm, -- when the

25   Commission subpoenas a brokerage firm, for say, account

1106

1    statements, the statement that they give us appears to come

2    straight out of the computer.  And it's not gussied up, if

3    you will.  So it's covering the same period of time.  It

4    doesn't look as nice as the one that goes to the client.

5         So -- and I think that's probably reflected in a few of

6    these where there may be a difference in the appearance of

7    the statement.  But in many cases, we got statements both

8    from Robert Cordes and statements from the brokerage firm.

9    Similarly, in many cases, I would have copies of debit and

10   credit items that I would have obtained both from the

11   brokerage firm and from Robert Cordes.

12        Q    Did you discover the brokerage firms from the

13   documents that Mr. Cordes provided you?

14        A    No.  I discovered the brokerage firms from the

15   transfer agent records.

16        Q    Transfer agent records?

17        A    Correct.

18        Q    Ms. Achuff, let me ask you now, to turn to Division

19   Exhibit No. 182.  Do you have it?

20        A    Yes, I do.

21        Q    Let me call your attention to page ten and 11 of

22   that document, where you have tabulated a total -- and the

23   entries from Michelle Martin, in particular.

24        A    I have it.

1107

1    Q    What is the basis upon which you have attributed
2    each and everyone of these amounts to Kenneth Weeks?
3    A    I understand Michelle Martin to be the wife of Ken
4    Weeks.
5    Q    Would it make a difference to learn, in connection
6    with this tabulation, that they got married on October 9th,
7    1999?
8    A    With respect to the payments to Michelle Martin, in
9    the name of Michelle Martin, where wired to five bank
10   accounts.  One of which was an account at Citibank.
11   According to the account records of that account, Ken Weeks
12   is a signatory on that account, along with Michelle Martin.
13   That would be an additional reason to put those monies in the
14   column for him.
15   Q    So if we took Exhibit 94 and took the Citibank
16   portions of the amounts to Michelle Martin, there we have a
17   joint account nexus?
18   A    Correct.
19   Q    And we can determine what that amount is?
20   A    Correct.  With respect to the others, the account
21   records for all five of the Michelle Martin accounts,
22   including the Citibank account, show an address in New York
23   City, which is also given as the address, I believe, -- and
24   actually, if I can check a document so I don't mis-speak.
25   I'd like to look at a record.  Is there a record in this

1108

1  evidence of the shareholders' names addresses from I Data,

2  Inc.?

3      Q    I don't believe a shareholders list was tendered.

4           MR. CARTER:  I don't know whether it's part of --

5  it may well be part of those 61 to 65 documents, the Exhibit

6  61 to 65.  I don't have one directly.

7           THE WITNESS:  Okay.  I have a document with me.  It

8  would be in my case in a manilla folder with my initials,

9  CHA.  And if you want to just give me that folder, I can get

10  it out.

11          JUDGE KELLY:  Off the record.

12                              (Off the record at 2:57 p.m.,

13                              and reconvened at 2:58 p.m.)

14          THE WITNESS:  I'm looking at a record that I've

15  annotated of a printout from -- that I obtained from I Data,

16  Inc. under the subpoena that I sent to them, that's a list of

17  shareholders for Dynamic American.  And actually, on this --

18  the address that I was thinking of -- the address shown for

19  Michelle Martin on all of the account records, at the five

20  banks, is the same as the address shown for Fernando Cordero,

21  care of David Hesterman at the address which is 26 West 75th

22  Street, Apartment 3A, in New York.  The zip is 10023.  I had

23  remembered that as being Ken Weeks.

24          I took testimony from a broker in -- at Investor

25  Associates who was the registered representative for the

Diversified Reporting Services, Inc.
(202) 296-9626

1109

1    Stockton accounts at Investors Associates.  He told me that

2    it was his understanding from conversations with Ken Weeks,

3    that Michelle Martin was Ken Weeks' girlfriend.  This would

4    have been probably in '96, '97.

5        Q    And that's the basis upon which you --

6        A    So I would say that the total of all of the things

7    that I just cited would be the basis.  And I am -- I have a

8    recollection that address is 26 West 75th Street, Apartment

9    3A, was an address that was given to us late in the

10   Commission's PanWorld civil investigation when we were

11   attempting to serve a subpoena on Ken Weeks, or serve notice

12   on him of our intent to file an injunctive action.  And that

13   that was the address that was given to us as being his

14   current address.

15       Q    Did anyone to tell you to attribute all of the

16   funds paid to Michelle Martin to Mr. Weeks?

17       A    I think, I made that decision jointly with Mr.

18   Carter.

19       Q    Long ago, right?

20       A    Yeah.  I would say so.  And --

21       Q    Did you ever make any effort to ascertain what Ms.

22   Martin may have done with any of the money?

23       A    Certainly, I obtained account records for all of

24   those accounts.  I subpoenaed all five of those banks.

1       Q       What did you find?

2       A       The lion share of the money -- the vast majority of

3   those funds was taken out of the accounts as cash.

4       Q       So you have no idea of the ultimate disposition of

5   the money?

6       A       No.  It's virtually impossible to trace cash.

7       Q       Let me ask you to step -- or turn backwards to page

8   nine in Exhibit 182.

9       A       Yes.

10      Q       And you see about, not quite half way down the

11  page, the entry for $30,000 check to Canyon Corporation?

12      A       Right.

13      Q       Isn't it true that all the information that you

14  have about Canyon Corporation also comes from Mr. Cordes?

15      A       No.  That is not true.

16      Q       It's not?

17      A       Correct.

18      Q       Isn't it true that the information you have about

19  this payment to Canyon Corporation is from Mr. Cordes?

20      A       The $30,000 payment?

21      Q       Yes.

22      A       Yes.  That's from the CIBC account records.  Yes.

23              (Pause.)

24      Q       Ms. Achuff, when is the last time you had any

25  occasion to try and have communications with Robert Cordes?

*1111*

1      A    Me, as an individual?

2      Q    Yes.

3      A    At the conclusion of my examination of him in

4    Dallas, in late January of 1999, I served him with two

5    additional subpoenas.  I had served him with the one that you

6    referenced earlier, the one dated December 14th.  At the

7    conclusion of his testimony, I served him with subpoenas for

8    records of Washington National Limited, which he had

9    identified in his testimony as a corporation that he set up

10   at the request of Ken Weeks.

11          And Brokerage -- let me get the name right here.

12   Brokerage Industries Limited, which is another corporation

13   that Mr. Cordes set up.  And so I served him with subpoenas

14   for those, for documents relating to those two entities.  And

15   so there would have been some follow-up actually with Mr.

16   Cordes' attorney, Bobby Majumder, relating to him sending me

17   those documents.  And I may have had some communication with

18   Mr. Majumder relating to that.  To the best of my knowledge,

19   I think that would have been the last time.  And I think I

20   got those documents in February of '99.  So a little over a

21   year ago, a year and --

22     Q    So if I understand things correctly, you would say

23   the approximate hour of 9:38 a.m. Central Standard Time, on

24   January 28th, 1999, was the last time you had any contact

25   with Mr. Cordes?

1112

1      A    No.  Let's see.  Yeah.  I think that's correct.  I

2   was going to say there was some -- we had set up a border

3   watch in order to be alerted by customs when Mr. Cordes came

4   into the country.  And there was some confusion about that

5   being lifted.  But I think all of that communication was

6   prior to his testimony on the -- whatever it was, the 26th

7   and 27th.  So I believe, yes.  That that was the last direct

8   contact I had with him.

9      Q    Now, who was with you when you conducted the

10  examination of Mr. Cordes on January 27th and 28th, 1999?

11           MR. CARTER:  I'm going to object, Your Honor, to

12  the relevance of all of this.  I think that if Counsel wants

13  to get into inquiring about his claim to grand jury issue,

14  that we're in the wrong forum to try that case or to hear

15  that case.

16           JUDGE KELLY:  No.  I'll allow the testimony.

17           THE WITNESS:  Okay.  I took Mr. Cordes' testimony

18  all day on the 27th, -- have I got my dates right?

19           BY MR. PARSONS:

20      Q    It's 27th and 28th, --

21      A    All day on the 27th --

22      Q    -- according to the face of the testimonies.

23      A    Okay.  And then, for roughly an hour on the morning

24  of the 28th, I was accompanied by Leslie Hendrickson-Hughes,

25  who is both a Commission employee and also a special U. S.

1    attorney, I guess is the designation.

2        Q    During the examination that you conducted on

3    January 27th, did Ms. Hendrickson actively participate?

4        A    She did not.

5        Q    Did she ask any questions?

6        A    The only statement that I have seen in perusing the

7    transcript of that testimony that she made was, at one point,

8    she asked if we could go off the record.  And I'm sorry.  She

9    said that, and at the very beginning of the testimony, she

10   said a few words to Mr. Cordes relating, I think principally,

11   to her dual status.  Other than that, no, she did not

12   participate.

13       Q    Did she take notes?

14       A    I would presume so.

15       Q    Did she pass you any notes to suggest any questions

16   that you might ask?

17       A    I don't have a recollection of that.

18       Q    Did you have dialogue with her that was not

19   recorded during the course of the testimony, while you were

20   still on the record?

21       A    It is conceivable.  I do recall, in fact, a

22   dialogue -- we were going through the -- Mr. Cordes and I

23   were going through the CIBC account records, which as you

24   have seen are voluminous.  And it was cumbersome to be

25   referring to pages to try and talk about transactions.  I had

1    already prepared as an aid to my examination of him -- I had

2    already prepared Exhibits 94 and 134.

3          And I had them with me to use an aid in examining

4    him.  And I think it was Leslie's suggestion that we mark

5    those summaries as exhibits.  And Mr. Cordes' testimony, in

6    order to facilitate talking about these transactions.  I

7    believe that that suggestion came from her.

8          Other than that, I -- and maybe some housekeep --

9    I'm sure we exchanged words.  I would imagine that it was

10   housekeeping stuff relating to where's the such and what

11   exhibit.  And that sort of thing.  But other than talking

12   about my summary statements, I have no recollection of any

13   specific conversations.

14   Q    Is the same true for conversations that were had

15   with you and -- between you and Ms. Hendrickson while the

16   proceedings were off the record?

17   A    Again, I have no specific recollection of any

18   conversation that she and I had.  We went out to dinner in a

19   public place and talked about things other than work.

20   Q    Prior to the time that you commenced Mr. Cordes'

21   testimony on January 27th, did you prepare to educe his

22   testimony?

23   A    Yes, I did.

24   Q    Did you prepare with Ms. Hendrickson?

*1115*

```
1        A    No, I did not.

2        Q    At the conclusion of your portion of conducting Mr.

3   Cordes' testimony, what happened, to your knowledge?

4        A    The record reflects, I think, that we went off the

5   record at 9:38.  I would have packed up whatever documents I

6   was taking with me.  I think I left the bulk of them there,

7   because I was under the impression that Ms. Hendrickson was

8   going to conduct her own examination of Mr. Cordes.  And I

9   left and went to the airport.

10       Q    Why was that?

11       A    Because I had finished my examination.

12       Q    Why didn't you stay for the portion with Ms.

13  Hendrickson?

14       A    Because my understanding was that if Ms.

15  Hendrickson had a subsequent interview with Mr. Cordes, it

16  was going to be, if you will, wearing her hat as a special U.

17  S. attorney -- I'm sorry.  I don't know exactly what her

18  title is, and I had no part of that.  And so there was no

19  reason for me to stay.  Furthermore, I was under the

20  impression it would have been inappropriate for me to stay.

21       Q    Were you under the impression, or understanding,

22  that there was a considerable risk of violation of Federal

23  Rule of Criminal Procedures 6E in the event that you might

24  stay?
```

1      A      I cannot say that I had an awareness of any

2    specific rule.  I'm sorry, sir.  I'm not a lawyer, but I knew

3    that I had finished my examination, as a part of the

4    Commission's civil investigation.  And that anything that was

5    going on with -- I was aware of the existence of something

6    called a 6E order from other things I've been involved with

7    at the Commission.  And I knew I was not on a 6E order.

8    There was no reason for me to stay.  And it was not something

9    that would have been appropriate.

10              MR. PARSONS:  I don't think I have anything else.

11              JUDGE KELLY:  Thank you.

12              BY MR. BARBER:

13      Q      Just a couple of things, Ms. Achuff.  In addition

14    to the substance of Exhibits 181 and 182, which appear to

15    detail, that is on 181, total payments to Robert Weeks of

16    $50,900.  That's on page three.  An additional 3,294.54,

17    which you attributed to Bob and Ken Weeks.

18      A      I'm sorry, Mr. Barber.  I've misplaced an exhibit.

19      Q      Okay.  I'm sorry.  And I was summarizing the

20    information on page three.

21      A      Of which --

22      Q      You concluded that 50,900 was paid to Bob Weeks

23    through the Maria Rosa Baez account.  And that also

24    attributable to Bob and Ken was an additional 3,294.54,

25    correct?

1117

1     A     Correct.

2     Q     And if we go to the substance of Exhibit 182, we

3  have a $10,000 payment attributed to -- total of two 5,000

4  payments, attributed to Bob and Ken, respecting the Draper

5  Rehab and Care Center.  And then another 3,000 --

6     A     I'm sorry.  Can you give me a page number just so I

7  can be following along here?

8     Q     That's not -- page nine.

9     A     Thank you.  Right.

10    Q     And then on page ten, you attribute another $3,000

11  to the two of them because their sister bought it, correct?

12    A     Right.

13    Q     All right.  That looks like 13 plus 50,900 plus

14  3,294.54 -- that's the sum of those attributions, correct?

15    A     Plus 3,000 -- I'm not sure if you said that, 3,000

16  from Exhibit 182, which I think is --

17    Q     But I lumped the ten and the 13 -- and the three

18  together to 13.

19    A     Well, no.  I don't think that's appropriate.  Let's

20  see.

21    Q     Well, let me ask a direct question, then.  If you

22  add those up what do you get?

23          JUDGE KELLY:  You've still got the 3,000 for the

24  Empanadas.

Diversified Reporting Services, Inc.
(202) 296-9626

1          THE WITNESS:  Well, exactly.

2          BY MR. BARBER:

3      Q    And I was looking for that.

4      A    Okay.

5      Q    So you've got another 3,000 --

6      A    Yeah.

7      Q    -- from the Empanadas?

8          JUDGE KELLY:  Page ten.

9          THE WITNESS:  The totals for the Respondents stand

10   alone.  The Ken and Bob Weeks column is a separate -- or

11   separate items from those in the Ken Weeks column and the Bob

12   Weeks column.

13         BY MR. BARBER:

14     Q    Yeah.

15     A    Okay.  So yes, if you total 13,000 from Ken and Bob

16   Weeks on Exhibit 182, 3,000 from -- for Bob Weeks on 182,

17   $3,294.54 for Ken and Bob on Exhibit 181, and 50,900 for Bob

18   on Exhibit 181, then whatever that total is, is the total for

19   those two exhibits, for those monies, as sort of, if you

20   will, first order recipients.

21     Q    I was hoping by Excel or otherwise, you may have

22   the total.

23     A    No.  But I have a calculator here.  And I'd be

24   happy to give you that.  So the total of those four is

25   70,194.54.

1119

1     Q    And a portion of that, if one were to apportion it

2 out, --

3     A    Some portion --

4     Q    -- would be jointly attributable to Bob and Ken,

5 perhaps divided in two?

6     A    Whatever would be the apportionment, correct.

7     Q    Okay.  During the course of your examination, have

8 you actually traced any other proceeds of any type or sort to

9 Robert Weeks?

10    A    I have.

11    Q    What are they?

12    A    As reflected in Exhibits 181 and 182.  Let's look

13 at 181 first.  On page two, you see that $98,800 was wired in

14 the name of Barbara Hesterman.  That money went into two

15 accounts at First Security Bank of Utah.

16    Q    Okay.

17    A    A portion of the money from that account went to

18 Robert Weeks in form of checks out of that account.

19    Q    I recall, I think a check for $6,300 -- well,

20 strike that.  There's an exhibit that has appended to it, I

21 think, two checks out of the Hesterman account to Robert

22 Weeks.  Does that sound familiar to you?  And I think it

23 might be Exhibit 159.

24    A    No.  Not from the description.

Diversified Reporting Services, Inc.
(202) 296-9626

1    Q    There's a schedule of the Hesterman account in

2  evidence; is there not?

3         MR. CARTER:  I don't believe so, Mr. Barber.

4         THE WITNESS:  I don't believe so.

5         MR. CARTER:  Exhibit 163 is Barbara Hesterman and

6  David Hesterman's joint bank account.  Is that what you're

7  thinking about?

8         MR. BARBER:  I think so.  Is that it?

9         JUDGE KELLY:  Off the record.

10                          (Off the record at 3:21 p.m.,

11                          and reconvened at 3:22 p.m.)

12        MR. BARBER:  Six or seven pages into that exhibit,

13 maybe more, there's a bates stamp 13480 to Robert Weeks for

14 $6,300, I believe.

15        JUDGE KELLY:  We're talking about Division Exhibit

16 163?

17        MR. BARBER:  Correct.

18        THE WITNESS:  Okay.  I've got it.  Bates -- check

19 bates stamped 13480, drawn on this -- her security account,

20 January 16th, '96, made out to Robert Weeks in the amount of

21 $6,300 even.

22        BY MR. BARBER:

23    Q    Right.  And if you'll look through there, will you

24 see if there are any other checks to Robert Weeks?

1121

1           MR. CARTER:  Just Robert Weeks?

2           MR. BARBER:  To Robert Weeks.  I didn't see any,

3   but --

4           THE WITNESS:  I don't --

5           MR. CARTER:  Yeah.  There's --

6           THE WITNESS:  Well, give me a moment.

7           MR. BARBER:  I don't have one in my exhibit.

8           MR. CARTER:  There's one more to Robert Weeks, and

9   there's some to Insurance Trust.  This is 13430.

10          MR. BARBER:  Okay.  Look at 1430 --

11          MR. CARTER:  13430.

12          MR. BARBER:  13430, is that it?

13          MR. CARTER:  13430.

14          MR. BARBER:  I don't know why that isn't in my --

15   oh, there they are.  Yeah.

16          BY MR. BARBER:

17      Q   There's another check to Robert --

18      A   Right.

19      Q   -- for 6,000?

20      A   I see that.

21      Q   Okay.  Now, let's find the Insurance Trust ones.

22   There's -- I can't -- there -- it's 13438.  Can you see how

23   much that is?  I can't read it.

24      A   I'm not entirely sure.  I have a document with me

25   that would allow me to --

Diversified Reporting Services, Inc.
(202) 296-9626

1122

```
 1        Q    Well, let's --

 2        A    -- tell you.

 3        Q    Yeah.

 4             MR. BARBER:  May she have leave to step down and do

 5     that, Your Honor?

 6             JUDGE KELLY:  Off the record.

 7                              (Off the record at 3:24 p.m.,

 8                              and reconvened at 3:25 p.m.)

 9             BY MR. BARBER:

10        Q    You have another document in front of you, which I

11     believe will tell us how much additional money Mr. Weeks got

12     out of the Barbara Hesterman account; is that correct?

13        A    That is correct.  I -- may I put Exhibit --

14        Q    Sure.  I think we're done with that.

15        A    Put this out of the way.

16        Q    And I think where we left off, we were trying to

17     figure out how much that check, which appears to be 4,900,

18     was.  And we've already talked about the 6,300, correct?

19        A    Right.  Let me just give you the whole thing

20     together, so it's clear, and I'm not confused.

21        Q    Okay.  I just don't want to double dip.

22        A    Exactly.

23        Q    If we disregard everything else that's been said

24     about the Hesterman account, will you tell me how much money,

25     total, he got out of that account?
```

1123

1    A    Yes, I will.

2    Q    That'll be great.

3    A    Okay.  I prepared a spreadsheet for the Hesterman

4    account at First Security in the same manner that I did for

5    the Stockton and Hamilton accounts.  And then, in the way

6    that we've looked at with those accounts, I sorted that by

7    payee.

8    Q    Great.

9    A    Okay.  So -- let me see if I've -- okay.  There are

10   checks made out to either Bob Weeks or Robert Weeks or Robert

11   G. Weeks totaling $36,800 coming out of the Hesterman

12   account.  There are checks to Insurance Trust totaling

13   68,800.  Checks to Maria Rosa Baez totaling 3,500.  And that

14   gives us a grand total of $109,100 coming out of the

15   Hesterman account at First Security Bank.

16   Q    Okay.  And that's in addition to the other totals

17   that we expressed out of Stockton and Hamilton, correct?

18   A    For Bob Weeks, that's correct.

19   Q    Yes.  All right.  So the total is in the

20   neighborhood of $170,000, 65 or 70?

21   A    The total is $179,294.54, including the, whatever

22   it was, 5,000 or so that's attributed to both Ken and Bob

23   Weeks.

24   Q    Okay.  Anything else that you can attribute to him,

25   so far as you know?

1124

```
 1        A     If I may look at another document?

 2        Q     Go ahead.

 3              JUDGE KELLY:  Off the record.

 4                              (Off the record at 3:28 p.m.,

 5                              and reconvened at 3:28 p.m.)

 6              THE WITNESS:  I also did a spreadsheet for the

 7    Washington National Limited bank account at CIBC.  And those

 8    records show -- pardon me, an additional 8,500 going to

 9    Insurance Trust out of Washington National, and that would be

10    all.

11              BY MR. BARBER:

12        Q     Okay.  So now, adding it all together, do we have a

13    grand total?

14        A     We have a grand total of $187,794.54, including the

15    small amount for the Ken and Bob Weeks column, for which I

16    can find actual checks or wires in the name of Bob Weeks or

17    entities or persons associated with him.

18        Q     And of that total, some 13 or 14,000, that is the

19    10,000 to the Draper Rehab and 37 or 900 to Larkin, is

20    attributable jointly to Ken and Bob, correct?

21        A     Correct.

22        Q     Respecting the Cordes matter, just a couple

23    additional questions.  Did Cordes come to Dallas and agree to

24    be deposed pursuant to your subpoena?  That is the one that

25    you caused to be served on him in, was it Miami?
```

1        A       Fort Lauderdale.

2        Q       Fort Lauderdale?

3        A       That's -- yes.

4        Q       All right.  Did Ms. Hendrickson also serve a

5    subpoena from the United States District Court on Cordes at

6    the same time in Fort Lauderdale, or at any other time, to

7    your knowledge?

8        A       Well, Ms. Hendrickson was not with me in Fort

9    Lauderdale.

10       Q       Well, --

11       A       And I'm not aware of any subpoena that she ever

12   served on Cordes.

13       Q       You were not present when any Grand Jury or other

14   subpoena from the U. S. District Court was served on Cordes,

15   at the same time, correct?

16       A       I am not aware of the existence of Grand Jury

17   subpoena --

18       Q       All right.

19       A       -- related to Mr. Cordes.

20       Q       All right.  For all you -- the only one you know

21   about it is the one you caused to be served on him?

22       A       You got it.

23       Q       All right.  Now, you made an arrangement,

24   apparently, through Mr. Majumder wherein you arranged an

25   appointment to go to Dallas and depose Mr. Cordes in

1  Majumder's office; is that correct?

2     A    Right.  I took his testimony in his attorney's

3  office.

4     Q    Did you tell Ms. Hendrickson that you were going to

5  do that?

6     A    Yes.

7     Q    Do you know whether anybody else informed her about

8  that?

9     A    I do not.

10     Q    But you called her and told her, I've got Cordes

11  coming to Dallas, and I'm going to interview him?  In sum?

12     A    In sum, yes.

13     Q    All right.  Did you invite her to go to Dallas and

14  also interview Cordes as an assistant United -- as a special

15  assistant United States attorney, at the occasion where he

16  had agreed to appear pursuant to your subpoena?

17     A    I'm not sure of the exact manner in which the

18  arrangements came about.  It was known to all of the parties

19  involved from the point where Mr. Majumder contacted me and

20  said that his client Mr. Cordes had gotten a subpoena to

21  appear, and we, at that point, started dealing with Mr.

22  Majumder, of course, rather than the witness.  It was, I

23  think, talked about with all of us that it was going to be a

24  -- that we would like to do -- or the -- that's the we of the

25  general we, would like to do a two part interview.  That I

1    wanted to interview Mr. Cordes.

2        Q    Ms. Achuff, the Court has, a number of times in

3    this hearing, expressed concern over answers in the passive

4    voice.  It was talked about.  If you're going to discuss what

5    was talked about, as a witness, it's your obligation to tell

6    us who said what.

7        A    Of course.

8        Q    And I'd appreciate it if you would account your

9    testimony in those terms.

10       A    Certainly.  Thank you for pointing out my error.  I

11   would say that I, -- for the Commission, I, Leslie

12   Hendrickson-Hughes, Don Hurl, who is the associate regional

13   director of our office, possibly, Dan Shay, who is the

14   regional director.

15       Q    Yes.

16       A    Robert Entertalio, who is the associate regional

17   director.  I would say that the five of us were involved in

18   discussions about how to proceed with respect to taking

19   testimony from Robert Cordes.

20       Q    All right.  And I can very easily understand that.

21    But I'm directing my questions now, to -- and I'm not really

22   sure -- care how the decision was made, but how it is that

23   Ms. Hendrickson-Hughes was invited to attend and also examine

24   Cordes.

1          First of all, was she invited by somebody from the

2     staff to be there and examine?

3          A    I -- your use of the word invited -- I'm sorry.  Is

4     not one that I can really respond to.  As I say, there was --

5          Q    Okay.  You tell me how she came to be there.

6          A    Okay.  As I said, the five of us discussed the

7     matter.  Obviously, Mr. Cordes is, -- as I knew already from

8     the Commission's civil investigation of PanWorld Minerals

9     International, Inc., that's where I became aware of Robert

10    Cordes, was in the course of that civil investigation.  That

11    civil investigation -- or pardon me.  The civil proceeding in

12    that matter was stayed, but it's still out there in limbo

13    somewhere.

14          And so from the Commission's standpoint, Mr. Cordes

15    could provide valuable testimony and documents relating to

16    both PanWorld and Dynamic American.  Leslie and I are both

17    officers of the Commission for purposes of the PanWorld --

18    Commission's PanWorld formal order.

19          We are also, along with pretty much everybody in

20    the Enforcement side of the office, officers for purposes for

21    the Dynamic American Commission investigation.  So it was

22    only -- plus I was aware of the existence of -- that the

23    Grand Jury was looking at PanWorld, because I had testified

24    to the Grand Jury.

1   Q   There wasn't a Grand Jury investigation.  There was

2   an indictment pending.  Wasn't there, at that time?

3   A   Well, sir, I testified to a Grand Jury.  I don't

4   remember the specific timing of events.  There is certainly

5   criminal interest in PanWorld.

6   Q   All right.

7   A   And so it was, -- of course, how many opportunities

8   would you have to speak with Robert Cordes for all of

9   these --

10  Q   Looks like one.

11  A   That's the way it's going.

12  Q   Yeah.

13  A   Well, two actually, mine and Leslie's.

14  Q   All right.

15  A   So naturally, you want to maximize your

16  opportunities.

17  Q   Well of course, I'm not -- nobody misunderstands

18  that.

19  A   Well, --

20  Q   The question is whether it's proper to do so.  And

21  my concern is, that in the Leslie Hendrickson interview of

22  Robert Cordes, she introduces herself as special assistant

23  United States Attorney, Hendrickson.

24  A   I'll take your word for that, sir.  I wasn't there.

1        Q    You don't know that.  Well, I'll tell you that
2    that's the case.

3        A    Well, actually, I do know because in the pleadings
4    that -- or I have seen a representation of the case because
5    of a recent motion that included a page in the transcript.

6        Q    That's what she did, right?

7        A    That's what the page shows, yes.

8        Q    And she was there in that role during the pendency
9    of at least a Grand Jury investigation of my client and
10   others, in connection with PanWorld, correct?

11       A    Right.

12       Q    My question is whether there was discussion amongst
13   the five members of the staff, that you've alluded to, about
14   a rule known as the Collateral Proceeding Rule, which
15   expresses at least concern about the use of SEC investigative
16   subpoenas to procure information for use in criminal
17   proceedings.  Was that discussed in any way, shape, or form?

18       A    I do not have a recollection of that.  But I will
19   tell you that when it starts getting hot and heavy on the
20   legal stuff, I tend to phase out.  And that would not have
21   been an issue that I would have been involved in.  I'm not a
22   lawyer, and so any discussions about the legal aspects of
23   this, I really am not the person to ask about that, sir.

24       Q    May have been with the Office of General Counsel or
25   somebody else?

1    A    Certainly.

2    Q    Okay.

3         MR. BARBER:  That's all I have, Your Honor.

4         JUDGE KELLY:  Thank you.

5         MR. CARTER:  Your Honor, I'd offer at this time

6  Exhibits 94, 134, 158, 159, 161, 169, 181, and 182, which are

7  summary exhibits pending.

8         MR. BARBER:  They're Ms. Achuff's summary exhibits.

9         MR. CARTER:  Right.  I ordered the underlying bank

10  record.

11        THE WITNESS:  Well --

12        MR. CARTER:  Well, we don't need 94.  I'm sorry.

13  Do we?

14        MR. BARBER:  Would you give me those numbers again,

15  Tom?

16        MR. CARTER:  Sure.  94, that's a spreadsheet for

17  Stockton's account at the CIBC.

18        MR. BARBER:  Okay.

19        MR. CARTER:  134, that's a spreadsheet for

20  Hamilton's account at the CIBC.  158 is the Ken

21  Weeks/Michelle Martin's Citibank account underlying some of

22  these.  159, wire transfers CIBC to Ken Weeks' Insurance

23  Service.  161, Michelle Martin Fleet Bank account.  169,

24  which is the first spreadsheet that Ms. Achuff did that we

25  talked about, that we now brought back and revised.

*1132*

1              MR. BARBER:  Yeah.

2              MR. CARTER:  But it still shows the Court the flow.

3      And then, 181 and 182, which are the two spreadsheets that

4      were revised at Counsel's and the Court's suggestion.

5              JUDGE KELLY:  Respondents?

6              MR. BARBER:  Your Honor, I object only to Exhibit

7      94 and Exhibit 134.  And I do so on the grounds that, so far,

8      there is no foundation in the record for the CIBC bank

9      records, which these exhibits purport to summarize.

10             We had nobody from CIBC appear to tell us what they

11     are, and they were apparently produced by Mr. Cordes.  And we

12     don't even have, in evidence, anything he said about it.

13             JUDGE KELLY:  Thank you.

14             MR. PARSONS:  Your Honor, I have the same objection

15     with respect to 94 and 134, I believe it is.  And I also

16     cannot agree to any of the Michelle Martin bank records,

17     which have not been authenticated either.  I believe that's

18     all he's offering at the moment.  If I've missed something

19     considerably, I object to anything that has not been

20     authenticated properly by a party -- by a person who is able

21     to authenticate them.

22             JUDGE KELLY:  Mr. Carter.

23             MR. CARTER:  Your Honor, I could illicit

24     information from Ms. Achuff at this time.  She's qualified to

25     tell the Court how bank records are kept.  All of these are

1    bank records on their face, their business records for

2    various banks.  I believe that Ms. Achuff would be a

3    qualified witness under the Rule.

4           MR. BARBER:  Except that wouldn't address the

5    difficulty.  Because it wouldn't provide foundation for the

6    introduction of those documents.  How they're kept as a

7    general matter isn't the issue.  The issue is whether these

8    are accurate, properly maintained records of the accounts of

9    Stockton and Limited -- and Hamilton.  And it takes the bank

10   to tell us that, I believe.

11          MR. CARTER:  I don't think that the Respondents

12   have made any showing of irregularity or any showing that

13   they are not, as represented, not authentic and not accurate.

14    Other than the bald assertion.

15          JUDGE KELLY:  Admitted.

16                          (Division's Exhibit Nos. 94,

17                           134, 158, 159, 161, 169, 181,

18                           182 were received into

19              evidence.)

20          JUDGE KELLY:  Are we through with this witness?

21          MR. CARTER:  Yes, Your Honor.

22          JUDGE KELLY:  Ms. Achuff, I want to thank you very

23   much for all the extra time you spent yesterday and today

24   preparing these additional summaries.  I find them helpful.

25   And I appreciate the work that you put into do that.

1    THE WITNESS:  Thank you, Your Honor.

2    JUDGE KELLY:  Shall we take a break?

3    MR. CARTER:  Yes.

4    MR. BARBER:  Please.

5    JUDGE KELLY:  All right.  Ten minutes.

6                    (Off the record at 3:44 p.m.,

7                    and reconvened at 3:54 p.m.)

8    JUDGE KELLY:  With respect to Ms. Achuff's

9  exhibits, there was one page yesterday that she made some

10  handwritten changes on, page five of six.  What I have asked

11  the Division of Enforcement to do, is to physically remove

12  the wrong page from the exhibit that will go to the Office of

13  the Secretary, and put in the page with the handwritten

14  corrections.  So --

15    MR. BARBER:  That's fine, as long as they provide

16  us a copy.

17    JUDGE KELLY:  I believe that they were handed out

18  yesterday.

19    MR. PARSONS:  They did.

20    MR. BARBER:  Oh.  Yeah.  We did get the changes.

21    JUDGE KELLY:  Go ahead, Mr. Carter.

22    MR. CARTER:  Well, Your Honor, I'd like to call

23  David Hesterman next.

24    MR. PARSONS:  Mr. Hesterman is not here.  I can go

25  call and see if I can get him here in a few minutes.

P.02/02

EXHIBIT 10

## BEFORE THE
## UNITED STATES SECURITIES AND EXCHANGE COMMISSION

*In re Barlow, et al.*

        **Respondents.**

                                    **ADMINISTRATIVE
PROCEEDING
File No. 3-9952**

### AFFIDAVIT OF BARBARA HESTERMAN

COUNTY OF         S
STATE OF UTAH      S

        Barbara Hesterman, being duly sworn, deposes and states as follows.

        1. I am over the age of eighteen years and fully competent to testify to the facts and matters set forth herein which are true and correct based upon my personal knowledge. I am the mother of David Hesterman, one of the respondents in this case.

        2. I have received a subpoena to testify on behalf of the staff of the United States Securities and Exchange Commission (SEC) at a hearing scheduled to begin on July 10, 2000, in Salt Lake City, Utah. To my knowledge I have never given a statement of any kind to any member of the staff of the SEC.

        3. In late 1999, however, I testified before a federal Grand Jury sitting in Salt Lake City, Utah, for approximately thirty minutes.

        I declare or affirm under the penalties that the foregoing is true and correct.

                              *Barbara Hesterman*
                                Barbara Hesterman

June 28, 2000