

STEPHEN J. SORENSON, First Assistant United States Attorney (#3049)
STEWART C. WALZ, Assistant United States Attorney (#3374)
LESLIE HENDRICKSON-HUGHES, Special Assistant United States Attorney
Attorneys for the United States of America
185 South State Street, #400
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | 2:98CR 0278ST |
| Plaintiff, | : | GOVERNMENT'S BRIEF ON RELEVANCE OF PANWORLD |
| ROBERT G. WEEKS, | : | INFORMATION IN DYNAMIC |
| DAVID A. HESTERMAN, | | AMERICAN INVESTIGATION |
| TERRENCE DUNNE, | : | |
| JOSEPH A. FABIILI, | | |
| CHRISTOPHER S. KNIGHT, | : | |
| LAWRENCE A. KRASNY, | | |
| AND KENNETH L. WEEKS, | : | |
| Defendants. | : | |

In response to the Court's request for information about the relationship between

Dynamic American Corporation and PanWorld Minerals International Inc., the United States

files this brief.

Under decisions by both the Supreme Court and the Tenth Circuit, administrative

subpoenas may be enforced judicially if the agency can show that (1) the inquiry is conducted

pursuant to a lawfully authorized, legitimate purpose; (2) it is reasonably relevant to an

investigation which the agency has authority to conduct, and (3) all administrative prerequisites



have been met. *United States v. Powell*, 379 U.S. 48, 57-58 (1964) (enforcement of an IRS subpoena); *SEC v. Blackfoot Bituminous, Inc.*, 622 F.2d 512, 514 (10th Cir.), *cert. denied*, 449 US 955 (1980).

The defendants do not dispute that the Commission's Dynamic American investigation was lawfully authorized or that the administrative prerequisites were met; rather they argue solely that it was improper for the Commission to obtain documents and testimony related to Canyon Corporation and PanWorld because those documents allegedly were not relevant to its Dynamic American investigation. Contrary to the defendants' assertion, the documents and testimony of Robert Cordes were relevant to the Commission's administrative investigation because Canyon Corporation and Pan World were related to the defendants Robert Weeks', Ken Weeks' and David Hesterman's involvement in Dynamic American. Further, through their control of PanWorld, the defendants established patterns of conduct and relationships with third parties that formed the basis for their similar conduct and relationships with Dynamic American.

Formal Order of Investigation In the Matter of Dynamic American

On January 16, 1997, the Commission issued a formal order of investigation, In the Matter of Dynamic American Corporation (D-2049). (The formal order is attached to the affidavit of Carleen Achuff, which affidavit is attached to this pleading as Exhibit 1.) The Formal Order names various persons, including Carleen Achuff and Leslie Hendrickson, as officers of the Commission for the purpose of issuing subpoenas for testimony and documents as part of the investigation into activities related to Dynamic American Corporation. The Formal

2

Order directs the offices to investigate whether any persons have engaged in acts or practices that violate, among other things, the securities registration provisions of 15 U.S.C. § 77(e), the anti-fraud provisions of 15 U.S.C. §§ 77q and 78j(b), the quarterly and annual reporting provisions of 15 U.S.C. § 78m(a), and the beneficial ownership reporting provisions of 15 U.S.C. § 78m(d). The Commission has authority to "make such investigations as it deems necessary to determine whether any party has violated, is violating, or is about to violate" the federal securities laws it is entrusted to uphold. 15 U.S.C. §§ 78u(a) and 77t(a).

The Formal Order alleges, among other things, that persons associated with Dynamic American engaged in fraud by participating in manipulative trading activity, by making false statements about the company's control persons, by misrepresenting the beneficial ownership of the company's stock, by misrepresenting the company's financial condition and assets, by misrepresenting the company's financial arrangements, and by making false statements about receipt of compensation for marketing Dynamic American stock. The issuance of the Formal Order is the only administrative requirement before the commencement of an investigation by the Commission. *SEC v. Blackfoot Bituminous, Inc.*, 622 F.2d 512, 514 (10th Cir. 1980).

### SEC Subpoenas to Cordes

On December 14, 1998, Carleen Achuff, an officer of the Commission in the Dynamic American investigation, issued a subpoena to Robert Cordes requiring him to appear for testimony and produce documents. The subpoena requested Cordes to provide documents related to a number of entities, including Canyon Corporation and PanWorld. For example, Item

6 of the December 14 subpoena requests "Documents identifying the amount, type, and payor of all compensation received by MASCO [also known as Management and Services Company, Inc., a Bahamian company of which Cordes was president] from or on behalf of the following: . . . e. Canyon Corporation; . . . h. Robert G. Weeks; i. David A. Hesterman; j. Kenneth L. Weeks; [and] k. PanWorld Minerals International, Inc." Item 7 requests "To the extent not provided in response to the previous Items, all correspondence during the period between MASCO and any other person or entity that refers to, relates to, or reflects Dynamic American Corp. or PanWorld Minerals International, Inc."

In response to the Dynamic American subpoena, Cordes produced on December 28, 1998 records related to Stockton, Ltd.; Nevada County Mining Inc.; Hamilton, Ltd.; and Wahoo International Corp., which documents were marked with bate numbers 10610 through 10973. Cordes sent these same records voluntarily to the U.S. Attorney's Office, which records were produced to the defendants as part of discovery in the criminal case. On January 12, 1999, Cordes produced additional records related to Stockton, Hamilton, Wahoo, Canyon, and X-Strav Graphics Inc., which were marked with bate numbers 11006 through 11711. Cordes requested that the SEC provide copies of these documents to the U.S. Attorney's Office. Copies of these documents were provided to the defendants as part of criminal discovery. In response to two additional Dynamic American subpoenas, Cordes produced on February 9, 1999 records related to Washington National Ltd. and Oakridge Industries Ltd., which were bate stamped 11769 through 12499. These documents were provided to the U.S. Attorney's Office. All of the

4

Cordes documents provided to the United States were provided to the defendants as bate numbers 45678 - 49121.

### Facts Demonstrating Defendants' Control of Dynamic American

As of December 1998, Achuff knew of the following facts indicating that the defendants Robert Weeks, Hesterman and Ken Weeks controlled Dynamic American. Achuff's affidavit recited these facts.

Jethro Barlow testified in October 1997 in the Dynamic American administrative investigation that he was the president, majority shareholder, and a director of Dynamic American from 1991 until August 1995. [Barlow at 29] In approximately June 1995, Barlow was searching for business opportunities for Dynamic American, which was a shell company without operations. [Barlow at 29, 23-25 ] He was put in contact with the defendants, and within days Barlow agreed to transfer control of Dynamic American to Robert Weeks, Hesterman and Ken Weeks. Initially, the defendants told Barlow that they planned to place the Spring Creek mining project in Nevada County, California into Dynamic American. A short time later, they told Barlow that Dynamic American would instead acquire a Bolivian tin mine. [Barlow at 189; DA 258-260] Barlow was to be paid a combination of cash and stock for Dynamic American. [Barlow at 43; 194] Barlow testified that he did not receive any payments from Dynamic American. [Barlow at 195]

Weeks, Hesterman and Weeks had no apparent source of income to pay Barlow for their purchase of Dynamic American, other than possible funds held in off-shore accounts. Dynamic

American did not have an active bank account. The defendants operated Dynamic American out of PanWorld's offices, used its computer, telephone, and facsimile, and paid Dynamic's expenses, including the salary of an office employee. Footers on printed copies of Dynamic's corporate resolutions contained computer file names that identified both PanWorld and Dynamic American. For example, Barlow testified that in the notation "PWWP/DACO/ 95MN11-1.DAC" on the November 5, 1995 corporate resolution, "DACO" means Dynamic American Company and 'PWWP" means PanWorld. [Barlow at 79]

The defendants installed new figurehead officers and directors of Dynamic American. Dynamic American's corporate minutes state that Alan Burton was appointed the president and CEO of Dynamic American on August 1, 1995. [DA 145] Ed Cox was appointed as a director on January 20, 1996 [DA4550], although he signed a corporate resolution in this capacity on December 15, 1995. [DA153] Both of these men initially were associated with PanWorld; Alan Burton consulted for PanWorld and appeared on a television informercial touting PanWorld stock. Ed Cox acted as a public relations person in PanWorld's offices distributing information to investors.

Barlow, Burton, Cox, and the office employee testified that Weeks, Weeks and Hesterman controlled Dynamic American. The defendants effected a reverse split of Dynamic American's stock; increased the number of authorizied shares; created four categories of preferred stock; selected the mineral properties that Dynamic American acquired; drafted corporate resolutions which were sent to Barlow, Burton, and Cox for their signature; directed

6

American did not have an active bank account.  The defendants operated Dynamic American out of PanWorld's offices, used its computer, telephone, and facsimile, and paid Dynamic's expenses, including the salary of an office employee.  Footers on printed copies of Dynamic's corporate resolutions contained computer file names that identified both PanWorld and Dynamic American. For example, Barlow testified that in the notation "PWWP/DACO/ 95MN11-1.DAC" on the November 5, 1995 corporate resolution, "DACO" means Dynamic American Company and 'PWWP" means PanWorld. [Barlow at 79]

The defendants installed new figurehead officers and directors of Dynamic American. Dynamic American's corporate minutes state that Alan Burton was appointed the president and CEO of Dynamic American on August 1, 1995.  [DA 145]   Ed Cox was appointed as a director on January 20, 1996 [DA4550], although he signed a corporate resolution in this capacity on December 15, 1995. [DA153]  Both of these men initially were associated with PanWorld; Alan Burton consulted for PanWorld and appeared on a television informercial touting PanWorld stock.  Ed Cox acted as a public relations person in PanWorld's offices distributing information to investors.

Barlow, Burton, Cox, and the office employee testified that Weeks, Weeks and Hesterman controlled Dynamic American.  The defendants effected a reverse split of Dynamic American's stock; increased the number of authorizied shares; created four categories of preferred stock; selected the mineral properties that Dynamic American acquired; drafted corporate resolutions which were sent to Barlow, Burton, and Cox for their signature; directed

6

Canyon sold shares of PanWorld through these two brokerage accounts and proceeds from the

stock sales were transferred to a Canyon bank account at CIBC in the Bahamas and other off-

shore accounts.

Robert Weeks, Ken Weeks and David Hesterman appeared to control the activities of

Canyon. Canyon transferred millions of shares from its Rimson account to pay various

consultants to, and obligations of, PanWorld, including the transfer of 17 million shares to settle

a civil lawsuit. Canyon also transferred 1,005,001 shares to a brokerage account in the name of

Gray Weeks, the father of Robert and Ken Weeks. Hesterman delivered funds into Canyon's

account at Rimson to pay for the purchase of 600,000 shares of PanWorld stock.

In similar fashion, Ms. Achuff learned from Dynamic American's transfer agent records

that Dynamic American issued 23,650,000 shares to Stockton Ltd. and 10 million shares to

Hamilton Ltd. for no apparent consideration. Both Stockton and Hamilton opened Canadian

brokerage accounts, on which Cordes and Lynn Turnquest were signatories. Proceeds from the

sales of Dynamic American stock were transferred to bank accounts at CIBC in the Bahamas.

As with Canyon, Robert Weeks, Ken Weeks and David Hesterman also appeared to

control the activities of Stockton and Hamilton. Robert Weeks prepared corporate resolutions

directing the issuance of Dynamic American stock to the two companies; David Hesterman

issued instructions to the transfer agent directing the disposition of the stock (including the

transfer of Stockton shares to third parties) and paid Dynamic American's transfer fees; and both

8

Ken Weeks and David Hesterman appear to have directed transactions in a brokerage account of Stockton.

### Mineral Properties in Common Between PanWorld and Dynamic American

PanWorld, Canyon, and Dynamic American were connected to some of the same mining projects. PanWorld purported to own several mining projects including Spring Creek, located in Nevada County, California and the Mapsa iron ore project in Peru. According to statements made to PanWorld investors in 1995, PanWorld, whose trading recently had been temporarily suspended by the Commission, planned to transfer these two mining properties to Dynamic American.

.    In August 1995 Ms. Achuff interviewed Stan Dyser, a PanWorld investor, who had contacted PanWorld's offices in late spring of 1995 and spoken with Ed Cox. Mr. Cox stated that PanWorld was going to transfer the Spring Creek and Mapsa mining properties to another company to be called Placer Gold Inc., in which PanWorld investors would receive one share for every 1,000 shares they owned in PanWorld. The stock value of the new company was to be $9 to $10 per share. According to Mr. Cox, Alan Burton was to be the president of the new company. [Stan Dyser notes] [132255; DPW028 0307]

Ms Achuff learned in a March 1996 interview with an investor in both PanWorld and Dynamic American, Wallace Jeffs, that in the summer of 1995, Robert Weeks told Mr. Jeffs that PanWorld had bought Dynamic American as a shell, that Dynamic American was buying a tin mine and would operate it, and that the price of Dynamic American stock would increase from

9

$4 to $25. The investor watched Dynamic American stock increase from $4 to $9 in two weeks during the summer of 1995. [CHA notes of conversations with Wallace Jeffs]

Transfer agent records show that 6,000,000 shares of Dynamic American stock was issued to Nevada County Mining Inc. on July 1, 1995. [DA 27] Dynamic American's auditors workpapers note that these shares were issued in exchange for the Spring Creek property. [DA 4334] PanWorld's Spring Creek property is located in Nevada County, California.

### PanWorld and Dynamic American shared common promoters

PanWorld and Dynamic American shared common promoters, Joe Fabiilli, Larry Krasny, and Richard Gladstone. PanWorld issued over 29 million shares to defendant Joe Fabiilli's company, Puritan Communications. This stock eventually provided the supply for sales made by Chris Knight, Fabiilli's brother-in-law, and other brokers at LaJolla Capital. In October 1994, Cordes wrote a letter to defendant Fabiilli stating that Canyon expected payment of $150,000 to $200,000 from Fabiilli's company, Puritan Communications, for coordinating the services to be provided by PanWorld and others in development of the Mapsa project in Peru. [PW 112859] Fabiilli and Puritan wired $25,000 to Canyon in late 1994. Fabiilli also paid the due diligence expense of Dynamic American so that LaJolla Capital could be traded it over-the-counter. Fabiilli received 1,260,000 shares of Dynamic American stock. Defendant Larry Krasny and his company, LK Management, received over 42 million shares of PanWorld stock for promoting the company, and 100,000 shares of Dynamic American stock for promoting that company.

10

Richard Gladstone and his companies received both PanWorld and Dynamic American stock and paid part of the proceeds back to the defendants.

### Cordes Records Confirm Connection Between PanWorld and Dynamic American

The records produced by Cordes confirmed there were connections between PanWorld and Dynamic American. Cordes incorporated Canyon, Stockton, Nevada County Mining Inc. (whose name was changed to Hamilton Ltd.) and other entities for the defendants. Cordes testified that he created these corporations at the request of Ken Weeks. The bank records at CIBC indicate that Cordes wrote a check on Stockton's account payable to Canyon for $30,055.25 on August 28, 1995, and wrote a check on Canyon's account for $85,000 to Stockton Ltd. on August 30, 1995. When the Canyon bank account was closed the proceeds of $2,005.14 were transferred to the Stockton account. In June 1995, Cordes sent a bill to Ken Weeks and Canyon Corporation for services provided to Stockton Ltd.

Included among Cordes' records were two confirmations stating that Canyon had purchased 25,000 shares of Dynamic American stock on December 20, 1995, which transaction was later cancelled. [Cordes Exh 18; Cordes document 11608] Ken Weeks sent Cordes a letter and private placement agreement which provided that Stockton was to pay Dynamic American $180,000. In August 1995, David Hesterman sent Cordes a fax on PanWorld letterhead containing stock powers and a corporate resolution for Turnquest to sign on Stockton's behalf.

The CIBC bank records confirm that proceeds of stock sales paid into the bank accounts of Canyon, Stockton and Hamilton were transferred to other bank accounts controlled by either

11

Ken Weeks, David Hesterman, and Robert Weeks. That proceeds from the accounts were also paid to Joe Fabiilli or his companies, and Krasny's company LK Management, which promoted the sale of both PanWorld and Dynamic American stock, and to brokers who sold PanWorld and Dynamic American stock.

### The SEC's inquiries about Canyon and PanWorld were Relevant to the Dynamic American Investigation

The investigative powers given by statute to an administrative agency are analogous to the powers of the grand jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950). The Commission is not required to show probable cause or a likelihood of violations before its subpoenas are enforceable. *Powell*, 379 U.S. at 57; *Blackfoot Bituminous, Inc.*, 622 F.2d at 514. It is enough if the subpoena seeks records which might reveal the existence and extent of any violation of the securities laws. *SEC v. First Security Bank*, 447 F.2d 166, 168-69 (10th Cir. 1971), *cert. denied*, 404 U.S. 1038 (1972).

The records sought from Cordes were relevant to determining if the defendants used off shore accounts to hide their control of Dynamic American, used the assets of PanWorld or Canyon to operate Dynamic American or paid compensation to promoters or brokers selling Dynamic American stock. The records were also relevant to several factors the Commission considers in evaluating whether to bring a suit for seeking an injunction. The Commission considers "the egregiousness of the defendant's actions, the isolated or recurrent nature of the

12

infraction, the degree of scienter involved, the sincerity of defendant's assurances against future
violations, defendant's recognition of the wrongfulness of the conduct and the likelihood that
defendant's occupation will present opportunities for future violations. *Steadman v. SEC*, 603
F.2d 1126, 1139 (5th Cir. 1979), aff'd, 450 U.S. 91 (1881). The defendants' pattern of stock
manipulation with both PanWorld and Dynamic American is relevant to evaluating whether to
seek an injunction against the defendants as a result of the investigation.

The records and testimony obtained from Robert Cordes were reasonably relevant to the
Commission's investigation of Dynamic American, because of the defendants' pattern of conduct
using off shore entities, the common mining properties, and use of the off shore accounts to pay
promoters and brokers. The defendants' due process rights were not violated by the Dynamic
American subpoena. See *SEC v. J.T. O'Brien, Inc.*, 467 U.S. 735, 742-43 (1984) ("a person
inculpated by materials sought by a subpoena issued to a third party cannot seek shelter in the
Self-Incrimination Clause of the Fifth Amendment" or the Fourth Amendment); see also *United
States v. Miller*, 425 U.S. 435, 444 (1976) which states "Since no Fourth Amendment interests of
the depositor are implicated here, this case is governed by the general rule that the issuance of a
subpoena to a third party to obtain the records of that party do not violate the rights of a
defendant, even if a criminal prosecution is contemplated or in progress at the time the subpoena
is issued. *California Bankers Assn. v. Shultz*, 416 U.S. [21,] 53, 94 S.Ct. at 1513, 39 L.Ed.2d at
835 [(1974)]; *Donaldson v. United States*, 400 U.S. 517, 537, 91 S.Ct. 534, 545, 27 L.Ed.2d 580,
592 (1971) (Douglas concurring)."

13

The defendants' request to suppress the records and testimony of Robert Cordes should

be denied.

DATED this 15th day of November, 2000.

STEPHEN J. SORENSON
Acting United States Attorney


STEWART C. WALZ
Assistant United States Attorney


LESLIE HENDRICKSON HUGHES
Special Assistant United States Attorney

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of the United States Attorney's

Office, and that a copy of the foregoing  GOVERNMENT'S BRIEF ON RELEVANCE OF

PANWORLD INFORMATION IN DYNAMIC AMERICAN INVESTIGATION was mailed to

all parties named below, this  *15*  day of November, 2000.

James N. Barber
Bank One, Suite 100
50 West Broadway
Salt Lake City, UT  84101

Walter Bugden
Bugden, Collins & Morton
623 E. 2100 S.
Salt Lake City, UT 84106

Max Wheeler
Rick VanWagoner
Snow, Christensen,
Martineau
10 Exchange Place, 11th Floor
Salt Lake City, UT  84145-
5000

Earl G. Xaiz
Yengich, Rich, Xaiz
175 E. 400 S. #400
Salt Lake City, UT  84111

Ed Brass
321 S. 600 E.
Salt Lake City, UT  84102

Francis M. Wikstrom
Douglas H. Owens
Parsons, Behle & Latimer
201 S. Main St. #1800
Salt Lake City, UT  84145

Delano S. Findlay
5350 S. 925 E. #E
Salt Lake City, UT  84117

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

      vs.

ROBERT G. WEEKS,  et al.,

      Defendants.

SECOND DECLARATION OF CARLEEN ACHUFF
IN OPPOSITION TO DEFENDANTS' MOTION TO SUPPRESS EVIDENCE

1.      Since July 1984, I have been employed by the Central Regional Office the U.S. Securities

and Exchange Commission, located in Denver, Colorado.

2.      The Commission designated me as an Officer for the purpose of conducting two

investigations, in the Matter of PanWorld Minerals International Inc., which began on

January 17, 1992, and in the Matter of Dynamic American Corporation, which began on

January 16, 1997.  A copy of the Dynamic American Formal Order of Investigation is

attached as Exhibit 1.

3.      I issued a subpoena on December 14, 1998 to Robert Cordes requiring him to appear for

testimony and to produce documents.  The subpoena requested Cordes to provide

documents related to a number of entities, including Canyon Corporation and PanWorld.

For example, Item 6 requests "Documents identifying the amount, type, and payor of all

compensation received by MASCO [also known as Management and Services Company,

Inc., a Bahamian company of which Cordes was president] from or on behalf of the

following: . . . e. Canyon Corporation; . . . h. Robert G. Weeks; i. David A. Hesterman; j.

Kenneth L. Weeks; [and] k.  PanWorld Minerals International, Inc."  Item 7 requests

**EXHIBIT**

**1**

"[t]o the extent not provided in response to the previous Items, all correspondence during the period between MASCO and any other person or entity that refers to, relates to, or reflects Dynamic American Corp. or PanWorld Minerals International, Inc."

4.   In response to the Dynamic American subpoena, Cordes produced on December 28, 1998 records related to Stockton, Ltd.; Nevada County Mining Inc.; Hamilton, Ltd.; and Wahoo International Corp., which documents I marked with bate numbers 10610 through 10973.   On January 12, 1999, Cordes produced additional records related to Stockton, Hamilton, Wahoo, Canyon, and X-Strav Graphics Inc., which I marked with bate numbers 11006 through 11711.   Cordes requested that the Commission provide copies of these documents to the U.S. Attorney's Office.   In response to two additional Dynamic American subpoenas, Cordes produced on February 9, 1999 records related to Washington National, Ltd. and Oakridge Industries, Ltd., which I bate stamped 11769 through 12499.

5.   Jethro Barlow testified in October 1997 in the Dynamic American administrative investigation that he was the president, majority shareholder, and a director of Dynamic American from 1991 until August 1995. In June or July 1995, Barlow was searching for business opportunities for Dynamic American, which was a virtual shell company without operations.   He was put in contact with the defendants, and subsequently agreed to transfer control of Dynamic American to Robert Weeks, David Hesterman and Ken Weeks.   Barlow was to be paid a combination of cash and stock for Dynamic American. Barlow testified that he did not receive any payments from Dynamic American.

6.   Robert Weeks, David Hesterman and Ken Weeks had no apparent source of income to pay Barlow for their purchase of Dynamic American, other than possible funds held in

offshore accounts. Dynamic American did not have an active bank account. Bill

Bosgraaf, the office secretary for PanWorld, also performed office work for Dynamic

American at the direction of the defendants. Bosgraaf testified that the defendants

operated Dynamic American out of PanWorld's offices using its computer, telephone,

and facsimile, and that PanWorld paid his salary.

7.    The defendants installed new figurehead officers and directors of Dynamic American.

Dynamic American's corporate minutes state that Alan Burton was appointed the

president and CEO of Dynamic American on August 1, 1995. Ed Cox was appointed as a

director on January 20, 1996, although he signed a corporate resolution in this capacity

on December 15, 1995. Both of these men initially were associated with PanWorld; Alan

Burton consulted for PanWorld and appeared on a television informercial touting

PanWorld stock. Ed Cox acted as a public relations person in PanWorld's offices

distributing information to investors.

8.    Barlow, Burton, Cox, and Bosgraaf testified that Robert Weeks, David Hesterman, and

Ken Weeks controlled Dynamic American. Among other things, the defendants made the

decisions and took the steps to effect a reverse split of Dynamic American's stock;

increase the number of authorized shares; create four categories of preferred stock;

acquire particular mineral properties; draft corporate resolutions and send them to

Barlow, Burton, and Cox for their signatures; determine who received new issuances

Dynamic American stock and the number of shares to be issued; and draft Dynamic

American's quarterly and annual reports to the Commission, as well as its investor

communications.

13.     I learned from Dynamic American's transfer agent records that Dynamic American, like

        PanWorld, also issued millions of shares of its stock to two Bahamas-based corporations,

        Stockton, Ltd. (23,650,000 shares) and Hamilton, Ltd. (10 million shares) for no apparent

        consideration.  Both Stockton and Hamilton opened Canadian brokerage accounts, on

        which Cordes and Lynn Turnquest were signatories.  From the brokerage records, I saw

        that proceeds from Stockton's and Hamilton's sales of Dynamic American stock were

        transferred to bank accounts at CIBC in the Bahamas.

14.     As with Canyon, Robert Weeks, Ken Weeks and David Hesterman also appeared to

        control the activities of Stockton and Hamilton.  Robert Weeks prepared corporate

        resolutions directing the issuance of Dynamic American stock to the two companies;

        David Hesterman issued instructions to the transfer agent directing the disposition of their

        shares (including the transfer of Stockton shares to third parties) and paid the transfer

        fees; and both Ken Weeks and David Hesterman appear to have directed transactions in a

        brokerage account of Stockton.  Burton testified in the Dynamic American administrative

        investigation that he understood from conversations with them that the defendants had

        created Stockton to receive Dynamic American stock.

15.     I learned that PanWorld and Dynamic American had common connections to certain

        mineral properties.

16.     PanWorld purported to own several mining projects, including the Spring Creek placer

        gold property located in Nevada County, California and the Mapsa iron ore project in

        Peru.  In August 1995, I interviewed Stan Dyser, a PanWorld investor, who had contacted

        PanWorld's offices in late spring of 1995 and spoken with Ed Cox.  Mr. Cox told Mr.

        Dyser that PanWorld was going to transfer the Spring Creek and Mapsa mining

properties to another company to be called Placer Gold Inc., in which PanWorld investors

would receive one share for every 1,000 shares they owned in PanWorld. According to

Mr. Cox, the stock value of the new company was to be $9 to $10 per share. According

to Mr. Cox, Alan Burton was to become the president of the new company.

17.    Jethro Barlow also connected the Spring Creek property to Dynamic American. He

testified that the defendants told him in June or July 1995 that they planned to place the

Spring Creek mining project in Nevada County, California into Dynamic American. A

short time later, they told Barlow that Dynamic American instead would acquire a

Bolivian tin mine.

18.    In March 1996, I interviewed Wallace Jeffs, a PanWorld creditor and Dynamic American

investor. Mr. Jeffs told me that in the summer of 1995 Robert Weeks told him that

PanWorld had bought Dynamic American as a shell, that Dynamic American was buying

a tin mine and would operate it, and that the price of Dynamic American stock would

increase from $4 to $25. Mr. Jeffs watched Dynamic American stock increase from $4 to

$9 in two weeks during the summer of 1995.

19.    Dynamic American's transfer agent records show that 6,000,000 shares of Dynamic

American stock were issued to a company called Nevada County Mining Inc. on July 1,

1995. Dynamic American's auditors' workpapers note that these shares were issued in

exchange for the Spring Creek property. The transfer agent records indicate that these

shares later were to be cancelled.

20.    From documents and testimony obtained in my administrative investigations, I learned

that PanWorld and Dynamic American shared three common promoters, Joe Fabiilli,

Larry Krasny, and Richard Gladstone. PanWorld issued over 29 million shares to

9.  At the time I prepared the December 14, 1998 subpoena for Mr. Cordes, I knew of the following connections between and among Robert Weeks, David Hesterman, Ken Weeks, Canyon, PanWorld, and Dynamic American.

10. I learned from PanWorld's transfer agent records that PanWorld issued 106 million shares to Canyon, a Bahamas-based corporation, from December 1994 through April 1995. An additional 2 million shares controlled by either Robert Weeks, Ken Weeks, or David Hesterman were also delivered into Canyon's brokerage accounts. These shares were issued without any apparent consideration.

11. I obtained records of brokerage accounts in Canyon's name from Yorkton Securities, Inc. in Canada and M. Rimson & Co., Inc. in the United States which showed that Robert Cordes and Lynn Turnquest, both located in the Bahamas, signed documents to open the brokerage accounts. Canyon sold shares of PanWorld through these two brokerage accounts and the brokerage records showed that the proceeds from the stock sales were transferred to a Canyon bank account at CIBC in the Bahamas and to other offshore accounts.

12. Robert Weeks, Ken Weeks and David Hesterman appeared to control the activities of Canyon. Canyon transferred millions of shares from its Rimson account to pay various consultants to and obligations of PanWorld, including the transfer of 17 million shares to settle a civil lawsuit. Canyon also transferred 1,005,001 shares to a brokerage account in the name of Gray Weeks, the father of Robert and Ken Weeks. David Hesterman delivered funds into Canyon's account at Rimson to pay for the purchase of 600,000 shares of PanWorld stock.

defendant Joe Fabiilli's company, Puritan Communications. This stock eventually provided the supply for sales made by Chris Knight, Fabiilli's brother-in-law, and other brokers at LaJolla Capital Corp. In October 1994, Cordes wrote a letter to defendant Fabiilli stating that Canyon expected payment of $150,000 to $200,000 from Puritan Communications for coordinating the services to be provided by PanWorld and others in development of the Mapsa project in Peru. Fabiilli and Puritan wired $25,000 to Canyon in late 1994.

21.    Fabiilli also provided services to Dynamic American, paying its due diligence expenses so that LaJolla Capital Corp. would commence trading its stock over-the-counter. Fabiilli received 1,260,000 shares of Dynamic American stock, some of them directly from Dynamic American, and some from Stockton and Hamilton.

22.    Defendant Larry Krasny and his company, LK Management, received over 42 million shares of PanWorld stock for promoting the company, and also received 100,000 shares of Dynamic American stock for promoting that company.

23.    Richard Gladstone and companies he controlled received both PanWorld and Dynamic American stock and paid part of the proceeds from sales of that stock back to the defendants.

24.    Cordes' testimony and documents confirm the connections between PanWorld, Dynamic American, Canyon, Stockton, Hamilton, and the defendants.

25.    Cordes testified that he incorporated Canyon, Stockton, Nevada County Mining Inc. (whose name was changed to Hamilton, Ltd.) and other entities for the defendants. Cordes testified that he created these corporations at the request of Ken Weeks. Cordes then took directions from Ken Weeks to open brokerage accounts in the U.S. and Canada

for the offshore entities. Cordes also opened bank accounts for the offshore entities at CIBC in Freeport, Bahamas. At Ken Weeks' direction, Cordes effected securities transactions in PanWorld, Dynamic American, and other securities in the brokerage accounts, caused the stock sale proceeds to be wired to the CIBC bank accounts, and directed the disposition of funds from the bank accounts to the defendants, promoters, brokers, and others.

26.     Numerous documents produced by Cordes connect the defendants, especially Ken Weeks, to the offshore entities. For example, among the bank records at CIBC was an August 28, 1995 check drawn on Stockton's account for $30,055.25 payable to Canyon, and an August 30, 1995 check drawn on Canyon's account for $85,000 payable to Stockton Ltd.. When the Canyon bank account was closed, the remaining balance of $2,005.14 was transferred to the Stockton account. Included among Cordes' records was a confirmation for Canyon's purchase of 25,000 shares of Dynamic American stock on December 20, 1995, which transaction was later cancelled. Generally, Cordes invoiced Ken Weeks for the services that MASCO provided to Canyon, Stockton, and Hamilton. For example, in June 1995, Cordes sent a bill to Ken Weeks and Canyon Corporation for services provided to Stockton Ltd. Ken Weeks sent Cordes a letter and a private placement agreement which provided that Stockton was to pay Dynamic American $180,000. Jethro Barlow testified that Dynamic American never received these funds, and Stockton's CIBC bank account does not reflect any payment to Dynamic American. In August 1995, David Hesterman sent Cordes a fax on PanWorld's letterhead containing stock powers and a corporate resolution for Turnquest to sign on Stockton's behalf.

27. The CIBC bank records confirm that proceeds from the offshore entities' sales of PanWorld and Dynamic American stock were paid into their CIBC bank accounts and subsequently transferred to other bank accounts controlled by either Ken Weeks, David Hesterman, and Robert Weeks in the United States. In addition, stock sale proceeds from the CIBC accounts were also paid to Joe Fabiilli or his companies; to Krasny's company, LK Management, which promoted the sale of both PanWorld and Dynamic American stock; and to brokers who sold PanWorld and Dynamic American stock.

28. I requested the various records from Cordes to determine if the defendants were using offshore bank accounts to hide their control of Dynamic American, were using the assets of PanWorld or Canyon in offshore accounts to operate Dynamic American, or were paying compensation from offshore accounts to promoters or brokers selling Dynamic American stock. The records were also relevant to my evaluation of whether to recommend to the Commission that it seek an injunction against the defendants relating to Dynamic American. A pattern, begun with PanWorld and continued with Dynamic American, of using offshore bank accounts to hide their control of stock and of using stock sale proceeds to pay promoters, brokers, and themselves would be a factor to consider in determining whether the defendants' conduct in Dynamic American was egregiousness and recurrent, and in demonstrating their knowledge that their actions were wrong.

I declare under penalty of perjury that the foregoing statements are true and correct.

*[signature]*, November 7, 2000

Carleen H. Achuff

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

January 16, 1997

|  |  |
|---|---|
| In the Matter of<br><br>Dynamic American Corporation<br>(D-2049) | CORRECTED<br>ORDER DIRECTING PRIVATE<br>INVESTIGATION AND<br>DESIGNATING OFFICERS<br>TO TAKE TESTIMONY |

I.

The Commission's public official files disclose that:

A.    Dynamic American Corporation ("Dynamic American") is a Utah corporation with its principal executive offices in Novato, California. On May 7, 1971, under the name National Land Corporation, Dynamic American filed a Form 10 registration statement, which was declared effective on March 16, 1972, registering a class of its securities with the Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended ("Exchange Act").

B.    Dynamic American filed a Form S-14 registration statement on September 16, 1982, which was declared effective on December 22, 1982, and another Form S-14 registration statement on September 8, 1983, which was declared effective on July 20, 1984. It filed a Form S-4 registration statement on April 23, 1986, which was declared effective on February 12, 1987. It filed a Form S-8 registration statement on July 19, 1995, which became effective on that date.

C.    No other registration statement has been filed or is in effect with the Commission under either the Securities Act of 1933, as amended ("Securities Act") or the Exchange Act with respect to the publicly traded securities of Dynamic American.

II.

Members of the staff have reported information to the Commission which tends to show that:

A.    From in or about June 1995 to the present, Dynamic American, persons associated with Dynamic American, or others may have offered to sell, sold, or delivered after sale to members of the public or to others, certain securities, namely common stock, without a registration statement having been filed or being in effect as to such securities or an exemption from registration having been available.

B.      From in or about June 1995 to the present, Dynamic American, persons associated with Dynamic American, and others, while engaged in or in connection with the offer, purchase, or sale of securities, may have, directly or indirectly, employed devices, schemes, or artifices to defraud; obtained money or property or made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engaged in acts, transactions, practices, or courses of business which did or would operate as a fraud or deceit upon other persons.

As part of the foregoing conduct, such persons may have:

1.      effected alone or with one or more other persons, a series of transactions in the securities of Dynamic American creating actual or apparent active trading in such securities, and raising or depressing the price of such securities;

2.      engaged in a scheme to distribute unregistered Dynamic American securities to public investors; and

3.      made false or misleading statements or omitted to state material facts concerning, among other things:

        a.      the company's control persons;

        b.      the company's financial condition and assets;

        c.      the beneficial ownership of the company's stock;

        d.      actual or projected mining revenues or operations;

        e.      financing arrangements;

        f.      the receipt of compensation from the company or others for marketing its stock;

        g.      the price charged for the company's securities in relation to the price determined by an independent market; and

        h.      the market demand for the securities and the manner in which the demand was generated.

C.      From in or about June 1995 to the present, Dynamic American, persons associated with Dynamic American, and others, may have omitted to file or omitted timely to file annual, quarterly, or other reports required to be filed by the Commission; or may have omitted to include in any such reports that were filed, in addition to the information required to be

2

included, such further material information as was necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.

D.    Certain persons, after becoming directly or indirectly the beneficial owners of more than five percent of the common stock of Dynamic American, may have failed to file with the Commission, within ten days after such acquisition, statements required by Section 13(d)(1) of the Exchange Act and Schedule 13D, and may have failed to file required amendments thereto.

E.    Certain persons, being directly or indirectly the beneficial owners of more than ten percent of the common stock of Dynamic American, may have failed to file with the Commission required statements on Forms 3, 4, and 5.

F.    While engaged in the activities or conduct referred to above, such persons or entities, directly or indirectly, may have made use of the means or instrumentalities of interstate commerce or of the mails.

III.

The Commission, having considered the staff's report and deeming such acts and practices, if true, to be in possible violation of Sections 5(a), 5(c), and 17(a) of the Securities Act, and Sections 10(b), 13(a), 13(d), 13(g), and 16(a) of the Exchange Act and Rules 10b-5, 12b-20, 12b-25, 13a-1, 13a-10, 13a-11, 13a-13, 13d-1, 13d-2, and 16a-3 promulgated thereunder, finds it necessary and appropriate and hereby:

ORDERS, pursuant to the provisions of Section 20(a) of the Securities Act and Section 21(a) of the Exchange Act, that a private investigation be made to determine whether the aforesaid persons or entities or any other persons have engaged or are about to engage in any of the reported acts or practices, or in any acts or practices of similar purport or object, and

FURTHER ORDERS, pursuant to the provisions of Section 19(b) of the Securities Act and Section 21(b) of the Exchange Act, that, for purposes of such investigation, Daniel F. Shea, Donald M. Hoerl, Katherine S. Addleman, Edward A. Lewkowski, Fred L. Chavez, Robert M. Fusfeld, Thomas D. Carter, Polly A. Atkinson, Julie K. Lutz, Leslie J. Hendrickson, Robin B. Shipman, Jennifer A. Ostrom, Amy J. Norwood, John B. Smith, G. Craig Fidler, Michael R. MacPhail, Bruce G. Ketter, Mary S. Brady, David R. Weiss, Michael E. Tabor, and Carleen H. Achuff, and each of them, are hereby designated an Officer of this Commission and empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance,

3

take evidence, and require the production of books, papers, correspondence, memoranda, or other records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith, as prescribed by law.

By the Commission.

Jonathan G. Katz
Secretary

4