CC JUDGE STEWART

FILED
CLERK, U.S. DISTRICT COURT

13 MAY 01 AM 11: 30

DISTRICT OF UTAH

BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) | |
| Plaintiff, | ) ) | Case No. 2:98-CR-278 ST |
| v. | ) ) | |
| ROBERT G. WEEKS, et al., | ) ) | REPORT & RECOMMENDATION |
| Defendants. | ) | |

Defendants Kenneth L. Weeks and David A. Hesterman filed a motion to suppress all evidence obtained from Robert Cordes, including any testimony and documents subpoenaed from Cordes and any evidence derived therefrom.  (File entry 118.)  Defendant Robert G. Weeks joined in the motion.  (File entry 125.) Defendants allege that the SEC misused the discovery process in an administrative proceeding (In re Dynamic American Corporation) to further the investigation in the instant criminal matter concerning individuals associated with PanWorld Minerals International, Inc.

The case was referred to the magistrate judge under 28 U.S.C. § 636(b)(1)(B).  The motion has been fully briefed and oral argument held before the magistrate judge.



# I. FACTUAL BACKGROUND

## A. PanWorld Criminal Case

On May 27, 1998, defendants Robert Weeks and David Hesterman were charged by indictment alleging that they had caused an issuer of securities, PanWorld Minerals International, Inc. (PanWorld), to file false periodic reports to the SEC.  (File entry 1.)  On April 28, 1999, a superseding indictment was filed adding a new count against Weeks and Hesterman and a related count against accountant Terrence Dunne.  (File entry 26.)

On December 8, 1999, a second superseding indictment was filed adding four defendants including Kenneth Weeks, the brother of Robert Weeks.  The second superseding indictment added sixteen new counts, fifteen of which charged all defendants except Mr. Dunne with money laundering.  The other new count alleged a conspiracy to defraud the public in the purchase and sale of PanWorld securities through boiler-room type sales operations and improper sales of unregistered securities.  (File entry 53.)

## B. PanWorld Administrative and Civil Proceedings

On January 17, 1992, long before the PanWorld indictments, the SEC issued a formal order of investigation in the PanWorld matter.  This investigation culminated in the filing of a civil

complaint against PanWorld on June 2, 1997 in the United States District Court for the District of Utah, (case no. 2:97-CV-425 ST).

On October 3, 1997, the United States Attorney for the District of Utah moved to intervene and stay the proceedings in the civil case pending the outcome of the parallel criminal investigation.  (See ex. 1.)[1]  On February 10, 1998, the court issued an order granting the motion to stay all proceedings in the civil case until the conclusion of the criminal investigation.  (Order, ex. 2.)  As noted above, the original indictment in this case was filed on May 27, 1998, approximately three months after the stay was entered.  The stay was never lifted and was still in effect on February 26, 2001, when the district court entered an order administratively closing the case with the provision that it could be reopened upon motion by any party.  (Case no. 2:97-CV-425 ST, file entry 79.)

_____

[1]Unless otherwise specified, all exhibits are attached to defendants' memorandum in support of their motion to suppress, file entry 119.

3

## C. Proceedings in the Dynamic American Matter

Defendants state that on January 16, 1997, the SEC issued a formal Order Directing Private Investigation and Designating Officers with regard to Dynamic American Corporation.  Defendants Hesterman, Robert Weeks, and Kenneth Weeks were subjects of this investigation and ultimately were respondents in an administrative proceeding in which an evidentiary hearing was held in July 2000.

## D. Participation of Hendrickson-Hughes and Achuff in Both Investigations

The formal order regarding Dynamic American designated attorney Leslie J. Hendrickson (now Hendrickson-Hughes) and geologist Carleen H. Achuff as officers of the Commission to conduct the Dynamic American investigation.  Both Hendrickson-Hughes and Achuff also participated extensively in the PanWorld investigation.  In fact, Ms. Hendrickson-Hughes has been designated as a Special Assistant United States Attorney for the District of Utah and has participated in the proceedings before the grand jury that issued the indictments in this case.

E. Evidence Obtained from Robert Cordes

Robert Cordes is a citizen of Canada who resides in the Bahamas.  In a deposition-like proceeding in the Dynamic American matter, Mr. Cordes testified that he operates a company called Management and Service Company, Limited (MASCO).  (Tr. of Cordes test. at 12-13, ex. 4.)  According to Mr. Cordes, MASCO forms corporations in various jurisdictions and provides nominee officers and directors for some of them.  (Cordes tr. at 15.) Cordes stated that he or MASCO established several offshore corporations, some of which transacted business in Dynamic American stock and one, Canyon Corporation, which transacted business in PanWorld stock.

On December 15, 1998, Ms. Achuff served Mr. Cordes in Fort Lauderdale, Florida with a subpoena duces tecum which ordered him to appear and testify and to produce records to the SEC in Denver on January 12, 1999.  The subpoena was issued in the Dynamic American administrative proceeding.  (Cordes tr. at 21-22; Dynamic American subpoena, ex. 5.)  At or about the same time, Cordes was served with a subpoena ordering him to appear before the grand jury in the PanWorld matter in Salt Lake City on January 6, 1998 (actually intending 1999).  (Grand jury subpoena, ex. 6.)  In lieu of these appearances pursuant to an agreement,

Mr. Cordes was interviewed under oath in Dallas, Texas on January 27 and 28, 1999. (Cordes tr. at 9, 22.) Mr. Cordes's attorney, Bobby Majumder, was present during the interview.

The Cordes interview took place in two sessions. During the first session, Ms. Achuff of the SEC questioned Mr. Cordes while Special Assistant United States Attorney Hendrickson-Hughes was present. Ms. Hendrickson-Hughes asked no questions. After Ms. Achuff was finished with her questioning, she left and returned to Denver. Ms. Hendrickson-Hughes then questioned Mr. Cordes. No SEC personnel were present during this portion of the interview.

Defendants point out that the Dynamic American subpoena, issued more than ten months after the stay in the PanWorld civil case, called directly for the production of documents related to PanWorld. (See attachment to Dynamic American subpoena, ¶¶ 6 & 7.) In addition, the subpoena indirectly called for production of documents relating to PanWorld. In particular, it called for records of Canyon Corporation which was an off-shore corporation used to deal in PanWorld securities. (See id. ¶¶ 4 & 5; Cordes tr. at 271-91, 298-311, 314-18.) Thus, many of the documents produced pursuant to the Dynamic American subpoena related directly and indirectly to PanWorld, including banking and

brokerage records.  Defendants also point out that both Achuff

and Hendrickson-Hughes questioned Cordes extensively about

PanWorld matters, and about Canyon Corporation matters relating

to PanWorld.  (Cordes tr. at 30-75, 82-83, 104-05, 269-314.)


## II. DISCUSSION

Defendants assert that the government's use of the Dynamic

American subpoena to obtain documents relating to PanWorld and

the questioning of Cordes concerning PanWorld matters was illegal

and improper, and that the documents and testimony so obtained

should be suppressed.  In opposition, the government asserts that

no statute, rule, regulation, or constitutional provision has

been violated, and that therefore, there is no basis for

suppression.  Defendants respond that several such rules were

violated; specifically their rights to procedural and substantive

due process, Rule 16(b) of the Federal Rules of Criminal

Procedure, and the stay in the civil proceeding in the PanWorld

matter.


## A. Parallel Proceedings

In a seminal case dealing with parallel proceedings, the

Court of Appeals for the District of Columbia Circuit observed

that "[t]he civil and regulatory laws of the United States frequently overlap with the criminal laws, creating the possibility of parallel civil and criminal proceedings, either successive or simultaneous." SEC v. Dresser Industries, Inc., 628 F.2d 1368, 1374 (D.C. Cir. 1980). The court stated, however, that absent substantial prejudice to the rights of the parties involved, such parallel proceedings are unobjectionable. Id.

The Securities Act of 1933 and the Securities Exchange Act of 1934 explicitly empower the SEC to investigate possible infractions of the securities laws for the purpose of both civil and criminal enforcement and to provide the results of the investigation to the Department of Justice for potential criminal prosecution. Dresser, 628 F.2d at 1376. The 1934 Act provides in relevant part that "[t]he Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter." 15 U.S.C. § 78u(a)(1). The Commission's investigative authority includes the power to administer oaths and affirmations, subpoena witnesses, and to require the production of records that it deems relevant or material. § 78u(b). If it determines that a person "is engaged or is about to engage in acts or practices" that violate the Act,

8

the SEC may file an action in the district court to enjoin such acts or practices. § 78u(d)(1). In addition, the SEC may transmit evidence of such acts to the Attorney General who may institute criminal proceedings. Id. The 1933 Act contains similar provisions. See 15 U.S.C. §§ 77s(b), 77t(a), (b).

The Supreme Court has approved parallel criminal and civil proceedings. In United States v. Kordel, 397 U.S. 1 (1970), the Food and Drug Administration (FDA) investigated a company and some of its officers for possible violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-397. Early in the investigation, at the recommendation of the FDA, the United States Attorney filed an in rem action for seizure of certain of the company's products. In connection with this civil action, the FDA prepared an extensive set of interrogatories to be served on the company. Before the company had responded to the interrogatories, the FDA notified the company and its officials that it was contemplating a criminal proceeding against them based upon the same transactions that were the subject of the civil case. The company then filed a motion to stay the civil proceedings or, in the alternative, to extend the time for answering the interrogatories until after the disposition of the criminal proceedings. The district court denied the motion and

the defendants answered the interrogatories.   Subsequently, the
government obtained indictments and convictions of two of the
company's officers.   Kordel, 397 U.S. at 3-6.

In the Supreme Court, the defendants argued that the use of
the civil discovery process to obtain information that could be
used to build the case in the parallel criminal proceeding was so
unfair and unjust as to require reversal of their convictions.
Id. at 11.   The Supreme Court disagreed, stating that the
defendants had not made out "either a violation of due process or
a departure from proper standards in the administration of
justice requiring the exercise of our supervisory power."   Id.
The Court noted that the public interest in protecting consumers
from misbranded drugs required the FDA to take prompt action,
while the decision whether to prosecute criminally might require
consideration of a more complete record.   Id.  The Court stated,
"It would stultify enforcement of federal law to require a
governmental agency such as the FDA invariably to choose either
to forgo recommendation of a criminal prosecution once it seeks
civil relief, or to defer civil proceedings pending the ultimate
outcome of a criminal trial."   Id.  The Court elaborated as
follows:

10

> We do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution.

Id. at 11-12 (footnotes omitted).

As in Kordel, the civil proceeding in the instant case was not instituted solely for the purpose of gathering evidence for the criminal prosecution. In fact, the Dynamic American proceeding was initiated long before the SEC issued the Cordes subpoena. Similarly, none of the other circumstances listed by the Supreme Court in Kordel are present in this case.

Further, since the evidence was obtained from a third party, many of the concerns raised by parallel proceedings are not implicated. The Supreme Court has stated that it is well-settled that "a person inculpated by materials sought by a subpoena issued to a third party cannot seek shelter in the Self-Incrimination Clause of the Fifth Amendment." SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 742 (1984). The Court explained that "[t]he rationale of this doctrine is that the Constitution proscribes only compelled self-incrimination, and, whatever may

11

be the pressures exerted upon the person to whom a subpoena is directed, the subpoena surely does not 'compel' anyone else to be a witness against himself." Id. Since the "target" of an SEC investigation has no Fifth Amendment right to challenge a subpoena directed to a third party, he has no derivative due process right to notice when the SEC issues such a subpoena. Id. at 742-43. See also California Bankers Ass'n v. Schultz, 416 U.S. 21, 55 (1974)(stating that "a party incriminated by evidence produced by a third party sustains no violation of his own Fifth Amendment rights.").

Similarly, a person has no Fourth Amendment right to challenge such a subpoena. This is so because once a person communicates information to a third party, even with the understanding that the communication is to be confidential, he cannot object if that party discloses the information, or records thereof, to government authorities. Jerry T. O'Brien, Inc., 467 U.S. at 743; United States v. Miller, 425 U.S. 435, 443 (1976);[2]

_____

[2]In response to the Miller decision, Congress passed the Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401-3422. The Act gives customers of banks and similar institutions certain rights to be notified and to challenge administrative subpoenas for financial records in the possession of banks. However, the Act is narrow in scope and carefully limits the types of customers to which it applies, the types of records for which they may seek protection, and includes strict procedural

see <u>California Bankers Ass'n</u>, 416 U.S. at 53; <u>Donaldson v. United</u>
<u>States</u>, 400 U.S. 517, 522 (1971).[3]  <u>See also</u> <u>Miller</u>, 425 U.S. at
444 (stating that since no Fourth Amendment rights were
implicated, the case was governed by the general rule that
issuance of a subpoena to a third party for records belonging to
that party does not violate the rights of the defendant).  <u>See</u>
<u>also</u> <u>Donaldson</u>, 400 U.S. at 537 (Douglas, J. concurring)(stating
that "it is difficult to see how the summoning of a third party,
and the records of a third party, can violate the rights of the
taxpayer, even if a criminal prosecution is contemplated or in
progress.").

B. <u>Due Process</u>

     The Due Process Clause of the Fifth Amendment provides that
no person shall be deprived of life, liberty, or property without
due process of law.  U.S. Const. Amend. V.  This due process
protection has two components, a substantive component and a
procedural component.  <u>Ho v. Greene</u>, 204 F.3d 1045, 1058 (10th

---

requirements.  See <u>Jerry T. O'Brien</u>, 467 U.S. at 745-46.

     [3]In response to <u>Donaldson</u>, Congress gave taxpayers the right
to be notified and to challenge third party summonses under
certain circumstances.  26 U.S.C. § 7609(a), (b).  See <u>Tiffany</u>
<u>Fine Arts, Inc. v. United States</u>, 469 U.S. 310, 314-16 (1985).

Cir. 2000).  Substantive due process precludes the government from engaging in conduct that "shocks the conscience," <u>Rochin v. California</u>, 342 U.S. 165, 172 (1952), or that interferes with rights "implicit in the concept of ordered liberty," <u>United States v. Salerno</u>, 481 U.S. 739, 746 (1987).  Procedural due process precludes the government from depriving a person of life, liberty, or property in an unfair manner.  <u>Ho</u>, 204 F.3d at 1058; see <u>Matthews v. Eldridge</u>, 424 U.S. 319 (1976).

In the instant case, defendants allege that their rights to both substantive and procedural due process were violated. First, they allege that their due process right to have the government abide by the stay in the PanWorld proceedings was violated.  However, defendants do not have any constitutional right to have the government comply with the stay order.  Thus, there can be no due process violation based upon this assertion.

Regarding their substantive due process claim, defendants do not contend that the government's conduct interfered with rights "implicit in the concept of ordered liberty."  <u>Salerno</u>, 481 U.S. at 746.  However, they do argue that suppression is warranted under the "shock the conscience" standard.  <u>Rochin</u>, 342 U.S. at 172.  In support of this argument, defendants state that substantive due process cases typically arise in emergency

14

situations where the victim must prove that a government agent
violated his constitutional rights in order to prevail under 42
U.S.C. § 1983.  Defendants state that typical cases involve high
speed police chases, County of Sacramento v. Lewis, 523 U.S. 833
(1998), or injury to an innocent bystander during a violent
arrest, Radecki v. Barela, 146 F.3d 1227 (10th Cir. 1998).
Defendants note that in such emergency situations, courts
generally have held that in order to rise to the level of a
constitutional violation, the government conduct must "shock the
conscience."  Defendants state, however, that in nonemergency
situations where the government actor has time for reflection and
deliberation, the standard is lower and can be satisfied by
"calculated indifference."  See Radecki, 146 F.3d at 1232 ("Where
the state actor has the luxury to truly deliberate about the
decisions he or she is making, something less than unjustifiable
intent to harm, such as calculated indifference, may suffice to
shock the conscience.").  Defendants assert that the standard of
"calculated indifference" is applicable to the instant case
because Achuff and Hendrickson-Hughes had months to plan their
interview with Cordes and "chose to ignore the rules and conduct
extensive portions of an interview with no legitimate purpose in

15

the Dynamic American matter."  (Defs.' Supplemental Mem. Supp.
Mot. Suppress at 13, file entry 146.)

Despite defendants' argument, the court concludes that the
government's conduct in this case does not satisfy the "shock the
conscience" standard so as to support a claim of a violation of
defendants' right to substantive due process.  Although there do
not appear to be any cases exactly on point, several cases
support the conclusion that no due process violation occurred
here.  For example, in Kordel v. United States, 397 U.S. 1, as
discussed above, evidence obtained through interrogatories in a
parallel civil proceeding was turned over to the prosecution for
use in the criminal case.  The defendants argued that use of the
civil discovery process in this manner was so unfair and unjust
as to require reversal of their convictions.  The Supreme Court
rejected the defendants' argument and held that they had not
established a due process violation.  Id. at 11-13.  See also
Donovan v. Spadea, 757 F.2d 74, 77-78 (3d Cir. 1985)(refusing to
recognize the existence of a general, albeit nonconstitutional,
rule that administrative subpoenas issued for the purpose of
developing a criminal case are unenforceable); United States v.
Teyibo, 877 F. Supp. 846, 855-57 (S.D.N.Y. 1995)(refusing in a
criminal case to suppress evidence which was obtained by the SEC

16

in a parallel civil investigation and finding no due process violation), aff'd, 101 F.3d 681 (2d Cir. 1996).

In United States v. Educational Development Network Corp., 884 F.2d 737 (3d Cir. 1989), the question before the court was whether the United States Attorney's use of subpoenas issued by the Department of Defense's Inspector General (IG) after a grand jury was in existence violated the defendants' rights to due process and indictment only by a grand jury. Id. at 738, 739. The defendants in that case argued that the evidence should have been suppressed because it was obtained through the use of subpoenas and a search warrant that the U.S. Attorney had caused to be issued in a bad faith attempt to make an end run around the requirement that indictments must be secured only through a grand jury. Id. at 741. On appeal, the government candidly admitted that the U.S. Attorney's office and the Department of Defense agreed to conduct a joint investigation and to use IG subpoenas so that the agencies could share the evidence obtained. Id. at 739. In upholding the use of the administrative subpoenas, the court stated that the defendants had failed to direct it to any statutory, regulatory, or case law that prevented the actions of the U.S. Attorney. Id. at 741. In the instant case, there is likewise no prohibition on using the information gained in the

17

Dynamic American investigation in the instant criminal proceeding.

Defendants also argue that the subpoena was merely a means to obtain information through the "back door" for use in the criminal proceedings that could not have otherwise been obtained because of the stay in the PanWorld proceeding.[4]  Despite

---

[4]In a footnote, defendants state that violation of the stay order is effectively a violation of their right to due process. The court concludes that there was no violation of the stay order, but briefly addresses defendants' argument.  In support of their contention that a violation of the stay order would amount to a due process violation, defendants cite SEC v. Gilbert, 79 F.R.D. 683 (S.D.N.Y. 1978), in which the district court discussed the propriety of a protective order staying civil discovery until the termination of parallel criminal proceedings.  The court stated that even if the continuation of civil discovery did not violate the defendant's Fifth Amendment rights, "the court would be justified in granting a protective order under the Due Process Clause or in its discretion under Rule 26(c) of the Federal Rules of Civil Procedure if the degree of cooperation between the Commission and the U.S. Attorney's office was unduly burdensome or unfair to [the defendant]."  Id. at 687.  However, this statement is dictum.  Rather than granting a protective order, the court actually vacated a protective order entered by the magistrate judge, noting that there was no evidence that the civil proceeding had been instituted solely for the purpose of gathering evidence for the criminal prosecution.  Id.  Although the court did order the SEC not to furnish the United States Attorney specially with any materials procured in the course of civil discovery, id., that order has been criticized because the court offered no authority for the order or any reason for its application.  See Dresser, 628 F.2d at 1386.  Thus, Gilbert does not support defendants' due process claim.

defendants argument, however, the information could have been obtained through the grand jury.

In <u>United States v. Aero Mayflower Transit Co.</u>, 831 F.2d 1142 (D.C. Cir. 1987), the Antitrust Division of the Justice Department had been investigating alleged price-fixing by the moving and storage industry.  The investigation led to five indictments and one prosecution by information of local moving and storage companies.  Subsequently, the Department of Defense (DOD) Inspector General started his own investigation of the moving and storage industry.  The Antitrust Division and the FBI then contacted the IG and suggested a "cooperative investigation."  <u>Id.</u> at 1144.  After agreeing to the joint investigation, the IG issued subpoenas to the appellants who refused to comply.  The government then sought summary enforcement which was granted by the district court.  <u>Id.</u>  On appeal, the appellants argued that the IG was acting in bad faith or for an improper purpose because the information sought was actually for the use of the Justice Department.  <u>Id.</u> at 1145.  The District of Columbia Circuit rejected this argument, stating that so long as the information the IG sought was relevant to the discharge of his duties, the fact of Justice Department guidance seemed manifestly immaterial.  <u>Id.</u> at 1146.  The court noted that

there was no suggestion that the Justice Department could not
have obtained the same information through the grand jury
process.  The court further observed that the use of IG
subpoenas, rather than grand jury subpoenas, served an important
DOD purpose since information obtained through the grand jury
would not have been readily available to the DOD in enforcing
civil remedies against those who defrauded it.  Id. at 1146.

As in Aero Mayflower, the government in the instant case
could have obtained the Cordes information through the use of
grand jury subpoenas.  As previously discussed, Cordes was served
with a subpoena to appear before the grand jury at the same time
he was served with the subpoena duces tecum to appear before the
SEC.  Although the government concedes that the grand jury
subpoena was probably invalid because it contained an incorrect
date, the grand jury could have issued a new subpoena with the
necessary correction.  Defendants put a great deal of emphasis on
the fact that the grand jury subpoena did not call for the
production of records.  Nevertheless, the grand jury could have
obtained the records had it chosen to do so.

After a defendant has been indicted, it is improper for the
government to use the grand jury for the "sole or dominant
purpose" of gathering additional evidence for trial.  United

States v. Gibbons, 607 F.2d 1320, 1328 (10th Cir. 1979); United

States v. Jenkins, 904 F.2d 549, 559 (10th Cir. 1990); United

States v. Brothers Construction Co., 219 F.3d 300, 314 (4th Cir.

2000), cert. denied, 121 S. Ct. 628 (2000); United States v.

Moss, 756 F.2d 329, 332 (4th Cir. 1985)(collecting cases).  See

24 Moore's Federal Practice § 606.05[2][c] (Matthew Bender 3d ed.

1997).  However, the government remains free to make a good faith

inquiry into charges not included in the indictment, or to

identify other individuals involved in the crime, even if it

uncovers additional evidence against an already-indicted person.

Gibbons, 607 F.2d at 1328; Brothers Construction Co., 219 F.3d at

314; Moss, 756 F.2d at 332.  One court has explained the rule as

follows:

> While a grand jury is barred from using a subpoena as a
> discovery device to prepare for a pending trial, it
> remains free to elicit information which may lead to
> further indictments even where new evidence is also
> obtained against an already indicted person as a by-
> product of the investigation.  Were it to be otherwise,
> the handing down of an indictment would foreclose the
> possibility of bringing related wrongdoers to trial or
> charging a defendant with newly discovered crimes.

In re Grand Jury Subpoenas Duces Tecum, 658 F. Supp. 474, 477-78

(D. Md. 1987)(citations omitted).  See also United States v.

Leung, 40 F.3d 577, 581 (2d Cir. 1994)(stating that where a grand

jury investigation is not primarily motivated by the improper

purpose of preparing for a pending trial, evidence obtained

pursuant to the investigation may be used at trial on the initial

charges).

In the instant case following the Cordes interview, the

grand jury handed down a superseding indictment adding new

charges and defendants. Thus, had the subpoena been issued by

the grand jury rather than the SEC, it could not be said that the

sole or dominant purpose of the subpoena was to gather evidence

for the pending trial. Further, any evidence incidentally

uncovered would have been admissible in the pending prosecution

under settled case law. Accordingly, there is no basis for the

suppression of the evidence on the ground that the subpoena was a

"back door" means of obtaining evidence not otherwise obtainable

because of the stay in the civil proceeding.


C. Federal Rule of Criminal Procedure 16(b)

In support of their Rule 16(b) argument, defendants point to

the following statement in Dresser:

> Other than where there is specific evidence of
> agency bad faith or malicious governmental tactics, the
> strongest case for deferring civil proceedings until
> after the completion of criminal proceedings is where a
> party under indictment for a serious offense is
> required to defend a civil or administrative action
> involving the same matter. The noncriminal proceeding,

> if not deferred, might undermine the party's Fifth
> Amendment privilege against self-incrimination, expand
> rights of criminal discovery beyond the limits of
> Federal Rule of Criminal Procedure 16(b), expose the
> basis of the defense to the prosecution in advance of
> criminal trial, or otherwise prejudice the case.

_Dresser_, 628 F.2d at 1375-76. Defendants assert that the instant case is one of the class of "strongest cases" where the stay of civil proceedings is warranted due to the risk that one of the parties may seek to expand the scope of criminal discovery beyond the limits of Rule 16(b).

At the outset, it should be noted that the other types of prejudice enumerated by the _Dresser_ court (compromise of the Fifth Amendment right against self-incrimination and exposure of defense strategies) are not implicated in this case because the subpoena applied to a third-party witness rather than the defendants. For the same reason, there is no danger of expansion of the rights of criminal discovery beyond the limits of Rule 16(b) in this case. Rule 16(b) is a reciprocal rule of discovery which sets forth the types of evidence subject to disclosure by the defendant. It does not limit the government's ability to obtain evidence from sources other than the defendant and has no application to the evidence defendants seek to suppress in this case.

D. <u>Stay Order</u>

Defendants argue that the evidence obtained through the Dynamic American subpoena should be suppressed because it violated the stay in the PanWorld civil case.  However, the stay order applied only to proceedings in the PanWorld civil case. (See order at 2-3, ex. 2.)  Since the subpoena was issued in the Dynamic American proceeding and the information was not used in the PanWorld civil proceeding, it did not violate the stay order.

E. <u>Sufficiency of the Connection Between Dynamic American and PanWorld</u>

The parties have submitted extensive briefing on the issue whether there was a sufficient connection between Dynamic American and PanWorld to justify the request for documents in the Dynamic American matter that related directly and indirectly to PanWorld.  The court finds that there was a relationship between the Dynamic American investigation and the material sought in the subpoena.  However, even absent such a relationship, the question is whether the continued gathering of information prejudiced the defense.  As <u>Dresser</u> makes clear, absent substantial prejudice to the rights of the parties, the government is free to use information in a criminal prosecution that was obtained by the

24

SEC in a parallel proceeding.  See Dresser, 628 F.2d at 1374.  In
this case, defendants have not shown that their rights were
prejudiced.  There was no infringement of their Fifth Amendment
right against self-incrimination and no disclosure of their
defense strategy.  Other than the fact that evidence helpful to
the prosecution apparently was obtained, defendants have failed
to show that the SEC's actions were detrimental to their position
or that use of the subpoena interfered with their ability to
defend this case.

Defendants contend that the SEC acted in "bad faith" in this
case.  However, as the Dresser court explained, a bad faith
investigation "is one conducted solely for criminal enforcement
purposes."  Id. at 1387.  The court stated that where an agency
has a legitimate noncriminal purpose for its investigation, it
acts in good faith.  Id.  See also Kordel, 397 U.S. at 11-12
(noting that the government had not instituted the civil action
"solely for the purpose of obtaining evidence for its criminal
prosecution.").  As previously discussed, the SEC investigation
into the Dynamic American matter was instituted well before it
issued the Cordes subpoena.  Since the SEC had a legitimate
noncriminal purpose for its investigation, it did not act in bad
faith.

F. Appropriateness of Suppression of the Cordes Evidence

    1. The Afro-Lecon Case

    Defendants have cited a number of cases that they contend warrant suppression of the evidence obtained as a result of the Cordes subpoena.  In Afro-Lecon, Inc. v. United States, 820 F.2d 1198 (Fed. Cir. 1987), Afro-Lecon entered into a contract to supply the General Services Administration (GSA) with a large number of filing cabinets.  After disputes arose over the contract, the parties agreed to terminate the contract, preserving Afro-Lecon's right to assert claims relating to its partial performance of its duties under the contract.  Id. at 1199-1200.  Afro-Lecon subsequently submitted a claim for its costs which was denied by the contracting officer and Afro-Lecon appealed to the General Services Administration Board of Contract Appeals (Board).  Id. at 1200.

    While this litigation was pending, Afro-Lecon learned that it was the subject of a grand jury investigation.  Consequently, Afro-Lecon moved for a stay of the civil proceedings.  The Board denied the motion and required Afro-Lecon to respond to the GSA's discovery requests.  Id.

    On appeal from the Board's denial of the motion to stay the civil case until completion of the criminal proceedings, the

Court of Appeals for the Federal Circuit vacated the Board's
decision and remanded with instructions to consider whether there
was any additional danger of abuse of discovery or whether there
was any likelihood that going forward with the civil case would
interfere with the administration of the criminal proceedings.
Id. at 1204.

In the course of its opinion, the Federal Circuit noted that
Afro-Lecon had filed a motion in the parallel criminal case to
suppress information gathered for use in the criminal trial which
was obtained by criminal investigators posing as persons who were
concerned with the civil case and attending civil discovery
meetings.  Id. at 1200.  The motion to suppress was granted in
part and denied in part by the district court.[5]  Id.  In its
suppression order, the district court criticized the government's
conduct as follows:  "This Court is not approbatory of the
prosecution's utilization of the ploy of having a criminal
investigator 'sit in' on and participate in a non-criminal
conference or interview when criminal prosecution was, as here,
eminently predictable and without advising the 'target' of the
investigator's role and purpose."  Id. at 1204 (quoting United

_____

    [5]The criminal case was United States v. Okwumabua and Afro-
Lecon, Inc., No. CR-86-28E (W.D.N.Y. Dec. 26 1986).

27

<u>States v. Okwumabua and Afro-Lecon, Inc.</u>, No. CR-86-28E (W.D.N.Y.
Dec. 26, 1986).

Defendants argue that the instant case is substantially
similar to <u>Afro-Lecon</u> in that Ms. Achuff "posed" as a person
interested in the Dynamic American matter, but instead subpoenaed
PanWorld documents and spent substantial time questioning Cordes
about matters related to PanWorld.  In addition, Ms. Hendrickson-
Hughes also relied on the PanWorld documents in questioning
Cordes.

Contrary to defendants' argument, however, the facts of this
case are significantly different from those in <u>Afro-Lecon</u> in that
the suppressed evidence consisted of statements made by the
defendant during a meeting at which a criminal investigator was
present and the defendant was not advised of the investigator's
role.  Here, the statements and documents were obtained from a
third party rather than the defendants.  Thus, there was no
danger of self-incrimination with respect to the defendants.
Further, Cordes was fully informed as to who Achuff and
Hendrickson-Hughes were and there roles in the investigation.

Moreover, as the government points out and defendants
acknowledge, the district court's suppression order quoted in
<u>Afro-Lecon</u> was reversed on appeal.  See <u>United States v.</u>

Okwumabua, 828 F.2d 950 (2d Cir. 1987).  In reversing the
suppression order, the Second Circuit reasoned that the Fifth
Amendment did not bar admission of incriminating statements made
by the defendant to a federal agent in a noncustodial setting.
Id. at 951.

Defendants in the instant case nevertheless argue that
Okwumabua supports suppression as a remedy since the Second
Circuit did not question that suppression would have been an
appropriate remedy if the defendant in that case had carried his
burden to show that he was affirmatively misled.  It is true that
the Second Circuit did discuss whether the defendant was
affirmatively misled and concluded that he was not.  Id. at 953-
54.  However, the sole issue before the court was whether the
Fifth Amendment privilege against compelled self-incrimination
barred the admission of the defendant's incriminating statements.
Id. at 951.  Since there is no Fifth Amendment issue in the
instant case, the discussion of suppression in Okwumabua is
inapposite.

Other cases cited by defendants are similarly unavailing.
In United States v. Armada Petroleum Corp., 700 F.2d 706 (Temp.
Emer. Ct. App. 1983), the Court of Appeals upheld a stay of civil
proceedings until completion of parallel criminal proceedings.

The court stated that allowing the enforcement of a subpoena duces tecum directed to the vice president of the corporate defendant Armada would result in "impermissible expansion of the government's right to pretrial discovery in the criminal prosecution." Id. at 709. However, the Armada case is distinguishable since the subpoena was directed to an officer of the defendant to obtain documents presumably belonging to the defendant rather than to a third party such as Cordes for documents belonging to him.

        2. Rule 16(d)(1)

        Defendants also assert that suppression is warranted under Rule 16(d)(1) which provides in pertinent part as follows: "Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate." Fed. R. Crim. P. 16(d)(1). Defendants contend that other "appropriate orders" include suppression, citing United States v. Wicker, 848 F.2d 1059, 1061-62 (10th Cir. 1988). However, Wicker involved a situation where the government had failed to comply with a discovery order issued by the court. The court suppressed the evidence as a sanction for this violation. In the instant case,

no discovery order has been violated and no infraction of the rules of discovery has occurred. Accordingly, the court finds this argument without merit.

The Wicker case is of interest, however, because it sets forth factors the district court should consider in determining whether sanctions are appropriate under Rule 16(d)(2). These factors include (1) the government's reason for its actions, including whether it acted in bad faith; (2) whether the defendant was prejudiced by the government's actions; and (3) the feasability of curing the prejudice with some other remedy. Wicker, 848 F.2d at 1061. Thus, even under Wicker, defendants would not be entitled to relief because they have failed to show that the defense was prejudiced in any way.

### 3. Suppression Based on Violation of Due Process

Defendants also argue that suppression is appropriate because the instant situation is closely analogous to unlawful searches and seizures in violation of the Fourth Amendment. Defendants state that the right violated is due process, but otherwise the same policy considerations apply. However, the court has concluded that no due process violation has been established. Thus, even if the court were to accept the argument

31

that suppression would be an appropriate remedy for such a violation, it would not apply in this case.

The Tenth Circuit has observed that "the Supreme Court has never approved exclusion of evidence as a sanction for government misconduct in the absence of a constitutional violation or statutory authority for such exclusion." United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999). According to the court, there are two types of constitutional protections that invoke exclusionary rules. Clanton v. Cooper, 129 F.3d 1147, 1157 (10th Cir. 1997).

> In the first category, the exclusion of unconstitutionally obtained evidence is designed to protect the enjoyment of constitutional rights themselves. Thus, for example, the Fourth Amendment protects the right to privacy by prohibiting officers from bursting into a home (lacking consent or exigent circumstances) and seizing evidence without a warrant; if the officers do so, the resulting evidence, though accurate, will be suppressed to discourage such unconstitutional actions. In this category, only the victims of the unconstitutional conduct may challenge the unconstitutional nature of the officer's actions, because only their rights have been violated.
> In the second category, a constitutional violation may assist officers in gathering evidence, but the violation has both offended the Constitution and rendered the evidence unreliable. A coerced confession fits into this category. . . .
> Consequently, because the evidence is unreliable and its use offends the Constitution, a person may challenge the government's use against him or her of a coerced confession given by another person.

32

<u>Clanton v. Cooper</u>, 129 F.3d 1147, 1157-58 (10th Cir.
1997)(citations omitted).  <u>See also</u> <u>Gonzales</u>, 164 F.3d at 1289
(stating that the defendants' due process rights could be
implicated if the witness was coerced into making false
statements which were admitted against the defendants at trial).

In the instant case, the evidence that defendants seek to
suppress does not fit into either category.  They have not
established a violation of their constitutional rights.
Likewise, there is no suggestion that Mr. Cordes's constitutional
rights were violated, or even if they were, that the evidence so
obtained was unreliable.

Defendants argue, however, that although Mr. Cordes's
statement was not coerced in the sense used in the <u>Clanton</u> and
<u>Gonzales</u> decisions, the rationale of those cases still applies
because Cordes's statement was obtained unlawfully.  This
argument is without merit.  First, defendants have failed to show
that the statements were unlawfully obtained.  Moreover, as
previously discussed, the Supreme Court has never approved the
exclusion of evidence for government misconduct absent a
violation of constitutional rights.  Thus, suppression of the
evidence at issue is not warranted under the <u>Clanton</u> and <u>Gonzales</u>
rationale.

33

## III. RECOMMENDATION

There is no basis to suppress the testimony and evidence obtained from Robert Cordes.  Therefore, defendants' motion to suppress should be denied.

Copies of the foregoing Report and Recommendation are being mailed to the parties, who are hereby notified that they have the right to object to the Report and Recommendation.  The parties are further notified that they must file any objections to the Report and Recommendation with the clerk of the court, pursuant to 28 U.S.C. § 636(b), within ten (10) days after receiving it. Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

DATED this _____ day of May, 2001.

Ronald N. Boyce
United States Magistrate Judge

jmo

United States District Court
for the
District of Utah
May 18, 2001


* * CERTIFICATE OF SERVICE OF CLERK * *


Re:  2:98-cr-00278


**True and correct copies of the attached were either mailed or faxed by the clerk to the following:**


    Mr. Francis M Wikstrom, Esq.
    PARSONS BEHLE & LATIMER
    201 S MAIN ST STE 1800
    PO BOX 45898
    SALT LAKE CITY, UT  84145-0898
    JFAX 9,5366111

    Mr. Delano S Findlay, Esq.
    923 E 5350 S STE E
    SALT LAKE CITY, UT  84117
    JFAX 9,2648043

    Mr. Edward K. Brass, Esq.
    175 E 400 S STE 400
    SALT LAKE CITY, UT  84111
    JFAX 9,3225677

    Mr. Earl G Xaiz, Esq.
    YENGICH RICH & XAIZ
    175 E 400 S STE 400
    SALT LAKE CITY, UT  84111
    JFAX 9,3646026

    Mr. Walter F. Bugden, Esq.
    BUGDEN COLLINS & MORTON
    623 E 2100 S
    SALT LAKE CITY, UT  84106
    JFAX 9,4671800

    Paul T. Moxley, Esq.
    HOLME ROBERTS & OWEN LLP
    111 E BROADWAY STE 1100
    SALT LAKE CITY, UT  84111
    JFAX 9,5219639

    Catherine L. Brabson, Esq.
    HOLME ROBERTS & OWEN LLP
    111 E BROADWAY STE 1100
    SALT LAKE CITY, UT  84111
    JFAX 9,5219639

```
US Probation
DISTRICT OF UTAH
,
JFAX 9,5261136

USMS
DISTRICT OF UTAH
,
JFAX 9,5244048

Mr. James N. Barber, Esq.
50 W BROADWAY #100
SALT LAKE CITY, UT  84101-2006
JFAX 9,3643406

Mr. Stewart C. Walz, Esq.
US ATTORNEY'S OFFICE
,
JFAX 9,5245985

Leslie Hendrickson Hughes, Esq.
SECURITIES AND EXCHANGE COMMISSION
1801 CALIFORNIA ST #4800
DENVER, CO  80202-2648
```